ACCEPTED
03-14-00717-CV
3677007
THIRD COURT OF APPEALS
AUSTIN, TEXAS
1/7/2015 10:35:57 AM
JEFFREY D. KYLE
CLERK

NO. 03-14-00717-CV

IN THE COURT OF APPEALS FOR THE
THIRD DISTRICT OF TEXAS

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
1/7/2015 10:35:57 AM
JEFFREY D. KYLE
Clerk

VIVEK GOSWAMI, M.D. AND AUSTIN HEART, PLLC

*Appellants*

v.

NANCY JO RODRIGUEZ

*Appellee*

ON APPEAL FROM THE 419TH JUDICIAL DISTRICT COURT
TRAVIS COUNTY, TEXAS

## BRIEF FOR APPELLANTS

Chris Knudsen
Texas Bar No. 24041268
SERPE JONES ANDREWS
CALLENDER & BELL, PLLC
2929 Allen Parkway, Suite 1600
Houston, Texas 77019
Telephone: (713) 452-4400
Facsimile: (713) 452-4499
Email: cknudsen@serpejones.com

**Counsel for Appellants Vivek Goswami,
M.D. and Austin Heart, PLLC**

**ORAL ARGUMENT REQUESTED**

## IDENTITY OF PARTIES AND COUNSEL

In accordance with Rule 38.1(a) of the Texas Rules of Appellate Procedure, Appellants provide the following complete list of all parties and counsel to the trial court's Order that forms the basis of this appeal.

**Trial and Appellate Counsel for Appellants Vivek Goswami, M.D. and Austin Heart, PLLC:**

Chris Knudsen
Texas Bar No. 24041268
Nicole Andrews
Texas Bar No. 00792335
SERPE JONES ANDREWS
CALLENDER & BELL, PLLC
2929 Allen Parkway, Suite 1600
Houston, Texas 77019
Telephone: (713) 452-4400
Facsimile:  (713) 452-4499
Emails:  cknudsen@serpejones.com
              nandrews@serpejones.com

**Trial Counsel for Appellee Nancy Jo Rodriguez:**

L. Todd Kelly
Texas Bar No. 24035049
The Carlson Law Firm
11606 N. IH-35
Austin, Texas 78753
Telephone: (512) 346-5688
Facsimile: (512) 719-4362
Email: TKelly@carlsonattorneys.com

**Trial Counsel for Defendants The Walgreen's Co. and Sarah Elizabeth McGuire (not parties to this appeal):**

Cynthia Day Grimes
State Bar No. 11436600
STRASBURGER & PRICE, LLP
2301 Broadway
San Antonio, Texas 78215-1157
Telephone: (210) 250-6000
Facsimile: (210) 250-6100
Email: Cynthia.Grimes@strasburger.com

**Trial Counsel for Defendant St. David's Health Care Partnership (not a party to this appeal):**

Missy Atwood
State Bar No. 01428020
GERMER BEAMAN & BROWN PLLC
301 Congress Avenue, Suite 1700
Austin, Texas 78701
Telephone: (512) 472-0288
Facsimile: (512) 472-0721
Email: matwood@germer-austin.com

# TABLE OF CONTENTS

**Page**

IDENTITY OF PARTIES AND COUNSEL ......................................................... ii

TABLE OF CONTENTS................................................................................iv

TABLE OF AUTHORITIES ..........................................................................vi

STATEMENT OF THE CASE.........................................................................2

ISSUES PRESENTED....................................................................................2

STATEMENT OF FACTS ..............................................................................3

SUMMARY OF THE ARGUMENT ................................................................6

ARGUMENT & AUTHORITY .......................................................................7

    I.     STANDARD OF REVIEW ...........................................................7

    II.    THE TRIAL COURT ABUSED ITS DISCRETION WHEN FINDING DR. BREALL'S REPORT SATISFIED THE REQUIREMENTS OF CHAPTER 74 AND DENYING APPELLANTS' MOTION TO DISMISS.........................................................8

        A.     Legislative Intent Of Chapter 74................................................8

        B.     Chapter 74's Expert Report Requirements ...............................9

        C.     Dr. Breall's Report Does Not Constitute A Good Faith Effort to Comply With Section 74.351..................11

            1.     Dr. Breall's report provides no facts to support his conclusions and thus does not constitute an expert report under Chapter 74 .................12

            2.     Dr. Breall fails to identify the standard of care applicable to Appellants.........................................16

3.     Dr. Breall fails to explain how Dr. Goswami and Austin Heart breached the applicable standard of care ................................................................. 19

4.     Dr. Breall's report fails to explain how an alleged breach in the standard of care by Dr. Goswami or Austin Heart caused Appellee's injuries ......................................................... 22

D.     By Serving A Report Like Dr. Breall's, Appellee Effectively Negates The Purpose Of Chapter 74's Expert Report Requirement ....................................................... 26

CONCLUSION & PRAYER ................................................................. 26

CERTIFICATE OF COMPLIANCE ..................................................... 28

CERTIFICATE OF SERVICE ............................................................. 29

APPENDIX

    Trial Court Orders ...................................................................... A

    Cases ........................................................................................ B

# TABLE OF AUTHORITIES

**Cases:**

*American Transitional Care Centers of Texas, Inc. v. Palacios*,
  46 S.W.3d 873 (Tex. 2001)........................................................................ passim

*Austin Heart, P.A. v. Webb*,
  228 S.W.3d 276 (Tex. App.—Austin 2007, no pet.) ............................................10

*Bogar v. Esparza*,
  257 S.W.3d 354 (Tex. App.—Austin 2008, no pet.) ............................................8

*Bowie Memorial Hosp. v. Wright*,
  79 S.W.3d 48 (Tex. 2002)..................................................................... 10, 13, 17

*CHCA Mainland, L.P. v. Burkhalter*,
  227 S.W.3d 221 (Tex. App.—Houston [1st Dist.] 2007, no pet.) .......................18

*Earle v. Ratliff*,
  998 S.W.2d 882 (Tex. 1999).............................................................................10

*Fung v. Fischer*,
  365 S.W.3d 507(Tex. App.—Austin 2012, no pet.), ...........................................24

*Gray v. CHCA Bayshore L.P.*,
  189 S.W.3d 855 (Tex. App.—Houston [1st Dist.] 2006, no pet.) ........................10

*Harris County Hospital District. v. Garrett*,
  232 S.W.3d 170 (Tex. App.—Houston [1st Dist.] 2007, no pet.) ....................7, 16

*Hebert v. Hopkins*,
  395 S.W.3d 884 (Tex. App.—Austin 2013, no pet.) ................................... passim

*Jelinek v. Casas*,
  328 S.W.3d 526 (Tex. 2010)............................................................................ passim

*Jernigan v. Langley*,
  195 S.W.3d 91 (Tex. 2006)...............................................................................9

*Kocurek v. Colby*,
  No. 03-13-00057-CV, 2014 WL 4179454 –5
  (Tex. App.—Austin Aug. 22, 2014, no pet.) .....................................................23

*Kuykendall v. Dragun*,
No. 11-05-00230-CV, 2006 WL 728068
(Tex. App.—Eastland Mar. 23, 2006, pet. denied)................................................14

*Regent Care Center of San Antonio II, Limited Partnership v. Hargrave*,
300 S.W.3d 343 (Tex. App.—San Antonio 2009, pet. denied) ...........................25

*Shenoy v. Jean*,
No. 01-10-01116-CV, 2011 WL 6938538
(Tex. App.—Houston [1st Dist.] Dec. 29, 2011, ..................................................13

*Smith v. Wilson*,
368 S.W.3d 574 (Tex. App.—Austin 2012, no pet.) .................................... passim

*Strom v. Memorial Hermann Hospital System*,
110 S.W.3d 216................................................................................ 16, 18

*Taylor v. Christus Spohn Health System Corp.,*
169 S.W.3d 241 (Tex. App.—Corpus Christi 2004, no pet.) ........................ 18, 19

*Taylor v. Fossett*,
320 S.W.3d 570 (Tex. App.—Dallas 2010, no pet.)..................................... 13, 21

*Tenet Hospitals Ltd. v. De La Riva,*
351 S.W.3d 398 (Tex. App.—El Paso 2011, no pet.)...........................................18

*W.B.M. Management Co. v. Flores*,
No. 07-14-00008-CV, 2014 WL 1691362 –6
(Tex. App.—Amarillo Apr. 25, 2014, no pet.) ............................................ 13, 21

*Walker v. Packer*,
827 S.W.2d 833 (Tex. 1992)..................................................................................7

*Wood v. Tice*,
988 S.W.2d 829 (Tex. App.—San Antonio 1999, pet. denied) .............................8

**Statutes:**

TEX. CIV. PRAC. & REM. CODE § 74.351......................................................... passim

TEX. CIV. PRAC. & REM. CODE § 74.351(a) .....................................................9, 19

vii

TEX. CIV. PRAC. & REM. CODE § 74.351(b) ........................................................ 1, 7, 9

TEX. CIV. PRAC. & REM. CODE § 74.351(l) ............................................................9

TEX. CIV. PRAC. & REM. CODE § 74.351(r) ...........................................................9

TEX. REV. CIV. STAT. ANN. art. 4590i .............................................................8, 26

NO. 03-14-00717-CV

IN THE COURT OF APPEALS FOR THE
THIRD DISTRICT OF TEXAS

VIVEK GOSWAMI, M.D. AND AUSTIN HEART, PLLC

*Appellants*

v.

NANCY JO RODRIGUEZ

*Appellee*

ON APPEAL FROM THE 419TH JUDICIAL DISTRICT COURT
TRAVIS COUNTY, TEXAS

**BRIEF FOR APPELLANTS**

TO THE HONORABLE JUSTICES OF THE THIRD COURT OF APPEALS:

Appellant Vivek Goswami, M.D. and Austin Heart, PLLC ("Appellants") file this appeal from an order denying their motion to dismiss pursuant to section 74.351(b) of the Texas Civil Practices and Remedies Code in Cause No. D-1-GN-14-000903; *Nancy Jo Rodriguez v. The Walgreen Co., et al.*, in the 419th Judicial District Court of Travis County, Texas, before the Honorable Visiting Judge Gus J. Strauss.

## STATEMENT OF THE CASE

Appellee Nancy Jo Rodriguez ("Appellee") filed a health care liability claim against several defendants, including Appellants, based on Appellee's taking of a medication known as Pradaxa. (CR 4–12). With her petition, Appellee served a report authored by Jeffrey A. Breall, M.D., Ph.D. ("Dr. Breall"). (CR 43–44). Appellants objected to Dr. Breall's report shortly thereafter. (CR 119–52). Over the next three months, Appellee did not serve any new or amended reports. After the expiration of the statutory deadline to serve expert reports under Chapter 74, Appellants moved to dismiss Appellee's claim. (CR 189–95). However, the trial court entered an order finding that Dr. Breall's report was adequate and denying Appellants' motion to dismiss. (CR 344–45, 365–66). Appellants subsequently filed this interlocutory appeal from that order. (CR 346–50).

## ISSUES PRESENTED

1.      Whether the trial court abused its discretion when holding Dr. Breall's report was adequate under Chapter 74 despite Dr. Breall only offering conclusory opinions that did not link the facts to his conclusions.

2.      Whether the trial court abused its discretion in denying Appellants' motion to dismiss pursuant to section 74.351 of the Texas Civil Practices and Remedies Code.

2

## STATEMENT OF FACTS

In 2012, Appellee was a patient of Austin Heart, PLLC ("Austin Heart") where she received treatment for an abnormal sinus rhythm in her heart. (CR 6). As a patient of Austin Heart, Appellee was treated by David Kessler, M.D. ("Dr. Kessler") and Vivek Goswami, M.D. ("Dr. Goswami"), both of whom are cardiologists. (*Id.*). In her petition, Appellee states that, on March 27, 2012, Dr. Kessler "orders that [Appellee] stop her use of the drug Pradaxa because she is maintaining her sinus rhythm without it." (*Id.*). However, Appellee alleges "this order to stop the medication was not followed by Dr. Goswami." (*Id.*). Appellee nonetheless admits she continued to refill her prescription for Pradaxa despite Dr. Kessler's order to stop. (*Id.*). Appellee claims her continued use of Pradaxa caused her hospitalization on July 2, 2012. (*Id.*).

On March 26, 2014, Appellee filed suit against The Walgreen Company, Sara E. McGuire, St. David's Health Care Partnership, Austin Heart, Dr. Kessler, and Dr. Goswami (collectively "Defendants"). (CR 4–5). With her petition, Appellee served Defendants with a curriculum vitae and report from Jeffrey Chad Hardy, Pharm.D., M.S. dated February 21, 2014 ("Hardy's report") and a curriculum vitae and report from Jeffrey A. Breall, M.D., Ph.D. dated March 18, 2014 ("Dr. Breall's report"). (CR 13–44). There is no dispute that Hardy's report

does not apply to Appellants. Rather, only Dr. Breall's report references Appellants.

As addressed more fully below, Dr. Breall's report fails to provide any facts surrounding the care and treatment provided by Dr. Goswami or Austin Heart. (CR 43–44). In fact, Dr. Breall's report fails to even identify which medical records he reviewed to support the opinions in his report. (*Id.*). If Dr. Breall provided the facts from the relevant records, Dr. Breall's report would have informed the trial court that, prior to Dr. Kessler's order to stop taking Pradaxa on March 27, 2012, Appellee already had a prescription for Pradaxa allowing for five refills. (CR 330–31). Specifically, Appellee was prescribed Pradaxa on February 10, 2012, and she filled the prescription on February 14, 2012. (CR 330). On March 16, 2012, Walgreen's requested five refills of Pradaxa. (CR 331). On March 27, 2012, Dr. Kessler ordered Appellee to stop taking the Pradaxa. (CR 6). Yet, on May 4, 2012, Appellee refilled her prescription using the authority provided to Walgreen's on March 16, 2012. (CR 332).[1] On June 16, 2012, Appellee again refilled her prescription using the authority provided to Walgreen's on March 16, 2012. (CR 333).

A review of these records would have also informed the trial court that Appellee used this prescription that pre-dated Dr. Kessler's order to obtain refills

---

[1] This Audit / Board of Pharmacy Inspection Report shows the "Original Date" for the prescription was 3/16/2012 16:04. (*Id.*).

after Dr. Kessler's March 27, 2012 order without any communication with Dr. Goswami or Austin Heart. (CR 332–33). Rather than provide these facts from the records, Dr. Breall chose not to provide any facts.

On May 12, 2014, Appellants objected to Dr. Breall's report. (CR 119–27). In their objections, Appellants specified that Dr. Breall failed to identify the standard of care applicable to each Appellant, failed to identify the alleged acts or omissions by each Appellant that amounted to a breach in the standard of care, and failed to explain the causal relationship between each alleged breach and the injuries alleged. (*Id.*). Despite having knowledge of these objections since May 12, 2014, Appellee failed to amend or supplement Dr. Breall's report over the next three months.

After the deadline for serving expert reports expired on August 19, 2014, Appellants filed their motion to dismiss. (CR 189–99).[2] On October 20, 2014, Appellee filed her response to Appellants' motion to dismiss arguing that Dr. Breall's report was sufficient and even moved for sanctions. (CR 297–306). On October 29, 2014, the trial court held a hearing on Appellants' motion to dismiss. (RR 1–48).

---

[2] Since Dr. Breall's report offered no criticisms of Dr. Kessler, Dr. Kessler also filed a motion to dismiss. (CR 171–80). Rather than face a hearing on Dr. Kessler's motion to dismiss and motion for attorneys' fees, Appellee non-suited Dr. Kessler. (CR 200–02).

On October 30, 2014, the Honorable Visiting Judge Gus J. Strauss issued a letter opinion finding "that the report of Dr. Breall pertaining to Dr. Goswami and Austin Heart is adequate under [Chapter] 74 and the plaintiff's claims will proceed. No sanctions [or] attorney's fees will be ordered." (Appx. A; CR 344–45). In this same order, the trial court granted Walgreen's and Sarah E. McGuire's motion to dismiss. (*Id.*). On December 4, 2014, the trial court signed a more formal order denying Appellants' motion to dismiss under section 74.351 of the Texas Civil Practices and Remedies Code. (Appx. A; CR 365–66). On November 17, 2014, Appellants timed filed their notice of appeal and this interlocutory appeal ensued. (CR 346–52).

## SUMMARY OF THE ARGUMENT

The trial court abused its discretion in holding that Dr. Breall's report was adequate under Chapter 74 and in denying Appellants' motion to dismiss under Chapter 74. In his report, Dr. Breall fails to provide any of the facts surrounding Appellee's care and treatment in this case, and Dr. Breall makes no attempt to link the facts to his conclusions on the elements of a Chapter 74 expert report. The Texas Supreme Court holds that, when a report lacks any explanation linking the expert's conclusion to the relevant facts, a trial court abuses its discretion if it denies the defendant's motion to dismiss. Additionally, Dr. Breall failed to identify the standard of care applicable to each Appellant, failed to explain how each

6

Appellant breached the standard of care, and failed to explain the causal link between each Appellant's alleged breach and the injuries alleged. Accordingly, Dr. Breall's report did not constitute a good faith effort to comply with the requirements of section 74.351, and the trial court erred in denying Appellants' motion to dismiss.

## ARGUMENT & AUTHORITY

### I. STANDARD OF REVIEW

A trial court's ruling on a motion to dismiss for failure to comply with section 74.351(b) of the Texas Civil Practice and Remedies Code is subject to review for abuse of discretion. *American Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 875 (Tex. 2001). However, if an expert report contains only conclusions about the statutory elements in section 74.351, the trial court has "no discretion but to conclude ... that the report does not represent a good-faith effort" to satisfy the statute. *Smith v. Wilson*, 368 S.W.3d 574, 577 (Tex. App.—Austin 2012, no pet.) (citing *Palacios*, 46 S.W.3d at 877, 880). Also, an incorrect construction of the law or a misapplication of the law to undisputed facts is an abuse of discretion. *See Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992); *Harris County Hosp. Dist. v. Garrett*, 232 S.W.3d 170, 176 (Tex. App.—Houston [1st Dist.] 2007, no pet.).

**II.** **THE TRIAL COURT ABUSED ITS DISCRETION WHEN FINDING DR. BREALL'S REPORT SATISFIED THE REQUIREMENTS OF CHAPTER 74 AND DENYING APPELLANTS' MOTION TO DISMISS.**

**A.** **Legislative Intent Of Chapter 74.**

The Legislature enacted Article 4590i (now codified in Chapter 74), including its expert reporting requirement, for the purpose of deterring frivolous lawsuits against health care providers. TEX. REV. CIV. STAT. ANN. art. 4590i; *Palacios, 46 S.W.3d at 879* (citing *Wood v. Tice, 988 S.W.2d 829, 830 (Tex. App.—San Antonio 1999, pet. denied)*). "The Legislature has determined that failing to timely file an expert report, or filing a report that does not evidence a good-faith effort to comply with the definition of an expert report, means that the claim is either frivolous, or at best has been brought prematurely. This is exactly the type of conduct for which sanctions are appropriate." *Bogar v. Esparza, 257 S.W.3d 354, 371 (Tex. App.—Austin 2008, no pet.)*.

As evidenced by this case, the purpose of deterring frivolous lawsuits is effectively negated when a claimant serves an expert report that conceals the facts surrounding the care in question and only provides vague conclusions on certain elements of a Chapter 74 expert report. Appellee should not be entitled to pursue a frivolous (or at best premature) claim by serving such a report.

8

**B.      Chapter 74's Expert Report Requirements.**

Chapter 74 requires that, when a plaintiff asserts a health care liability claim, she must serve each defendant physician and health care provider with an expert report along with the expert's curriculum vitae within 120 days of filing suit. *See* TEX. CIV. PRAC. & REM. CODE § 74.351(a)-(c). Chapter 74 further provides that a failure to serve a report within 120 days mandates that the trial court dismiss the case and award attorneys' fees and costs. *Id* at § 74.351(b).

In order to comply with Chapter 74, an expert report must represent an objective good faith effort to comply with the definition of an expert report under Chapter 74. TEX. CIV. PRAC. REM. CODE § 74.351(l). The good faith effort standard requires the report to provide an adequate analysis for each of the following elements of a health care liability claim: (1) the applicable standard of care; (2) the manner in which the care rendered by the physician or health care provider failed to meet the standard; and (3) the causal relationship between that failure and the injury, harm or damages claimed. *Id.* at § 74.351(r)(6); *Palacios*, 46 S.W.3d at 879. The Texas Supreme Court holds that a report will not constitute a good faith effort if it omits any of these statutory requirements. *Jernigan v. Langley*, 195 S.W.3d 91, 94 (Tex. 2006). Further, in order to constitute a good faith effort, the report must, at a minimum: (1) inform the defendant of the specific conduct called into

9

question; and (2) provide a basis for the trial court to conclude the claims have merit. *Palacios*, 46 S.W.3d at 879.

The Texas Supreme Court also holds that, while a report need not marshal all of the plaintiff's proof, it must include the expert's opinion on each of the elements identified in section 74.351. *Palacios*, 46 S.W.3d at 878. A report cannot merely state the expert's conclusions about the statutory elements. *Id.* at 879. "Rather, the expert must explain the basis of his statements to link his conclusions to the facts." *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002) (quoting *Earle v. Ratliff*, 998 S.W.2d 882, 890 (Tex. 1999)). It is not enough that the expert report provides "insight" about the plaintiff's claims. *Id.* "A report that merely states the expert's conclusions about the standard or care, breach, and causation does not fulfill the two purposes of a good-faith effort." *Hebert v. Hopkins*, 395 S.W.3d 884, 890 (Tex. App.—Austin 2013, no pet.) (quoting *Jelinek*, 328 S.W.3d at 539).

Importantly, the only information relevant to determining whether a report complies with the statute is "within the four corners of the document." *Palacios*, 46 S.W.3d at 878. "This requirement precludes a court from filling gaps in a report by drawing inferences or guessing as to what the expert likely meant or intended." *Austin Heart, P.A. v. Webb*, 228 S.W.3d 276, 279 (Tex. App.—Austin 2007, no pet.) (citing *Bowie Mem'l*, 79 S.W.3d at 53; *Gray v. CHCA Bayshore L.P.*, 189

10

S.W.3d 855, 859 (Tex. App.—Houston [1st Dist.] 2006, no pet.)). As this Court recognized, "neither the trial court nor this Court may infer additional opinions or underlying facts to fill in gaps that the report itself leaves open." *Hebert*, 395 S.W.3d at 890.

> **C.** **Dr. Breall's Report Does Not Constitute A Good Faith Effort to Comply With Section 74.351.**

For ease of reference, Appellants provide below the paragraphs from Dr. Breall's report containing his opinions in this case. These paragraphs are the only ones from Dr. Breall's report addressing Appellants:

> In my opinion the care and treatment provided to Nancy Jo Rodriguez by Austin Heart fell below the accepted standards of care in the following particulars:
>
> Despite Dr. David Kessler, one of her cardiologists from Austin Heart, requesting that the Pradaxa be discontinued (in this patient who, at best, has bipolar disorder and at times was confused, this was a reasonable request), Pradaxa therapy nevertheless was continued after her acute hospitalization. This request to stop the medication was not appreciated by her primary cardiologist, Dr. Vivek Goswami (who was in the same group as Dr. Kessler). Furthermore, Ms. Rodriguez appeared to be obtaining refills for this medication authorized by nurses and staff of this same heart group who recommended discontinuing this medication (Austin Heart). The standard of care would have been to follow the orders of Dr. Kessler to stop the administration of Pradaxa.
>
> Failure to discontinue the use of Pradaxa was a direct cause of her subsequent acute admission to the hospital with hypotension, acute kidney injury and apparent gastrointestinal bleeding – known side effects of the over-use of Pradaxa. Ms. Rodriquez's entire hospitalization was attributable to the failure to stop Pradaxa therapy as ordered by Dr. Kessler. More likely than not, had the Pradaxa

11

medication been discontinued as requested, Ms. Rodriguez's hospitalization would never have needed to take place.

I hold these opinions to a reasonable degree of medical certainty. They are based upon my education, training and experience as well as the records which I have reviewed.

(CR 43–44). As explained herein, the report fails to satisfy any of the elements of a Chapter 74 expert report as to Dr. Goswami or Austin Heart and does not constitute an expert report under Chapter 74.

### 1. Dr. Breall's report provides no facts to support his conclusions and thus does not constitute an expert report under Chapter 74.

Before addressing Dr. Breall's specific failures to satisfy the statutory elements of a Chapter 74 expert report, it is important to note that Dr. Breall's report provides absolutely no factual background regarding the care and treatment in question. (CR 43–44). In fact, Dr. Breall's report fails to even identify which records he reviewed to support the opinions in his report. (*Id.*). It is well established that an expert must link his conclusions to the facts in order satisfy Chapter 74's expert report requirement. Most recently, the Texas Supreme Court held in *Jelinek v. Casas*, 328 S.W.3d 526 (Tex. 2010), when the report in question lacked any explanation linking the expert's conclusion to the relevant facts, the trial court abused its discretion in denying the defendant's motion to dismiss and the court of appeals erred by affirming that ruling. *Id.* at 540 (citing *Bowie Mem'l, 79 S.W.3d at 52*).

Several Texas appellate courts have reached the same conclusion. The appellate courts recognize that an expert's failure to provide any facts to support his or her conclusions on standard of care, breach, and causation prevents the trial court from concluding the plaintiff's claims have merit. *See Taylor v. Fossett*, 320 S.W.3d 570, 578 (Tex. App.—Dallas 2010, no pet.) (finding trial court abused its discretion in denying physician's motion to dismiss since expert report provided only conclusory opinions without supporting facts); *W.B.M. Mgmt. Co. v. Flores*, No. 07-14-00008-CV, 2014 WL 1691362, *5–6 (Tex. App.—Amarillo Apr. 25, 2014, no pet.) (holding that expert report was not a good faith effort to provide a fair summary of his opinions and warranted dismissal since expert failed to provide facts to support his conclusion); *Shenoy v. Jean*, No. 01-10-01116-CV, 2011 WL 6938538, *6 (Tex. App.—Houston [1st Dist.] Dec. 29, 2011, pet. denied) (holding that "an expert report that merely asserts that a defendant physician's breach caused the plaintiff's injury without providing a factual basis does not provide the trial court with the information necessary to evaluate the merits of the plaintiff's claim.").

The failure to set forth facts supporting an expert's opinions on the standard of care, breach, and causation is not an argument based on "semantics." *Kuykendall v. Dragun*, No. 11-05-00230-CV, 2006 WL 728068, *3 (Tex. App.—

Eastland Mar. 23, 2006, pet. denied). Rather, the facts are "vital" in determining whether the plaintiff's claims have merit. *Id.*

For instance, in *Kuykendall v. Dragun*, the expert's report stated that the plaintiff suffered peripheral nerve damage in a surgery performed by several physicians and indicated that the literature provided this type of injury was typically caused by failure to properly pad self-retaining retractors, improperly positioning the patient, or leaning on the patient. *Id.* The expert then opined that these were the most likely causes of the plaintiff's injuries. However, the report failed to identify any facts supporting the conclusion. The report did not state the defendant physician used a self-retaining retractor during the procedure, and the report did not even identify the types of procedures carried out by the defendant physician. The court of appeals held that the expert's failure to link these facts to his conclusions justified the trial court's dismissal under Chapter 74. *Id.* In reaching this conclusion, the trial court found the need for this specific information in the report is not mere "semantics." *Id.* Rather, this information is "vital" when assessing whether the defendant breached the standard of care. *Id.*

Similarly, Dr. Breall leaves out key facts supporting his conclusions. In fact, Dr. Breall leaves out any facts concerning Appellee's care and treatment. Appellee's malpractice action is based on her continued use of Pradaxa after her treating cardiologist, Dr. Kessler, ordered her to stop taking this medication (CR

14

6). Yet, Dr. Breall's report provides absolutely no facts about Dr. Kessler's order to stop Pradaxa; the date of the order; to whom the order was communicated; whether Dr. Goswami or Austin Heart treated, or even had contact with, Appellee after Dr. Kessler's order; the prescription used by Appellee after Dr. Kessler's order to stop; the circumstances in which Appellee continued to refill her prescription and continued to use Pradaxa; and many other relevant facts. Rather, Dr. Breall simply offers conclusory opinions about the standard of care, breach, and causation.

It is evident Dr. Breall chose not to include relevant facts since they obviously did not support the opinions in his report. After all, the medical records reflect there was no interaction between Appellants and Appellee after Dr. Kessler's order to stop taking Pradaxa, and Appellee continued to use a prescription with five remaining refills that pre-dated Dr. Kessler's order to stop taking Pradaxa. Dr. Breall's report is silent on these facts (or any facts for that matter) because they do not support his conclusions.[3] Since Dr. Breall failed to provide any facts to support his conclusions, his report did not constitute a good faith effort to comply with section 74.351 of the Texas Civil Practices and Remedies Code. Given the lack of facts to support Dr. Breall's conclusion, the trial

---

[3] Appellants include these facts not for purposes of determining the sufficiency of Dr. Breall's report but to illustrate why an expert is required to provide factual support so the trial court may assess whether the plaintiff's claims have merit.

15

court abused its discretion in finding the report was sufficient. *See Smith, 368 S.W.3d at 577*.[4] As a result, Appellants request that the Court reverse the trial court's order.

### 2. Dr. Breall fails to identify the standard of care applicable to Appellants.

In addition to Dr. Breall's general failure to provide any facts supporting his conclusions, Dr. Breall also failed to make a good faith effort to comply with section 74.351's requirements. In his report, Dr. Breall fails to identify the standard of care applicable to Appellants. The standard of care for a health care provider or a physician is what an ordinarily prudent health care provider or physician would do under the same or similar circumstances. *See Strom v. Mem'l Hermann Hosp. Sys., 110 S.W.3d 216, 222 (Tex. App—Houston [1st Dist.] 2003, pet. denied)*. Identifying the standard of care is "critical" because "[w]hether a defendant breached his or her duty to a patient cannot be determined absent specific information about what the defendant should have done differently." *Palacios, 46 S.W.3d at 880*. From Dr. Breall's report, Appellants cannot determine what, specifically, they should have done differently in their care and treatment of Appellee.

---

[4] Also, without the relevant facts, the trial court either misapplied the law regarding the sufficiency of expert reports or inferred additional underlying facts to fill in gaps that the report itself left open. This amounts to an abuse of discretion. *See Garrett, 232 S.W.3d at 176*; *Hebert, 395 S.W.3d at 890*.

As explained above, a good faith report must, at a very minimum: (1) inform the defendant of the specific conduct called into question; and (2) provide a basis for the trial court to conclude the claims have merit. *Palacios*, 46 S.W.3d at 879. A report cannot merely state the expert's conclusions about the statutory elements. *Id.* at 879. "Rather, the expert must explain the basis of his statements to link his conclusions to the facts." *Bowie Mem'l*, 79 S.W.3d at 52. As this Court recognizes, "[a] report that merely states the expert's conclusions about the standard or care, breach, and causation does not fulfill the two purposes of a good-faith effort." *Hebert*, 395 S.W.3d at 890.

In his report, Dr. Breall's provides only a single, conclusory statement setting forth his opinion on the standard of care: "The standard of care would have been to follow the orders of Dr. Kessler to stop the administration of Pradaxa." (CR 44). However, Dr. Breall fails to identify the standard of care applicable to Appellants given the factual circumstances of this case. As provided above, Dr. Breall fails to set forth any facts indicating that Dr. Kessler's order was communicated to anyone except Appellee. (Recall, Appellee admits that Dr. Kessler "orders that Nancy stop her use of the drug Pradaxa"). (CR 6). In fact, Dr. Breall's own report suggests Dr. Kessler did not communicate his order to Dr. Goswami by stating Dr. Goswami failed to appreciate the order. (CR 44). Dr.

Breall's report fails to explain the standard of care when an order to stop a medication is not communicated to other physicians and health care providers.

Moreover, since Dr. Breall failed to describe the factual circumstances surrounding the prescription and administration of Pradaxa, he could not have identified the applicable standard of care in this case. After all, the standard of care for a health care provider or physician is what an ordinarily prudent health care provider or physician "would have done under the same or similar circumstances." *See Strom, 110 S.W.3d at 222*. Since Dr. Breall did not contemplate the circumstances surrounding this case, he could not have identified the standard of care applicable to Dr. Goswami or Austin Heart.

Also, Dr. Breall's report fails to attribute his standard of care opinion to any particular defendant. "When a plaintiff sues more than one defendant, the expert report must set forth the standard of care applicable to each defendant and explain the causal relationship between each defendant's individual acts and the injury." *Tenet Hosps. Ltd. v. De La Riva,* 351 S.W.3d 398, 404 (Tex. App.—El Paso 2011, no pet.); *see also CHCA Mainland, L.P. v. Burkhalter,* 227 S.W.3d 221, 227 (Tex. App.—Houston [1st Dist.] 2007, no pet.). An expert report may not assert that multiple defendants are all negligent for failing to meet the standard of care without providing an explanation of how each defendant breached the standard of care and how that breach caused or contributed to the cause of injury. *Taylor v.*

18

*Christus Spohn Health Sys. Corp.,* 169 S.W.3d 241, 244 (Tex. App.—Corpus Christi 2004, no pet.). "Collective assertions of negligence against various defendants are inadequate." *Id.*

In this case, Appellee filed suit against multiple defendants. Dr. Breall's report mentions three defendants, Dr. Kessler, Dr. Goswami, and Austin Heart. However, Dr. Breall made no attempt to explain the standard of care applicable to each defendant. Rather, Dr. Breall only provides one standard of care opinion and fails to explain to whom it applies. Dr. Breall's collective statement is prohibited by Chapter 74 and Texas case law. *See* TEX. CIV. PRAC. & REM. CODE § 74.351(a); *Taylor,* 169 S.W.3d at 244. Dr. Breall's report effectively provides no standard of care opinion with regard to Dr. Goswami or Austin Heart, and therefore, the trial court abused its discretion in denying Appellants' motion to dismiss.

### 3. Dr. Breall fails to explain how Dr. Goswami and Austin Heart breached the applicable standard of care.

Dr. Breall's report also fails to explain how Dr. Goswami and Austin Heart allegedly breached their respective standards of care. Dr. Breall's only stated criticism against Dr. Goswami was that the order to stop Pradaxa "was not appreciated by her primary cardiologist, Dr. Vivek Goswami (who was in the same group as Dr. Kessler)." (CR 44). However, Dr. Breall does not define this alleged "failure to appreciate" as a breach of the applicable standard of care. In fact, Dr. Breall does not identify the standard of care for appreciating another physician's

19

order. Hence, Dr. Breall effectively provides no opinion that Dr. Breall breached the standard of care.

Also, Dr. Breall does not explain how Dr. Goswami could have "appreciated" Dr. Kessler's order. Once again, Dr. Breall leaves out necessary and vital facts to support this opinion. At no point does Dr. Breall's report state that Dr. Kessler communicated his March 27, 2012 order to Dr. Goswami. Rather, Appellee admits this order to stop taking Pradaxa was communicated to her. (CR 6). Dr. Breall's report again fails to link his conclusions to the facts in the case.

Moreover, Dr. Breall fails to explain what Dr. Goswami should have done differently had he been apprised of the order by another treating cardiologist. Specifically, Dr. Breall fails to explain what else Dr. Goswami should have done other than what Appellee admits Dr. Kessler did, which is to tell Appellee to stop taking the Pradaxa. *Dr. Breall's report certainly does not state that Dr. Goswami continued to prescribe Pradaxa after Dr. Kessler's order.*

Again, Dr. Breall's decision not to include supporting facts is not surprising given that the facts reveal that Appellee continued to refill a Pradaxa prescription that predated Dr. Kessler's March 27, 2012 order without any notice to Dr. Goswami. The report certainly does not explain how the facts establish Dr. Goswami breached the standard of care. As explained in Section II(C)(1) above, Dr. Breall's failure to provide facts to support his opinion mandates dismissal.

20

*Jelinek*, 328 S.W.3d at 540; *Taylor*, 320 S.W.3d at 578; *Flores*, 2014 WL 1691362, *5–6. Dr. Breall's report fails to provide any statement that Dr. Goswami breached the applicable standard of care.

In regard to Austin Heart, Dr. Breall states Appellee "appeared to be obtaining refills for this medication authorized by nurses and staff of this same heart group who recommended discontinuing this medication (Austin Heart)." (CR 44). However, this conclusory statement is a careful and calculated attempt to mischaracterize the facts by excluding vital information. In this statement, Dr. Breall noticeably fails to indicate the date in which Pradaxa refills were "authorized by nurses and staff" of Austin Heart. If Austin Heart's nurses and staff authorized the refills ***before*** Dr. Kessler ordered Appellee to stop taking the medication, there could not have been a breach. Dr. Breall noticeably omits the date in which Austin Heart employees allegedly authorized refills of Pradaxa.[5]

Without this vital information, the trial court could not have determined whether Appellee's claims have merit. Rather, in order to conclude the report was sufficient as to Austin Heart, the trial court needed to draw an inference that Austin Heart employees authorized refills of Pradaxa ***after*** Dr. Kessler's March 27, 2012

_____

[5] Per Appellee's Original Petition, Dr. Kessler ordered Appellee to stop taking Pradaxa on March 27, 2012. (CR 6). The pharmacy records show that Appellee's refill request was completed on March 16, 2012, eleven days before Dr. Kessler's order. (CR 331). Appellee then used the prescription and refill requests, which predated Dr. Kessler's order, to refill her Pradaxa on two separate occasions. (CR 332–33). Again, Appellants include this information not for purposes of determining the sufficiency of the report but to illustrate why the underlying facts are important when analyzing an expert's opinions.

order. Yet, those facts are not provided in Dr. Breall's report (most likely because they are not the facts supported by the records or the witnesses in this case), and the trial court abused its discretion in inferring these facts to find the report was sufficient.

Also, Dr. Breall's supposed breach opinion again does not match a corresponding standard of care opinion. Nowhere in Dr. Breall's report does he provide the standard of care for nurses and staff members who receive a request to authorize prescription refills. (CR 43–44). Therefore, Dr. Breall's breach statement is wholly insufficient to satisfy Chapter 74. In sum, Dr. Breall does not provide any statement showing that Austin Heart's nurses or staff breached the standard of care, and the trial court abused its discretion in finding that Dr. Breall's report was sufficient as to Austin Heart.

**4.      Dr. Breall's report fails to explain how an alleged breach in the standard of care by Dr. Goswami or Austin Heart caused Appellee's injuries.**

Dr. Breall's report completely fails to explain how an alleged breach in the standard of care by Dr. Goswami or Austin Heart caused Appellee's injuries. As the Supreme Court has recognized, "[a]n expert cannot simply opine that the breach caused the injury. … Instead, the expert must go further and explain, to a reasonable degree, how and why the breach caused the injury based on the facts presented." *Jelinek*, 328 S.W.3d at 539–40. Without this explanation, the trial court

22

cannot conclude the claims have merit. *Id.*; *see also* Smith, 368 S.W.3d at 578 (Austin Court reversing trial court's denial of motion to dismiss after finding report failed to provide facts explaining the causal link between alleged breach and the occurrence or injury); *Kocurek v. Colby*, No. 03-13-00057-CV, 2014 WL 4179454, *4–5 (Tex. App.—Austin Aug. 22, 2014, no pet.). Here, Dr. Breall's report fails to establish a causal link between an alleged breach in the standard of care by Appellants and Appellee's alleged injuries.

In regard to Dr. Goswami, Dr. Breall's report only complains that Dr. Kessler's order to stop the medication was not "appreciated" by Dr. Goswami. However, as explained above, Dr. Breall fails to explain how Dr. Goswami's lack of knowledge of Dr. Kessler's order to stop taking Pradaxa caused Appellee to continue to take Pradaxa. Dr. Breall's report does not provide any facts indicating that Dr. Goswami knew of Dr. Kessler's order or that, after Dr. Kessler ordered Appellee to stop taking Pradaxa, Dr. Goswami had any further contact with Appellee before her alleged injuries. Moreover, one would expect Appellee to follow the order of her treating cardiologist (Dr. Kessler) without needing a second cardiologist (Dr. Goswami) to repeat the order. In short, Dr. Breall fails to explain how any act or omission by Dr. Goswami led Appellee to continue to take Pradaxa.

In regard to Austin Heart, Dr. Breall's only breach statement was that Appellee "appeared to be obtaining refills for this medication authorized by nurses

and staff of this same heart group who recommended discontinuing this medication (Austin Heart)." But again, Dr. Breall fails to allege that Austin Heart's employees authorized refills of Pradaxa *after* Dr. Kessler's order to stop. To make a causal connection, Dr. Breall would need to establish that Austin Heart employees authorized Appellee to obtain refills of Pradaxa *after* Dr. Kessler's order on March 27, 2012. Without this information, the trial court could not have concluded from Dr. Breall's report that an act or omission by Austin Heart employees caused Appellee to continue to take Pradaxa after March 27, 2012.[6]

As this Court recently noted in *Smith v. Wilson*, an expert must explain, with supporting facts, how each defendant's alleged breach in the standard of care caused the injury in question. 368 S.W.3d at 577–78. A conclusory statement on causation is wholly insufficient. *Id.* Dr. Breall's report offers no explanation or facts explaining the causal link between alleged breaches in the standard of care by Appellants and Appellee's continued use of Pradaxa. Hence, Dr. Breall's report fails to satisfy the requirements of section 74.351.

Furthermore, Dr. Breall fails to explain how Appellee's ingestion of Pradaxa between March 27, 2012 and her hospitalization in July of 2012 caused the injuries

---

[6] Further, Dr. Breall cannot satisfy the causation element by offering mere possibilities. *See Fung v. Fischer*, 365 S.W.3d 507, 530 (Tex. App.—Austin 2012, no pet.), *overruled on other grounds*, *Certified EMS, Inc. v. Potts*, 392 S.W.3d 625 (Tex. 2013). "Reports providing a 'description of only a possibility of causation do[ ] not constitute a good-faith effort to comply with the statute.'" *Id.* Dr. Breall states Appellee "*appeared* to be obtaining refills for [Pradaxa] authorized by" Austin Heart employees. (CR 44) (emphasis added). This language indicates Dr. Breall is simply guessing that Austin Heart employees authorized refills for Appellee.

24

alleged in his report -- hypertension, acute kidney injury, and apparent gastrointestinal bleeding. Rather, Dr. Breall simply states, without any explanation, "[f]ailure to discontinue the use of Pradaxa was a direct cause of her subsequent admission to the hospital with hypotension, acute kidney injury and apparent gastrointestinal bleeding." (CR 44). Dr. Breall provides no explanation or factual support for this conclusion as to how Appellee's ingestion of Pradaxa over a two month period caused these physical injuries. Conclusory statements on causation will not satisfy Chapter 74's expert report requirements. *See Palacios*, 46 S.W.3d at 875; *Regent Care Ctr. of San Antonio II, Ltd. P'ship v. Hargrave*, 300 S.W.3d 343, 346 (Tex. App.—San Antonio 2009, pet. denied).

Since Dr. Breall only offered conclusions about the statutory elements of an expert report, the trial court had "no discretion but to conclude ... that the report does not represent a good-faith effort" to satisfy the statute. *Smith*, 368 S.W.3d at 577. Nonetheless, the trial court in this case found that Dr. Breall's report was "adequate under Chapter 74" and denied Appellants' objections and motion to dismiss. (CR 344, 365–66). The trial court's ruling amounted to an abuse of discretion. *Smith, 368 S.W.3d at 577*. Appellants request that this Court reverse and the trial court's ruling and remand with an order to grant Appellants' motion to dismiss.

25

**D. By Serving A Report Like Dr. Breall's, Appellee Effectively Negates The Purpose Of Chapter 74's Expert Report Requirement.**

As stated above, the purpose of section 74.351 is to prevent the filing of frivolous lawsuits against physicians and health care providers in Texas. One of the central purposes of the expert report is to provide a basis for the trial court to conclude the claims have merit. *Palacios,* 46 S.W.3d at 879. Stated otherwise, the report should let the trial court know the claims are not frivolous. When an expert report conceals the relevant facts and provides only baseless conclusions on the three elements of a health care liability claim, a plaintiff effectively negates the purpose of the expert report requirement and circumvents section 74.351.

This is precisely what Appellee has done in this case. Dr. Breall's report conceals the relevant facts in hopes that his vague conclusions would hide the frivolous nature of Appellee's claims. If the trial court's decision is upheld, the purposes behind Chapter 74 will effectively be nullified and claimants would likely use this Court's decision to file frivolous claims against physicians and health care providers by simply ignoring the facts. This is certainly not what the Legislature intended when enacting Chapter 74 (formerly article 4590i).

**CONCLUSION & PRAYER**

In conclusion, Dr. Breall's report suffers from a number of fatal flaws. Dr. Breall provides absolutely no facts to support his conclusions on the applicable

standard of care, breach, and causation. Dr. Breall also fails to apprise Appellants of the specific conduct called into question so as to notify the trial court of what Appellants should have done differently in their care for Appellee. Moreover, Dr. Breall's report fails to identify the standard of care applicable to each Appellant, fails to describe any act or omission by the Appellants that amounted to a breach in that standard of care, and fails to show how any alleged breaches by Appellants caused Appellee's injuries. To the extent Dr. Breall does offer a limited opinion on any of these elements, he only offers baseless conclusions that do not even connect the applicable standard of care with an alleged breach of that standard of care along with a causal link. Accordingly, the trial court abused its discretion when holding that Dr. Breall's report was "adequate" under Chapter 74 and denying Appellants' motion to dismiss.

WHEREFORE, PREMISES CONSIDERED, Appellants respectfully request that this Court reverse the trial court's order denying Appellants' Chapter 74 Motion to Dismiss and remand to the trial court with an order that all claims and causes of action asserted by Appellee against Appellants be dismissed with prejudice and that Appellants be awarded their reasonably attorneys' fees and costs as allowed by Chapter 74 of the Texas Civil Practices and Remedies Code. Appellants further pray for such other relief that they may be justly entitled.

Respectfully submitted,

**SERPE, JONES, ANDREWS,
CALLENDER & BELL, PLLC**


By: _/s/ Chris Knudsen_____
      Chris Knudsen
      Texas Bar No. 24041268
      cknudsen@serpejones.com
America Tower
2929 Allen Parkway, Suite 1600
Houston, Texas 77019
Telephone: (713) 452-4400
Facsimile:  (713) 452-4499

**Attorneys for Appellants Vivek Goswami,
M.D. and Austin Heart, PLLC**

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing Brief for Appellants is computer generated, has been prepared in a conventional typeface no smaller than 14-point for text and 12-point for footnotes, contains 6,322 words according to word count function of the computer program used to prepare this Brief, excluding any parts exempted by TEX. R. APP. P. 9.4(i)(1), and otherwise complies with Texas Rule of Appellate Procedure 9.4.


_/s/ Chris Knudsen_____
Chris Knudsen

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument has been forwarded to all known counsel of record in accordance with the Texas Rules of Appellate Procedure on this the 5th day of January, 2015.

L. Todd Kelly
THE CARLSON LAW FIRM, P.C.
11606 N IH-35
Austin, Texas 78753
*Counsel for Plaintiff/Appellee*

Cynthia Day Grimes
STRASBURGER & PRICE, LLP
2301 Broadway
San Antonio, Texas 78215-1157
*Counsel for Defendants Walgreen Co.*
*and Sara Elizabeth McGuire*

Missy Atwood
GERMER BEAMAN & BROWN, PLLC
301 Congress Avenue, Suite 1700
Austin, Texas 78701
*Counsel for Defendant St. David's Health*
*Care Partnership*

*/s/ Chris Knudsen*
Chris Knudsen

29

APPENDIX A

TRIAL COURT ORDERS



Filed in The District Court
of Travis County, Texas

NOV 05 2014

At 11:54 a.m.

Amalia Rodriguez-Mendoza, Clerk

**OFFICE OF THE DISTRICT JUDGES**
Travis County Court House
P.O. Box 1748
Austin, Texas 78767
(512) 854-9300

October 30, 2014

Mr. L. Todd Kelly
The Carlson Law Firm, P.C.
11606 N. IH 35
Austin, Texas 78753
*Via Facsimile: (512) 719-4362*

Ms. Cynthia Day Grimes
Strasburger & Price, LLP
2301 Broadway
San Antonio, Texas 78215-1157
*Via Facsimile: (210) 250-6003*

Mr. Christopher Knudsen
Serpe, Jones, Andrews,
Callender & Bell, PLLC
American Tower
2929 Allen Parkway, Suite 1600
Houston, Texas 77019
*Via Facsimile: (713) 452-4499*

Ms. Missy Atwood
Germer Beaman & Brown, PLLC
301 Congress Avenue, Suite 1700
Austin, Texas 78701
*Via Facsimile: (512) 472-0721*

Re: Cause No. D-1-GN-14-000903; *Nancy Jo Rodriguez vs. The Walgreen Company, Sara Elizabeth McGuire, Austin Heart PLLC, St. David's Health Care Partnership, David Kessler, MD, and Vivek Goswami, MD;* in the 419th Judicial District Court of Travis County, Texas

Dear Counsel:

Having reviewed the above said matter the Court will find that purported expert reports regarding alleged negligence against Walgreens and Sara Elizabeth McGuire are inadequate to satisfy the requirements of Chapter 74, Tex.Civ. Prac. & Rem Code and such claim should be dismissed.

The Court will find that expert report of Dr. Breall pertaining to Dr. Goswami and Austin Heart is adequate under Chapt. 74 and the plaintiff's claim will proceed. No sanctions on attorney's fee will be ordered.

344

Filed in The District Court
of Travis County, Texas

NOV 0 5 2014

At_____11:54____a.m.
Amalia Rodriguez-Mendoza, Clerk

I ask that Mr. Kelly and Ms. Grimes prepare appropriate orders reflecting the Court's Rulings and forward the same to Lorraine Elzia, Office of the District Judges, Rm, 327, P.O. Box 1748, Austin, Texas 78767.

Thank you.

Sincerely Yours,

Gus J. Strauss
Presiding Judge

cc:   Travis County District Clerk

Filed in The District Court
of Travis County, Texas

DEC 05 2014

at _____

Amalia Rodriguez-Mendoza, Clerk

CAUSE NO. D-1-GN-14-000903

| | | |
|---|---|---|
| **NANCY JO RODRIGUEZ** | § | **IN THE DISTRICT COURT OF** |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **VS.** | § | **TRAVIS COUNTY, TEXAS** |
| | § | |
| **THE WALGREEN COMPANY,** | § | |
| **SARA ELIZABETH MCGUIRE,** | § | |
| **AUSTIN HEART PLLC, ST. DAVID'S** | § | |
| **HEALTHCARE PARTNERSHIP,** | § | |
| **AND VIVEK GOSWAMI, M.D.** | § | |
| | § | |
| **Defendants.** | § | **419th JUDICIAL DISTRICT** |

## ORDER DENYING DEFENDANTS VIVEK GOSWAMI, M.D. AND AUSTIN HEART, PLLC'S CH. 74 MOTION TO DISMISS AND MOTION FOR AWARD OF ATTORNEYS' FEES

Defendants, Vivek Goswami, M.D. and Austin Heart, PLLC's Motion to Dismiss Pursuant to Section 74.351 of the Texas Civil Practice & Remedies Code and Motion for Award of Attorneys' Fees came to be heard and considered in the above-entitled and numbered cause on October 29, 2014. The Court, after hearing argument of counsel and considering the written motion, objections to the report of Dr. Jeffrey A. Breall, response and reply, is of the opinion that the Defendants' motion should be DENIED and that the report of Dr. Jeffrey A. Breall adequately complies with §74.351 of the Texas Civil Practice and Remedies Code. Accordingly, it is hereby,

ORDERED, ADJUDGED AND DECREED as follows:

1. Defendants, Vivek Goswami, M.D. and Austin Heart, PLLC's Motion to Dismiss Pursuant to Section 74.351 of the Texas Civil Practice & Remedies Code and Motion for Award of Attorneys' Fees are DENIED;

365

2. **Dr. Jeffrey A. Breall's** expert report complies with §74.351 of the Texas Civil Practice and Remedies Code; and

3. Plaintiff's Counter-Motion for Sanctions is DENIED.

SIGNED this ___4___ day of ___December___, 2014.

_____
JUDGE PRESIDING

AGREED AS TO FORM:

_____
L. Todd Kelly
THE CARLSON LAW FIRM, P.C.
11606 N. IH-35
Austin, TX 78753

_____
Nicole Andrews
Chris M. Knudsen
Margaret Garib
SERPE, JONES, ANDREWS,
CALLENDER & BELL, PLLC
2929 Allen Pkwy, Suite 1600
Houston, TX 77019

# APPENDIX B

## CASES

46 S.W.3d 873
Supreme Court of Texas.

AMERICAN TRANSITIONAL CARE CENTERS
OF TEXAS, INC. d/b/a American Transitional
Hospital, Petitioner,
v.
Teofilo PALACIOS and Maria Palacios,
individually and a/n/f of Gloria Janeth Palacios
and Rocio Daniela Palacios, minors, Maria
Angelica Palacios, and Sentry Insurance, a mutual
company, Respondents.

No. 99–1311. | Argued Dec. 6, 2000. | Decided May
10, 2001. | Rehearing Overruled June 28, 2001.

Medical malpractice action was brought against hospital
to recover for injuries patient allegedly suffered in fall at
hospital. The 280th District Court, Harris County, Tony
Lindsay, J., dismissed case for failure to file expert report,
as required by Medical Liability and Insurance
Improvement Act. Patient appealed. The Houston Court
of Appeals, First District, reversed and remanded, 4
S.W.3d 857. On petition for review, the Supreme Court,
Hankinson, J., held that: (1) trial court's determination
about adequacy of expert report under Act is reviewed
under abuse-of-discretion standard, and (2) expert's report
did not provide fair summary of standard of care and how
it was breached.

Court of Appeals' judgment reversed.

**Attorneys and Law Firms**

**\*875** Matthew T. McCracken, John C. Marshall, James C.
Marrow, Dee L. Dawson, Marshall & McCraken,
Houston, for Petitioner.

D. John Leger, Leger & Coplen, Levon G. Hovnatanian,
Martin Disiere & Jefferson, Houston, Mickey C. Shyrock,
Law Office of Mickey C. Shyrock, Athens, for
Respondents.

**Opinion**

Justice HANKINSON delivered the opinion of the Court.

In this medical-malpractice case we determine the
standards for reviewing an expert report under section
13.01 of the Medical Liability and Insurance
Improvement Act. TEX.REV.CIV. STAT. ANN.. art.
4590i, § 13.01. The trial court dismissed the Palacioses'

medical-malpractice claims against American Transitional
Care Centers, Inc., d/b/a American Transitional Hospital,
because it determined that the Palacioses' expert report
did not show a good-faith effort to provide a fair summary
of the expert's opinions about the standard of care,
breach, and causation, as required by section 13.01. See
id. § 13.01(d), (e), (l), (r)(6). The court of appeals, after
evaluating the trial court's decision as it would a
summary-judgment decision, reversed, holding that the
report did meet the statutory requirements. 4 S.W.3d 857,
860.

We hold that a trial court's decision to dismiss a case
under section 13.01(e) is reviewed for abuse of discretion.
We further hold that to constitute a good-faith effort to
provide a fair summary of an expert's opinions under
section 13.01(l ), an expert report must discuss the
standard of care, breach, and causation with sufficient
specificity to inform the defendant of the conduct the
plaintiff has called into question and to provide a basis for
the trial court to conclude that the claims have merit. In
this case, the trial court did not abuse its discretion in
concluding that the challenged report does not meet the
statutory requirements and in dismissing with prejudice
the claims against American Transitional. Accordingly,
we reverse the court of appeals' judgment and dismiss
with prejudice the Palacioses' claims.

Teofilo Palacios suffered brain damage and other severe
injuries following a two-story fall at work. After almost a
year in an intensive rehabilitation program, he was
transferred to American Transitional Hospital for further
rehabilitation. Although Palacios at that time was able to
**\*876** communicate with others and respond to simple
commands, he required assistance with most daily tasks.
In addition, due to the severity of his brain damage,
Palacios' physicians prescribed bed restraints for him.
Nevertheless, while a patient at American Transitional,
Palacios fell from his bed and required additional medical
care for his injuries. His family claims that this fall caused
him to sustain further brain injury, which impaired his
ability to communicate with others and to assist them in
his care.

Palacios and his family sued American Transitional and
the treating doctors, respectively, for negligently failing to
prevent the fall and negligently treating him after the fall.
After ninety days passed from the date the Palacioses
filed suit, American Transitional, along with the other
defendants, moved to require the Palacioses to file a
$7,500 cost bond, as required by section 13.01(b) of the
Medical Liability and Insurance Improvement Act. See
TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(b)
(authorizing a trial court to order a plaintiff to file a

$7,500 cost bond for each defendant physician or health-care provider if the plaintiff has not complied with the expert-report or $5,000 cost-bond requirement in section 13.01(a)); *id.* § 13.01(a) (requiring the plaintiff to file either an expert report or a $5,000 cost bond for each defendant physician or health-care provider within ninety days of filing suit). The trial court granted the motion, and the Palacioses filed a cost bond for each defendant.

After 180 days passed from the date the Palacioses filed suit, American Transitional moved to dismiss the case against it because the Palacioses did not file an expert report and curriculum vitae, or nonsuit the claims against American Transitional, as section 13.01(d) of the Act requires. *Id.* § 13.01(d), (e). The Palacioses moved for an extension of time to file the report, which the trial court granted. *See id.* § 13.01(f), (g). The Palacioses then filed a report prepared by Dr. Catherine F. Bontke, who treated Palacios at the first rehabilitation hospital. American Transitional again moved to dismiss under section 13.01(e), claiming that the report did not satisfy the statutory requirements. *See id.* § 13.01(*l*), (r)(6). The trial court granted the motion, dismissed with prejudice the claims against American Transitional, and severed those claims to make the judgment against American Transitional final. *See id.* § 13.01(e).

The Palacioses appealed, and with one justice dissenting, the court of appeals reversed and remanded after using summary-judgment review standards to evaluate the sufficiency of the expert report. 4 S.W.3d at 860. After indulging every reasonable inference in the Palacioses' favor and eliminating any deference to the trial court's decision, the court of appeals concluded that the trial court erred in dismissing the case because the Palacioses made a good-faith effort to provide a report that met the requirements of section 13.01(r)(6). *Id.* at 862–63. American Transitional petitioned for review challenging both the standard of review applied by the court of appeals and the sufficiency of the Palacioses' report.

[1] Texas courts have long recognized the necessity of expert testimony in medical-malpractice cases. *E.g., Hart v. Van Zandt,* 399 S.W.2d 791, 792 (Tex.1965); *Bowles v. Bourdon,* 148 Tex. 1, 219 S.W.2d 779, 782 (1949). "There can be no other guide [than expert testimony], and where want of skill and attention is not thus shown by expert evidence applied to the facts, there is no evidence of it proper to be submitted to the jury." *Hart,* 399 S.W.2d at 792. Because expert testimony is crucial to a medical-malpractice case, **\*877** knowing what specific conduct the plaintiff's experts have called into question is critical to both the defendant's ability to prepare for trial and the trial court's ability to evaluate the viability of the plaintiff's claims. This makes eliciting an expert's

opinions early in the litigation an obvious place to start in attempting to reduce frivolous lawsuits. *See* HOUSE COMM. ON CIV. PRAC., BILL ANALYSIS, Tex. H.B. 971, 74th Leg., R.S. (1995).

Accordingly, in section 13.01, the Legislature requires medical-malpractice plaintiffs, within 180 days of filing suit, either to provide each defendant physician and health-care provider with an expert report and the expert's curriculum vitae, or to nonsuit the claims. TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(d). If the plaintiff fails within the time allowed either to provide the expert reports and curriculum vitae, or to nonsuit the case, the trial court must sanction the plaintiff by dismissing the case with prejudice, awarding costs and attorney's fees to the defendant, and ordering the forfeiture of any applicable cost bond necessary to pay that award. *Id.* § 13.01(e). If the plaintiff does timely file a report, the defendant may move to challenge the adequacy of the report, and the trial court must grant the motion if "it appears to the court ... that the report does not represent a good faith effort to comply with the definition of an expert report." *Id.* § 13.01(*l*). The statute defines an expert report as "a written report by an expert that provides a fair summary of the expert's opinions ... regarding applicable standards of care, the manner in which the care rendered ... failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." *Id.* § 13.01(r)(6). If a trial court determines that an expert report does not meet these statutory requirements and the time for filing a report has passed, it must then dismiss with prejudice the claims against the defendant who has challenged the report. *Id.* § 13.01(e).

American Transitional contends that a trial court's determination about the adequacy of an expert report should be reviewed under an abuse-of-discretion standard. The Palacioses respond that whether a report meets the requirements of subsections 13.01(*l*) and (r)(6) is a question of law. They suggest that a trial court's decision on the adequacy of a report should be reviewed as a court would review a summary-judgment decision: that is, by indulging every reasonable inference and resolving any doubts in the nonmovant's favor, and eliminating any deference to the trial court's decision. We agree with American Transitional.

[2] [3] The plain language of section 13.01 leads to the conclusion that abuse of discretion is the proper standard. First, the statute directs the trial court to grant a motion challenging the adequacy of an expert report if it "appears to the court" that the plaintiffs did not make a good-faith effort to meet the statutory requirements. *Id.* § 13.01(*l*). This language plainly vests the trial court with discretion. *See* TEX. GOV'T CODE § 312.002. ("[W]ords shall be

given their ordinary meaning."). Second, the statute states that dismissal under section 13.01(e) is a sanction: If the requirements of section 13.01(d) are not met, the court must "enter an order as sanctions" dismissing the case and granting the defendant its costs and attorneys' fees. TEX.REV.CIV. STAT. ANN .. art. 4590i, § 13.01(e). Sanctions are generally reviewed under an abuse-of-discretion standard. *Koslow's v. Mackie,* 796 S.W.2d 700, 704 (Tex.1990). And we presume the Legislature was aware of the standard of review ordinarily applied in sanctions cases when it explicitly identified a court's dismissal under section 13.01(e) as a sanction. **\*878** *See McBride v. Clayton,* 140 Tex. 71, 166 S.W.2d 125, 128 (1943) ( "All statutes are presumed to be enacted by the legislature with full knowledge of the existing condition of the law and with reference to it.").

Nevertheless, the court of appeals concluded that the usual standard of review for sanctions should not apply here. The court reasoned that the provisions of article 4590i at issue here were intended to discourage frivolous lawsuits, while sanctions, in contrast, are a response to litigation misconduct. We disagree with this distinction.

Filing a frivolous lawsuit can be litigation misconduct subject to sanction. *See* TEX.R. CIV. P. 13 (imposing sanctions for filing groundless motions, pleadings, or other papers in bad faith or for the purposes of harassment). And one purpose of the expert-report requirement is to deter frivolous claims. HOUSE COMM. ON CIV. PRAC., BILL ANALYSIS, Tex. H.B. 971, 74th Leg., R.S. (1995). The Legislature has determined that failing to timely file an expert report, or filing a report that does not evidence a good-faith effort to comply with the definition of an expert report, means that the claim is either frivolous, or at best has been brought prematurely. *See id.* This is exactly the type of conduct for which sanctions are appropriate. *See TransAmerican Natural Gas Corp. v. Powell,* 811 S.W.2d 913, 918 (Tex.1991) (holding that "death-penalty" sanctions are appropriate when a party's discovery abuse justifies a presumption that its claims lack merit). For these reasons, we hold that an abuse-of-discretion standard of review applies to a trial court's decision to dismiss a case under section 13.01(e).

[4] We next consider whether the trial court abused its discretion in dismissing the Palacioses' claims against American Transitional. The parties disagree about how to determine a report's adequacy under section 13.01(*l* ). American Transitional argues that the trial court must engage in a two-step process: (1) the trial court must determine whether the report constitutes a fair summary of the expert's opinions, TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(r)(6); and (2) if the trial court concludes that the report is not a fair summary, it must

then look outside the report at the plaintiff's conduct to determine whether the plaintiff made a good-faith effort to meet the statutory requirements, *id.* § 13.01(*l* ). The Palacioses, on the other hand, argue that the statute requires only one inquiry—whether the report evidences a good-faith effort to provide a fair summary of the expert's opinions. According to the Palacioses, the trial court does not have to make any factual determinations because the only relevant information is in the report itself. We agree with the Palacioses that a trial court should look no further than the report in conducting a section 13.01(*l* ) inquiry.

The issue for the trial court is whether "the report" represents a good-faith effort to comply with the statutory definition of an expert report. *Id.* § 13.01(*l* ). That definition requires, as to each defendant, a fair summary of the expert's opinions about the applicable standard of care, the manner in which the care failed to meet that standard, and the causal relationship between that failure and the claimed injury. *Id.* § 13.01(r)(6). Because the statute focuses on what the report discusses, the only information relevant to the inquiry is within the four corners of the document.

[5] [6] Under subsections 13.01(*l* ) and (r)(6), the expert report must represent only a good-faith effort to provide a fair summary of the expert's opinions. A report need not marshal all the plaintiff's proof, but it must include the expert's opinion on each of the elements identified in the statute. *See* **\*879** *Hart v. Wright,* 16 S.W.3d 872, 877 (Tex.App.—Fort Worth 2000, pet. denied). In setting out the expert's opinions on each of those elements, the report must provide enough information to fulfill two purposes if it is to constitute a good-faith effort. First, the report must inform the defendant of the specific conduct the plaintiff has called into question. Second, and equally important, the report must provide a basis for the trial court to conclude that the claims have merit. *See* 4 S.W.3d at 865 (Taft, J. dissenting); *Wood v. Tice,* 988 S.W.2d 829, 830 (Tex.App.—San Antonio 1999, pet. denied) (noting that one of the purposes of article 4590i is to deter frivolous claims).

[7] [8] [9] [10] A report that merely states the expert's conclusions about the standard of care, breach, and causation does not fulfill these two purposes. Nor can a report meet these purposes and thus constitute a good-faith effort if it omits any of the statutory requirements. *See, e.g., Hart,* 16 S.W.3d at 877 (holding that a report was inadequate because it stated that the patient had a heart attack and the doctor breached the standard of care, without describing the standard of care); *Wood,* 988 S.W.2d at 831–32 (holding that an expert report did not meet the statutory requirements because it did not name

the defendants, state how the defendants breached the standard of care, demonstrate causation and damages, or include a curriculum vitae). However, to avoid dismissal, a plaintiff need not present evidence in the report as if it were actually litigating the merits. The report can be informal in that the information in the report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial. *See, e.g.,* TEX.R. CIV. P. 166(f) (setting out the requirements for the form and content of affidavits offered as summary-judgment proof); TEX.R. EVID. 802 (stating that most hearsay is inadmissible).

[11] American Transitional contends that Dr. Bontke's report does not meet the statutory requirements because it does not represent a good-faith effort to provide a fair summary of her opinion on the standard of care and how American Transitional breached that standard. The Palacioses respond that the following parts of Dr. Bontke's report establish these elements:

> Based on the available documentation I was able to conclude that: Mr. Palacios fell from his bed on 5/14/94 while trying to get out of it on his own. The nursing notes document that he was observed by nursing on the hour for two hours prior to the fall. In addition, ten minutes before the fall, the nursing notes documents [sic] the his wrist/vest restraints were on. Yet, at the time of his fall he was found on the floor with his vest/wrist restraints on but not tied to the bed. It is unclear how he could untie all four of the restraints from the bedframe in under ten minutes. Obviously, Mr. Palacios had a habit of trying to undo his restraints and precautions to prevent his fall were not properly utilized.

> ....

> All in all, Mr. Palacios sustained a second brain injury with a left subdural hematoma while he was an inpatient at [the Hospital].... [I]n my opinion, the medical care rendered to Mr. Palacios at the time of his second brain injury was below the accepted and expected standard of care which he could expect to receive. Moreover, this [sic] below the accepted standard of care extends to both the cause of the second injury as well as the subsequent treatment....

The Palacioses rely mostly on one sentence in the report to establish the standard of care: "Mr. Palacios had a habit of **\*880** trying to undo his restraints and precautions to prevent his fall were not properly utilized." They argue that the inference can be made from that sentence, along with the statement that "[i]t is unclear how he could untie all four of the restraints from the bed frame in under ten

minutes," that Dr. Bontke believes American Transitional's staff should have tied the restraints to the bed more securely.

[12] The standard of care for a hospital is what an ordinarily prudent hospital would do under the same or similar circumstances. *See Birchfield v. Texarkana Mem'l Hosp.,* 747 S.W.2d 361, 366 (Tex.1987). Identifying the standard of care is critical: Whether a defendant breached his or her duty to a patient cannot be determined absent specific information about what the defendant should have done differently. "While a 'fair summary' is something less than a full statement of the applicable standard of care and how it was breached, even a fair summary must set out what care was expected, but not given." 4 S.W.3d at 865 (Taft, J., dissenting). The statement the Palacioses rely upon—that precautions to prevent Palacios' fall were not properly used—is not a statement of a standard of care. Neither the trial court nor American Transitional would be able to determine from this conclusory statement if Dr. Bontke believes that the standard of care required American Transitional to have monitored Palacios more closely, restrained him more securely, or done something else entirely. "It is not sufficient for an expert to simply state that he or she knows the standard of care and concludes it was [or was not] met." *See Chopra v. Hawryluk,* 892 S.W.2d 229, 233 (Tex.App.—El Paso 1995, writ denied). Knowing only that the expert believes that American Transitional did not take precautions to prevent the fall might be useful if American Transitional had an absolute duty to prevent falls from its hospital beds. But as a general rule, res ipsa loquitur does not apply in medical-malpractice cases. TEX.REV.CIV. STAT. ANN.. art. 4590i, § 7.01 (limiting res ipsa loquitur in medical malpractice to the limited classes of cases to which it applied as of August 29, 1977); *Haddock v. Arnspiger,* 793 S.W.2d 948, 951 (Tex.1990).

When the expert report's conclusory statements do not put the defendant or the trial court on notice of the conduct complained of, section 13.01(*l* ) affords the trial court no discretion but to conclude, as the trial court did here, that the report does not represent a good-faith effort to provide a fair summary of the standard of care and how it was breached, as section 13.01(r)(6) requires. And because the statutory 180 day time period had passed when the trial court here made that determination, section 13.01(e) required the court to dismiss with prejudice the Palacioses' claims against American Transitional. *See* TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(e). Accordingly, we reverse the court of appeals' judgment and dismiss with prejudice the Palacioses' claims.

**Parallel Citations**                                             44 Tex. Sup. Ct. J. 720

---

End of Document                                   © 2015 Thomson Reuters. No claim to original U.S. Government Works.

228 S.W.3d 276
Court of Appeals of Texas,
Austin.

AUSTIN HEART, P.A. and David J. Kessler, M.D.,
Appellants,
v.
Christian L. WEBB and Marilou Webb, Appellees.

No. 03–06–00607–CV. | May 9, 2007.

**Synopsis**
**Background:** Patient brought medical malpractice action against physician and physician's professional association alleging that physician failed to diagnose and treat the medical condition which caused patient's severe heart palpitations and other health conditions. Physician and professional association moved to dismiss on the basis that patient's expert report did not identify them as the parties responsible for breaching the standard of care or causing injury to patient. The District Court, 98th Judicial District, Travis County, Paul Davis, P.J., initially granted the motion to dismiss, but, on patient's motion for a rehearing, reversed its ruling to deny the motion to dismiss. Physician and professional association appealed.

**Holdings:** The Court of Appeals, G. Alan Waldrop, J., held that:

[1] patient's expert report was deficient as it did not specifically state that the defendant physician was the physician that breached the relevant standard of care and caused alleged injury to patient, but

[2] patient was entitled to a 30-day extension to cure such deficiencies.

Reversed and remanded.

Jan J. Patterson, J., filed a dissenting opinion.

**Attorneys and Law Firms**

**\*278** Robert L. Hargett, Emily J. Davenport, Davis & Wilkerson, P.C., Austin, for appellant.

James L. Wright, Watts Law Firm, L.L.P., Austin, for appellee.

Before Justices PATTERSON, PEMBERTON and WALDROP.

*OPINION*

G. ALAN WALDROP, Justice.

Austin Heart, P.A. and David J. Kessler, M.D. appeal the district court's order denying their motion to dismiss Christian and Marilou Webb's medical malpractice claims. Austin Heart and Dr. Kessler contend that the expert report served on them pursuant to civil practice and remedies code section 74.351 did not comply with the statute because it did not sufficiently identify either Austin Heart or Dr. Kessler as the parties responsible for the alleged breach of the standard of care or the cause of the alleged injury to Mr. Webb. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351 (West 2005 & Supp.2006). We agree that the plaintiffs' expert report was deficient and that the district court erred in denying the motion to dismiss. However, we are of the view that the cure provisions of section 74.351(c) are designed to allow the plaintiffs an opportunity to address and correct the defect. Consequently, we reverse the district court's order denying the motion to dismiss and remand this cause to the district court to consider whether a 30–day extension of the deadline for serving the report to allow the plaintiffs to address the deficiency is appropriate.

The Webbs sued Austin Heart and Dr. Kessler in January of 2006 alleging that Dr. Kessler failed to "diagnose and treat the medical condition which caused [Mr. Webb's] severe palpitations and resulting associated health conditions." The palpitations and other symptoms described by the Webbs were related to Mr. Webb's pacemaker. On May 31, 2006, the Webbs filed and served the expert report and curriculum vitae of Dr. Alan E. Cororve pursuant to the requirements of section 74.351 of the civil practice and remedies code setting forth Dr. Cororve's opinions regarding Mr. Webb's treatment for his problems with his pacemaker. Austin Heart and Dr. Kessler filed a motion to dismiss on June 21, 2006, claiming that Dr. Cororve's report did not identify either Dr. Kessler or Austin Heart as the parties responsible for breaching the standard of care or causing Mr. Webb injury and, therefore, the report was not a timely report as to them. In response, the Webbs claimed that the report was sufficient as written and, in the alternative, filed a motion for a 30–day **\*279** extension to cure in the event the court found the report deficient.

The district court initially granted the motion to dismiss on August 22, 2006, and did not grant a 30–day extension to allow the plaintiffs to attempt to cure the deficiency. The Webbs filed a motion for rehearing and a motion for new trial on September 15, 2006, arguing that the court had misinterpreted case law relating to what constitutes a sufficient report under section 74.351 and that Dr. Cororve's report was sufficient. They also re-urged their request for a 30–day extension to cure in the event the court denied their motion for rehearing. The district court then reversed its original ruling, granted the motion for rehearing, and entered an order denying the motion to dismiss. This appeal followed.

[1] Section 74.351 requires a claimant pursuing a health care liability claim to serve one or more expert reports on each party no later than the 120th day after the filing of the original petition. *Id.* § 74.351(a). The expert report must provide "a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." *Id.* § 74.351(r)(6). A court shall grant a motion challenging the adequacy of a report only if the report "does not represent an objective good faith effort to comply" with the definition of "expert report" in the statute. *Id.* § 74.351(*l* ). To constitute a good faith effort, the report must provide enough information to fulfill two purposes: (1) it must inform the defendant of the specific conduct the plaintiff has called into question, and (2) it must provide a basis for the trial court to conclude that the claims have merit. *Bowie Memorial Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002) (*citing American Transitional Care Ctrs., Inc. v. Palacios,* 46 S.W.3d 873, 879 (Tex.2001)).

[2] [3] The Texas Supreme Court has also stated that a report need not marshal all of the plaintiff's proof, but it must include the expert's opinion on each of the elements identified in section 74.351. *Palacios,* 46 S.W.3d at 878. A report cannot merely state the expert's conclusions about the statutory elements. *Id.* at 879. "Rather, the expert must explain the basis of his statements to link his conclusions to the facts." *Bowie Memorial,* 79 S.W.3d at 52 (*quoting Earle v. Ratliff,* 998 S.W.2d 882, 890 (Tex.1999)). In addition, since the statute focuses on what is required in the report, the only information relevant to determining whether a report complies with the statute is "within the four corners of the document." *Palacios,* 46 S.W.3d at 878. This requirement precludes a court from filling gaps in a report by drawing inferences or guessing as to what the expert likely meant or intended. *See Bowie Memorial,* 79 S.W.3d at 53 ("The report must include the

required information within its four corners."); *see also Gray v. CHCA Bayshore L.P.,* 189 S.W.3d 855, 859 (Tex.App.-Houston [1st Dist.] 2006, no pet.).

[4] We review a district court's ruling on a motion to dismiss under section 74.351 for an abuse of discretion. *Palacios,* 46 S.W.3d at 877–78. A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner or without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985). A trial court does not abuse its discretion simply because it may decide a matter within its discretion differently than an appellate court. *Id.* at 242. However, a trial court has no discretion in determining **\*280** what the law is or applying the law to the facts. *Walker v. Packer,* 827 S.W.2d 833, 840 (Tex.1992). A clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion. *Id.*

In a single issue, Austin Heart and Dr. Kessler argue that section 74.351(b) mandates dismissal of the Webbs' lawsuit. Their argument is straightforward: Read literally, without any inferences or reliance on information outside of its four corners, Dr. Cororve's report does not identify either Dr. Kessler or Austin Heart as having breached the standard of care or having caused Mr. Webb injury. The Webbs respond that, while the sections of Dr. Cororve's report relating to the breach of the standard of care and causation do not identify any specific physicians, the meaning of the report read as a whole is apparent and reveals that Dr. Cororve is referring to Mr. Webb's treatment by Dr. Kessler.

Dr. Cororve's two and one-half page report is divided into five sections—"Qualifications," "Materials Reviewed and Background," "Standard of Care," "Standard of care not met," and "Causation." In the section titled Materials Reviewed and Background, Dr. Cororve lists the various medical records he reviewed.[1] He then sets out selected portions of these records detailing the relevant aspects of Mr. Webb's history of treatment for a trial fibrillation and palpitations over a period of nearly four years beginning with the placement of his pacemaker in November 2001. This review of Mr. Webb's treatment history includes a number of references to Dr. Kessler's office notes, comments by Dr. Kessler in those notes, complaints by Mr. Webb contained in the notes, a reference to the office notes of a Dr. George Rodgers, an email from Mr. Webb to Dr. Kessler, a response email from Dr. Rodgers,[2] and a general statement that "[Mr. Webb] was seen by various physicians, including several electrophysiological consultations." The background section concludes with the observation that "[f]urther evaluation eventually documented diaphragmatic stimulation and a new right

ventricular lead was placed on September 7, 2005. The patient was subsequently discharged in excellent condition."[3] The background section of the report offers no opinions regarding the appropriateness of the treatment or the responses of the physicians to Mr. Webb's complaints. It is strictly a recitation of historical material contained in the medical records reviewed by Dr. Cororve.

The report then concludes with the following three sections:

### Standard of Care

The standard of care in a patient such as this requires more intensive investigation as to the source of a patient's symptoms and subsequent corrective actions to ameliorate the problem. Attempts at adjusting the ventricular pacing outputs should routinely be attempted and would most likely have pinpointed the problem much earlier. This standard of care was not met.

### Standard of care not met

The diagnostic and corrective action eventually taken, specifically the increase **\*281** in the ventricular pacing output, should have been implemented much sooner.

### Causation

Had the corrective action described occurred, Mr. Webb would not have undergone the physical and mental problem(s) he had and could have continued his normal lifestyle much earlier than he did.

[5] Dr. Kessler and Austin Heart point to these sections and argue that, while they may articulate an opinion on the breach of the standard of care and on causation, the sections do not identify Dr. Kessler as breaching the standard of care or causing injury.[4] The Webbs concede that these sections do not expressly mention Dr. Kessler. They argue, however, that the background section of the report makes it clear Dr. Cororve's opinions relate to Dr. Kessler because it is primarily Dr. Kessler's actions that are noted in the relevant history.[5] Thus, they argue the report should be read to mean that the opinions in the standard of care and causation sections refer to the actions and conduct of Dr. Kessler set out in the background section of the report.

The problem with this argument is that it requires the reader to infer or make an educated guess that Dr.

Cororve is identifying Dr. Kessler as the physician who breached the standard of care and caused injury. Had Dr. Cororve referenced only actions by Dr. Kessler in the background section of his report, the link between Dr. Cororve's opinions and the responsible physician might be more apparent. However, Dr. Cororve also refers to actions taken by Dr. Rodgers and makes a vague reference to Mr. Webb having been "seen by various physicians, including several electrophysiological consultations" after he was treated by Dr. Kessler but before his condition improved.[6] There is nothing *in the report* that links Dr. Kessler to Dr. Cororve's opinions regarding the breach of the standard of care and causation any more than Dr. Rodgers or the other "various physicians" referenced.

The Webbs point out that (1) Dr. Kessler is the only defendant physician and (2) the essence of Dr. Cororve's opinions is that the breach of the standard of care was the failure of the treating physicians, implicitly including Dr. Kessler, to properly adjust the ventricular pacing outputs. **\*282** However, that Dr. Kessler is the only defendant physician is not relevant to an analysis of whether an expert report complies with section 74.351. The fact that he is the only defendant physician and, therefore, very likely to be the subject of the report is outside the four corners of the report. *See Palacios,* 46 S.W.3d at 878. It also does nothing to clarify to whom the opinions of the expert supplying the report apply. The expert's opinions are, of course, confined to the report and must tell the reader not only what conduct breached the standard of care, but whose conduct breached the standard of care. The plaintiffs' allegation that a particular physician was at fault does not substitute for the requirement that they supply an expert report demonstrating that the expert is of the same opinion.

We also do not agree that the substance of Dr. Cororve's opinions could only be associated with the conduct of Dr. Kessler. The essence of Dr. Cororve's opinion is that the physicians who treated Mr. Webb should have adjusted his ventricular pacing outputs sooner and the failure to do so was a breach of the standard of care. This opinion could apply or not apply equally to Dr. Kessler, Dr. Rodgers, or the various unnamed physicians. The report must state, in some manner, who breached the standard of care and who caused the alleged injury, and whether that includes Dr. Kessler. In the words of the supreme court in *Palacios,* "the report must inform the defendant of the specific conduct the plaintiff has called into question." *Palacios,* 46 S.W.3d at 879. This includes informing the defendant of the specific conduct in question *of that defendant. See Palacios,* 46 S.W.3d at 878 (The statute requires, *as to each defendant,* a fair summary of the expert's opinions about the applicable standard of care,

the manner in which the care failed to meet that standard, and the causal relationship between the failure and the claimed injury).

We are mindful that a report's adequacy under section 74.351 does not depend on whether the expert uses any particular magic words such as "the standard of care was breached *by Dr. Kessler." See Bowie Memorial, 79 S.W.3d at 53.* However, the report must communicate in some fashion—within its four corners—how the care rendered by the physician failed to meet the applicable standard of care and the causal relationship between that failure and the injury suffered by the claimant. Tex. Civ. Prac. & Rem.Code Ann. § 74.351(r)(6). We recognize that this information could be communicated in a number of ways and it could be communicated in sections of a report other than sections titled "Standard of Care" or "Causation." The form of the report and the location of the information in the report are not dispositive. However, in this case, Dr. Cororve's report is silent as to whether a single physician, multiple physicians, or all physicians mentioned in the report failed to meet the standard of care and caused injury to Mr. Webb. It simply does not state that the care rendered by Dr. Kessler failed to meet applicable standards and caused injury.

[6] While we are of the view that Dr. Cororve's report is deficient under section 74.351 because it requires the reader to make an educated guess regarding an essential element, we are also aware that the defect might well be curable. The tenor of Dr. Cororve's report, coupled with the fact that there is only one physician defendant, makes it quite likely that Dr. Cororve intended to opine that Dr. Kessler breached the standard of care and caused injury even though the report did not contain that opinion. The report's failure on this point is the kind of defect that the cure provisions of section 74.351(c) were designed **\*283** to address. Since the district court ultimately found the report to be sufficient, the court did not consider whether a 30–day extension of the report deadline to allow the Webbs to attempt to cure a defect would be appropriate. In light of our ruling that the report does contain a defect, we believe consideration by the trial court of the Webbs' request for an extension to attempt to cure the defect is warranted.

Austin Heart and Dr. Kessler argue that *Garcia v. Marichalar,* 185 S.W.3d 70 (Tex.App.-San Antonio 2005, no pet.), supports the proposition that an expert report that references multiple health care providers but fails to delineate the standard of care, breach and causal connection as to specific, individual defendants is tantamount to no report at all with respect to those defendants. They then posit that since Dr. Cororve's report should be considered no report at all as to Dr.

Kessler, the court has no discretion but to dismiss the plaintiffs' claims with prejudice. *See Jernigan v. Langley,* 195 S.W.3d 91, 94 (Tex.2006); *Marichalar,* 185 S.W.3d at 73–74. This overstates the holding in *Garcia.* The physician in *Garcia* was not mentioned in the report at all. There was literally nothing in the report that related to the physician in any way. Thus, the report was no report as to him. The *Garcia* court then held that this was a situation where no expert report was timely filed with respect to the physician in question, precluding the trial court from considering an extension to cure because there was no timely report to cure. 185 S.W.3d at 74 (trial court had no authority to allow a cure period for a nonexistent report).

A closer case is *Jernigan v. Langley,* 195 S.W.3d 91 (Tex.2006). In *Jernigan,* the supreme court noted that a mere "passing reference" to a physician in a report, without explanation of how the physician breached the standard of care or caused the injury, would not constitute a sufficient report. 195 S.W.3d at 94. The only reference to Dr. Jernigan in the report was "[a]t 4:30 p.m. [John Langley's] case was discussed with Dr. Jernigan and at 4:50 p.m. a lactulose enema was ordered." The expert's opinion on breach of the standard of care had to do with the failure to examine certain x-rays. The report did not link Dr. Jernigan or the referenced discussion with Dr. Jernigan to a breach of the standard of care or to the failure to examine x-rays in any way. It made no other mention of him or what he did at all. The supreme court noted that the single reference to Dr. Jernigan in the report was so oblique that there was no connection at all between the reference to him and the expert's opinions regarding the standard of care and causation. It affirmed the trial court's dismissal of the lawsuit based on the insufficiency of the report, stating that "the trial court had no discretion but to conclude, as it did here, that Langley's claims against Dr. Jernigan must be dismissed." *Id.*

The report in *Jernigan,* as in *Garcia,* amounted to no report at all as to Dr. Jernigan and warranted dismissal for failure to serve a timely report. There was no discretion for the court to grant an extension to cure because there was no timely report—with respect to Dr. Jernigan—to cure.[7] Any attempt by the plaintiffs **\*284** to "cure" the reports in *Jernigan* and *Garcia* would, in effect, have been to create and serve new reports—that did not exist at all within the time period for serving reports—with respect to the physicians in question in each case. This is conceptually no different from the situation where a plaintiff simply missed the deadline for serving a report.

*Jernigan* and *Garcia* differ from this case in crucial respects. Here, a timely report plainly discusses the conduct of the physician in question and the report

discusses opinions on the standard of care and causation that could be linked to the conduct of the physician set out in the report, but simply are not. The report is not deficient because it does not relate to Dr. Kessler at all. It is deficient because the link between Dr. Kessler's conduct and the expert's conclusions is not expressly stated. The report in this case is, therefore, some report as to Dr. Kessler (among others), but it is not sufficient to meet all of the requirements of section 74.531. It is an example of what section 74.351(c) refers to as a report that "has not been served within the [120–day period for serving reports] because elements of the report are found deficient." Tex. Civ. Prac. & Rem.Code Ann. § 74.351(c). In such a circumstance, section 74.351(c) grants the trial court discretion to allow a 30–day extension of the deadline "in order to cure the deficiency." *Id. Jernigan* and *Garcia* cannot be read to mean that any deficiency in a report requires dismissal without the possibility of an extension to cure because that would mean section 74.351(c) has no possible application and is superfluous. Section 74.351(c) contemplates that there are circumstances where a timely report will be deficient, but the deficiency can be cured. To be consistent with the statute, *Jernigan* and *Garcia* must be read to allow for at least some situations where a timely report is deficient, but the trial court should consider whether the deficiency is such that it warrants allowing a cure period.[8] *Id.*

**\*285** We are of the opinion that the report in this case falls into that category. It was served timely, it makes more than a passing reference to Dr. Kessler, and it notes conduct by Dr. Kessler that could be linked to the expert's conclusions regarding the breach of the standard of care and causation. It is deficient only because it does not expressly make the link between the expert's conclusions and the referenced conduct by Dr. Kessler. If the expert is of the opinion that Dr. Kessler's conduct breached the standard of care and caused injury, he will not have to generate a new, previously nonexistent report. He will simply have to add the link between his already stated conclusions and the already referenced conduct of Dr. Kessler. Therefore, the circumstances here are not similar to the situation where a plaintiff simply has missed the deadline for serving a report with respect to the conduct of a physician.

We reverse the district court's order denying the motion to dismiss filed by Austin Heart, P.A. and Dr. Kessler and remand this cause for further proceedings.

Dissenting Opinion by Justice PATTERSON.

JAN P. PATTERSON, Justice, dissenting.

While the expert report requirement in medical malpractice cases is designed to weed out frivolous claims, it is not meant to be an insurmountable hurdle. The majority **\*286** raises the bar, however, by requiring a fastidious reading of the report. The expert report proffered by the Webbs may not be a perfect report, but it is clear when viewed as a whole whose conduct is at issue—Dr. Kessler's. I therefore cannot agree that the trial court abused its discretion in finding the report adequate. I would affirm the order of the trial court.

Even assuming the report is merely "some report as to Dr. Kessler (among others)," the remand fashioned by the majority is not appropriate in this case and alters the statutory scheme crafted by the legislature. Austin Heart and Dr. Kessler moved to dismiss the Webbs' lawsuit solely on the ground that the expert report was "no report" and, thus, the trial court had no discretion to consider an extension to cure deficiencies. Having found that the report is indeed some report for which the trial court could have granted an extension, the majority has rejected Austin Heart's and Dr. Kessler's sole ground for dismissal. The appropriate remedy would be a remand to the trial court for the cause to proceed without the need for an extension. For these reasons, I respectfully dissent.

## FACTUAL AND PROCEDURAL BACKGROUND

On January 31, 2006, the Webbs filed suit against Austin Heart and Dr. Kessler, alleging that Dr. Kessler, individually, and Austin Heart, through the actions of Dr. Kessler, negligently failed to diagnose and treat Christian Webb for a medical condition related to his pacemaker that caused him to experience "severe palpitations" and other associated health conditions. On May 31, 2006, the Webbs filed the expert report and curriculum vitae of Dr. Alan Cororve pursuant to section 74.351 of the civil practice and remedies code. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(a) (West Supp.2006). Austin Heart and Dr. Kessler filed a motion to dismiss under section 74.351(b), asserting that the Webbs had failed to file an expert report specifically addressing the standard of care, breach of the standard of care, or causation as to either Austin Heart or Dr. Kessler. *See id.* § 74.351(b). The district court initially granted the motion to dismiss. The Webbs filed a motion for rehearing and motion for new trial, and the district court granted the motions. The district court then denied Austin Heart's and Dr. Kessler's motion to dismiss, and this interlocutory appeal followed.

## ANALYSIS

In their single issue on appeal, Austin Heart and Dr. Kessler argue that dismissal was mandated by section 74.351(b).

### *Abuse of discretion standard*

We review a trial court's ruling on a motion to dismiss under section 74.351(b) for an abuse of discretion. *American Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 877–78 (Tex.2001). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner or without reference to any guiding rules and principles. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985). When reviewing matters committed to the trial court's discretion, we may not substitute our own judgment for that of the trial court. *Walker v. Gutierrez,* 111 S.W.3d 56, 63 (Tex.2003).

### *The expert report requirement*

In a health-care liability claim, the claimant must provide each defendant with one or more expert reports, including a curriculum vitae for each expert, within 120 days of filing the original petition. Tex. Civ. Prac. & Rem.Code Ann. § 74.351(a). An "expert report" is:

> a written report by an expert that provides a fair summary of the expert's **\*287** opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between the failure and the injury, harm, or damages claimed.

*Id.* § 74.351(r)(6). Failure to serve an adequate expert report mandates dismissal with prejudice. *Id.* § 74.351(b). A report need not marshal all of the plaintiff's proof, but it must include the expert's opinion on each of the elements identified in the statute. *Palacios,* 46 S.W.3d at 878. To constitute a good faith effort, the report must inform the defendant of the specific conduct called into question and provide a basis for the trial court to determine that the claims have merit. *Id.* at 879.

The supreme court has stated that "to avoid dismissal, a plaintiff need not present evidence in the report as if it were actually litigating the merits. The report can be informal in that the information in the report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial." *Id.* Because the statute focuses on what the report should discuss, the only information relevant to the inquiry is that which appears within the four corners of the document. *Id.* at 878. When examined in its entirety, an expert report may be so deficient as to a particular defendant that it constitutes no report as to that defendant. *See, e.g., Garcia v. Marichalar,* 198 S.W.3d 250, 255 (Tex.App.-San Antonio 2006, no pet.) (*Garcia II); Garcia v. Marichalar,* 185 S.W.3d 70, 74 (Tex.App.-San Antonio 2005, no pet.) (*Garcia I* ).

### *Dr. Cororve's report*

To satisfy the expert report requirement, the Webbs served Austin Heart and Dr. Kessler with a two-and-one-half-page report from Dr. Cororve. The report begins by stating that "[a]ny reference in this report to Dr. David J. Kessler, M.D. refers to Dr. Kessler individually, and his employer, Austin Heart, P.A."[1] In a section titled "Materials Reviewed and Background," the first paragraph begins, "My opinions are based upon my review of ...," then lists specific medical records and office notes from four medical facilities and five doctors, and states that "[i]n addition, my opinions are based upon my experience, training, knowledge, and qualifications as a physician." The report next discusses Mr. Webb's treatment history following the implantation of his pacemaker on November 30, 2001:

> Subsequent to that procedure, Mr. Webb complained on various occasions concerning his sensing the pacemaker pacing or being aware of forceful heartbeats. To that extent, Dr. Kessler noted on 01/18/02 "possibly diaphragmatic stimulation intermittently." With the office visit of 03/19/03, Dr. Kessler notes this was the second complaint of abdominal twitching. The pacemaker was reduced to see if abdominal symptoms could be relieved with less frequent pacing. On 04/25/03, Dr. Kessler states the patient was aware of pacing intermittently and was suspicious of diaphragmatic stimulation.

**\*288** Dr. Kessler states he had previously assessed this and had not found it to be present. On that day, he tested the pacemaker with various outputs, the patient was aware of pacing at higher outputs, but the doctor did not believe the patient had true diaphragmatic stimulation.

During a pacemaker check performed on 06/08/03, the patient stated he still had "hiccup" feelings in his abdomen, and Dr. Rodgers' office note of 05/06/04 stated the patient had some feelings of hiccup-like discomfort.

On 12/16/04, Dr. Kessler references the patient's ongoing anxiety, use of Xanax and his request for the PCP's assistance managing the anxiety. Mr. Webb's email to Dr. Kessler on 04/27/05 states how the patient's "been suffering two years." The patient's email of 05/04/05 asks if the pacemaker lead might be in the wrong place, and Dr. Rodgers responded "no."[2] Dr. Kessler's note of 05/27/05 states the patient was complaining of palpitations but "I am reluctant to place a new lead at this time."

Subsequent to these events, Mr. Webb continued to have palpitations and problems with diaphragmatic stimulations. He was seen by various physicians, including several electrophysiological consultations. The persistence of his symptoms significantly impaired his quality of life and ability to concentrate at work. Because of this, he was presecribed an anti-depressant and anti-anxiety medication. Further evaluation eventually documented diaphragmatic stimulation and a new right ventricular lead was placed on September 7, 2005. The patient was subsequently discharged in excellent condition.

The report has three final sections setting out the three statutorily required elements:

### Standard of Care

The standard of care in a patient such as this requires more intensive investigation as to the source of a patient's symptoms and subsequent corrective actions to ameliorate the problem. Attempts at adjusting the ventricular pacing outputs should routinely be attempted and would most likely have pinpointed the problem much earlier. This standard of care was not met.

### Standard of care not met

The diagnostic and corrective action eventually taken, specifically the increase in the ventricular pacing output, should have been implemented much sooner.

### Causation

Had the corrective action described occurred, Mr. Webb would not have undergone the physical and mental problem(s) he had and could have continued his normal lifestyle much earlier than he did.

Austin Heart and Dr. Kessler do not challenge the adequacy of the report's description of these three elements; rather, they assert that it is not clear to which doctor they apply because the report mentions five doctors and four health care institutions, but fails to reference any of the providers in the analysis of standard of care, breach and causation. They urge, **\*289** therefore, that Dr. Cororve's report is essentially "no report" as to Austin Heart and Dr. Kessler.

Because Austin Heart and Dr. Kessler do not contest the adequacy of the report's descriptions of the statutorily required elements, the only question before this Court is whether the trial court abused its discretion in determining that the report sufficiently ties Dr. Kessler to the analysis of the statutory elements. From the context and structure of the report, it is clear that Dr. Cororve's listing of the notes and records of the doctors and health care institutions in the "Materials Reviewed" paragraph of the report was not intended to make the doctors or health care institutions themselves the focus of Dr. Cororve's analysis. Thus, the focus is on the section of the report discussing Mr. Webb's medical treatment and the sections setting out the statutorily required elements. In the medical-treatment discussion, only two doctors are named—Dr. Kessler and Dr. Rodgers—and there is one reference to unnamed "various physicians." No doctor is expressly mentioned in the sections addressing the statutorily required elements.

Austin Heart and Dr. Kessler contend that Dr. Cororve's report did not adequately tie Dr. Kessler to the statutory elements, citing this Court to *Jernigan,* 195 S.W.3d 91, *Garcia II,* 198 S.W.3d 250, *Garcia I,* 185 S.W.3d 70, and *Longino v. Crosswhite ex rel. Crosswhite,* 183 S.W.3d 913 (Tex.App.-Texarkana 2006, no pet.). These cases are distinguishable.

In *Jernigan,* the plaintiff filed suit against a hospital and several physicians including Dr. Jernigan. 195 S.W.3d at 92. The plaintiff served two expert reports; however, the first failed to mention Dr. Jernigan at all, and the second mentioned him in only one sentence: "At 4:30 p.m. [the plaintiff's] case was discussed with Dr. Jernigan...." *Id.* at 93. The supreme court concluded that the report was

inadequate as to Dr. Jernigan, stating that "[t]his passing reference does not identify with specificity any action or inaction by Dr. Jernigan that breached the applicable standard of care. This perfunctory mention alleges no misconduct whatsoever, much less discusses the required elements with 'sufficient specificity' to inform Dr. Jernigan of 'the conduct the plaintiff has called into question.' " *Id.* (quoting *Palacios,* 46 S.W.3d at 875).

In *Longino,* the plaintiffs sued two doctors and a hospital for failing to diagnose their child's bacterial meningitis sooner. 183 S.W.3d at 915. The plaintiffs served a single expert report that did not distinguish between the actions of the two doctors. *Id.* at 917. The report stated that, "[i]n consultation with Dr. James Longino," Dr. Cameron ordered tests and admitted the plaintiffs' child to the hospital, and in the discussion of the standard of care, the report stated that

> Dr. Cameron['s] and Dr. Longino's care of [the plaintiffs' child] fell below the standard of care.... Their failure to either recognize or acknowledge the obvious symptoms of fever, altered mental status, and neck pain; to perform a timely diagnostic lumbar puncture; and to aggressively treat [the child's] bacterial meningitis with an appropriate combination of antibiotics led to an unnecessary exacerbation of his symptoms.

*Id.* The court concluded that the report contained "no specific information concerning how Longino breached the standard of care apart from Cameron's conduct," and therefore did not demonstrate a good-faith effort as to Longino. *Id.*

In the *Garcia* cases, the plaintiff filed suit against three doctors, two nurses, and a hospital. *Garcia II,* 198 S.W.3d at 252. The plaintiff served two expert reports, but neither report mentioned Dr. Garcia at **\*290** all. *Id.* Dr. Garcia filed a motion to dismiss the claims against him asserting that he had not been "served" with a report. *Id.* The trial court initially granted the motion, but later dissolved its order and granted the plaintiff a 30–day extension to cure any deficiencies in the report. *Id.* In *Garcia I,* the appellate court addressed the extension, distinguishing situations in which a deficient report is filed from those in which no report is filed—a trial court has discretion to grant a 30–day extension in the former situation, but not the latter. 185 S.W.3d at 73. Because the reports served by the plaintiff focused on the acts of other defendants and failed to mention Dr. Garcia at all, the court

concluded that Dr. Garcia had not been served with a report and, thus, the trial court did not have authority to grant the extension. *Id.* at 74. In *Garcia II,* the appellate court addressed Dr. Garcia's motion to dismiss. 198 S.W.3d 250. The court concluded that "neither report informed Dr. Garcia of the specific conduct he allegedly performed that [the plaintiff] had called into question," and, thus, the expert reports did not constitute a good-faith effort to comply with the statutory requirements. *Id.* at 255. The court therefore held that the trial court abused its discretion in denying Dr. Garcia's motion to dismiss, and the cause was remanded with instructions to the trial court to render judgment dismissing the claims against Dr. Garcia with prejudice and to award him his reasonable attorney's fees and costs of court. *Id.* at 256 (citing Tex. Civ. Prac. & Rem.Code Ann. § 74.351(b)).

Unlike *Jernigan, Longino,* and *Garcia,* in this case, the Webbs have filed a lawsuit complaining of the actions of only one doctor, Dr. Kessler, and their expert report is not one in which they mentioned him only in passing, in connection only with another doctor, or not at all. Instead, he is the subject of the majority of the report and is named eleven times.[3] The first paragraph, which states that any reference to Dr. Kessler refers to him individually and to his employer, Austin Heart, may be fairly read as signaling that the report is about Dr. Kessler. In addition, Dr. Cororve's description of Mr. Webb's medical history covers five visits with and one e-mail to Dr. Kessler spanning two and one half years in which Dr. Kessler noted the following: "possibly diaphragmatic stimulation intermittently," a second complaint about abdominal twitching, Mr. Webb's awareness of pacing intermittently and suspicion of diaphragmatic stimulation, Mr. Webb's awareness of pacing at higher outputs, disbelief that the patient had true diaphragmatic stimulation, Mr. Webb's ongoing anxiety and request for assistance managing the anxiety, and Mr. Webb's complaining of palpitations, but "I am reluctant to place a new lead at this time." The report's two references to comments from Dr. Rodgers—a notation that the patient had some feelings of hiccup-like discomfort and a response of "no" to Mr. Webb's e-mail asking if the lead might be in the wrong place—as well as the single reference to unnamed "various physicians," do not obscure the report's focus on the actions of Dr. Kessler. In addition, unlike *Longino,* the actions of the two doctors named are distinguishable.

Dr. Cororve's analysis of the statutory elements states that the standard of care required "more intensive investigation," "[a]ttempts at adjusting the ventricular pacing outputs should routinely be attempted," and "[t]he diagnostic and corrective **\*291** action eventually taken, specifically the increase in the ventricular pacing output, should have been implemented much sooner." In the

discussion of Mr. Webb's medical history earlier in the report, it appears that both Dr. Kessler and Dr. Rodgers investigated Mr. Webb's symptoms; however, only Dr. Kessler is named in connection with testing and making adjustments to the pacemaker. In addition, Dr. Kessler's notations contradict what Dr. Cororve states is the standard of care. According to Dr. Cororve's report, Dr. Kessler "did not believe the patient had true diaphragmatic stimulation" however, "[f]urther evaluation eventually documented diaphragmatic stimulation and a new right ventricular lead was placed." Under "Standard of Care," Dr. Cororve states that "[a]ttempts at adjusting the ventricular pacing outputs should routinely be attempted and would most likely have pinpointed the problem much earlier." After reviewing the report in its entirety, I cannot conclude that the trial court abused its discretion in determining that the report represents a good-faith effort to address the actions of Dr. Kessler.

### *The Remand*

The majority concludes that Dr. Cororve's report is deficient and remands this cause to the district court to consider whether a 30–day extension is appropriate to address the deficiency. This remedy is inappropriate because it provides relief to Austin Heart and Dr. Kessler on a ground not raised in the trial court or on appeal. *See* Tex.R.App. P. 33.1.

Austin Heart and Dr. Kessler challenged Dr. Cororve's report solely on the ground that it was "no report," not that it was a "deficient report."[4] The difference between the two is strategically significant. If the report is "no report," then the trial court *must* dismiss the case with

prejudice and has no discretion to grant a 30–day extension. Tex. Civ. Prac. & Rem.Code Ann. § 74.351(b)-(c); *Garcia I,* 185 S.W.3d at 73. Yet, if the report is merely "deficient" (and timely filed, as here), the trial court is not required to immediately dismiss and has discretion to grant a 30–day extension to cure the deficiencies. Tex. Civ. Prac. & Rem.Code Ann. § 74.351(c).

Austin Heart and Dr. Kessler elected to move for dismissal solely on the ground that the report was "no report."[5] Having concluded that the report is "some report as to Dr. Kessler (among others)," the majority has rejected the sole ground for dismissal. As such, the appropriate remedy would be a remand to the trial court for the cause to proceed without the need for an extension.

### CONCLUSION

In summary, I disagree with the majority's holding that the trial court abused its **\*292** discretion in finding that the expert report proffered by the Webbs adequately links Dr. Kessler to the elements of standard of care, breach of the standard, and causation. I would affirm the order of the trial court. I further disagree with the remedy fashioned by the majority because it grants relief to Austin Heart and Dr. Kessler on a ground that they did not raise in the trial court or on appeal. For these reasons, I respectfully dissent.

Footnotes

[1]    These included records of five physicians, three hospitals, and a clinic.

[2]    In their brief, the Webbs state that the email response was actually by Dr. Kessler rather than Dr. Rodgers and the reference in the report is a typographical error. However, there is no evidence in the record on this point other than Dr. Cororve's report.

[3]    The report does not mention who was responsible for the diagnosis of diaphragmatic stimulation or placing a new right ventricular lead.

[4]    Austin Heart, P.A. is alleged to be vicariously liable for the conduct of Dr. Kessler. Dr. Cororve's report notes at the outset that "[a]ny reference in this report to David J. Kessler, M.D. refers to Dr. Kessler individually, and his employer, Austin Heart, P.A." Consequently, for the purposes of this appeal, the report must link Dr. Cororve's opinions to the actions of Dr. Kessler.

[5]    The Webbs suggest that a tally of the number of times a physician is mentioned in a report is significant. They note that Dr. Kessler's name appears eleven times in Dr. Cororve's report (as opposed to three times for Dr. Rodgers and once for "various physicians"). They argue that this could lead to a reasonable conclusion that the report must be about Dr. Kessler and his actions. However, we are not persuaded that such a tally is relevant to the analysis. A physician may be named in a report any number of times simply because he was intimately involved in the treatment of a patient, yet the complaint may be with the conduct of a physician who saw the patient only once and is mentioned in the report only once. The number of times a physician

is mentioned in a report, by itself, has little bearing on whether the opinions expressed in the report concern that physician. What matters, of course, is how the physician is mentioned and what the report communicates about that physician.

6      It is not clear what the reference to "various physicians" and "electrophysiological consultations" in the report means or is intended to communicate.

7      *Jernigan* interpreted a prior version of the statute that had a different standard for granting an extension to cure. Under the previous iteration of the statute, the trial court could grant an extension only if it found that the failure to comply with the statute was "not intentional or the result of conscious indifference but was the result of an accident or mistake." *See* former Tex.Rev.Civ. Stat. Ann. art. 4590i, § 13.01(g) *repealed by* Acts 2003, 78th Leg., ch. 204, § 10.09, eff. Sept. 1, 2003. The *Jernigan* opinion does not discuss the application of this standard, the trial court's failure to grant an extension under this standard, or whether the trial court could have considered such an extension if it had made such findings. Thus, the *Jernigan* opinion is distinguishable from this case on this basis alone. However, even if the trial court's discretion to dismiss claims under either version of the statute is viewed as the same, the expert report in *Jernigan* would still constitute "no report" for the purposes of dismissal under either version of the statute.

8      The dissent argues that by remanding to allow the trial court to consider whether a section 74.351(c) extension is appropriate we are granting Dr. Kessler and Austin Heart more relief than they requested or are entitled to. The dissent's theory is that there is a distinction under section 74.351 between (1) seeking dismissal on the basis that no report was served and (2) seeking dismissal on the basis that a report was served, but it does not meet the requirements of the statute and is deficient. According to the dissent, if a defendant seeks dismissal only on the basis that no report was served, then dismissal is not appropriate if the court finds that a report, no matter how deficient, was served. There are two problems with this theory.

First, the dismissal mechanism of section 74.351 does not work the way the dissent suggests. Under section 74.351, a claimant must serve an "expert report," as defined in the statute, or be subject to dismissal. If a claimant does not serve a report that complies with the statutory requirements, then the claimant has not served an "expert report" as defined in the statute. Whether a claimant actually fails to serve a report at all or serves a deficient report the effect under section 74.351(b) is the same—the claimant has failed to serve the required "expert report" and dismissal is the remedy. However, section 74.351(c) provides a potential cure period for situations where the claimant has served a report, but the report does not constitute the required "expert report" because "elements of the report are found deficient." The claimant then has an opportunity to fix the defect in the report that was served. If there is a failure to cure the defect by the extended deadline, then dismissal is mandatory because the claimant has failed to serve an "expert report" as defined in the statute.

While section 74.351(b) does not distinguish between a complete failure to serve a report and the failure to serve a complying report, there is a distinction between the two for the purposes of 74.351(c). When a claimant fails to serve a report at all, section 74.351(c) does not provide a basis for the trial court to grant any extension of the deadline for serving a report. Consequently, dismissal is mandatory without any cure period. When a claimant serves a report, but it is deficient, section 74.351(c) gives the trial court the discretion to grant an extension to cure. Regardless of whether a claimant has failed to serve a report at all or has served a deficient report, the statutory basis of the motion to dismiss by a defendant is the same—the claimant has failed to serve an "expert report" as required by section 74.351(b). The fact that the claimant who files a deficient report may request and receive an extension of time to cure the deficiencies does not alter the nature of the defendant's motion to dismiss. The motion to dismiss is on the ground that the plaintiff has failed to serve an "expert report."

Second, the defendants in this case did request dismissal on the basis that, while the Webbs had served a report that mentioned Dr. Kessler, the report "fails to address the standard of care applicable to Dr. Kessler, the breach of the standard or any alleged causal link." This is an allegation that the report served was deficient. The defendants acknowledge that a report was served and that the report addresses conduct of Dr. Kessler, but they claim it is deficient in failing to address the statutorily required elements. They are aware that section 74.351(c) grants the trial court some discretion in allowing an extension to cure certain deficient reports. But, they argue that the report in this case is so deficient that it should be viewed as "no report," requiring dismissal rather than remand for consideration of an extension period. By alleging that the deficiency is severe enough to constitute "no report" the defendants are trying to avoid the possibility of a cure period. They are not altering their claim that the report they received is deficient and will require dismissal if not corrected.

We have concluded that the report is deficient, but not so deficient as to constitute "no report." Therefore, our options are (1) reverse the trial court order denying the motion to dismiss and render judgment of dismissal or (2) reverse the trial court order and remand for consideration of whether an extension should be granted to give the plaintiffs an opportunity to attempt to cure. Remanding for the case to proceed on its merits, even though we agree with the appellants that the report is deficient, is not an option.

1      While Dr. Cororve's report explicitly mentions Austin Heart, the Dallas court of appeals has held that when a defendant is only alleged to be vicariously liable for the negligence of another defendant, the expert report need not specifically name or address the negligence of the defendant to whom liability will be imputed. *University of Tex. Southwestern Med. Ctr. v. Dale,* 188 S.W.3d 877, 879 (Tex.App.-Dallas 2006, no pet.). What is relevant is that the report specifically identify the person whose conduct the plaintiff is calling into question and show how that person's conduct constituted negligence. *Id.*

2    Earlier in the report, under the materials reviewed section, Dr. Cororve refers to an e-mail from Mr. Webb to Dr. Kessler dated 05/04/05. In their brief on appeal, the Webbs assert that the report erroneously attributes the response to that e-mail as being from Dr. Rodgers when it was actually from Dr. Kessler. There is, however, no evidence in the record indicating who sent the e-mail.

3    While it is true that the number of times a physician is named, by itself, does not indicate the report complains of that physician's conduct, it is more likely that a report discussing mainly the conduct of one physician is about the conduct of that physician.

4    The motion to dismiss clearly distinguishes the two scenarios, stating:

> This is not an occasion in which a report was served on Austin Heart, P.A. or David J. Kessler, M.D. wherein the expert failed to address a requisite element, such as the standard of care, the alleged breach of the standard, or the alleged causal link, thus making the report deficient. Here, the report constitutes no report at all.

Thus, Austin Heart and Dr. Kessler did not, as the majority contends, "argue that the report in this case is so deficient that it should be viewed as 'no report.' "

5    The remand fashioned by the majority grants Austin Heart and Dr. Kessler relief not requested because the majority treats their motion to dismiss as if it were based on two grounds: (1) that the report was "no report" and (2) that even if the report was some report that it was deficient. Austin Heart's and Dr. Kessler's motion, however, was based solely on the first ground. Without a motion to dismiss based on *deficiency,* there is no basis for a finding of deficiency and no need for a 30–day extension "to cure the deficiency." *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(c).

---

**End of Document**                                      © 2015 Thomson Reuters. No claim to original U.S. Government Works.

---

257 S.W.3d 354
Court of Appeals of Texas,
Austin.

Mark D. BOGAR, M.D., Appellant
v.
Dolores G. ESPARZA, Individually and as
Administrator of the Estate of Katherine G.
Guerrero; Deceased; Fernando Guerrero; Sofia G.
Butschy; Gilberto Guerrero; Antonio Guerrero;
Rosie G. Garza; Benito Guerrero; Josey G. Selvera;
and Frances G. Faz, Appellees.

No. 03–07–00037–CV. | May 16, 2008.

**Synopsis**
**Background:** Survivors of deceased patient brought medical malpractice action against patient's physician and hospital after patient died from post-surgery pharmaceutical drug overdose. Physician and hospital filed a joint motion for dismissal and attorney fees based on survivors' alleged failure to file an expert report that complied with statutory requirements. The Probate Court No. 1, Travis County, Guy S. Herman, J., denied the motion for dismissal. Physician appealed.

**Holdings:** On denial of rehearing, the Court of Appeals, Bob Pemberton, J., held that:

[1] statute allowed physician to file an interlocutory appeal from trial court's denial of the motion to dismiss;

[2] expert report failed to comply with the statutory requirements, entitling physician to sanction;

[3] the expert report constituted "no report" as to physician, such that dismissal of the action against him was required without any opportunity to cure the report; and

[4] discovery limitations set forth in expert-report statute did not deny survivors due process.

Reversed, rendered, and remanded in part.

Jan P. Patterson, J., filed a dissenting opinion and dissented from the denial of en banc reconsideration.

Diane Henson, J., filed dissenting opinion on denial of motion for en banc reconsideration.

**Attorneys and Law Firms**

**\*357** Carla Garcia Connolly, Connolly & Castagna, L.L.P., Austin, for Appellant.

Robert C. Alden, Don L. Davis, Byrd, Davis & Furman LLP, Austin, Stephen B. Pershing, Center for Constitutional Litigation, P.C., Washington, DC, for Appellees.

Before Justices PATTERSON, PEMBERTON and WALDROP.

*OPINION*

BOB PEMBERTON, Justice.

We withdraw our opinion, dissenting opinion and judgment dated June 28, 2007 and substitute the following in its stead. We overrule the Appellees' Motion for Rehearing.

We again address issues arising from the expert report requirements of section 74.351 of the civil practice and remedies code. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351 (West Supp.2006). Appellant Mark D. Bogar, M.D. appeals the probate court's denial of his motion to dismiss appellees' health care liability claims under section 74.351(b) for failure to serve an expert report. Their appeal requires us to consider (1) whether we have subject-matter jurisdiction to consider it; (2) whether appellees served the required expert report; and, if not, (3) the appropriate appellate remedy. We conclude that we have jurisdiction over Dr. Bogar's interlocutory appeal and that the controlling law and "four corners" of appellees' report leave us no alternative but to reverse and render judgment dismissing appellees' claim and awarding attorney's fees and costs. *See id.* § 74.351(b). In their motion for rehearing and en banc **\*358** reconsideration, appellees have urged that our application of section 74.351 violates due process and due course of law. We disagree, for reasons we will explain herein. We will remand to the probate court to determine the amount of attorney's fees to which Dr. Bogar is entitled.

## BACKGROUND

Appellees sued Dr. Bogar and Healthsouth on May 1, 2006, alleging negligence in connection with medical care provided to Katherine R. Guerrero by Dr. Bogar and the "agents, servants, employees, representatives, and staff" of Healthsouth Rehabilitation Hospital of Austin between December 28, 2004, and January 12, 2005, when Ms. Guerrero died. Appellees alleged that following surgery, Ms. Guerrero was placed under the care of Dr. Bogar and Healthsouth and, in the course of her rehabilitative treatment, was given a fatal overdose of pharmaceutical products. Appellees pleaded that an autopsy report from the Travis County Medical Examiner concluded that Ms. Guerrero "died as a result of an overdose of oxycodone and propoxyphene."

On or around June 6, 2006, Appellees served on Dr. Bogar and Healthsouth an expert report prepared by Dr. Jesse Adame that purported to comply with the requirement of subsection 74.351(a). *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(a) ("In a health care liability claim, a claimant shall, not later than the 120th day after the date the claim was filed, serve on each party or the party's attorney one or more expert reports ... for each physician or health care provider against whom a liability claim is asserted."). Both defendants timely filed objections to the sufficiency of Dr. Adame's report. *See id.* ("Each defendant physician or health care provider whose conduct is implicated in a report must file and serve any objection to the sufficiency of the report not later than the 21st day after the date it was served, failing which all objections are waived."). Each defendant contended that Dr. Adame's report failed to satisfy the statutory definition of an "expert report" by failing to provide a fair summary of the expert's opinions regarding applicable standards of care, the manner in which the care rendered by each defendant failed to meet the standards, and the causal relationship between such failure and Ms. Guerrero's death. *See id.* § 74.351(a), (*l* ), (r)(6). Further, Dr. Bogar urged that Dr. Adame, a pathologist, had failed to demonstrate that he was an "expert" qualified to render opinions concerning the standards of care applicable to Dr. Bogar, a physical medicine rehabilitation physician. *See id.* § 74.351(r)(5), § 74.401 (West 2005).

Subsequently, after appellees' 120–day deadline for serving their expert reports expired, *see id.* § 74.351(a), Dr. Bogar and Healthsouth filed a joint motion seeking dismissal with prejudice, attorney's fees and costs for failure to file an expert report complying with section 74.351. *See id.* § 74.351(b). Dr. Bogar later filed an amended motion to dismiss adding his earlier challenge to Dr. Adame's qualifications. On January 10, 2007, the probate court denied the dismissal motions.

Both Dr. Bogar and Healthsouth timely filed notices of interlocutory appeal. In the interim, Healthsouth settled with appellees. We accordingly address only the appellate issues presented by Dr. Bogar.

## ANALYSIS

In a single issue, Dr. Bogar argues that the probate court abused its discretion in denying his motion to dismiss and request for attorney's fees and costs. In addition to disputing the merits of this contention, appellees have filed a motion to dismiss **\*359** Dr. Bogar's interlocutory appeal for want of jurisdiction, contending that no statute authorizes him to appeal the order he seeks to challenge.

### Jurisdiction

[1] Appellate courts generally have subject-matter jurisdiction only over appeals from final judgments and have jurisdiction over appeals of interlocutory orders only when that authority is explicitly granted by statute. *Academy of Oriental Med., L.L.C. v. Andra,* 173 S.W.3d 184, 185 (Tex.App.-Austin 2005, no pet) (citing *Stary v. DeBord,* 967 S.W.2d 352, 352–53 (Tex.1998)). Section 51.014(a) of the civil practice and remedies code authorizes an interlocutory appeal from two types of orders regarding expert reports under chapter 74. First, an interlocutory appeal may be taken from an order that "denies all or part of the relief sought by a motion under Section 74.351(b), except that an appeal may not be taken from an order granting an extension under Section 74.351(c)." Tex. Civ. Prac. & Rem.Code Ann. § 51.014(a)(9) (West Supp.2006). Second, an interlocutory appeal may be taken from an order that "grants relief sought by a motion under Section 74.351(*l* )." *Id.* § 51.014(a)(10).

[2] Appellees assert that the order from which Dr. Bogar seeks to appeal is neither of these. They suggest that "the relief sought by a motion under Section 74.351(b)" is available only where a claimant has failed to timely file an instrument purporting to be an "expert report" by the 120–day deadline of subsection (a), not when a purported "expert report" is timely filed but is found to be inadequate. *See id.* § 74.351(b) ("If ... an expert report has not been served within the period specified by Subsection (a)...."). Here, appellees maintain, there is no dispute that "the expert report of Dr. Adame was served within the required period of time." Appellees further assert that challenges to the adequacy or sufficiency of expert

reports, as contrasted with their absence or timeliness, are governed exclusively by section 74.351(*l* ). Section 74.351(*l* ) states that "[a] court shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report in Subsection (r)(6)." *Id.* § 74.351(*l* ). Because Dr. Bogar's motion, in appellees' view, is "a motion under section 74.351(*l* )," they assert that his right of interlocutory appeal is controlled by section 51.014(a)(10) rather than (a)(9), and no appeal is available from the probate court's order denying him relief. *See id.* § 51.014(a)(10) (permitting appeal from an order that "*grants* relief sought by a motion under Section 74.351(*l* )") (emphasis added). They equate this case to *Academy of Oriental Medicine, L.L.C. v. Andra,* where we held that an order denying a motion challenging the sufficiency of an expert report was governed by section 74.351(*l* ) rather than section 74.351(b) and that "[b]ecause this appeal challenges an order that is neither an order denying the relief sought by a motion under § 74.351(b) nor one granting relief sought by a motion under § 74.351(*l* ), we lack jurisdiction to hear it." 173 S.W.3d at 186–89. We disagree with appellees' views of section 74.351 and *Andra.*

[3] Under section 74.351(b), as the supreme court has recently explained, a plaintiff may fail to "serve" an "expert report" within the period specified by Subsection (a) not only by failing to serve any expert report within that deadline (an "absent report"), but also by failing to provide a report within the deadline that satisfies the statutory requirements for "expert reports" (a "deficient report"). *See Ogletree* **\*360** *v. Matthews,* No. 05–0502, —– S.W.3d ——, —— & n. 2, 2007 WL 4216606, at *2–3 & n. 2, 2007 Tex. LEXIS 1028, at *6–8 & n. 2, (Tex. Nov. 30, 2007); *Austin Heart P.A. v. Webb,* 228 S.W.3d 276, 284 (Tex.App.-Austin 2007, no pet.); *Apodaca v. Russo,* 228 S.W.3d 252, 257–58, (Tex.App.-Austin 2007, no pet.); *cf. Walker v. Gutierrez,* 111 S.W.3d 56, 61 (Tex.2003) (dismissal under former article 4590i warranted for "failure to comply" with report deadline by either failure to file or failure to file adequate report). This conclusion is apparent from the text and structure of section 74.351. Subsection (a) requires the claimant to file one or more "expert reports" not later than the 120th day after the date the original petition was filed, and subsection (b) mandates sanctions "[i]f, as to a defendant physician or health care provider, an expert report has not been served within the period specified by Subsection (a)." "Expert report" is defined within section 74.351 as: "a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care

provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." Tex. Civ. Prac. & Rem.Code Ann. § 74.351(r)(6); *see id.* § 74.351(r)(5) (definition of "expert"). Thus, if the report does not comply with subsection (r)'s "expert report" definition, it does not satisfy the claimant's requirement under subsection (a) and exposes the claimant to potential sanctions under (b), including dismissal.

Subsection (c), however, provides that "[i]f an expert report *has not been served* within the period specified by Subsection (a) because *elements of the report are found deficient,*" the trial court is afforded discretion to grant a single 30–day extension "in order to cure the deficiency." Tex. Civ. Prac. & Rem.Code Ann. § 74.351(c) (emphases added); *See Ogletree,* 262S.W.3d at ——, 2007 WL 4216606, at *2–3, 2007 Tex. LEXIS 1028, at *7–8 ("the Legislature recognized that not all initial timely served reports would satisfy each of the statutory criteria. As a result, the [2003] amendments explicitly give trial courts discretion [in subsection (c) ] to grant a thirty-day extension so that parties may, where possible, cure deficient reports.... In this important respect, a deficient report differs from an absent report."). Conversely, "[i]f no report is served within the 120–day deadline provided by 74.351(a)—i.e., an 'absent report'—the Legislature denied trial courts the discretion to deny motions to dismiss or grant extensions." *Ogletree,* 262S.W.3d at ——–, 2007 WL 4216606, at *2, 2007 Tex. LEXIS 1028, at *6; *see also id.* at —— & n. 2, 2007 WL 4216606, at *2 & n. 2, at *7 & n. 2 ("section 74.351's language is somewhat confusing, as the statute uses the phrase "has not been served" to refer both to deficient and absent reports.").

The supreme court also reiterated the concept that a report served within the 120–day deadline that fails entirely to implicate the conduct of a defendant is not merely deficient, but is in effect an absent report or no report as to that defendant. *See id.* at —— – ——, 2007 WL 4216606, at *2–3, at *6–8 (citing with approval *Garcia v. Marichalar,* 185 S.W.3d 70, 73 (Tex.App.-San Antonio 2005, no pet.) for the principle that an "expert report" that mentioned other providers but not Garcia was in effect no report as to Garcia and concluding that an extension was, therefore, improper); *cf. Austin Heart,* 228 S.W.3d at 284 (holding that timely report that "plainly discusses the conduct of the physician in question" but was deficient in failing to explicitly link the physician to the **\*361** report's stated opinions regarding standard of care and causation was potentially curable and should be remanded for consideration of whether a subsection (c) extension should be granted).

Recently, the Texas Supreme Court has laid to rest any question as to whether the availability of interlocutory review of an order denying relief under section 74.351(b) differs depending on whether the motion's grounds relate to (1) the absence of any timely-served expert report, (2) a timely expert report that is nonetheless not "served" on a defendant because it is deficient as to one or more statutory criteria, or (3) a timely expert report that is effectively "no report" as to a defendant because it fails to implicate that defendant's conduct. The supreme court concluded, as we did on original submission, that it does not. *See Lewis v. Funderburk,* 253 S.W.3d 204, 207–08 (Tex.2008). A potential limitation on this right to appeal exists, however, where a timely expert report implicates a defendant's conduct: the trial court, in its discretion, may grant an extension under section 74.351(c), in which case the order denying the motion under section 74.351(b) is not appealable. Tex. Civ. Prac. & Rem.Code Ann. §§ 51.014(a)(9), 74.351(b)-(c); *see Ogletree,* 262 S.W.3d at ——, 2007 WL 4216606, at * 3–4, 2007 Tex. LEXIS 1028, at *6–8 ("If no report is served within the 120 day deadline provided by 74.351(a), the Legislature denied trial courts the discretion to dismiss or grant extensions, and a trial court's refusal to dismiss may be immediately appealed.... [But] even when a report is deemed not served because it is deficient, the trial court retains discretion to grant a thirty-day extension, and the Legislature explicitly stated that such orders are not appealable.... [I]f a deficient report is served and the trial court grants a thirty-day extension, that decision—even if coupled with a denial of a motion to dismiss—is not subject to appellate review."). In other words, an order denying relief under subsection (b) is immediately appealable unless the trial court has discretion under subsection (c) to grant a 30–day extension and actually does so.

Here, Dr. Bogar filed objections to Dr. Adame's expert report within 21 days of service, *see* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(a), and a motion, after the 120–day deadline had expired, explicitly invoking subsection (b) and asserting that the probate court should dismiss appellees' claim against him with prejudice and award attorney's fees and costs for failure to file "a statutorily defined expert report" by the deadline. *See id.* § 74.351(b). The probate court denied that motion without granting an 30–day extension. *Id.* § 74.351(b), (c). That order "denies all or part of the relief sought by a motion under Section 74.351(b)," and we have subject-matter jurisdiction to adjudicate Dr. Bogar's appeal from that order. *Id.* § 51.014(a)(9); *see Lewis,* 253 S.W.3d at 207; *Ogletree,* 262 S.W.3d at ——, 2007 WL 4216606, at *2–3, 2007 Tex. LEXIS 1028, at *6–8; *Andra,* 173 S.W.3d at 186–87. We accordingly deny appellees' motion to dismiss Dr. Bogar's appeal.

**Dr. Adame's report**

We turn now to Dr. Bogar's issue. Dr. Bogar asserts that the probate court abused its discretion in denying his section 74.351(b) motion because appellees failed to "serve" him with an expert report. Specifically, Dr. Bogar urges that (1) Dr. Adame's report did not represent a good faith effort to comply with the statutory requirements for "expert reports" and, in fact, constituted no report as to him; and (2) Dr. Adame, as a pathologist, was not qualified as an "expert" to evaluate Dr. Bogar's performance as a rehabilitative **\*362** medicine specialist. We need not reach the latter contention because we agree that Dr. Adame's report was deficient with regard to the statutory requirements for expert reports.

[4] [5] [6] As noted above, the "expert report" or reports that a health care liability claimant must serve under section 74.351(a) must provide "a fair summary of the expert's opinion as of the date of the report regarding the applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." Tex. Civ. Prac. & Rem.Code Ann. § 74.351(r)(6). A trial court, again, must grant a motion challenging the adequacy of a report only if the report "does not represent an objective good faith effort to comply" with this definition of "expert report." *Id.* § 74.351(*l* ). To constitute a "good faith effort," the report must provide enough information to fulfill two purposes: (1) it must inform the defendant of the specific conduct the plaintiff has called into question; and (2) it must provide a basis for the trial court to conclude that the claims have merit. *Austin Heart,* 228 S.W.3d at 279 (citing *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002); *American Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 879 (Tex.2001)). Although a report need not marshal all of a claimant's proof, it must include the expert's opinion on each of the elements identified in section 74.351. *Id.* (citing *Palacios,* 46 S.W.3d at 878). It is not enough for the report merely to state the expert's conclusions about the statutory elements. *Id.* (citing *Palacios,* 46 S.W.3d at 879). "Rather, the expert must explain the basis of his statements to link his conclusions to the facts." *Id.* (quoting *Bowie Mem'l,* 79 S.W.3d at 52) (quoting *Earle v. Ratliff,* 998 S.W.2d 882, 890 (Tex.1999)).

[7] Importantly, because the statute dictates what is required in the report, the only information relevant to determining whether a report complies with the statute is that within "the four corners" of the report. *Id.* (citing

*Palacios,* 46 S.W.3d at 878). This requirement "precludes a court from filling gaps in a report by drawing inferences or guessing as to what the expert likely meant or intended." *Id.* (citing *Bowie Mem'l,* 79 S.W.3d at 53).

[8] We review a trial court's ruling on a section 74.351(b) motion under an abuse of discretion standard. *Palacios,* 46 S.W.3d at 877–78. A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner or acts without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241 (Tex.1985). A clear failure by the trial court to analyze or apply the law correctly also constitutes an abuse of discretion. *Walker v. Packer,* 827 S.W.2d 833, 840 (Tex.1992).

The document prepared by Dr. Adame recites his qualifications and concludes that "I am qualified based on my education, training and experience to offer an expert opinion regarding the cause and mechanism of death of Mrs. Katherine Ramirez Guerrero. As a pathologist, I am familiar with the standard of care required of physicians not to prescribe drugs either alone or in combination that will cause a fatal overdose." "Such conduct," Dr. Adame adds, "falls below the standard of care required of physicians."

Dr. Adame then lists the medical records and other materials he had reviewed, and summarizes Ms. Guerrero's medical history. Dr. Adame notes that Ms. Guerrero was 76 years of age, and had a "past medical history of hyperlipidemia, **\*363** osteoarthritis, poorly controlled hypertension, and chronic dizziness." He recounts that Ms. Guerrero had complained of left hip pain following a December 25, 2004 fall and had been "admitted to Seton/Brackenridge Hospital after is was determined that she had a nondisplaced fracture of the left femur," but "[i]t was also determined at that time, that no surgical intervention was needed." Adame then states:

> Her medical problems and rehabilitation were managed by HealthSouth Rehabilitation Hospital of Austin. She was transferred to that facility on December 28, 2004. She was placed on a Duragesic patch at 25 mcg on December 29, 2004. It was increased to 50 mcg on December 30, 2004 because of continued significant pain. She was also given her usual home medications including Doxepin, Norvasc, Zescril, Tenormin, and Imdur. Because of significant drowsiness

with the Duragesic patch, her dose was reduced back to 25 mcg. She was also given Protonix for gastrointestinal prophylaxis. Despite a fairly stable hospital course, her pain increased. On January 7, 2005, after her records were reviewed and she was cleared for surgery, she was taken to the operating room at Seton/Brackenridge Hospital for open reduction and internal fixation of her left femur. Her surgery went well and she was transferred back to HealthSouth Rehabilitation Hospital of Austin on January 8, 2005. She resumed her medical regimen along with physical and occupational therapy. Her pain persisted and she was taken off of Duragesic patch post surgery. OxyContin was added to her therapy, initially at 10 mg and later increased to 20 mg. She had bouts of constipation and loose stool which was medically managed. On January 12, 2005 at 9:34 p.m. she experienced cardiopulmonary arrest. Despite cardiopulmonary resuscitation until 10:13 p.m., she was pronounced dead.

Dr. Adame then summarizes the "significant findings" of the autopsy report from the Travis County Medical Examiner's Office, including "the conclusions ... that Mrs. Guerrero died as a result of an overdose of oxycodone and propoxyphene."

Adame then states his "opinions and conclusions." He begins: "I concur with the autopsy conclusions." He observes that the medical examiners "performed a complete autopsy with toxocological analysis of blood, vitreous humor, and urine," and references certain autopsy findings. Dr. Adame describes the composition and effect of oxycodone and propoxyphene as various dosing levels, including the levels indicative of toxicity and death. Drawing on these observations, he states the following:

> Mrs. Guerrero had postmortem blood oxycodone concentration of 0.25 mg/L. This level and the clinical findings of nausea and labored breathing (noted in nursing notes shortly before her death) indicates that the oxycodone was inducing respiratory depression.

.....

Mrs. Guerrero had postmortem blood propoxyphene levels of 1.0 mg/L. This concentration of propoxyphene and the clinical findings of nausea, labored breathing, and cardiac arrest (noted in nursing notes shortly before her death) indicates that the propoxyphene was inducing respiratory depression, cardiac arrhythmia, and circulatory collapse and subsequent death. In addition, the respiratory depression was exacerbated by the high concentrations of oxycodone (see above).

Dr. Adame then concludes:

In summary, Mrs. Guerrero had toxic levels of oxycodone along with lethal levels of propoxyphene which caused her **\*364** demise. The mechanism of death was respiratory depression, cardiac arrhythmia, and circulatory collapse. Additionally, autopsy examination failed to demonstrate an anatomic cause of death.

All of my opinions above are predicated upon a reasonable medical probability.

[9] Dr. Adame's report fails to comply with the requirements of section 74.351. Most notably, it does not identify in any way the person or persons whose conduct is the subject of any of his opinions regarding standard of care, causation, and death. We have held that where a defendant is not identified at least in some manner within the "four corners" of the report, the report is, for that reason alone, deficient as to that defendant because it would require the reader to infer or make an educated guess as to whose actions the expert is complaining. *Austin Heart,* 228 S.W.3d at 281; *Apodaca,* 228 S.W.3d at 257–58; *see Marichalar,* 198 S.W.3d at 255.[1] The report likewise fails to describe the standard of care potentially applicable to Dr. Bogar, other than a broad reference to "the standard of care required of physicians not to prescribe drugs either alone or in combination that will cause a fatal overdose," which he never applies or analyzes in light of specific facts and circumstances. Further, Dr. Adame never describes how Dr. Bogar might have breached a standard of care or link such a breach to Ms. Guerrero's death. *See Jernigan v. Langley,* 195 S.W.3d 91, 93–94 (Tex.2006) (affirming dismissal under former article 4590i where report made only "passing mention" of defendant physician and failed to state how he breached the standard of care or how his alleged breach caused injury); *see also Palacios,* 46 S.W.3d at 879–80 (conclusory statement that "precautions to prevent [patient's] fall were not properly utilized" did not sufficiently apprise physician whether the expert believed that the standard of care required him "to have monitored

[the patient] more closely, restrained him more securely, or done something else entirely"). In essence, Dr. Adame's report is a second autopsy report, opining about the cause of Ms. Guerrero's death without explaining who caused it or how. *See Sherman v. Austin State Hosp.,* No. 03–05–00296–CV, 2006 WL 305300, at \*1, 2006 Tex.App. LEXIS 1115, at \*30–4 (Tex.App.-Austin 2006, pet. denied) (mem.op.)("A report finding only the cause of death does not satisfy the statutory requirements."), *cert. denied,* 549 U.S. 1133, 127 S.Ct. 976, 166 L.Ed.2d 740 (2007). We hold that the probate court abused its discretion in denying Dr. Bogar's motion for sanctions under section 74.351(b). We sustain Dr. Bogar's issue.

## Remedy

[10] In the probate court, appellees requested that, in the event Dr. Adame's report was found deficient, the court grant them a discretionary 30–day extension under section 74.351(c) to enable them to cure any deficiencies in the report. *See Tex. Civ. Prac. & Rem.Code Ann. § 74.351(c).* Because the probate court held that Dr. Adame's report "is sufficient in meeting the requirements of ... Ch. **\*365** 74," it did not reach the extension issue. As earlier noted, trial courts have discretion to grant extensions under subsection (c) where "an expert report has not been served within the period specified by Subsection (a) because elements of the report are found deficient." *See id. § 74.351(c).* Conversely, where an expert report has not been "served" as to a defendant within the 120–day period because no report is timely served or a report fails to implicate the defendant's conduct, the trial court has no discretion but to dismiss upon a section 74.351(b) motion. *Ogletree,* 262 S.W.3d at ——, 2007 WL 4216606, at \*2, 2007 Tex. LEXIS 1028, at \*6 (citing *Marichalar,* 185 S.W.3d at 73). In *Austin Heart,* we discerned from this statutory scheme legislative intent that in "at least some situations where a timely report is deficient [but not entirely absent or no report] ... the trial court should consider whether the deficiency is such that it warrants allowing a cure period." 228 S.W.3d at 284. Because we concluded that the report at issue in the case was deficient as opposed to no report regarding the physician defendant, we deduced that subsection (c) required us to remand to the trial court, in lieu of rendering a judgment of dismissal and sanctions, to afford the court the opportunity to exercise its discretion whether to grant a 30–day extension. *Id.* Appellees urge that the same appellate relief is appropriate here if we reverse the probate court's order denying Dr. Bogar's section 74.351(b) motion.

Our disposition of this question turns on whether the flaws in Dr. Adame's report render it merely deficient

with respect to the statutory criteria or, as Dr. Bogar argues, render the report no report as to him. If we hold the former, we would, under *Austin Heart,* remand to afford the trial court the opportunity to exercise its discretion whether to grant a 30–day extension under section 74.351(c) to cure the deficiency. If we conclude that Dr. Adame provided no report as to Dr. Bogar, we would instead render the judgment the trial court should have rendered—dismissal. *Austin Heart,* 228 S.W.3d at 284; *see Ogletree,* 262 S.W.3d at ——, 2007 WL 4216606 at *3, 2007 Tex. LEXIS 1028, at *8–9 ("If no report is served within the 120 day deadline provided by 74.351(a), the Legislature denied trial courts the discretion to dismiss or grant extensions...."). We accordingly compare Dr. Adame's report to those in other cases under section 74.351 in which the distinction between a timely report constituting no report versus a merely deficient report has been addressed.

In *Marichalar,* the plaintiff asserted claims for medical negligence relating to a sponge that was left in her body during abdominal surgery. She named as defendants three physicians—Prieto, Garcia–Arecha, and Garcia—two nurses, and the hospital. Marichalar timely served an expert report prepared by an obstetrician-gynecologist, Dr. Miller, in which he stated that Prieto, the surgeon, and Garcia–Arecha, the assistant surgeon, deviated from the standard of care because they allowed "the lap sponges not to be counted correctly and then noted in the chart that they were correct" and then "failing to diagnose and remove the laparotomy sponge in a timely manner." However, neither Dr. Miller nor a nurse expert implicated Dr. Garcia, as opposed to the other providers, in their respective reports. *See Garcia v. Marichalar,* 198 S.W.3d 250, 253 (Tex.App.-San Antonio 2006, no pet.). The San Antonio Court of Appeals concluded that "with regard to Garcia, there was no timely served expert report," requiring the trial court to dismiss Marichalar's claims against Garcia and depriving it of any discretion to grant a 30–day extension. *Marichalar,* **\*366** 185 S.W.3d at 73; *Marichalar,* 198 S.W.3d at 252.

In *Austin Heart,* the expert, Dr. Cororve, repeatedly referred in the report's background section to defendant physician Dr. Kessler by name and discussed various acts by him and other identified and unidentified caregivers. However, Dr. Cororve did not explicitly link Dr. Kessler's acts to Cororve's subsequent opinions regarding the applicable standard of care, how it was breached, and how the breach caused injury. *Austin Heart,* 228 S.W.3d at 280–81. We concluded that the report was deficient because "it requires the reader to infer or make an educated guess that Dr. Cororve [the expert] is identifying Dr. Kessler as the physician who breached the standard of care and caused injury" and that "[t]here is nothing *in the*

*report* that links Dr. Kessler to Dr. Cororve's opinions regarding the breach of the standard of care and causation any more than Dr. Rodgers or the other 'various physicians' references." *Id.* at 281. Although we emphasized that "a report's adequacy under section 74.351 does not depend on whether the expert uses any particular magic words such as 'the standard or care was breached *by Dr. Kessler,*' " we observed that "Dr. Cororve's report is silent as to whether a single physician, multiple physicians, or all physicians mentioned in the report failed to meet the standard of care and caused injury to Mr. Webb." *Id.* at 281–82. Nonetheless, we distinguished Dr. Cororve's deficient report from the "no report" found in *Marichalar:*

> Here, a timely report plainly discusses the conduct of the physician in question and the report discusses opinions on the standard of care and causation that could be linked to the conduct of the physician set out in the report, but simply are not. The report is not deficient because it does not relate to Dr. Kessler at all. It is deficient because the link between Dr. Kessler's conduct and the expert's conclusions is not expressly stated. The report in this case is, therefore, some report as to Dr. Kessler (among others), but it is not sufficient to meet all of the requirements of section 74.351. It is an example of what section 74.351(c) refers to as a report that "has not been served within the [120–day period for serving reports] because elements of the report are found deficient."

*Id.* at 284; *see also id.* at 285 (suggesting that "[i]f the expert is of the opinion that Dr. Kessler's conduct breached the standard of care and caused injury, he will not have to generate a new, previously nonexistent report. He will simply have to add the link between his already stated conclusions and the already referenced conduct of Dr. Kessler. Therefore, the circumstances here are not similar to the situation where a plaintiff simply has missed the deadline for serving a report with respect to the conduct of a physician.").

More recently, the supreme court in *Ogletree,* although apparently endorsing the "no report" concept of *Marichalar, see Ogletree,* 262 S.W.3d at ——, 2007 WL 4216606, at *2, 2007 Tex. LEXIS 1028, at *6 (citing *Marichalar* with approval), also indicated that the omission of a defendant's name would not categorically render a report "no report" as to that defendant. The plaintiffs alleged negligence by Dr. Jan Ogletree, a urologist, in performing a urinary catheterization procedure on John Burke Matthews in a manner causing him injuries and ultimate death. The plaintiff timely served the one-page expert report of Dr. Richard Karsh, which stated, in relevant part:

In my opinion (but I would have to defer to a urologist on this) given the inability of the nursing staff to pass the Foley catheter into the bladder and the necessity **\*367** for the urologist to utilize a stiff metallic "wire" to transverse the urethra, such manipulation and catherization should have been performed under fluoroscopic guidance. Had that been done the perforation might well have been avoided but certainly could have been diagnosed at the outset, with the likelihood of a smaller tear having resulted.

If not recognized in a timely manner, such a tear could lead to long-term problems, including bladder (or, if a urethral tear, urethral) dysfunction, infection, etc. It is apparent that a cystogram was performed shortly after the catherization, although the exact timetable is unclear; nor do I have records to determine whether or not the response of the physician to the tear was appropriate. (Of course, those might be best reviewed by a urologist).

*Ogletree,* 262 S.W.3d at ——, 2007 WL 4216606, at \*1, 2007 Tex. LEXIS 1028, at \*2–3. Dr. Ogletree complained that Dr. Karsh, as a radiologist, was not qualified to render opinions on a urologist's standard of care. Because of this defect, Ogletree asserted, no "expert report" was "served" within the 120–day deadline, the trial court had no discretion to grant a 30–day extension and its denial of his section 74.351(b) motion should therefore be immediately appealable. The supreme court, however, characterized this type of complaint as a report being "deemed not served because it is deficient," and subject to a discretionary 30–day extension under section 74.351(c). *Id.* at ——, 2007 WL 4216606, at \*3, at \*7–8. It held that "[b]ecause a report that *implicated Dr. Ogletree's conduct* was served and the trial court granted an extension, the court of appeals could not reach the merits of its motion to dismiss." *Id.* at ——, 2007 WL 4216606, at \*4, at \*9 (emphasis added).

Although the supreme court did not squarely address the significance of Dr. Karsh's omission of Dr. Ogletree's name from his report, it characterized the report as "directed solely to Dr. Ogletree's care (although it did not mention him by name)," *id.* at ——, 2007 WL 4216606, at \*1, at \*2, and "implicating" Dr. Ogletree's conduct. *Id.* at ——, 2007 WL 4216606, at \*4, at \*9 ("a report that implicated Dr. Ogletree's conduct"). The supreme court's references to a report "implicating" a provider's conduct appears to allude to section 74.351(a)'s 21–day deadline by which "[e]ach defendant physician or health care provider *whose conduct is implicated in a report* must file and serve any objection to the sufficiency of the report." Tex. Civ. Prac. & Rem.Code Ann. § 74.351(a) (emphasis added). Elsewhere the court distinguishes between cases

"where there is an absence of a report, rather than a report that implicated a provider's conduct but was somehow deficient." *Ogletree,* 262 S.W.3d at —— n. 2, 2007 WL 4216606, at \*7 n. 2, 2007 Tex. LEXIS 1028, at \*7 n. 2. These statements imply that a defendant provider's conduct can be "implicated" by a report even if the provider is not explicitly mentioned by name and that although such an omission might render the report deficient, it would not for that reason alone render the report "no report" as to the provider.[2]

**\*368** [11] Turning to Dr. Adame's report, it is, as noted, essentially a second autopsy report, opining about the cause of Ms. Guerrero's death without explaining who caused it or how. There are only cursory references to the conduct of anyone connected to Ms. Guerrero's care. In the "History" section of his report, Dr. Adame notes that after her fall, Ms. Guerrero's "medical problems and rehabilitation were managed by HealthSouth Rehabilitation Hospital of Austin," where she was later "transferred back ... on January 8, 2005" following her hip surgery at Brackenridge. Adame then recounts:

> She resumed on her medical regimen along with physical and occupational therapy. Her pain persisted and she was taken off of Duragesic patch post surgery. OxyContin was added to her therapy, initially at 10 mg and later increased to 20 mg. She had bouts of constipation and loose stools which were medically managed. On January 12, 2005, at 9:34 p.m., she experienced cardiopulmonary arrest. Despite cardiopulmonary resuscitation until 10:13 p.m., she was pronounced dead.

In his "opinions and conclusions" regarding the cause of death, Dr. Adame does not elaborate on the specific conduct or persons to whom he attributes the overdose other than vaguely alluding to "clinical findings" of "nausea, labored breathing, and cardiac arrest" that, to him, confirmed that the amounts and combination of oxycodone and propoxyphene were inducing respiratory depression, cardiac arrhythmia, circulatory collapse, and subsequent death.

Although the distinction between "no report" and a deficient-but-potentially curable report can be elusive, we conclude that Dr. Adame's report is no report as to Dr. Bogar. Dr. Adame, again, never mentions Dr. Bogar in his report. Although that omission alone may not alone render the report "no report," the report entirely fails to

implicate Dr. Bogar's conduct—if any person's conduct. The report is simply silent regarding how the overdose occurred and who, if anyone, was responsible for it. Dr. Adame does not identify any acts or omissions, by persons identified or unidentified, to which he attributes the overdose. *Cf. Ogletree,* 262 S.W.3d at ——, 2007 WL 4216606, at *1, 2007 Tex. LEXIS 1028, at *2–4 (report opining that "the urologist" should have performed manipulation and catheterization under fluoroscopic guidance and attributing patient's injuries to same). Nor, even assuming Adame's passing references to Ms. Guerrero's "medical regimen" and receipt of oxycodone could implicate the conduct of any person, would his report implicate *Dr. Bogar's* conduct as opposed to unidentified agents of Healthsouth. *See Marichalar,* 185 S.W.3d at 73; *Marichalar,* 198 S.W.3d at 252. Dr. Adame cannot cure these omissions simply by "add[ing] the link between his already stated conclusions and **\*369** the already referenced conduct" of Dr. Bogar. *See Austin Heart,* 228 S.W.3d at 285. There is nothing in the report regarding Dr. Bogar that could be linked to anything. Consequently, Dr. Adame could "cure" the deficiencies in his report only by "generat[ing] a new, previously nonexistent report" as to Dr. Bogar. *See id.* Such a remedy, as we have explained, is proscribed by section 74.351.[3]

[12] In their motion for rehearing and reconsideration en banc, appellees acknowledge that "[t]he report did not assign blame for the victim's harm to a specific physician or hospital employee by name" and is silent regarding "who exactly did what." They suggest that "Dr. Adame's report shows a fatal overdose of medications given to an inpatient in the hospital, a lapse with all the hallmarks of *res ipsa loquitur* " that "create[s] a powerful presumption that the overdoses were the result specifically of negligence by the treating physician of record." Even assuming *res ipsa loquitur* applied in this case, this evidentiary presumption would not create an exception to section 74.351's expert report requirement. The *Marichalar* court rejected a similar contention in a "sponge case"—surgeons left surgical sponges inside the plaintiff during abdominal surgery. The court explained:

> While section 74.201 allows for the application of res ipsa loquitur, we do not interpret it as an exception to section 74.351's expert report requirement. Res ipsa loquitur is an evidentiary rule. In contrast, section 74.351's expert report requirement establishes a threshold over which a claimant must proceed to continue a lawsuit; it does not establish a requirement for

recovery. It may be that once discovery is complete and the case is tried, there is no need for expert testimony.... But the Legislature envisioned that discovery and the ultimate determination of what issues are submitted to the factfinder should not go forward unless at least one expert has examined the case and opined as to the applicable standard of care, that it was breached, and that there is a causal relationship between that failure to meet the standard of care and the injury, harm, or damages claimed. Thus, because res ipsa loquitur is an evidentiary rule while the expert report is a threshold requirement for bringing a lawsuit, we do not believe that the Legislature intended for section 74.201 to eliminate the procedural requirement of an expert report at the commencement of litigation.

*See Marichalar,* 198 S.W.3d at 255–56. (internal citations and quotes omitted). We find this analysis persuasive. Consequently, even if *res ipsa loquitur* applied to appellees' claims against Dr. Bogar, it would not excuse their failure to serve him with an expert report.

### Constitutional issues

[13] In their motion for rehearing and for reconsideration *en banc,* appellees attribute their noncompliance to chapter 74's **\*370** limitations on discovery, urging that "the report could not have [complied] without compulsory process, as the precise facts regarding which named individuals administered each dose, failed to comprehend the danger or catch the error, or failed to remedy its effects, were then and remain today in the sole possession of the defendants." Section 74.351(s) provides:

> Until a claimant has served the expert report and curriculum vitae as required by Subsection (a), all discovery in a health care liability claim is stayed except for acquisition by the claimant of information, including medical or hospital records or other documents or tangible things, related to the patient's health care through:
>
> (1) written discovery as defined in Rule 192.7, Texas Rules of Civil Procedure;

(2) depositions on written questions under Rule 200, Texas Rules of Civil Procedure; and

(3) discovery from nonparties under Rule 205, Texas Rules of Civil Procedure.

Tex. Civ. Prac. & Rem.Code Ann. § 74.351(s). "Notwithstanding any other provision of this section, after a claim is filed all claimants, collectively, may take not more than two depositions before the expert report is served as required by Subsection (a)." *Id.* § 74.351(u). These provisions thus bar oral depositions of parties and allow only two oral depositions of non-parties before the expert report is served. They also bar pre-suit depositions to investigate potential claims under rule 202. *In re Jorden,* 249 S.W.3d 416, 420 (Tex.2008).

[14] [15] Appellees urge that their inability to orally depose Dr. Bogar before serving their expert report creates "an intolerable procedural conundrum" or "catch–22" by preventing them from obtaining the very information they need to prepare a sufficient expert report.[4] This "conundrum," appellees assert, imposes an "impossible condition" on medical malpractice claimants' property rights in their causes of action that violates the due process clause of the fourteenth amendment to the United States Constitution and due course of law under article I, section 19 of the Texas Constitution. *See* U.S. Const. amend. XIV; Tex. Const. art. I, § 19.[5] Appellees acknowledge that "Texas courts construe Article I, Section 19, in line with the federal due process guarantees" and that "[s]tandards for Texas constitutional claims regarding access to the courts are the same under due process and open courts." *See University of Tex. Med. Sch. v. Than,* 901 S.W.2d 926, 929 (Tex.1995); *Sax v. Votteler,* 648 S.W.2d 661, 664 (Tex.1983).[6] Appellees stop short of "contend[ing] that the expert report requirement must be invalidated for all cases," but instead urge us to "construe Section 74.351 to avoid a constitutional problem" by either "declar[ing], for cases where medical negligence by one or more defendants **\*371** is clear but where the plaintiff cannot allocate fault among them without discovery, that Section 74.351(s) does not stay the discovery necessary to obtain the fault allocation facts that would perfect the required expert report; or declar[ing] the expert report in such a case sufficient without those facts, since they are unnecessary to demonstrate at the threshold that the case has merit."[7]

[16] [17] [18] [19] We begin with the presumption that section 74.351 is constitutional. *Walker,* 111 S.W.3d at 66. Additionally, the party challenging the constitutionality of a statute bears the burden of establishing that the enactment fails to meet constitutional requirements. *Id.* With regard to restrictions on health care liability claims

in particular, we are mindful of two general principles. First, "there are constitutional limitations upon the power of courts ... to dismiss an action without affording a party the opportunity for a hearing on the merits of his [or her] cause." *Thoyakulathu v. Brennan,* 192 S.W.3d 849, 855 (Tex.App.-Texarkana 2006, no pet.) (*quoting Walker,* 111 S.W.3d at 66 (*quoting TransAmerican Nat. Gas Corp. v. Powell,* 811 S.W.2d 913, 917–18 (Tex.1991))). Second, the filing of a frivolous lawsuit can be misconduct subject to sanction. *Id.* (citing *Palacios,* 46 S.W.3d at 878). "[O]ne purpose of the expert-report requirement is to deter frivolous claims." *Walker,* 111 S.W.3d at 66. "The Legislature has determined that failing to timely file an expert report, or filing a report that does not evidence a good-faith effort to comply with the definition of an expert report, means that the claim is either frivolous, or at best has been brought prematurely. This is exactly the type of conduct for which sanctions are appropriate." *Palacios,* 46 S.W.3d at 878. Consequently, the supreme court rejected a due-process challenge to former article 4590i's mandatory dismissal of health care liability claims for failure to comply with statutory requirements. *Walker,* 111 S.W.3d at 66 ("The Gutierrezes' failure to file an adequate report thus raised the presumption that their claims were frivolous, or at best, premature.... We do not believe the Constitution requires prior notice that the law is serious about a clearly stated consequence for failing to comply with its terms. The sanction imposed ... was a direct result of their failure to file an expert report that complied with the statutory requirements. Consequently, dismissal was appropriate and did not violate the due process clause, even in the absence of a notice of noncompliance prior to the motion to dismiss."); *see Brennan,* 192 S.W.3d at 855–56 (applying *Walker* to section 74.351).

Turning to appellees' specific challenge, they have the burden of establishing that section 74.351's discovery limitations have in fact prevented them from satisfying the statute's expert-report requirements and pursuing their claim. *See McGlothlin v. Cullington,* 989 S.W.2d 449, 453 (Tex.App.-Austin 1999, pet. denied) (burden on claimant asserting open-courts violation is to provide sufficient evidence that the expert report requirement, and not her own inaction, actually functioned to keep her from pursuing her claim). Appellees suggest in their motion that they were forced to "prepare their report[ ] on medical records alone" and that these records were inadequate, but do not suggest they ever actually pursued the discovery permitted under section 74.351(s) beyond serving requests for disclosures at some unspecified point in **\*372** time.[8] Nor is there any evidence in the record to support such an assertion. We observe that section 74.351(s) and (u) authorize claimants to obtain discovery via not only requests for disclosure, but interrogatories,

requests for production, requests for admissions, and depositions on written questions to parties (i.e., forms of discovery that could have been directed to Dr. Bogar); and rule 205 requests for production, depositions on written questions, and up to two oral depositions of non-parties.[9] The rules further provide mechanisms for enforcing compliance with discovery requests.[10] Appellees dismiss the significance of "[t]he limited written discovery that Section 74.351(a) nominally permits before service of the expert report," asserting that it is "widely understood not to extend beyond the medical records specifically mentioned in that subsection, and defense counsel in health care liability actions uniformly refuse any other written discovery." If that could be so, it is not because of anything the legislature actually provided in section 74.351, nor do appellees present evidence that any such application of section 74.351(s) in fact prevented them from obtaining any necessary discovery they had actually sought. *See Brennan,* 192 S.W.3d at 854 n. 5 (rejecting similar due-process argument "premised on [claimant's] failure to receive discovery from another party" as "ignor[ing] the remedies available to him to enforce lawful discovery requests"); *see also Marichalar,* 198 S.W.3d at 254 n. 1 (observing that "if the medical records are indeed conflicting" as to assistant surgeon's identity, as counsel had orally contended, "Marichalar could have propounded discovery to Dr. Garcia to discovery whether he was the assistant surgeon ... [a]nd if Dr. Garcia failed to timely answer the discovery requests, Marichalar could have moved to compel his answers."). Like the *Brennan* court, "we can certainly imagine a due process deprivation to a health care liability claimant pinned between a firm expert report deadline and a hypothetical absence of discovery tools," but must similarly conclude that appellees have not carried their burden of demonstrating that they were denied due process by such a situation here. *Brennan,* 192 S.W.3d at 856 n. 8; *see McGlothlin,* 989 S.W.2d at 453 (claimant's affidavit made "no mention of any actual attempt to obtain an expert report," in lieu of article 4590i bond requirement, "only some perceived financial barrier").

[20] Appellees also question whether there is a rational relationship between chapter 74's expert-report requirement as applied here and the legislature's goal of discouraging frivolous lawsuits. *See Lucas v. United States,* 757 S.W.2d 687, 691 (Tex.1988) (holding that it was "unreasonable and arbitrary for the legislature to conclude that arbitrary damage caps, applicable to all claimants no matter how seriously injured, will help assure a rational relationship between actual damages and the amounts awarded."). This argument is predicated upon appellees' view that the bare fact Ms. Guerrero died of a drug overdose while in the hospital "create[s] a powerful presumption that the overdoses were the result

specifically of **\*373** negligence by the treating physician of record," whom they assert was Dr. Bogar. We disagree that it is irrational, in light of the legislature's goal of curtailing frivolous health care liability claims, for it to require that appellees serve an expert report explaining why or how this outcome was actually caused by the conduct of *Dr. Bogar,* as opposed to some other person or health care provider. *See Walker,* 111 S.W.3d at 66 (explaining that the plaintiffs' failure to comply with the expert-report requirements "raised the presumption that their claims were frivolous, or at best, premature" and dismissal did not violate due process); *Marichalar,* 198 S.W.3d at 254–55 ("Section 74.351(r)(6) requires that an expert report explain how the care *rendered by the physician* failed to meet the applicable standard of care and the causal relationship between that failure and the injury suffered by the claimant."); *see also Brennan,* 192 S.W.3d at 855–56 (applying *Walker* to reject as-applied challenge to expert-report requirement where claimant had attempted to serve report timely, but fax machine failed; "Section 74.351 need not provide an exception geared toward such misfortune in order to provide constitutionally adequate safeguards.").

We accordingly reject appellees contentions that our application of section 74.351 on the present record violates due process or due course of law.

### CONCLUSION

As the Texas Supreme Court recently acknowledged, the requirements of section 74.351(b) "can lead to seemingly harsh results." *Ogletree,* 262S.W.3d at ——, 2007 WL 4216606, at *3, 2007 Tex. LEXIS 1028, at *3. Here, they require us to render judgment dismissing appellees' claims against Dr. Bogar with prejudice and awarding Dr. Bogar attorney's fees and costs. *See Tex. Civ. Prac. & Rem.Code Ann. § 74.351(b).* Further, our performance of our duty to effectuate these legislative mandates does not, on this record, exceed constitutional limitations. We accordingly reverse and render a judgment of dismissal and remand to the probate court for a determination of the amount of the attorney's fee award.

Dissenting Opinion by Justice PATTERSON.

JAN P. PATTERSON, J., dissenting.

Given the length of time this accelerated interlocutory appeal has been pending, I will adopt my prior dissent with an additional observation, substituting this opinion and dissenting to the denial of appellees' motion for rehearing. In *Palacios,* the supreme court held that (i) a trial court's decision whether to dismiss a case under this statute is reviewed for abuse of discretion, and (ii) to constitute a good-faith effort to provide a fair summary of an expert's opinions, "an expert report must discuss the standard of care, breach, and causation with sufficient specificity to inform the defendant of the conduct the plaintiff has called into question and to provide a basis for the trial court to conclude that the claims have merit." *American Transitional Care Ctrs. v. Palacios,* 46 S.W.3d 873, 875 (Tex.2001) (predecessor statute). In that case, the court found that the trial court did not abuse its discretion in its ruling and reversed the court of appeals. Based upon *Palacios,* I would hold that the trial court did not abuse its discretion here. For these reasons, I respectfully dissent.

The majority has stepped into both shoes of the trial court: (i) overruling its determination that the expert report is sufficient and the litigation should go forward, and (ii) finding the report to be not just deficient, but "no report," thus foreclosing **\*374** an opportunity to cure any asserted deficiency. As the reviewing court, we are admonished that a trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to guiding rules or principles. *See Garcia v. Martinez,* 988 S.W.2d 219, 222 (Tex.1999). When reviewing a trial court's decision for an abuse of discretion, we recognize that such discretionary choices are left to a court's judgment, and its judgment is to be guided by sound legal principles. *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 416, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975) (quoting *United States v. Burr,* 25 F. Cas. 30, 35 (CC Va. 1807) (Marshall, C.J.)). We may not substitute our own judgment for that of the trial court. *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002). While a trial court's failure to analyze and apply the law correctly would constitute an abuse of discretion, *Walker v. Packer,* 827 S.W.2d 833, 840 (Tex.1992), "[t]he test for abuse of discretion is not whether, in the opinion of the reviewing court, the facts present an appropriate case for the trial court's action.... [I]t is a question of whether the court acted without reference to any guiding rules and principles." *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985). A trial court does not abuse its discretion merely because it decides a discretionary matter differently than an appellate court would in a similar circumstance. *Id.* at 242.

The parties agree that Dr. Bogar was the physical medicine rehabilitation doctor in charge of Ms. Esparza's care; he was the only doctor named in the lawsuit. An autopsy established that Ms. Esparza, who was admitted for post-operative hip surgery rehabilitation, died of an overdose of Oxycodone and Vicodin. After a hearing, the trial court expressly found the report to be sufficient and denied the motion to dismiss.[1]

The supreme court has recently held that an expert report that implicates the doctor's conduct, but fails to mention the doctor by name, is merely deficient and subject to the trial court's discretionary power to grant a 30–day extension as allowed under section 74.351(c). *See Ogletree v. Matthews,* No. 05–0502, —— S.W.3d ——, ———, ———, 2007 WL 4216606, at \*1, 4, 2007 Tex. LEXIS 1028, at \*2, 14 (Tex. Nov. 30, 2007). While the majority recognizes this recent supreme court holding, it fails to apply it to an expert report that plainly implicates appellant's conduct in prescribing a lethal dose of Oxycodone and Vicodin—choosing instead to ignore the statutory discretion imparted to the trial court by the legislature. *See id.*

Although the trial court's determination is not shielded from review, we may not substitute our judgment for that of the trial court charged with a gatekeeping function in the first instance under this statute. Indeed, the trial court is charged not only with exercising its discretion in affirming or denying the motion to dismiss, but the trial court may—in its discretion—grant a 30–day extension to cure any deficiency. Tex. Civ. Prac. & Rem.Code Ann. § 74.351(c) (West Supp.2007). Because the trial court here found the report to be sufficient—and not deficient or "no report"—it did not consider whether to grant a discretionary extension to amend the report.

I believe the trial court did not abuse its discretion in concluding that the report was sufficient. Because (i) the standard of review recognizes that there is a range of decisions that are appropriate as long as the trial court does not act in an arbitrary or unreasonable manner or without reference **\*375** to guiding rules and principles, and (ii) the trial court acted in accord with the supreme court's holdings in *Palacios,*[2] I would conclude that the trial court was guided by and employed sound legal principles and properly denied the motion to dismiss. I would affirm the trial court's order.

Alternatively, because the trial court found the report to be sufficient and not deficient or "no report," I would follow this Court's precedent in *Austin Heart, P.A. v. Webb,* 228 S.W.3d 276 (Tex.App.-Austin 2007, no pet.), and remand this cause for further proceedings to allow the trial court to exercise its discretion and determine whether a 30–day extension should be granted.[3]

By cherry-picking language from the supreme court's *Ogletree* opinion to support its admitted "elusive" line between a deficient report and a "nonexistent" report, the majority overlooks the supreme court's common sense approach regarding expert reports that implicate a health provider's conduct: The supreme court reasoned that "while the 2003 amendments were intended to decrease claims, they do not mandate dismissal for deficient, but curable, reports." *Ogletree,* 262 S.W.3d at ——, 2007 WL 4216606, at *3, 2007 Tex. LEXIS 1028, at *9. In finding this report "no report," we are beyond cherry-picking and into hair-splitting for which the aim is not to seek the statutory mandate nor substantial justice.

I would, therefore, grant the motion for rehearing.

JAN P. PATTERSON, Justice, dissenting.

For the reasons expressed in my dissenting opinion to this Court's disposition of this case on rehearing, I respectfully dissent from the denial of appellee's motion for en banc reconsideration. *See Bogar v. Esparza,* No. 03–07–00037–CV, 257 S.W.3d 354 (Tex.App.-Austin May 16, 2008) (Patterson, J., dissenting).

DIANE HENSON, Justice, dissenting.

The expert reports required by section 74.351 of the civil practice and remedies code "are simply a preliminary method to show a plaintiff has a viable cause of action that is not frivolous or without expert support." *Kelly v. Rendon,* 255 S.W.3d 665, 679 (Tex.App.-Houston [14th Dist.] 2008, no pet. h.). One of the benefits behind the expert-report requirement is that the screening mechanism frees up judicial resources to address non-frivolous claims. *See* House Comm. on Civil Practices, Bill Analysis, Tex. H.B. 971, 74th Leg., R.S. (1995) (noting that predecessor statute to section 74.351 "would help focus judicial resources on legitimate claims"). The present case, which arose after a patient **\*376** suffered a fatal overdose of oxycodone and propoxyphene while receiving post-operative care for hip-replacement surgery, does not appear to be the type of meritless claim that the legislature intended to prevent by imposing the gate-keeping measure of the expert report.

I join Justice Patterson's dissent in holding that the trial court acted within its discretion in finding the expert report sufficient, but write separately to further address the majority's failure to remand this case for a determination of whether, in the discretion afforded to the

trial court under section 74.351(c), the appellees should be given a 30–day extension of time in order to cure any deficiencies in the expert report.[1]

The majority reverses the trial court's determination that Dr. Adame's expert report is sufficient and renders judgment of dismissal, holding that this report constitutes "no report" as to Dr. Bogar and therefore that the trial court did not have discretion to allow a 30–day extension. *See id.* § 74.351(b) (stating that trial court shall dismiss claim if expert report has not been served within 120 days); *Ogletree v. Matthews,* No. 06–0502, ——S.W.3d ——, ——, 2007 WL 4216606, at * 3, 2007 Tex. LEXIS 1028, at *8 (Tex. Nov. 30, 2007) ("If no report is served within the 120 day deadline provided by 74.351(a), the Legislature denied trial courts the discretion to deny motions to dismiss or grant extensions."). If an expert report fails to implicate the conduct of a particular defendant, it is treated as "no report" as to that particular defendant. *See Apodaca v. Russo,* 228 S.W.3d 252, 257 (Tex.App.-Austin 2007, no pet.) (report that described conduct of other doctors and health-care providers but failed to mention appellee at all constituted "no report" as to appellee); *Garcia v. Marichalar,* 185 S.W.3d 70, 72–73 (Tex.App.-San Antonio 2005, no pet.) (report that focused on conduct of other defendants and did not mention appellant at all was considered "no report" as to appellant). However, an expert report that does not fully satisfy the statutory criteria but is not so inadequate as to be deemed "no report" is treated as a deficient report, and trial courts have discretion to allow parties an extension of time in order to cure the deficiencies. *See Ogletree,* 262 S.W.3d at ——, 2007 WL 4216606, at *3, 2007 Tex. LEXIS 1028, at *10 ("[A] deficient report differs from an absent report. Thus, even when a report is deemed not served because it is deficient, the trial court retains discretion to grant a thirty-day extension.").

While Dr. Adame's report does not mention Dr. Bogar by name, it unambiguously implicates Dr. Bogar's conduct. Unlike the reports in *Apodaca, see* 228 S.W.3d at 257, or *Marichalar, see* 185 S.W.3d at 72–73, the report in the present case does not implicate, identify, or describe the conduct of any physicians or medical professionals other than Dr. Bogar. Furthermore, Dr. Adame's report describes "the standard of care required of *physicians* not to prescribe drugs either alone or in combination that will cause a fatal overdose." (Emphasis **\*377** added). The report states that "[s]uch conduct falls below the standard of care required of physicians," and details how the levels of oxycodone and propoxyphene found in Guerrero's blood exceeded the amounts known to cause death. In light of this language, it is clear from the four corners of the report that Dr. Adame is implicating the conduct of the physician who prescribed oxycodone and

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.

propoxyphene to Guerrero. *See American Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 878 (Tex.2001) ("[T]he only information relevant to the inquiry is within the four corners of the document."). *See also Ogletree,* 262 S.W.3d at ——, 2007 WL 4216606 at *1, 2007 Tex. LEXIS 1028, at *2 (where expert report implicated appellant's conduct but did not mention appellant by name, report was merely deficient and subject to extension allowed under section 74.351(c), rather than "no report" as to appellant).

An expert report does not have to meet the same requirements as evidence offered in a summary-judgment proceeding or at trial, but is merely required to "discuss the standard of care, breach, and causation with sufficient specificity to inform the defendant of the conduct the plaintiff has called into question." *Palacios,* 46 S.W.3d at 875, *see also* 879. The trial court, in its discretion, may have reasonably concluded that Dr. Bogar was sufficiently informed of the conduct that the plaintiff in this case was calling into question—prescribing a combination of drugs in amounts that resulted in a fatal overdose.

The majority's holding in the present case conflicts with this Court's holding in *Austin Heart, P.A. v. Webb,* 228 S.W.3d 276 (Tex.App.-Austin 2007, no pet.), in which we held that an expert report's failure to specifically identify a physician as having breached the standard of care or having caused the patient's injury merely results in a deficient report, subject to the cure provisions of section 74.351(c), rather than "no report." *Id.* at 282–83. The report in *Austin Heart* not only discussed the conduct of the appellant without identifying the appellant as having breached the standard of care or caused the injury, but also discussed the conduct of various other physicians without making it clear that the report related to the appellant physician. *Id.* at 280. Despite these omissions, this Court stated:

> While we are of the view that Dr. Cororve's report is deficient under section 74.351 because it requires the reader to make an educated guess regarding an essential element, we are also aware that the defect might well be curable. The tenor of Dr. Cororve's report, coupled with the fact that there is only one physician defendant, makes it quite likely that Dr. Cororve intended to opine that Dr. Kessler breached the standard of care and caused injury even though the report did not contain that

opinion. *The report's failure on this point is the kind of defect that the cure provisions of section 74.351(c) were designed to address.*

*Id.* at 282–83 (emphasis added).

Significantly, the *Austin Heart* opinion also states, "Had Dr. Cororve referenced only actions by Dr. Kessler in the background section of his report, the link between Dr. Cororve's opinions and the responsible physician might be more apparent." *Id.* at 281. The link between Dr. Adame's opinions and Dr. Bogar could not be more apparent in the present case, where no other physicians or health-care professionals are named as defendants or mentioned in the expert report.

Furthermore, the Texas Supreme Court's mandate that only information within the four corners of the expert report **\*378** may be reviewed for sufficiency, *see Palacios,* 46 S.W.3d at 878, does not necessarily preclude the trial court from conducting an independent analysis of the information contained in the report. In *IHS Acquisition No. 140, Inc. v. Travis,* No. 13–07–00481–CV, 2008 WL 1822780, 2008 Tex.App. LEXIS 2950 (Tex.App.-Corpus Christi Apr. 24, 2008, no pet. h.), the appellant argued that the trial court made an improper inference about causation that extended outside of the four corners of the expert report. The report failed to address a one-month gap between treatment of the patient's eye abscess and her death, and the trial court commented that the gap was the time which "causes the abscess to grow in the system and proliferate." *Id.* at * 3, at *24. The court of appeals held that the trial court did not abuse its discretion in making such a comment, noting that expert reports may contain some level of ambiguity "that is subject to the independent analysis of the trial court." *Id.* The court further stated:

> [T]he trial court's explanation was only beyond the 'four corners' of the report in the sense that the trial court explained medical concepts—such as abscess and cardiogenic shock—which Dr. Starer did not explain. The trial court, however, did not propose unique causation theories that were not discussed in the expert report.
>
> We believe that Dr. Starer's report, which explained causation, but which did not explain certain medical concepts that would perhaps need to be explained at trial, was 'less than all the evidence necessary to establish causation at trial,' but still provided a 'fair summary' of causation.... The trial court's comments

were not an improper 'inference' and do not constitute an abuse of discretion.

*Id.* at * 9, at *25 (quoting *Tovar v. Methodist Healthcare Sys. of San Antonio, Ltd., L.L.P.,* 185 S.W.3d 65, 68 (Tex.App.-San Antonio 2005, pet. denied)).

Similarly, the trial court's conclusion that the report implicated the conduct of Dr. Bogar—the only physician named as a defendant—where no other physicians or healthcare providers were implicated in the report can best be characterized as an analysis of the information included in the report, rather than an impermissible venture outside the four corners of the expert report.

Because the trial court found Dr. Adame's report to be sufficient, no 30–day extension was ever required, although the appellees requested an extension in the event that the report was found to be deficient. In light of the majority's ruling that Dr. Adame's expert report fails to

meet the statutory requirements, "consideration by the trial court of [the appellees'] request for an extension to attempt to cure the defect is warranted." *See Austin Heart,* 228 S.W.3d at 283.

I agree with Justice Patterson's dissent that the trial court acted within its discretion in determining that Dr. Adame's report was sufficient. However, assuming that the report was not sufficient, I would hold in the alternative that Dr. Adame's report is merely deficient, rather than "no report" as to Dr. Bogar, and therefore that the proper remedy is a remand to allow the trial court to determine whether to grant a 30–day extension of time under section 74.351(c), giving the appellees an opportunity to cure any deficiencies.[2] As a result, I respectfully join the dissent.

Footnotes

[1]  As we emphasized in *Austin Heart*—and as suggested by the supreme court in *Ogletree,* as we discuss below—this is not a "magic words" test. There may be a number of ways that a defendant may be referenced within the four corners a report so as to comply with the legislature's mandate that the report "provide[ ] a fair summary as of the date of the report regarding applicable standards of care, the manner in which the care *rendered by the physician or health care provider* failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." Tex. Civ. Prac. & Rem.Code Ann. § 74.351(r)(6) (emphasis added).

[2]  In *Apodaca v. Russo,* 228 S.W.3d 252, 255–58 (Tex.App.-Austin 2007, no pet.), this Court affirmed a trial court order dismissing a health care liability suit under section 74.351(b) and refusing to grant a 30–day extension under section 74.351(c). The lone defendant was Dr. Russo, a general surgeon, who was alleged to have acted negligently in failing to implement precautions against pulmonary embolism or stroke. The report described various deviations from the standard of care, including failures to properly address deep venous thrombosis prevention or to insert an IVC filter, but did not identify Dr. Russo by name or otherwise. The panel observed that "[a]lthough appellant has sued only Dr. Russo, other doctors and health-care providers are implicated by the facts set forth in the report. The report references other providers as well as their conduct and refers to another doctor by name, but fails to mention Dr. Russo at all." *Id.* at 257. The panel found the report deficient *and no report,* reasoning that it did not "specifically identify the defendant and apply the statutory elements to that defendant," *id.* at 258, and "[i]f a report fails to address the defendant physician, it constitutes no report as to that defendant, and the trial court may not grant a 30–day extension." *Id.* at 257. We need not consider *Ogletree's* implications for *Apodaca's* analysis of the "no report" issue because it is dicta. *See Ogletree,* 262 S.W.3d at ——, ——, 2007 WL 4216606, at *2–3, 2007 Tex. LEXIS 1028, at *6–8 (emphasizing discretionary nature of 30–day extension when trial court finds expert report deficient).

[3]  The dissent criticizes this holding, suggesting that we could remand to the probate court in the same manner as in *Austin Heart,* 228 S.W.3d at 285 (Patterson, J., dissenting). As the dissent has acknowledged in *Austin Heart* and elsewhere, section 74.351 does not permit such a remedy where, as here, the report constitutes no report. *See Austin Heart,* 228 S.W.3d at 291 (Patterson, J., dissenting) ("[t]he difference between the two is strategically significant. If the report is 'no report,' then the trial court *must* dismiss the case with prejudice and has no discretion to grant a 30–day extension.") (emphasis in original); *Apodaca,* 228 S.W.3d at 257 ("If a report fails to address the defendant physician, it constitutes no report as to that defendant, and the trial court may not grant a 30–day extension.") (citing *Garcia v. Marichalar,* 185 S.W.3d 70, 74 (Tex.App.-San Antonio 2005, no pet.)).

[4]  Appellees similarly suggest that this regime incentivizes medical malpractice defendants to "maintain[ ] silence until the expert report deadline [to] entirely defeat a valid claim that in any other tort case they would each work affirmatively to defect onto a co-defendant as early as possible."

[5]  Dr. Bogar does not dispute that appellees preserved their constitutional arguments in the trial court.

6    However, as appellees further recognize, the open courts guarantee, *see* Tex. Const. art. I, § 13, is not directly implicated in this case because it applies only to common-law causes of action, not their statutory wrongful-death or survival claims.

7    Appellees similarly urge us to "avoid a constitutional confrontation" by remanding the case to afford them the opportunity to amend their expert report.

8    In a footnote in their motion, appellees complain that "Texas courts have never implemented the regime of preliminary disclosures provided in principle in Section 74.352; the plaintiffs had to request disclosures from the defendants, who responded—after the expert report was served—with little or nothing of substance."

9    *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(s), (u); Tex.R. Civ. P. 192.7(a) (defining "written discovery"); *see generally* Tex.R. Civ. P. 194, 196–98, 200–01.

10   *See* Tex.R. Civ. P. 215.

1    The hospital settled and was dismissed from the lawsuit.

2    In *Palacios,* the court faulted the expert report for its conclusory statement that the standard of care required the hospital to have monitored Palacios more closely, restrain him more securely or done something else entirely. The court stated: "Knowing only that the expert believes that American Transitional did not take precautions to prevent the fall might be useful if American Transitional had an absolute duty to prevent falls from its hospital beds." *American Transitional Care Ctrs. v. Palacios,* 46 S.W.3d 873, 880 (Tex.2001). Here, the trial court may have concluded that the standard of care and duty were clear from the report detailing the "toxic levels of oxycodone along with lethal levels of propoxyphene" that caused the death.

3    The majority's criticism of this approach relies on *Apodaca v. Russo,* 228 S.W.3d 252 (Tex.App.-Austin 2007, no pet.), and *Garcia v. Marichalar,* 185 S.W.3d 70 (Tex.App.-San Antonio 2005, no pet.), but those cases are distinguishable in that both involved multiple defendants, whereas here we have only one defendant—Dr. Bogar.

1    I do not take issue with the majority's holding that the appellees, who failed to take full advantage of the discovery tools provided by section 74.351 of the civil practices and remedies code, cannot now argue that the statute imposes an unconstitutional burden by restricting discovery until after expert reports have been served. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(s), (u) (West Supp.2007). However, while the appellees may not have established that section 74.351's discovery limitations prevented them from serving a sufficient expert report, they have also not been given any opportunity to cure deficiencies in Dr. Adame's report, which, until this Court's holding on appeal, had been deemed sufficient as to Dr. Bogar.

2    In addition to arguing that Dr. Adame's report constituted "no report," Dr. Bogar also argues that Dr. Adame, a pathologist, was not qualified to render opinions concerning the standard of care applicable to physical medicine rehabilitation physicians, such as Dr. Bogar. While the majority does not address this contention in light of their holding that the expert report constituted "no report" as to Dr. Bogar, I would hold that even if Dr. Adame is deemed unqualified to render an expert opinion in this case, the appellees should still be afforded the opportunity to request the 30–day extension provided by section 74.351(c).
     A similar argument regarding expert qualifications was made in *Ogletree,* in which the appellant asserted that a radiologist was incapable of opining on the standard of care applicable to urologists. *Ogletree v. Matthews,* No. 06–0502, —— S.W.3d —— —, ——, 2007 WL 4216606, at *2, 2007 Tex. LEXIS 1028, at *4 (Tex. Nov. 30, 2007). In a concurring opinion, Justice Willett stated that the defect in the expert report consisted of "designating the wrong type of medical professionals to opine on standard of care," and that using the wrong type of expert "is the type of defect for which a trial court may grant a discretionary section 74.351(c) extension." *Id.* at *6, at *18 (Willett, J., concurring).

**End of Document**                                          © 2015 Thomson Reuters. No claim to original U.S. Government Works.

79 S.W.3d 48
Supreme Court of Texas.

BOWIE MEMORIAL HOSPITAL a/k/a Bowie
Hospital District d/b/a Bowie Hospital District
Authority d/b/a Bowie Memorial Hospital,
Petitioner,
v.
Barbara WRIGHT and P.L. Wright, Respondents.

No. 01–0814. | June 13, 2002.

Patient brought medical malpractice action against hospital, physician, physician's assistant, and others, alleging that failure to timely discover that her foot was fractured led to necessity of two additional surgeries. The 78th District Court, Wichita County, Keith Nelson, J., dismissed patient's claims. Patient appealed. The Fort Worth Court of Appeals, 48 S.W. 3d 443, affirmed in part, reversed in part, and remanded. Upon grant of hospital's petition for review, the Supreme Court held that expert report submitted by patient did not constitute a good-faith effort to summarize causal relationship between hospital's alleged failure to meet applicable standards of care and patient's injury under Medical Liability and Insurance Improvement Act.

Reversed.

**Attorneys and Law Firms**

**\*50** Gregory J. Lensing, Charles T. Frazier, Jr. Cowles & Thompson, Dallas, Susan Irene Nelson, Dallas, for Petitioner.

Britta Jean Gordon, Michael Kevin Queenan, Queenan Law Firm, DeSoto, for Respondents.

**Opinion**

PER CURIAM.

This case involves the Medical Liability and Insurance Improvement Act's ("the Act") expert-report requirements. *See* TEX.REV.CIV. STAT. art. 4590i, § 13.01. The trial court dismissed the plaintiffs' medical malpractice claims after it determined that their expert report did not satisfy the Act's requirements. The court of appeals concluded that the trial court abused its discretion when it dismissed the plaintiffs' claims, because the expert report represented a good-faith effort to comply with the Act. 48 S.W.3d 443, 448. We disagree.

Accordingly, we reverse the court of appeals' judgment and dismiss with prejudice the Wrights' claims against Bowie Memorial Hospital.

Barbara Wright was admitted to Bowie after she sustained injuries in a car accident. While at Bowie, Michael Layne, a physician's assistant that Bowie employed, x-rayed Barbara's right knee and foot and diagnosed her with a fractured patella. However, Layne allegedly misplaced or misread the foot x-ray and, therefore, did not discover that Barbara had also fractured her right foot in the accident. Shortly after Barbara was admitted to Bowie, Dr. Hodde, Layne's supervisor, recommended that Bowie refer her to an orthopedic surgeon. Barbara was immediately referred to an orthopedic surgeon and transferred to another hospital. Her accompanying medical report, which Layne prepared, only indicated that Barbara had a fractured knee.

Nearly a month after the accident, Barbara's orthopedic surgeon discovered Barbara's fractured foot. By that time, the surgeon had already operated on Barbara's knee. The Wrights claim that the surgeon could have operated on Barbara's foot at the same time if he had known about the injury. Instead, Barbara had two additional surgeries over the next ten months.

Barbara and her husband sued Bowie, Layne, and Dr. Hodde for medical malpractice. The Wrights also sued the orthopedic surgeon, another treating doctor, and three medical clinics not associated with Bowie. The Wrights' allegations pertinent here are that Bowie personnel did not: diagnose Barbara's foot fracture; protect her foot; review diagnostic tests ordered and administered at the hospital; or properly supervise Layne.

The Wrights filed an expert medical report about Bowie's, Dr. Hodde's, and another doctor's alleged negligence. *See* TEX.REV.CIV. STAT. art. 4590i, § 13.01(d). The expert report states, in part:

> I have reviewed the material you sent me on the above case. I believe that the hospital fell below the appropriate standard of care in not having a defined mechanism in place whereby x-rays taken in the E.R. are read by a physician specialized in interpreting the films in a timely manner (i.e., less than 24 hrs). X-rays taken in the E.R. need to have re-reads performed within 24 hrs and if **\*51** there is a discrepency [sic] in the x-ray readings a system should be in place to inform the patient of this. There did not appear to be any procedure that the hospital has for tracking x-rays. The hospital also doesn't seem to have a system of orienting health care professionals working in the E.R.

nor any form of Q/A for P.A.'s staffing the E.R. There didn't appear to be any organized system or protocols for P.A. supervision in the E.R.

...

I do believe that it is reasonable to believe that if the x-rays would have been correctly read and the appropriate medical personnel acted upon those findings then Wright would have had the possibility of a better outcome.

Bowie moved to dismiss the Wrights' claims, alleging that the expert report "fails to establish how any act or omission of employees of Bowie Memorial Hospital caused or contributed to Ms. Wright's injuries." Therefore, Bowie argued, the report does not satisfy the Act's requirements.

The trial court held two hearings to determine if the report represents a good-faith effort to meet the Act's requirements. *See* TEX.REV.CIV. STAT. art. 4590i, § 13.01(*l* ). At the first hearing, the trial court asked about the causal relationship between Bowie's conduct and Barbara's injury. The Wrights explained that if Bowie had diagnosed Barbara's fractured foot earlier, then she "probably would have had a better outcome." They also conceded that the orthopedic specialist Barbara saw immediately after leaving Bowie "had an independent duty to verify" Bowie's medical report. Nevertheless, the Wrights claimed that, if Bowie's report had indicated that Barbara had a broken foot, it would have been "much easier" for the orthopedic doctor to make a proper diagnosis. After the second hearing, the trial court granted Bowie's motion to dismiss. The record indicates that the trial court did not believe the Wrights' claims against Bowie, "the people who transferred [Barbara]," had merit, given that the orthopedic surgeon "could have done his own work."

The court of appeals reversed and remanded, holding that the trial court abused its discretion when it dismissed the Wrights' claims against Bowie. 48 S.W.3d at 448. The court concluded that the report inadequately summarizes the causal relationship between Bowie's alleged negligence and Barbara's injury. However, it determined that the report represents a good-faith effort to comply with the Act, because it raises the possibility that, but for Bowie's breach, Barbara "would have had a better outcome." 48 S.W.3d at 447.

[1] Medical-malpractice plaintiffs must provide each defendant physician and health-care provider an expert report with the expert's curriculum vitae, or they must voluntarily nonsuit the action. *See* TEX.REV.CIV. STAT.

art. 4590i, § 13.01(d); *American Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 877 (Tex.2001). The expert report must provide "a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." TEX.REV.CIV. STAT. art. 4590i, § 13.01(r)(6). If a plaintiff timely files an expert report and the defendant moves to dismiss because of the report's inadequacy, the trial court must grant the motion "*only if* it appears to the court, after hearing, that the report does not represent a *good faith effort* to comply with the definition of an expert report in Subsection (r)(6) of this **\*52** section." TEX.REV.CIV. STAT. art. 4590i, § 13.01(*l* ) (emphasis added).

[2] We recently discussed the Act's expert-report requirement for medical-malpractice cases. *See Palacios,* 46 S.W.3d at 877–80. In *Palacios,* we explained that, when considering a motion to dismiss under section 13.01(*l* ), "[t]he issue for the trial court is whether 'the report' represents a good-faith effort to comply with the statutory definition of an expert report." *Palacios,* 46 S.W.3d at 878. To constitute a "good-faith effort," the report must provide enough information to fulfill two purposes: (1) it must inform the defendant of the specific conduct the plaintiff has called into question, and (2) it must provide a basis for the trial court to conclude that the claims have merit. *Palacios,* 46 S.W.3d at 879.

[3] [4] [5] The trial court should look no further than the report itself, because all the information relevant to the inquiry is contained within the document's four corners. *Palacios,* 46 S.W.3d at 878. The report need not marshal all the plaintiff's proof, but it must include the expert's opinion on each of the three elements that the Act identifies: standard of care, breach, and causal relationship. *Palacios,* 46 S.W.3d at 878. A report cannot merely state the expert's conclusions about these elements. *Palacios,* 46 S.W.3d at 879. "[R]ather, the expert must explain the basis of his statements to link his conclusions to the facts." *Earle v. Ratliff,* 998 S.W.2d 882, 890 (Tex.1999).

[6] [7] [8] We review a trial court's order dismissing a claim for failure to comply with section 13.01(d)'s expert-report requirements under an abuse-of-discretion standard. *Palacios,* 46 S.W.3d at 878. A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985). When reviewing matters committed to the trial court's discretion, a court of appeals may not

substitute its own judgment for the trial court's judgment. *See Flores v. Fourth Ct. of Appeals,* 777 S.W.2d 38, 41 (Tex.1989).

Here, the parties do not dispute that the expert report fairly summarizes the alleged standard of care, because it states that a hospital should have established procedures to read and interpret x-rays in a timely manner and to inform patients about the results. *See* TEX.REV.CIV. STAT. art. 4590i, § 13.01(r)(6). Also, the parties do not dispute that the report fairly summarizes how Bowie allegedly breached the standard of care, because the report states that Bowie did not have a procedure to track x-rays. *See* TEX.REV.CIV. STAT. art. 4590i, § 13.01(r)(6). Consequently, the parties only contest whether the report constitutes a "good-faith effort" to fairly summarize the causal relationship between Bowie's alleged breach and Barbara's injury. *See* TEX.REV.CIV. STAT. art. 4590i, § 13.01(r)(6); *Palacios,* 46 S.W.3d at 879.

Contrary to the court of appeals' conclusion, it is not enough that the expert report "provided insight" about the plaintiff's claims. *See* 48 S.W.3d at 447. Rather, to constitute a good-faith effort to establish the causal-relationship element, the expert report must fulfill *Palacios* 's two-part test. *See Palacios,* 46 S.W.3d at 879. Thus, under the *Palacios* test, we must determine whether the trial court acted unreasonably and without reference to guiding principles when it dismissed the Wrights' claims against Bowie. *See Downer,* 701 S.W.2d at 241–42.

The Wrights primarily rely on one statement in the report to establish causation: "if the x-rays would have been correctly read and the appropriate medical personnel **\*53** acted upon those findings then Wright would have had the possibility of a better outcome." In their brief to this Court, the Wrights contend that this statement "explains why Petitioners' damages were caused by Bowie Hospital's breach: if the proper medical personnel at Bowie had reviewed the x-rays, [Barbara] would have had a chance of diagnosis and treatment of her foot fracture."

Bowie responds that the report's statement about causation is conclusory, because it does not explain how Bowie's failing to correctly read or act upon the x-rays caused injury to Barbara. Moreover, Bowie asserts, the statement does not even identify the specific injuries Bowie's conduct allegedly caused.

In reviewing the report's adequacy, the court of appeals focused on "whether the report provides a basis to conclude that the claims have merit." 48 S.W.3d at 447 (citing *Palacios,* 46 S.W.3d at 878–79). Although the causation statement recognizes only the "possibility"—

rather than the "reasonable medical probability"—that Barbara might have had a better outcome, the court of appeals concluded that the report's adequacy should not turn "solely upon the claimant's failure to use magical words like 'reasonable probability.' " 48 S.W.3d at 447. Accordingly, the court of appeals held that the report met the good-faith effort test, because it gave the trial court a basis to conclude that the Wrights' claims against Bowie have merit. 48 S.W.3d at 448.

We agree with the court of appeals' conclusion that a report's adequacy does not depend on whether the expert uses any particular "magical words." Nothing in the Act's plain language, or in *Palacios,* suggests that, for these purposes, an expert report must express the causal relationship in terms of "reasonable medical probability." However, we disagree with the court of appeals' conclusion that the trial court abused its discretion in dismissing the Wrights' claims against Bowie. We have held that the only information relevant to whether a report represents a good-faith effort to comply with the statutory requirements is the report itself. *Palacios,* 46 S.W.3d at 878. And, we have held that we review a trial court's decision about whether a report constitutes a good-faith effort to comply with the Act under an abuse-of-discretion standard. *Palacios,* 46 S.W.3d at 878.

After reviewing this report, we conclude that the trial court could have reasonably determined that the report does not represent a good-faith effort to summarize the causal relationship between Bowie's failure to meet the applicable standards of care and Barbara's injury. *See* TEX.REV.CIV. STAT. art. 4590i, § 13.01(r)(6); *Palacios,* 46 S.W.3d at 879. That is because the report simply opines that Barbara might have had "the possibility of a better outcome" without explaining how Bowie's conduct caused injury to Barbara. We cannot infer from this statement, as the Wrights ask us to, that Bowie's alleged breach precluded Barbara from obtaining a quicker diagnosis and treatment for her foot. Rather, the report must include the required information within its four corners. *See* TEX.REV.CIV. STAT. art. 4590i, § 13.01(r)(6); *Palacios,* 46 S.W.3d at 878. Because the report lacks information linking the expert's conclusion (that Barbara might have had a better outcome) to Bowie's alleged breach (that it did not correctly read and act upon the x-rays), the trial court could have reasonably determined that the report was conclusory. *See Palacios,* 46 S.W.3d at 880; *Earle,* 998 S.W.2d at 890. A conclusory report does not meet the Act's requirements, because it does not satisfy the *Palacios* test. *Palacios,* 46 S.W.3d at 879.

**\*54** For these reasons, we hold that the trial court did not abuse its discretion when it concluded that the report did

not represent a good-faith effort to meet the Act's requirements. Therefore, the trial court had no discretion but to dismiss the plaintiffs' claims against Bowie. *See* TEX.REV.CIV. STAT. art. 4590i, § 13.01(*l* ); *Palacios,* 46 S.W.3d at 880. In reviewing the trial court's order, the court of appeals improperly substituted its own judgment for the trial court's judgment. *See Flores,* 777 S.W.2d at 41. Accordingly, we grant Bowie's petition for review. Without hearing oral argument, we reverse the court of appeals' judgment and dismiss with prejudice the Wrights' claims against Bowie. *See* TEX.R.APP. P. 59.1.

**Parallel Citations**

45 Tex. Sup. Ct. J. 833

---

**End of Document**  © 2015 Thomson Reuters. No claim to original U.S. Government Works.

227 S.W.3d 221
Court of Appeals of Texas,
Houston (1st Dist.).

CHCA MAINLAND L.P. d/b/a Mainland Medical
Center, Appellant,
v.
James M. BURKHALTER, Individually and as
Independent Executor of the Estate of Glenda
Burkhalter, Deceased, and Jamie N. Burkhalter
and Joe E. Ferguson, II, Appellees.

No. 01–06–00158–CV. | March 8, 2007.

**Synopsis**
**Background:** Surviving family member of deceased
patient, individually and as independent executor of
patient's estate, as well as other family members, brought
medical negligence action against physician and medical
center, alleging that the emergency care patient received
caused her death. Medical center moved to dismiss on the
basis of an insufficient expert report. The 122nd District
Court, Galveston County, John Ellisor, J., denied the
motion. Medical center appealed.

**Holdings:** The Court of Appeals, Terry Jennings, J., held
that:

[1] the medical center's appeal was timely, and

[2] the expert report submitted in support of claims against
medical center omitted the statutory elements, thus
requiring dismissal of the action.

Reversed and rendered.

**Attorneys and Law Firms**

**\*223** John Wesley Raley, Lanette Lurleen Lutich–
Matthews, Houston, TX, Michelle Elaine Robberson,
Cooper & Scully, Dallas, TX, for appellant.

Sheila P. Haddock, The Law Firm of Sheila P. Haddock,
PLLC, Houston, TX, for appellees.

Panel consists of Justices NUCHIA, JENNINGS, and
HIGLEY.

**OPINION**

TERRY JENNINGS, Justice.

In this interlocutory appeal,[1] appellant, CHCA Mainland
L.P. doing business as Mainland Medical Center
("Mainland"), challenges the trial court's January 25,
2006 order denying its motion to dismiss the health care
liability claim of appellees, James M. Burkhalter,
individually and as independent executor of the estate of
Glenda Burkhalter, deceased, and Jamie N. Burkhalter
and Joe E. Ferguson, II ("the Burkhalters").[2]

We reverse the trial court's January 25, 2006 order
denying Mainland's motion to **\*224** dismiss and render
judgment dismissing with prejudice the Burkhalters'
claims against Mainland.

**Procedural Background**

In their original petition, filed on July 8, 2005, the
Burkhalters sued Mainland and Dr. Robin Lynn
Armstrong,[3] alleging that their negligence proximately
caused the death of Glenda Burkhalter. On July 22, 2005,
the Burkhalters amended their original petition, further
alleging that, on or about August 28, 2003, Glenda
Burkhalter sought medical care and treatment at
Mainland's emergency room because she was suffering
from progressive epigastric abdominal pain radiating to
her back, nausea, vomiting, diarrhea, some chest pain, and
palpitations. They also alleged that Mainland and Dr.
Armstrong were negligent and proximately caused Glenda
Burkhalter's injuries in (1) "deviating from the standard
of care for treatment of gallstone pancreatitis secondary to
acute common bile duct obstruction by stone(s)"; (2)
"failing to properly and timely diagnosis [sic] [Glenda
Burkhalter's] gallstone pancreatitis secondary to acute
common bile duct obstruction by stone(s)"; (3) "failing to
properly treat [Glenda Burkhalter's] condition"; (4)
"failing to refer [Glenda Burkhalter] with expressed
immediacy to a specialist or physician qualified to
confirm diagnosis and treat [her], or to consult with such
a specialist or physician concerning [her] condition"; (5)
"failing to insure that [Glenda Burkhalter] was properly
monitored"; and (6) "failing to admit [Glenda Burkhalter]
to an intensive care unit upon discharge from the
emergency room."

On August 1, 2005, the Burkhalters served Mainland with the expert report[4] of John H. Fullerton, M.D. Mainland, on August 22, 2005, filed its "Objection to Plaintiffs' Chapter 74.351 Expert Report." Mainland objected to Dr. Fullerton's report as inadequate and requested a "dismissal" of the Burkhalters' claim.[5] The Burkhalters filed a response, and, on November 18, 2005, the trial court entered a written order denying Mainland's "objections." Mainland, on December 6, 2005, filed a "Motion to Dismiss" the Burkhalters' claim based on Dr. Fullerton's "inadequate" report. The Burkhalters filed a response, and the trial court, on January 25, 2006, signed its order denying Mainland's motion to dismiss. Subsequently, on February 14, 2006, Mainland filed its notice of appeal of the January 25, 2006 order.

## Jurisdiction

[1] At the outset, we address the Burkhalters' argument that Mainland's appeal is untimely because "[a] defendant seeking review of a trial court's refusal to dismiss based on an inadequate expert report must file a notice of appeal within 20 days of the order denying relief." *See* TEX.R.APP. P. 26.1(b), 28.1. They assert that "[a]lthough captioned as an 'Objection' to the expert report, Mainland's first motion specifically cited section 74.351(b) and clearly sought the relief enumerated in that subsection: dismissal and recovery of costs and attorney's fees." *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(b) (Vernon Supp.2006). Therefore, because "[t]he motion was denied November 18, 2005, ... any interlocutory appeal must have been commenced no later than December 8, 2005." In response, Mainland argues that **\*225** because the trial court, in its first order, only denied its "objections" to Dr. Fullerton's report and did not rule on its request to dismiss the Burkhalters' claims under section 74.351(b), the November 18, 2005 order was not appealable.

Section 74.351(a) provides that within 120 days of filing an original petition in a health care liability claim, a plaintiff must serve on each defendant an expert report, along with the expert's curriculum vitae. *Id.* § 74.351(a) (Vernon Supp.2006). An expert report is defined as "a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." *Id.* § 74.351(r)(6) (Vernon Supp.2006).

Section 74.351(*l* ) provides the proper basis for lodging objections to the adequacy of an expert report. *See id.* § 74.351(*l* ) (Vernon Supp.2006) ("A court shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report in Subsection (r)(6)."); *Methodist Healthcare Sys. of San Antonio, Ltd. v. Martinez–Partido,* No. 04–05–00868–CV, 2006 WL 1627844, at \*2 (Tex.App.-San Antonio June 14, 2006, pet. denied) (mem. op.). Although an interlocutory appeal may be taken from an order that "grants relief sought by a motion under Section 74.351(*l* )," a defendant has no right of interlocutory appeal if the trial court denies the defendant's challenge to the adequacy of an expert report under section 74.351(*l* ). TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(10) (Vernon Supp.2006); *Lewis v. Funderburk,* 191 S.W.3d 756, 760 (Tex.App.-Waco 2006, pet. filed).

[2] An expert report may be deemed untimely filed under section 74.351(a) if the report is served before the 120–day deadline, but deficient. *Acad. of Oriental Med., L.L.C. v. Andra,* 173 S.W.3d 184, 187 n. 5 (Tex.App.-Austin 2005, no pet.); *Martinez–Partido,* 2006 WL 1627844, at \*1. If an adequate expert report "has not been served" within the 120–day period, the court, on the defendant's motion, shall, subject to section 74.351(c),[6] enter an order that "awards to the affected physician or health care provider reasonable attorney's fees and costs of court" and "dismisses the claim with respect to the physician or health care provider, with prejudice to the refiling of the claim." TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(b). A person may appeal from an interlocutory order that "denies all or part of the relief sought by a motion under Section 74.351(b), except that an appeal may not be taken from an order granting an extension under Section 74.351." *Id.* § 51.014(a)(9) (Vernon Supp.2006); *see id.* § 74.351(c) (Vernon Supp.2006).

Here, Mainland, in its August 22, 2005 "Objection to Plaintiffs' Chapter 74.351 Expert Report," in addition to objecting to the adequacy of the Burkhalters' report, also requested dismissal of the Burkhalters' claims with prejudice. However, the trial court, in its November 18, 2005 order, did not rule on Mainland's initial request to dismiss the case pursuant to section 74.351(b). Rather, the trial court only overruled Mainland's objections to Dr. **\*226** Fullerton's report made pursuant to section 74.351(*l* ). We note that in order to complain of an error on appeal, the record must show that the trial court either expressly or impliedly ruled on the request, objection, or motion. *See* TEX.R.APP. P. 33.1(a)(2)(A). Only after Mainland filed its subsequent "Motion to Dismiss" did the trial

court enter its January 25, 2006 order denying Mainland's request for a dismissal pursuant to section 74.351(b). Accordingly, we have jurisdiction over the instant appeal of the trial court's January 25, 2006 order denying Mainland's motion to dismiss.

### Expert Report

In its sole issue, Mainland argues that the trial court, in its January 25, 2006 order, erred in denying Mainland's motion to dismiss because Dr. Fullerton's expert report "did not contain a fair summary of the expert's opinions against Mainland on any of the three elements required by section 74.351(r)(6)." Mainland asserts that the report "failed to include any standard(s) of care for the hospital or the hospital staff, and it was conclusory as to the hospital and hospital staff on the elements of breach of the standard of care and causation," and therefore "was not an objective good faith effort under section 74.351(l)."

[3] [4] [5] We review a trial court's decision on a motion to dismiss a case under section 74.351(b) for an abuse of discretion. *See Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 875 (Tex.2001) (holding trial court's decision to dismiss under former article 4590i, section 13.01(e), is reviewed for abuse of discretion); *Lookshin v. Feldman,* 127 S.W.3d 100, 103 (Tex.App.-Houston [1st Dist.] 2003, pet. denied) (same). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to guiding rules or principles. *Downer v. Aquamarine Operators., Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985). When reviewing matters committed to the trial court's discretion, we may not substitute our own judgment for that of the trial court. *Walker v. Packer,* 827 S.W.2d 833, 839 (Tex.1992).

Here, the issue is whether Dr. Fullerton's report represents an objective good faith effort to comply with the statutory definition of an expert report. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(l); *Palacios,* 46 S.W.3d at 878. The definition requires a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(6). If a plaintiff timely files an expert report and the defendant moves to dismiss because of the report's inadequacy, a trial court must grant the motion "only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the

definition of an expert report in Subsection (r)(6)." *Id.* § 74.351(l); *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 51–52 (Tex.2002) (applying former article 4590i, section 13.01(l)).

[6] [7] [8] Because the statute focuses on what the report discusses, the only information relevant to the inquiry is within the four corners of the document. *Palacios,* 46 S.W.3d at 878. A report need not marshal all the plaintiffs' proof, but it must include the expert's opinion on each of the elements identified in the statute. *Id.* In setting out the expert's opinions on each of those elements, the report must provide enough information to fulfill two purposes **\*227** if it is to constitute a good faith effort. *Id.* at 879. First, the report must inform the defendant of the specific conduct the plaintiffs have called into question. *Id.* Second, and equally important, the report must provide a basis for the trial court to conclude that the claims have merit. *Id.*

[9] [10] A report that merely states the expert's conclusions about the standard of care, breach, and causation does not fulfill these two purposes. *Id.* Rather, the expert must explain the basis of his statements to link his conclusions to the facts. *Wright,* 79 S.W.3d at 52. Nor can a report meet these purposes and thus constitute a good faith effort if it omits any of the statutory requirements. *Palacios,* 46 S.W.3d at 879. However, to avoid dismissal, a plaintiff need not present evidence in the report as if it were actually litigating the merits. *Id.* The report can be informal in that the information in the report does not have to meet the same requirements as the evidence offered in a summary judgment proceeding or at trial. *Id.*

[11] [12] [13] Identifying the standard of care is critical: whether a defendant breached his or her duty to a patient cannot be determined absent specific information about what the defendant should have done differently. *Id.* at 880. While a "fair summary" is something less than a full statement of the applicable standard of care and how it was breached, even a fair summary must set out what care was expected, but not given. *Id.* When a plaintiff sues more than one defendant, the expert report must set forth the standard of care for each defendant and explain the causal relationship between each defendant's individual acts and the injury. *See Doades v. Syed,* 94 S.W.3d 664, 671–72 (Tex.App.-San Antonio 2002, no pet.); *Rittmer v. Garza,* 65 S.W.3d 718, 722–23 (Tex.App.-Houston [14th Dist.] 2001, no pet.).

[14] Mainland argues that Dr. Fullerton's report is inadequate because he "did not include in his report any discussion of any standard of care applicable to a hospital, its nurses, or other hospital employees" and, "[a]s to Mainland, Dr. Fullerton's opinions on breach and

causation were conclusory at best." Mainland asserts that "[i]n his report, Dr. Fullerton never states the standards of care applicable to a hospital or its nurses or other employees." It further asserts that "[a]lthough Dr. Fullerton states in one sentence—the only mention of the hospital or its staff in the entire expert report—that the hospital staff breached the standard of care during Glenda [Burkhalter's] hospitalization at Mainland, he does not identify how Mainland's staff breached the standard of care." Additionally, "[i]n discussing proximate causation, Dr. Fullerton does not state how any conduct of Mainland or its nurses or other employees was a proximate cause of Glenda [Burkhalter's] death," and "his opinions on proximate cause are conclusory."

In the five-page report, the only specific mention of the hospital occurs when Dr. Fullerton states that "[n]egligent care was rendered to Glenda Burkhalter and the standard of care breached—by Dr. Armstrong, the treating physicians (including the hospitalists), and the hospital staff-during her hospitalization at Mainland Medical Center." However, the report fails to mention the appropriate standard of care specifically in regard to Mainland, its nurses, and its staff. The report similarly fails to identify specifically how Mainland, its nurses, or staff breached that standard of care. Nor does the report explain any causal relationship between the acts of Mainland, its nurses and staff, and the injuries of Glenda Burkhalter. Thus, the report omitted the statutory elements of the Burkhalters' claim against Mainland. *See* TEX. CIV. PRAC. & REM.CODE **\*228** ANN. § 74.351(*l* ), (r)(6); *Jernigan v. Langley,* 195 S.W.3d 91, 94 (Tex.2006).

The Burkhalters argue that because they allege in their petition that Dr. Armstrong was acting as the hospital's "agent, servant, and/or employee," that "each statement regarding Dr. Armstrong may implicate Mainland." However, the Burkhalters cite no authority for the proposition that, by alleging in a petition that a doctor is acting as an "agent, servant, and/or employee" of a hospital, an expert report may be adequate under section 74.351 in regard to a hospital. Moreover, Mainland notes that "Dr. Fullerton did not state that his opinions against Dr. Armstrong would also apply against the hospital because of the Burkhalters' pleading that Dr. Armstrong was an agent of the hospital."

Because Dr. Fullerton's expert report omits at least one of the three specifically enumerated requirements of section 74.351(r)(6) in regard to Mainland, it cannot constitute an objective good faith effort to meet the statutory requirements. *See Jernigan,* 195 S.W.3d at 94. Accordingly, we hold that the trial court erred in denying Mainland's December 6, 2005 motion to dismiss the health care liability claim of the Burkhalters.

### Conclusion

We reverse the trial court's January 25, 2006 order denying Mainland's motion to dismiss and render judgment dismissing with prejudice the Burkhalters' claims against Mainland.[7]

Footnotes

[1]   *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(9) (Vernon Supp.2006).

[2]   *See id.* § 74.351 (Vernon Supp.2006). Before September 1, 2005, section 74.351(a) required that a plaintiff, within 120 days of filing a health care liability claim, serve on each defendant an expert report, along with the expert's curriculum vitae. *See* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.01, 2003 Tex. Gen. Laws 847, 875, *amended by* Act of May 18, 2005, 79th Leg., R.S., ch. 635, § 1–3, 2005 Tex. Sess. Law Serv. 1590, 1591 (Vernon Supp.2006). Section 74.351(a) has been amended since the Burkhalters' health care liability claim accrued. *See id.* (providing that amendment took effect September 1, 2005). However, which version of the statute applies does not affect our analysis, and we therefore cite to the current version of the statute.

[3]   Dr. Armstrong is not a party to this appeal.

[4]   *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(a).

[5]   *See id.* § 74.351.

[6]   *See id.* § 74.351(c) ("If an expert report has not been served ... because elements of the report are found deficient, the court may grant one 30–day extension to the claimant in order to cure the deficiency.").

[7]     We note that, in its brief, Mainland did not request an award of reasonable attorney's fees. *See id.* § 74.351(b)(1).

---

**End of Document**                                            © 2015 Thomson Reuters. No claim to original U.S. Government Works.

998 S.W.2d 882
Supreme Court of Texas.

Stephen EARLE, M.D., Petitioner,
v.
Michael RATLIFF and Shirley Ratliff,
Respondents.

No. 98–0115. | Argued April 7, 1999. | Decided July 1, 1999. | Rehearing Overruled Oct. 7, 1999.

Patient sued surgeon who performed two back surgeries involving metal bone plates and pedicle screws, asserting medical malpractice and lack of informed consent. The 288th Judicial District Court, Bexar County, David Peeples, J., granted summary judgment for surgeon on statute of limitations grounds. Patient appealed. The San Antonio Court of Appeals, 961 S.W.2d 591, reversed and remanded. Surgeon filed petition for review. The Supreme Court, Hecht, J., held that: (1) any negligence by surgeon concerning initial surgery occurred on or before date of that surgery, and limitations period thus began to run on that date rather than when surgeon quit treating patient; (2) surgeon did not fraudulently conceal known wrong, so as to toll limitations periods for medical malpractice claim; (3) open courts provision of state constitution did not preclude limitations bar of patients' claims relating to initial back surgery; (4) genuine issue of material fact existed, precluding summary judgment for surgeon, on whether he was negligent concerning second surgical implant of devices in patient's back; (5) surgeon could not be held negligent concerning disclosure of risks attendant to second spinal implant surgery, where surgeon disclosed all risks identified by Texas Medical Disclosure Panel and thus complied with Medical Liability Insurance Improvement Act; and (6) Medical Liability and Insurance Improvement Act barred patient's Deceptive Trade Practices-Consumer Protection Act (DTPA) claims that surgeon misrepresented and concealed truth concerning back surgeries.

Judgment of the Court of Appeals affirmed in part and reversed in part, and case remanded.

**Attorneys and Law Firms**

***883** George H. Spencer, Sr., Phylis J. Speedlin, San Antonio, for Petitioner.

Donna J. Bowen, Michael L. Slack, Austin, James A. Hall, San Antonio, for Respondents.

**Opinion**

***884** Justice HECHT delivered the opinion of the Court.

This medical malpractice case raises several issues, but our attention centers on whether the plaintiff's claim that the defendant negligently performed surgery on him is barred by limitations. The plaintiff contends that limitations did not begin to run on his claim until his post-surgical course of treatment by the defendant ended, and until he became aware that the defendant had fraudulently concealed from him the truth about the surgery and the treatment that followed. Further, the plaintiff asserts, to bar his claim would violate the Open Courts provision of the Texas Constitution.[1] On each of these matters we disagree with the plaintiff, but on other claims described below, we believe the plaintiff is correct. The district court granted defendant summary judgment on all plaintiff's claims. The court of appeals reversed summary judgment on all claims.[2] We partially affirm, and partially reverse, the judgment of the court of appeals and remand the case to the district court for further proceedings.

## I

Michael Ratliff, a thirty-eight-year-old freight handler in good health, sustained a work-related back injury in June 1991, for which he was treated by Dr. Stephen Earle. On November 21, 1991, Earle operated on Ratliff, fusing his lumbar spine at three levels, decompressing nerves at four levels, and inserting metal bone plates and screws manufactured by AcroMed Corporation. Unfortunately, Ratliff's condition gradually worsened. Earle continued to treat Ratliff, and on November 16, 1993, Earle operated again to remove and replace the instrumentation implanted in the first surgery. Following this surgery, Ratliff's condition deteriorated even further, to the point where he was in constant pain and unable to walk, talk, or care for himself. A month later, Ratliff saw a television report on the risks associated with the AcroMed instrumentation that had been surgically implanted in him and removed. Ratliff contends that this was his first inkling that Earle's treatment had been improper. Ratliff returned to Earle on January 4, 1994, for a final visit, and not quite two months later, on February 28, he and his wife (collectively, "Ratliff") sued Earle and others. We are concerned only with Ratliff's action against Earle.

Ratliff sued Earle for negligence, fraudulent concealment, strict liability, and violations of the Deceptive Trade

Practices–Consumer Protection Act.[3] Ratliff alleged that Earle was negligent in:

· misdiagnosing his condition;

· performing unwarranted and unnecessary surgeries on him;

· implanting in his back pedicle devices not approved by the Federal Food and Drug Administration;

· failing to warn him of the risks of the surgery and the causes of his subsequent pain; and

· misrepresenting throughout the entire course of treatment the risks of pedicle instrumentation and the problems experienced by other patients from such a procedure.

Ratliff further alleged that Earle had fraudulently concealed:

· that the surgeries were unwarranted and unnecessary;

· that objective reports did not support Earle's diagnosis and recommendation of surgery;

· that statements Earle made to induce Ratliff to have surgery were incorrect;

· that assurances Earle gave Ratliff about his condition and the reasons **\*885** for his continuing pain were misleading, incomplete, and inaccurate; and

· the risks of using spinal fixation devices, some of which were printed on an insert in the packaging of the instrumentation Earle implanted in Ratliff.

Finally, Ratliff alleged that Earle violated the DTPA by telling him that:

· he needed surgery;

· he would get "95% better" and would be able to return to work;

· the devices implanted in Ratliff were safe, approved for such use, and permanent; and

· the pain he endured was to be expected and would get better.

(Ratliff has dismissed his strict liability claim in order to participate in a settlement reached in *In re Orthopedic Bone Screw Products Liability Litigation (Fanning v. Acromed Corp.).*[4])

Earle moved for summary judgment on several grounds, including: that Ratliff's claims relating to his 1991 surgery were barred by limitations; that with respect to the 1993 surgery, Earle did not breach the standard of care owed Ratliff or cause him any injury; that Earle obtained from Ratliff the consent to treatment and surgery required by statute;[5] and that Earle did not knowingly make any misrepresentation to Ratliff. In connection with the last ground, Earle argued that Ratliff's health care liability claims could not be recast as DTPA violations. Earle supported his motion with his own affidavit and certain medical records. Ratliff responded, relying on his own affidavit and that of an expert witness, Dr. Vert Mooney, as well as other medical records. The district court granted Earle's motion "on all grounds", and Ratliff appealed.

The court of appeals reversed, holding that Earle was not entitled to summary judgment on any ground raised in his motion.[6] Concerning limitations, the court concluded "that the allegations of this case [involving] elements of both misdiagnosis and mistreatment mak[e] it difficult to ascertain a specific date when the malpractice claim arose."[7] Under the circumstances, the court found that limitations did not begin to run on Ratliff's claims until the date of Earle's last treatment,[8] which, as we have said, was less than two months before Ratliff filed suit.

We granted Earle's petition for review.[9] We first consider whether Ratliff's claims relating to the 1991 surgery are barred by limitations, and then whether Earle was entitled to summary judgment on Ratliff's other claims.

## II

Ratliff's negligence claims are "health care liability claims" within the meaning of the Medical Liability and Insurance Improvement Act.[10] Section 10.01 of the Act provides in pertinent part that

no health care liability claim may be commenced unless the action is filed within two years from the occurrence of the breach or tort or from the date the medical or health care treatment that is the subject of the claim or the hospitalization **\*886** for which the claim is made is completed....[11]

Thus, under this statute limitations is to run from one of three dates: the date of the breach or tort, the completion

of treatment, or the completion of hospitalization. We have repeatedly held that a plaintiff cannot choose the most favorable of the three dates specified, and that "if the date of the negligence can be ascertained, ... limitations must be measured from the date of the tort."[12]

Ratliff contends, and the court of appeals agreed, that limitations did not begin to run on his claims regarding the 1991 surgery until Earle quit treating him, shortly before he filed suit. Earle asserts that limitations began to run on those claims the date surgery was performed. Ratliff also contends that the running of limitations was suspended by Earle's fraudulent concealment of certain facts about the surgery and his prognosis. Earle responds that Ratliff has failed to raise a genuine issue of material fact on the elements of fraudulent concealment. Finally, Ratliff argues that his claims cannot be barred by limitations without violating the Open Courts provision of the Texas Constitution. Earle responds that Ratliff has failed to raise a fact issue that he did not have a reasonable opportunity to sue, and thus he is not entitled to the protection of the Open Courts provision. We address each of these issues—when limitations began to run, fraudulent concealment, and Open Courts—in turn.

### A

[1] Ratliff neither complains nor offers evidence of any negligence by Earle in the treatment following the 1991 surgery. Ratliff does not contend, for example, that Earle should have done something after the surgery to relieve his pain or improve his back. Ratliff alleges that Earle did not tell him the truth about the surgery, the reasons for his continued pain afterward, or his prognosis, but he does not assert that Earle's alleged post-surgical statements or concealments affected his treatment or his condition.

Rather, Ratliff contends that Earle was negligent in misdiagnosing the need for surgery, in failing to disclose the attendant risks of surgery beforehand, and in performing unwarranted surgery. Assuming Ratliff is correct, Earle's negligence occurred on or before the date he performed surgery, and limitations on Ratliff's claim began to run on that date. We reached the same conclusion in similar circumstances in *Gormley v. Stover.*[13] There, Stover complained that Gormley was negligent in performing skin graft surgery to improve her ability to wear dentures, but she argued that limitations did not begin to run until Gormley quit treating her. We explained:

Gormley's motion for summary judgment stated that the health care of which Stover complained occurred before or during surgery. None of the excerpts of Stover's and her expert witness' deposition testimony, attached to Gormley's motion, mentioned any negligence occurring after surgery. Gormley's affidavit stated that if Stover was injured at all, it was during surgery. Stover's affidavit did not assert that Gormley was negligent following surgery. Her affidavit did assert that Gormley represented to her after her surgery that her pain would shortly subside, but she does not claim that her continued pain was attributable to his post-surgical treatment of her. In short, Gormley's affidavit established as a matter of law that no actionable negligence occurred after surgical treatment was completed, and nothing else in the **\*887** summary judgment record raises a fact issue on the matter. The trial court correctly granted summary judgment for Gormley on Stover's negligence claims in their entirety.[14]

As far as we have been able to determine, the only courts of appeals to consider this issue have reached the same conclusion.[15]

The court of appeals in the present case was concerned about the lingering effects of Earle's alleged misdiagnosis, leading to unnecessary surgery, continued pain and complications, and finally another surgery. But if the running of limitations on negligent surgery were deferred while the patient continued to experience the effects of that surgery, then the first clause of section 10.01 pegging the date of the breach or tort as the beginning of the limitations period would seldom apply to surgery.

Our conclusion does not suggest that limitations is not affected when a physician who can correct a misdiagnosis or lessen its consequences fails to do so. On the contrary, we suggested in *Rowntree v. Hunsucker* that a claim for continued mistreatment is not barred simply because treatment was based on a much earlier misdiagnosis.[16] *Rowntree* did not present such a situation,[17] but *Chambers v. Conaway,*[18] the case on which the court of appeals relied, did. Conaway claimed that Chambers, her family physician, failed to diagnose cancer on two occasions when she complained of a lump in her breast and on several other visits to him for general health care. Based on evidence that Chambers had a duty to follow up on Conaway's complaints each time he saw her, we held that the tort Conaway complained of did not occur, and limitations did not begin to run, until the last time Chambers failed to diagnose her cancer, which was her last visit.[19] We did not apply the course-of-treatment limitations provisions of section 10.01 to allow Conaway to complain of the initial misdiagnosis, but neither did we

allow that first misdiagnosis to bar Conaway's complaints about later visits.

Nor does our conclusion suggest that limitations on claims of post-surgical negligence runs from the date of surgery. If treatment is negligent following surgery, then section 10.01 provides that limitations begins to run from the date of the breach or tort or from the date that treatment was completed. Thus, limitations on a claim that a physician has improperly treated a patient's infection following surgery does not begin to run on the date of surgery merely because the infection would not have occurred but for the surgery.

Ratliff does not allege that Earle misdiagnosed or mistreated his condition after surgery or that he failed to do anything following surgery to rectify or ameliorate his earlier misdiagnosis that surgery was appropriate. Under these circumstances, limitations began to run on Ratliff's complaints concerning the 1991 surgery the date it was performed.

**B**

Although section 10.01 prescribes the limitations period for all health care liability claims "[n]otwithstanding any other **\*888** law,"[20] we held in *Borderlon v. Peck* that the statute "does not abolish fraudulent concealment as an equitable estoppel to the affirmative defense of limitations".[21] Proof of fraudulent concealment, we added, does not prohibit an assertion of limitations altogether, but does suspend the running of limitations until such time as the plaintiff learned of, or should have discovered, the deceitful conduct or the facts giving rise to the cause of action.[22] Ratliff contends that because Earle fraudulently concealed that the 1991 surgery was unnecessary and risky, limitations on claims concerning that surgery did not begin to run until he learned the truth in a television broadcast more than two years later, a few months before he filed suit.

[2] We considered the effect of fraudulent concealment in the medical malpractice context in *Carrell v. Denton.*[23] There the defendant physician had left a gauze sponge in plaintiff's body after surgery. To avoid having his negligence claim barred by limitations, plaintiff asserted fraudulent concealment. We rejected plaintiff's argument, explaining:

> The proposition which lies at the bottom of this contention is to the effect that the relation between a surgeon and his patient involves trust and confidence,

therefore fraudulent concealment is imputed to Dr. Carrell because of his failure to inform the plaintiff that the gauze sponge had been left inside the plaintiff's body. The proposition is essentially unsound. In conducting a surgical operation on his patient, and in respect to any treatment he may administer, a surgeon is under the duty to exercise due care. His failure to discharge this duty constitutes negligence and therefore is wrongful—but the failure does not, of itself, constitute fraud or expose the surgeon to the imputation of fraudulent concealment. Among other essential ingredients, a fraudulent concealment in cases of this sort includes, first, actual knowledge of the fact that a wrong has occurred, and, second a fixed purpose to conceal the wrong from the patient. Neither of these ingredients appears from the allegations of the plaintiff's petition. The trial court did not err in sustaining the special exception in question and in dismissing the suit.[24]

In other words, proof of fraudulent concealment requires more than evidence that the physician failed to use ordinary care; it also requires evidence that the defendant actually knew the plaintiff was in fact wronged, and concealed that fact to deceive the plaintiff.[25]

[3] [4] [5] A person who asserts fraudulent concealment to avoid summary judgment on limitations must raise a genuine issue of material fact that would support his assertion.[26] Of course, fraudulent concealment may be shown by circumstantial evidence as well as direct evidence.[27] We therefore must examine the evidence Ratliff offered to support his claim of fraudulent concealment: Ratliff's affidavit and that of his expert, Dr. Mooney.

Mooney's affidavit focuses on whether Earle was negligent, not whether Earle deliberately concealed facts from Ratliff to deceive him. Mooney states that Earle **\*889** must have known that his recommendation of surgery was negligent because it was contraindicated by the objective test results set out in Ratliff's medical records and because information available to Earle concerning pedicle implementation showed that surgery should not have been attempted. While this evidence certainly shows a difference of opinion between Mooney and Earle and raises a question whether Earle was negligent, it falls short of showing Earle's "actual knowledge of the fact that a wrong ... occurred" necessary for fraudulent concealment. In addition, Mooney refers to portions of Earle's deposition testimony as evidence that Earle knew about, but did not inform Ratliff of, certain serious risks associated with spinal fixation surgery. This testimony, too, reflects a difference of professional opinion and does not show that Earle intended to deceive Ratliff.

Ratliff's affidavit does not show that Earle fraudulently concealed facts from him. Ratliff states that Earle "assur[ed] me that I would be '95 ≠tter' and would return back to work soon", that Earle "did not inform me that my surgery could make my condition even worse" and "never explained the permanency and severity of my condition", and that Earle "told me the [1993] surgery was necessary because I had four broken screws" when in fact the surgery was necessitated by loose, not broken, screws. But Ratliff offers no evidence, direct or circumstantial, that Earle actually knew these statements were in fact false when he made them, let alone that Earle's purpose in making them was deceit. Earle may have been negligent in what he said to Ratliff, just as he may have been negligent in performing the 1991 surgery, but Ratliff has offered no summary judgment evidence that Earle acted fraudulently by concealing a known wrong.

Because Ratliff has failed to raise an issue of fact concerning fraudulent concealment, we conclude that he cannot thereby avoid the bar of limitations.

### C

[6]   [7]   The Open Courts provision of the Texas Constitution[28] does not permit a well-established common-law cause of action to be restricted by statute in a way that is unreasonable or arbitrary in view of the statute's purpose.[29] In *Jennings v. Burgess,* we held that the limitations provisions of section 10.01 do not violate the Open Courts guarantee if a plaintiff has had a reasonable opportunity to discover the alleged wrong and bring suit before the limitations period expired.[30] We assumed in *Jennings,* without expressly explaining our reasons, that the plaintiff must raise a fact issue concerning the applicability of the provision to avoid a summary judgment on limitations.[31] We believe that the same rule should apply for asserting the Open Courts guarantee in response to a motion for summary judgment on limitations as is applied in asserting fraudulent concealment.

Ratliff's affidavit establishes that he did not learn of the risks of pedicle implantation until he saw a television broadcast about a month after his second surgery. However, the only evidence Ratliff has offered to show that he could not have learned of the risks sooner consists of statements in Mooney's affidavit that he was justified in trusting Earle and the following statement: "From the information that I have reviewed, there is no evidence that Mr. Ratliff could have known that his care and continued

treatment by Dr. Earle was negligent and had caused the problems he was experiencing until, at the earliest, in December 1993 when he saw the [television broadcast]." The district court correctly struck this latter **\*890** statement as being conclusory. Even if the sentence had not been struck, neither it nor Mooney's broad statements about justified reliance on a physician's advice would support Ratliff's constitutional claim. Mooney's statement that *he* had seen no evidence that Ratliff could have discovered Earle's alleged negligence sooner is not conclusive of the record. Between the 1991 and 1993 surgeries, Ratliff made twenty-four visits to Earle's office. Medical records establish that he repeatedly complained of pain and a lack of improvement in his condition. In his own affidavit, Ratliff reiterates that his pain persisted during that period and that there was little improvement in his condition. Ratliff's condition was not latent, nor does he assert that the risks associated with his surgery were generally unknown to medical practitioners.

The record establishes that Ratliff had an opportunity to learn of any negligence by Earle in performing the 1991 surgery, and the fact that he waited more than two years to do so does not raise constitutional concerns. Accordingly, we conclude that Ratliff's claims concerning the 1991 surgery are barred by limitations.

### III

We now turn to three additional claims Ratliff makes: that Earle was negligent in performing the 1993 surgery, that Earle failed to disclose the risks attendant to that surgery, and that statements Earle made violated the DTPA.

### A

[8]   Ratliff claims that Earle was negligent in performing the 1993 surgery. In his affidavit supporting his motion for summary judgment, Earle states that he did not breach the applicable standard of care in performing the 1993 surgery. "Both in 1991 and 1993," Earle's affidavit states, "use of Steffe pedicle screws and plates met the standard of care." Mooney's affidavit states with respect to the 1993 surgery: "Considering the degree of spinal instability created by Mr. Ratliff's first surgery, and the fact that Mr. Ratliff's first set of AcroMed screws and plates resulted in hardware failure with loosening, the insertion of another device was medically unwarranted." The district court struck this statement in Mooney's affidavit as being conclusory, but we do not regard it as

any more conclusory than statements in Earle's affidavit. Mooney's statement raises the question whether, given Ratliff's failure to improve following the first surgical implantation and his increased spinal instability, a second implant was warranted. Earle's affidavit and other summary judgment evidence do not address this issue.

[9] Summary judgment can be granted on the affidavit of an interested expert witness, like Earle, but the affidavit must not be conclusory.[32] An expert's simple *ipse dixit* is insufficient to establish a matter; rather, the expert must explain the basis of his statements to link his conclusions to the facts.[33] Earle's affidavit does not explain why implantation of additional devices in the 1993 surgery was medically warranted, given Ratliff's history; the affidavit states only the conclusion that Earle met the applicable standard of care.

Accordingly, the court of appeals did not err in reversing summary judgment on this claim.

**B**

[10] Ratliff contends that Earle was negligent in failing to disclose the risks attendant to the 1993 surgery. This claim **\*891** is governed by the Medical Liability and Insurance Improvement Act.[34] The Act creates the Texas Medical Disclosure Panel and gives it the responsibility to "identify and make a thorough examination of all medical treatments and surgical procedures ... to determine which ... do and do not require disclosure of the risks and hazards to the patient".[35] The Panel prepares and publishes two lists, one (List A) of treatments and procedures for which the risks must be disclosed, and the other (List B) of treatments and procedures for which disclosure of risks is not required.[36] For all List A procedures, the Panel must also state what risks must be disclosed and the form in which disclosure must be made.[37] The Act then provides that a physician who discloses to a patient the risks of a List A procedure in the substance and form prescribed by the Panel "shall be considered to have complied" with the Act,[38] and that a patient's consent to a List A procedure obtained as prescribed "shall be considered effective".[39] It is undisputed that both of Ratliff's surgeries were List A procedures.[40] Earle's affidavit states in effect that he disclosed all risks identified by the Texas Medical Disclosure Panel in the manner required, and Ratliff's signed consent form shows that Earle is correct.

[11] The court of appeals held, however, that Earle's affidavit only raised a rebuttable presumption that he was not negligent in disclosing the risks of surgery to Ratliff, a

presumption Ratliff could and did rebut with Mooney's affidavit stating that Earle should have disclosed certain risks beyond those enumerated by the Texas Medical Disclosure Panel.[41] The court relied on another court of appeals' decision, *Penick v. Christensen,*[42] which concluded that a physician who makes disclosure for a List A procedure or treatment as prescribed by the Panel can nevertheless be negligent for failing to make additional disclosures. *Penick* based its conclusion on section 6.07(a)(1) of the Act, which provides that disclosure made as prescribed for a List A procedure "shall create a rebuttable presumption that the requirements of [the Act] have been complied with".[43]

We do not agree that the Act permits a finding that a physician who made disclosures as prescribed by the Panel was negligent for not disclosing other risks and hazards associated with the recommended procedure. Were it so, the Act would afford a physician who complied with Panel directives no protection from liability for nondisclosure if there were any evidence that additional disclosure was appropriate. The entire purpose of the Panel decisions would thus be thwarted. Section 6.07(a)(1) is not entirely clear, but we agree with the weight of scholarly authority that, read in the light of the other provisions of the Act, it permits the presumption of proper disclosure to be rebutted only by showing the **\*892** invalidity of the consent form, such as by proof that the patient's signature was forged, or that the patient lacked capacity to sign.[44]

Ratliff produced no evidence that his written consent was ineffective due to incapacity or was otherwise invalid, and thus he has raised no issue that Earle was negligent in disclosing the risks of surgery. Accordingly, we hold that the court of appeals erred in reversing summary judgment on this claim, and we disapprove *Penick* to the extent its reasoning is contrary to ours.

**C**

[12] Finally, Ratliff claims that Earle misrepresented and concealed the truth concerning both the 1991 and the 1993 surgeries in violation of the DTPA. Section 12.01(a) of the Medical Liability and Insurance Improvement Act precludes application of the DTPA to physicians "with respect to claims for damages for personal injury or death resulting, or alleged to have resulted, from negligence".[45] Ratliff and Earle both argue whether Ratliff's DTPA claims are thus precluded.

In *Sorokolit v. Rhodes,* we held that section 12.01(a) does not preclude a DTPA claim that is not based on a physician's breach of the accepted standard of medical care.[46] We added, however, that "[c]laims that a physician or health care provider was negligent may not be recast as DTPA actions" to avoid the provisions of the Act.[47] We held that a physician's promise that his patient's appearance following cosmetic surgery would be identical to a specific photograph was actionable under the DTPA.[48]

In *Gormley v. Stover,* however, we held that a dentist's statements that he could perform surgery on the plaintiff with no problems, that a skin graft would work as well as a bone graft, that after surgery the plaintiff could wear dentures with no problems, and that her pain and numbness would subside following surgery were not actionable under the DTPA.[49] All these statements, we concluded, related to whether the dentist's choice of surgical procedure and his performance of it met the applicable standard of care.[50] In *Walden v. Jeffery,* we held that a dentist's failure to provide the plaintiff dentures that fit was a negligence claim, not a DTPA claim.[51] More recently, we held in *MacGregor Medical Ass'n v. Campbell* **\*893** that a clinic's statements in its HMO literature that it provided qualified personnel and resources, the best services possible, and emergency service twenty-four hours a day were not actionable under

the DTPA when the plaintiff's complaint was that her deceased husband had been negligently treated.[52]

The representations Ratliff alleges Earle made are all related to Earle's treatment of him and the surgeries performed, as in *Gormley, Walden,* and *MacGregor,* and do not resemble the representations that were possible DTPA violations in *Sorokolit.* The gist of all of Ratliff's claims, variously phrased and labeled, is that Earle did not hold to the applicable standard of care. Such a claim sounds only in negligence. Summary judgment on these claims was therefore proper.

* * * * *

Accordingly, the court of appeals' judgment is affirmed in part and reversed in part, and the case is remanded to the district court for further proceedings.

**Parallel Citations**

42 Tex. Sup. Ct. J. 919

Footnotes

1    TEX. CONST. art. I, § 13 ("All courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law.").

2    961 S.W.2d 591.

3    TEX. BUS. & COM.CODE §§ 17.41–.63.

4    176 F.R.D. 158, 165–166 (E.D.Pa.1997).

5    TEX.REV.CIV. STAT. ANN. art. 4590i, §§ 6.05–.06 (Vernon Supp.1999).

6    961 S.W.2d 591.

7    *Id.* at 597.

8    *Id.*

9    42 TEX. SUP.CT. J. 335 (Feb. 4, 1999).

10   " 'Health care liability claim' means a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care or health care or safety which proximately results in injury to or death of the patient, whether the patient's claim or cause of action sounds in tort or contract." TEX.REV.CIV. STAT. ANN. art. 4590i, § 1.03(4) (Vernon Supp.1999).

11      *Id.* § 10.01.

12      *Husain v. Khatib,* 964 S.W.2d 918, 919 (Tex.1998) (per curiam); *accord Bala v. Maxwell,* 909 S.W.2d 889, 891 (Tex.1995) (per curiam); *Kimball v. Brothers,* 741 S.W.2d 370, 372 (Tex.1987).

13      907 S.W.2d 448 (Tex.1995) (per curiam).

14      *Id.* at 449–450.

15      *See Winkle v. Tullos,* 917 S.W.2d 304, 310 (Tex.App.—Houston [14th Dist.] 1995, writ denied); *Desiga v. Scheffey,* 874 S.W.2d 244, 248–249 (Tex.App.—Houston [14th Dist.] 1994, no writ); *Shook v. Herman,* 759 S.W.2d 743, 745–746 (Tex.App.—Dallas 1988, writ denied). *Cf. Jones v. Cross,* 773 S.W.2d 41, 43 (Tex.App.—Houston [1st Dist.] 1989, writ denied) (holding that limitations began to run from the last date of treatment rather than the date of the last of two eye surgeries because plaintiff alleged negligence in the follow-up treatment).

16      833 S.W.2d 103, 105 (Tex.1992).

17      *Id.* at 108.

18      883 S.W.2d 156 (Tex.1993).

19      *Id.* at 158–159.

20      TEX.REV.CIV. STAT. ANN. art. 4590i, § 10.01 (Vernon Supp.1999).

21      661 S.W.2d 907, 909 (Tex.1983).

22      *Id.; Nichols v. Smith,* 507 S.W.2d 518, 519 (Tex.1974).

23      138 Tex. 145, 157 S.W.2d 878 (1942).

24      *Id.* at 879.

25      *See Borderlon,* 661 S.W.2d at 908 (holding that a physician has a duty to disclose a negligent act or the fact that an injury has occurred).

26      *Ryland Group, Inc. v. Hood,* 924 S.W.2d 120, 121 (Tex.1996) (per curiam); *American Petrofina, Inc. v. Allen,* 887 S.W.2d 829, 830 (Tex.1994).

27      *See Spoljaric v. Percival Tours, Inc.,* 708 S.W.2d 432, 435 (Tex.1986).

28      TEX. CONST. art. I, § 13.

29      *See Diaz v. Westphal,* 941 S.W.2d 96, 100 (Tex.1997).

30      917 S.W.2d 790, 794 (Tex.1996).

31      *See id.*

32      *Anderson v. Snider,* 808 S.W.2d 54, 55 (Tex.1991) (per curiam).

33      *Gammill v. Jack Williams Chevrolet, Inc.,* 972 S.W.2d 713, 726–727 (Tex.1998) (quoting *General Elec. Co. v. Joiner,* 522 U.S.

136, 146, 118 S.Ct. 512, 523, 139 L.Ed.2d 508 (1997); *Merrell Dow Pharm., Inc. v. Havner,* 953 S.W.2d 706, 711–712 (Tex.1997); *Schaefer v. Texas Employers' Ins. Ass'n,* 612 S.W.2d 199, 202–204 (Tex.1980)).

34      TEX REV. CIV. STAT. ANN. art. 4590i, §§ 6.01–.08 (Vernon Supp.1999).

35      *Id.* § 6.04(a).

36      *Id.* § 6.04(b), (c).

37      *Id.* § 6.04(b).

38      *Id.* § 6.05.

39      *Id.* § 6.06.

40      The Texas Medical Disclosure Panel lists "spine operation" as a procedure requiring written disclosure, and defines the procedure as including "laminectomy, decompression, fusion, internal fixation or procedures for nerve root or spinal cord compression". 25 TEX. ADMIN. CODE § 601.2(m)(3) (1998). The Panel has identified six risks which must be disclosed prior to a spine operation: "pain, numbness or clumsiness", "impaired muscle function", "incontinence or impotence", "unstable spine", "recurrence or continuation of the condition that required the operation", and "injury to major blood vessels". *Id.*

41      961 S.W.2d at 597.

42      912 S.W.2d 276, 285–286 (Tex.App.—Houston [14th Dist.] 1995, writ denied).

43      TEX.REV.CIV. STAT. ANN. art. 4590i, § 6.07(a)(1) (Vernon Supp.1999).

44      *See* Jim M. Perdue, *The Law of Texas Medical Malpractice, Chapter X: Informed Consent,* 22 HOUS. L. REV. 399, 426 n. 190 (1985) (observing "[t]here appears to be no avenue for disputing th[e] presumption" of sections 6.05 and 6.06, that written disclosure of the panel's enumerated risks is sufficient for List A procedures); Frank W. Elliott, *The Impact of the Texas Medical Liability and Insurance Improvement Act on Informed Consent Recovery in Medical Malpractice Litigation,* 10 TEX. TECH L. REV . 381, 387 (1979)("[I]t appears that evidence that could rebut the presumption of disclosure under Section 6.07(a)(1) is evidence that would attack the validity of the consent."); COMM. ON PATTERN JURY CHARGES, STATE BAR OF TEX., TEXAS PATTERN JURY CHARGES—MALPRACTICE, PREMISES & PRODUCTS PJC 51.15, cmt. (1997) ("If the physician has obtained the patient's signature on a consent form ... containing the risks enumerated on list A, the only means by which the patient may recover for failure to obtain informed consent is to prove the invalidity of the form and that the risks had not otherwise been disclosed to him."); *see also Crundwell v. Becker,* 981 S.W.2d 880 (Tex.App.—Houston [1ˢᵗ Dist.] 1998, pet. denied) (holding that the trial court's directed verdict on an informed consent claim was not error when the patient who signed the consent form offered no evidence of incapacity).

45      TEX.REV.CIV. STAT. ANN. art. 4590i, § 12.01(a) (Vernon Supp.1999).

46      889 S.W.2d 239, 242 (Tex.1994).

47      *Id.*

48      *Id.* at 242–243.

49      907 S.W.2d 448, 449–450 (Tex.1995) (per curiam).

50      *Id.* at 450.

51      907 S.W.2d 446, 447–448 (Tex.1995) (per curiam).

52      985 S.W.2d 38, 40–41 (Tex.1998) (per curiam).

---

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

365 S.W.3d 507
Court of Appeals of Texas,
Austin.

Frederick FUNG, M.D.; Mindy Minicucci, R.N.;
Ana Urukalo, D.P.M.; The Austin Diagnostic Clinic
Association d/b/a Austin Diagnostic Clinic; The
Austin Diagnostic Clinic, P.A.; Austin Diagnostic
Clinic, P.A.; et al., Appellants,
v.
Kathryn FISCHER and Myron Fischer, Appellees.

No. 03–10–00298–CV. | April 13, 2012.

### Synopsis

**Background:** Patient brought action against podiatrist, primary care physician, nurse and clinics, alleging negligence relating to the alleged misdiagnosis and improper treatment of a cancerous tumor on patient's foot. The Probate Court No. 1, Travis County, Guy S. Herman, J., overruled defendants' objections to expert reports and denied their motions to dismiss. Defendants appealed.

**Holdings:** The Court of Appeals, Jeff Rose, J., held that:

[1] objection by a defendant is not required as a predicate for seeking dismissal of health care liability action when the claimant has failed to serve a timely expert report;

[2] twenty-one-day deadline for objecting to the sufficiency of expert reports was not triggered until the expert reports were served on defendants;

[3] service of expert report addressing podiatrist's conduct did not trigger clinic's duty to object to sufficiency of expert report to support direct-liability claim against clinic;

[4] physician had no duty to object to expert report served on other defendants before physician became a party to the action;

[5] report addressing podiatrist's standard of care constituted "no report" as to referring physician;

[6] speculative and contradictory report concerning physician's negligence did not constitute a "good faith effort" at compliance with expert report requirement; and

[7] patient was not entitled to extension of time to cure deficient expert reports that effectively amounted to "no report" as to physician.

Reversed in part, vacated in part, rendered in part, and remanded.

### Attorneys and Law Firms

**\*512** J. Mark Holbrook, W. Lance Cawthon, Janice M. Byington, Davis & Wilkerson, P.C., Christanne Carlton, Mark T. Beaman, Maria Cantu Hexsel, Germer, Gertz, Beaman & Brown, L.L.P., Emily J. Davenport, Kemp Smith, L.L.C., Austin, TX, for appellant.

Paul S. Jacobs, The Jacobs Law Firm, Tanya N. Garrison, Eleven Greenway, Houston, TX, Mark R. Mueller, Mueller Law Firm, Austin, TX, for appellee.

Before Justices PURYEAR, PEMBERTON and ROSE.

### *OPINION*

JEFF ROSE, Justice.

Frederick Fung, M.D.; Mindy Minicucci, R.N.; Ana Urukalo, D.P.M.; The Austin Diagnostic Clinic Association d/b/a Austin Diagnostic Clinic; The Austin Diagnostic Clinic, P.A.; Austin Diagnostic Clinic, P.A.; The Austin Diagnostic Clinic, P.A. d/b/a Austin Diagnostic Clinic Ambulatory Surgery Center; and The Austin Diagnostic Clinic Ambulatory Surgery Center bring this interlocutory appeal of the probate court's orders concerning expert reports that Kathryn Fischer and Myron Fischer provided in support of their health care liability claims.

Seven orders are challenged in this appeal: three orders overruling Minicucci's, Urukalo's, and the ADC appellants' objections to appellees' expert reports, three **\*513** corresponding orders denying these appellants' motions to dismiss, and one order overruling Fung's objections and denying his motion to dismiss. For the reasons that follow, as to Minicucci, Urukalo, and the ADC appellants, we reverse the three orders overruling their respective objections, vacate the three orders on their respective motions to dismiss, and remand this case for consideration of those motions on the merits; and as to Fung, we reverse the order overruling his objections and

denying his motion to dismiss, render judgment for him, and remand this case for determination of his reasonable attorney's fees and costs under the civil practice and remedies code.

### BACKGROUND

In 2007, the Fischers filed suit against Urukalo, a podiatrist, for her alleged negligence in misdiagnosing and improperly treating a cancerous tumor on Kathryn Fischer's foot. The Fischers' original petition also alleged that the Austin Diagnostic Clinic d/b/a Austin Diagnostic Clinic (ADC) was vicariously liable for Urukalo's acts and omissions and independently negligent for its lack of policies and procedures on appropriate testing for certain types of cysts. In an effort to comply with the requirements applicable to "health care liability claims" under chapter 74 of the civil practice and remedies code, the Fischers in 2007 provided expert reports from Brad J. Bachmann, a podiatrist, and Mark E. Johnson, M.D. These reports explicitly addressed only Urukalo's acts or omissions and did not mention any acts or omissions by ADC.[1] Urukalo and ADC did not challenge the adequacy of these two reports, and this appeal does not concern the Fischers' health care liability claim that asserts Urukalo's negligence and shifts liability for her conduct to ADC as pled in the Fischers' original petition in 2007. However, Urukalo and ADC challenged the reports that the Fischers provided in 2009, which are the focus of this appeal.

Urukalo and ADC remained the only defendants in the case for eighteen months until the Fischers filed a series of five amended petitions between April and July of 2009. Their first amended petition added allegations of gross negligence and malice against Urukalo and an allegation of gross negligence against ADC. Their second amended petition added as defendants a host of other ADC-related entities—"The Austin Diagnostic Clinic, P.A.; Austin Diagnostic Clinic, P.A.; The Austin Diagnostic Imaging Center; and The Austin Diagnostic Clinic Ambulatory Surgery Center"—in addition to the previously named Austin Diagnostic Clinic d/b/a Austin Diagnostic Clinic, alleging twenty-two categories of negligence and gross negligence against the ADC defendants collectively concerning hiring, training, and supervision of "employees, agents, servants, and vice-principals"; authorization/ratification of the employees', agents', servants', and vice-principals' negligence; and overall operation of the clinic. The Fischers' third amended petition added as defendants: (1) "The Austin Diagnostic Clinic, P.A. d/b/a Austin Diagnostic Clinic Ambulatory Surgery Center," in addition to the previously named

ADC parties, now adding an allegation of malice, and (2) Frederick Fung, M.D., alleging negligence, gross negligence, and malice as a treating physician **\*514** and as a member of ADC's board of directors. The Fischers' fourth amended petition named as defendants: (1) Sara LeViseur and (2) Mindy Minicucci, R.N., alleging the negligence of each as an "employee, agent, or servant of ADC's Ambulatory Surgery Center"; and (3) David Joseph, M.D., alleging negligence, gross negligence, and malice as chairman of ADC's board of directors and of the governing body of ADC's Ambulatory Surgery Center. The same petition also included allegations that: (1) Fung was negligent as a member of the governing body of ADC's Ambulatory "Surgical" Center; (2) Urukalo was negligent as a shareholder of ADC and committed the offenses of aggravated assault, battery, securing execution of a document by deception, fraudulently concealing a writing, and injury to an elderly individual; and (3) ADC was vicariously liable for the negligence, malice, gross negligence, assault, and battery committed by its employees, agents, servants, and vice principals and ADC was not a health care provider that practiced medicine; or alternatively, ADC was a health care institution and was directly responsible for the negligence, gross negligence, and breach of fiduciary duties of its "board of directors, medical executive committees, governing body, officers, and directors."

In September 2009, almost two years after filing their original petition, the Fischers filed their fifth amended petition. The Fischers' fifth amended petition: (1) nonsuited by omission The Austin Diagnostic Imaging Center, LeViseur, and Joseph; (2) added allegations that Urukalo committed the offenses of tampering with a government record, tampering with physical evidence, and fraudulent destruction, removal, or concealment of a writing; (3) added allegations that ADC was directly liable for ratifying Urukalo's negligence, gross negligence, malice, and fraud; (4) added allegations that ADC was vicariously liable for "Urukalo's aggravated assault, battery, forgery, and any other conduct defined by the Texas Penal Code"; and (5) added allegations that ADC was vicariously liable for its employees' conspiracy to commit fraud, negligence, gross negligence, and malice. Along with this petition, the Fischers provided a supplemental expert report from Johnson and a new expert report from Joseph Varon, M.D.

The Fischers' new expert reports from Johnson and Varon triggered objections and motions to dismiss from Minicucci, Urukalo, the ADC entities collectively, and Fung. While these objections and motions to dismiss were pending, the Fischers obtained an order transferring their suit from district court to probate court. *See* Tex.Rev.Civ. Stat. Ann. § 608 (West Supp. 2011) (allowing transfer to

probate court of district court action that is related to guardianship proceeding pending in probate court).[2] The probate court held a hearing, took the matters under advisement, and eventually signed orders overruling all of the appellants' objections—concluding specifically in three of the orders that Minicucci's, Urukalo's, and ADC's objections to the reports were untimely—and denying all of the appellants' motions to dismiss. The court's seven orders concerning Johnson's supplemental report and Varon's report are the subject of this appeal.

The appellants' issues have some overlap but are not identical. All appellants argue that the Fischers did not serve a timely **\*515** report addressing the "health care liability claim or claims" pled against them in 2009. All appellants argue that they filed timely objections to the reports and thus did not waive their corresponding rights to seek dismissal. Fung contends that the reports from the Fischers' experts neither implicated him nor complied with chapter 74's requirements. Our analysis of these issues begins with an overview of the statutory framework governing health care liability claims set forth in chapter 74.

## APPLICABLE LAW

### Chapter 74 framework

[1] Health care liability claims in Texas are governed by the Texas Medical Liability Act in chapter 74 of the civil practice and remedies code. *See* Tex. Civ. Prac. & Rem.Code Ann. §§ 74.001–.507 (West 2011 & West Supp. 2011). The code defines a "health care liability claim" as

> a cause of action against a physician or health care provider for treatment, lack of treatment, or other claimed departure from accepted standards of medical care or health care, or safety or professional or administrative services directly related to health care, which proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract.

*Id.* § 74.001(a)(13). A primary feature of chapter 74's framework is a series of requirements that health care liability claimants support their claims, early in a case, with expert testimony and reports summarizing the expert

opinions. A health care liability claimant must serve each party or the party's attorney with an expert's report and the expert's curriculum vitae within 120 days of filing the original petition asserting a health care liability claim against that defendant. *Carroll v. Humsi,* 342 S.W.3d 693, 696–97 (Tex.App.-Austin 2011, no pet.); *Hayes v. Carroll,* 314 S.W.3d 494, 501 (Tex.App.-Austin 2010, no pet.); *see* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(a) (stating statutory requirements).

[2] An "expert report" is a written report by an expert that provides a fair summary of the expert's opinions as of the report's date regarding: (1) applicable standards of care; (2) the manner in which the physician or health care provider's care failed to meet the standards; and (3) the causal relationship between that failure and the injury, harm, or damages claimed. Tex. Civ. Prac. & Rem.Code Ann. § 74.351(r)(6). The report is intended to inform the defendant of the specific conduct that the claimant has called into question and provide a basis for the trial court to conclude that the claims have merit. *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002) (citing *American Transitional Care Ctrs. of Tex. v. Palacios,* 46 S.W.3d 873, 879 (Tex.2001)).

[3] [4] A defendant may file a motion to dismiss if the expert report is not timely served. Tex. Civ. Prac. & Rem.Code Ann. § 74.351(b). If a defendant is not served with an expert report within the 120–day period, the trial court must enter an order on the motion of the physician or health care provider that dismisses the claim with prejudice and awards fees and costs to the physician or health care provider. *Id.; see Lewis v. Funderburk,* 253 S.W.3d 204, 207 (Tex.2008). Reports that are timely served but substantively deficient may be eligible for a thirty-day extension to cure the deficiencies when the report: (1) contains the opinion of an individual with expertise that the claim has merit and (2) implicates the defendant's conduct. *See Scoresby v. Santillan,* 346 S.W.3d 546, 556 (Tex.2011) (citing *Ogletree v. Matthews,* 262 S.W.3d 316, 317, 321 (Tex.2007) (noting that report that did not mention doctor's **\*516** name but was directed solely to one doctor's care "implicated [that doctor's] conduct")); *see also* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(r)(6) (defining expert report).

[5] A defendant whose conduct is implicated in a report may file objections to the report's sufficiency. Tex. Civ. Prac. & Rem.Code Ann. § 74.351(a). Objections must be filed and served within twenty-one days after the date that the defendant is served with the report implicating that defendant's conduct, otherwise the objections to the report's sufficiency are waived. *Id.* The deadline for filing objections to a report's sufficiency is not triggered until: (1) the physician or health care provider becomes a

"party"—meaning that the claimant obtains service of process, waiver of service, or an appearance from the physician or health care provider named in the petition—and (2) the claimant serves the expert report on that party or that party's attorney. *See Humsi,* 342 S.W.3d at 698–99; *see also* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(a) (stating statutory requirements); *Key v. Muse,* 352 S.W.3d 857, 863–64 (Tex.App.-Dallas 2011, no pet.); *Dingler v. Tucker,* 301 S.W.3d 761, 767 (Tex.App.-Fort Worth 2009, pet. denied); *Yilmaz v. McGregor,* 265 S.W.3d 631, 638 (Tex.App.-Houston [1st Dist.] 2008, pet. denied).

[6] [7] By contrast, there is no deadline in chapter 74 for a defendant to object to an expert report as untimely, or even a requirement that a defendant object at all as a predicate for seeking dismissal when the claimant has failed to serve a report within 120 days. *Poland v. Grigore,* 249 S.W.3d 607, 616 (Tex.App.-Houston [1st Dist.] 2008, no pet.); *see Victoria Gardens of Frisco v. Walrath,* 257 S.W.3d 284, 290 (Tex.App.-Dallas 2008, pet. denied) (holding that twenty-one-day deadline applies only to objections about timely served report's "sufficiency," not to objections about report's untimeliness); *see also Methodist Charlton Med. Ctr. v. Steele,* 274 S.W.3d 47, 51 (Tex.App.-Dallas 2008, pet. denied) (holding that complaint in motion to dismiss about failure to timely serve reports was not subject to twenty-one-day deadline for objections to report's sufficiency). This means that there is no duty to object to an expert report that was never served, that was served untimely, or that was so deficient as to constitute no report at all within the 120–day period. *See Funderburk,* 253 S.W.3d at 207 (explaining that "an expert report has not been served" when "an inadequate report *has* been served"); *Bogar v. Esparza,* 257 S.W.3d 354, 361 (Tex.App.-Austin 2008, no pet.) (noting that complaints about absent report, timely but deficient report, or timely report that fails to implicate defendant's conduct and is effectively "no report" are same for purpose of interlocutory review).

**Standard of review**

[8] [9] [10] [11] We review a trial court's rulings on motions to dismiss health care liability claims for an abuse of discretion. *Jernigan v. Langley,* 195 S.W.3d 91, 93 (Tex.2006); *Palacios,* 46 S.W.3d at 877. A trial court abuses its discretion by rendering an arbitrary and unreasonable decision lacking support in the facts or circumstances of the case or by acting in an arbitrary or unreasonable manner without reference to guiding rules or principles. *Samlowski v. Wooten,* 332 S.W.3d 404, 410 (Tex.2011) (plurality op.). The trial court is limited to the

information contained in the four corners of the report in reaching its ruling on a motion to dismiss. *Palacios,* 46 S.W.3d at 878. Further, a trial court cannot grant a motion to dismiss that is based on untimely objections to the sufficiency of a report because a defendant's untimely objections are waived. *See* **\*517** *Ogletree,* 262 S.W.3d at 322 (affirming denial of motion to dismiss because hospital failed to raise timely objections to reports' sufficiency and waived such objections); *Bakhtari v. Estate of Dumas,* 317 S.W.3d 486, 493 (Tex.App.-Dallas 2010, no pet.) (noting that trial court could not grant motion to dismiss based on untimely objections); *see also* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(a).

**Jurisdiction**

[12] As a preliminary matter, we address and reject the Fischers' impromptu assertion made at oral argument that, for various reasons, this Court lacks jurisdiction to consider this interlocutory appeal.[3] The Fischers first argue that there is no statutory authorization for this interlocutory appeal. However, the plain language of the statute authorizing interlocutory appeals permits a defendant to appeal from an order that "denies all or part of the relief sought by a motion under Section 74.351(b)," the section that addresses motions to dismiss a claim for a plaintiff's failure to serve a timely expert report.[4] Tex. Civ. Prac. & Rem.Code Ann. § 51.014(a)(9) (West Supp. 2011). The orders appealed here denied the relief—dismissal and fees—sought in appellants' motions to dismiss, which were based upon the Fischers' failure to serve timely and adequate expert reports. *See id.* § 74.351(b); *Funderburk,* 253 S.W.3d at 207 (concluding that doctor's motion seeking dismissal and fees for report that was considered "not served" because of its inadequacy was section 74.351(b) motion and was immediately appealable); *Bogar,* 257 S.W.3d at 361 (noting *Funderburk's* clarification that availability of interlocutory appeal is not dependent on whether motion's grounds relate to absent report, timely but deficient report, or timely report that fails to implicate defendant's conduct and is effectively "no report"); *cf. Academy of Oriental Med., L.L.C. v. Andra,* 173 S.W.3d 184, 186, 189 (Tex.App.-Austin 2005, no pet.) (concluding that defendants' motion was not brought under section 74.351(b) because it was filed before expiration of claimant's 120–day period for serving expert reports and sought only to strike expert report). Thus, this Court has jurisdiction over this interlocutory appeal pursuant to section 51.014(a)(9) of the civil practice and remedies code.

The Fischers next argue that this Court lacks jurisdiction because there is no actual controversy between the

parties, alleging that "[a]ppellants admit that sufficient reports were timely filed and served as to Mrs. Fischer's health care liability claim in this case." The record disproves this argument. As noted previously, all appellants argue that the Fischers failed to serve timely expert reports; Minicucci, Urukalo, and ADC further argue that the trial court erred in overruling their objections to the reports as untimely; and Fung contends that deficiencies in the reports rendered them the equivalent of "no report" as to him. As such, the Fischers' argument that we lack jurisdiction because there is no actual controversy between the parties lacks merit.

The Fischers also argue—based on governmental-immunity cases—that this **\*518** Court lacks jurisdiction because appellants waived the protection of section 74.351 by failing to plead that specific section of the statute. The Fischers' cited cases are inapposite. *See City of Dallas v. Moreau,* 718 S.W.2d 776, 778 (Tex.App.-Corpus Christi 1986, writ ref'd n.r.e.) (noting that City raised defense of governmental immunity from suit in its pretrial and post-verdict motions); *City of Brownsville v. Pena,* 716 S.W.2d 677, 680–81 (Tex.App.-Corpus Christi 1986, no writ) (concluding that City never pled its governmental immunity from liability). Similar to the claimant in *Sedeno v. Mijares,* 333 S.W.3d 815, 823 (Tex.App.-Houston [1st Dist.] 2010, no pet.), the Fischers cite no authority supporting their argument that the dismissal provision in chapter 74 is an affirmative defense that must be pled. *See id.* Like the court in *Sedeno,* we have found no authority suggesting that a defendant is "required to file any additional pleadings to invoke its right to file a motion to dismiss pursuant to section 74.351." *Id.* Further, the record reflects that appellants' answers pled the protection of chapter 74 and that the Fischers acknowledged appellants as health care providers.[5] Accordingly, the Fischers' argument that we lack jurisdiction because appellants waived the protection of chapter 74 is unpersuasive. Having determined that there is no jurisdictional bar to this appeal, we now consider appellants' issues.

## ANALYSIS

### Nurse Minicucci's objections and motion to dismiss

Minicucci, a nurse who provided preoperative and recovery care to Kathryn Fischer and witnessed her signature on the surgical consent form, was named in the Fischers' fourth amended petition but was not served with it. After counsel for Urukalo and ADC received Johnson's supplemental report and Varon's report, Minicucci decided to file her objections despite not having been

served with the reports. Minicucci's objections began with the assertion that the Fischers had not served her with process and explained that she filed the objections to the sufficiency of the reports out of an abundance of caution. Minicucci's motion to dismiss reiterated her objections to the sufficiency of the reports and pointed out that she was not served with the Fischers' expert reports within the statutory 120–day period.

The probate court overruled Minicucci's objections, "find[ing] that the objections were untimely under Texas Civil Practice & Remedies Code § 74.351(a)." The same day, the court signed an order denying her motion to dismiss.

[13] In her first issue, Minicucci contends that because she was not served with the expert reports as required by chapter 74, her twenty-one-day deadline was not triggered and her objections to the sufficiency and lack of service of the expert reports could not have been untimely. Minicucci also contends that the probate court's erroneous ruling that all of her objections were untimely under section 74.351(a) necessarily resulted in the denial of her motion to dismiss addressing the merits of those objections. *See* **\*519** *Rosemond v. Al–Lahiq,* 331 S.W.3d 764, 767 (Tex.2011) ("The issue of timeliness is a threshold issue in the expert report framework the Legislature enacted."). We note that when ruling on Minicucci's motion to dismiss, the probate court could not have considered objections that were untimely because untimely objections would have been waived. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(a).

In response to this issue, the Fischers concede that "Minicucci's objections were timely," and we agree and hold accordingly. *See Humsi,* 342 S.W.3d at 702–03 (concluding that report provided to attorney for named defendant who had not been made "a party" to lawsuit was not served on "a party or the party's attorney" within meaning of chapter 74); *Dingler,* 301 S.W.3d at 767 (concluding that service of report on counsel who ultimately came to represent doctor failed to comply with chapter 74 because doctor was nonparty when report was served); *University of Tex. Health Sci. Ctr. at Houston v. Gutierrez,* 237 S.W.3d 869, 872–73 (Tex.App.-Houston [1st Dist.] 2007, pet. denied) (concluding that nonparty health science center's receipt of courtesy copy of expert report from someone other than claimants did not establish service of report complying with chapter 74). But they contend, without citation to the record, that "her motion to dismiss was not denied on that basis" so the error "is of no consequence." We disagree.

The order overruling Minicucci's objections specifies that the probate court found the objections untimely. Although

we hold here that the objections were timely, and thus should have been considered by the probate court when ruling on Minicucci's corresponding motion to dismiss, it would have been improper for the court to consider the merits of the objections after ruling that they were untimely. *See Ogletree,* 262 S.W.3d at 322 (holding that because hospital failed to object within statutory twenty-one day period, it waived its objections, and trial court correctly denied hospital's motion to dismiss); *Bakhtari,* 317 S.W.3d at 493 (concluding that trial court could not grant motion to dismiss based on objections that were untimely); *see also* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(a). Thus, although the order denying Minicucci's motion to dismiss states that the court reviewed the pleadings, responses, and arguments of counsel, we must assume that the probate court did not consider the substance of Minicucci's objections, which it found untimely.

Having determined that Minicucci's objections were timely under section 74.351(a) of the civil practice and remedies code, we conclude that the probate court abused its discretion in finding to the contrary and that this error caused the objections not to be considered in Minicucci's corresponding motion to dismiss. As such, we sustain Minicucci's first issue, reverse the probate court's order overruling Minicucci's objections as untimely, vacate the order denying her motion to dismiss, and remand this case so that the court may consider the merits of Minicucci's objections and her motion to dismiss.

### Podiatrist Urukalo's objections and motion to dismiss

[14] Urukalo is the podiatrist who treated the mass on Kathryn Fischer's foot. Like Nurse Minicucci, Urukalo contends that the trial court abused its discretion by overruling her objections to the 2009 expert reports as untimely and that this error necessarily resulted in the denial of her motion to dismiss.

Urukalo objected to the 2009 reports from Varon and Johnson as substantively deficient and also untimely because they were served more than 120 days after the November 2, 2007 filing of the Fischers' petition asserting a "health care liability **\*520** claim" against her. *See Humsi,* 342 S.W.3d at 696–97; *Hayes,* 314 S.W.3d at 501; *see also* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(a). Urukalo filed a corresponding motion to dismiss directed to the Fischers' allegations of gross negligence, malice, fraud, aggravated assault, battery, forgery, securing execution of a document by deception, and fraudulent destruction, removal, or concealment of a writing, all of which were pled for the first time in 2009. Similar to Minicucci's motion, Urukalo's motion to

dismiss was based on her previously filed objections, which if untimely, were waived and would not have been considered toward her motion to dismiss.

The Fishers served Varon's and Johnson's reports on September 25, 2009, and September 29, 2009, respectively. Urukalo filed and served her objections to Varon's report and to Johnson's supplemental report on October 16, 2009. The Fischers' response filed with the probate court acknowleged that Urukalo filed timely objections to the 2009 reports from Varon and Johnson.[6] We agree that Urukalo's October 16 objections were timely because they were filed and served "not later than the 21st day after the date [she] was served" with the September 25 and September 29 reports. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(a).

Nevertheless, the order overruling Urukalo's objections specifies that the probate court found the objections untimely. Although we hold here that the objections were timely, and thus should have been considered by the probate court when ruling on Urukalo's corresponding motion to dismiss, it would have been improper for the court to consider the merits of the objections after ruling that they were untimely. *See Ogletree,* 262 S.W.3d at 322 (holding that because hospital failed to object within statutory twenty-one day period, it waived its objections, and trial court correctly denied hospital's motion to dismiss); *Bakhtari,* 317 S.W.3d at 493 (concluding that trial court could not grant motion to dismiss based on objections that were untimely); *see also* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(a). Thus, although the order denying Urukalo's motion to dismiss states that the court reviewed the pleadings, responses, and arguments of counsel, we must assume that it did not consider the substance of Urukalo's objections, which it found untimely.

Having determined that Urukalo's objections were timely under section 74.351(a) of the civil practice and remedies code, we conclude that the probate court abused its discretion in finding to the contrary, and that this error caused the objections not to be considered in Urukalo's corresponding motion to dismiss. As such, we sustain Urukalo's first issue, reverse the probate court's order overruling Urukalo's objections as untimely, vacate the order denying her motion to dismiss, and remand this case so that the court may consider the merits of Urukalo's objections and her motion to dismiss.

### \*521 ADC's objections and motion to dismiss

According to the Fischers' pleadings, the various ADC entities and their "employees, agents, and servants"

provided treatment to Kathryn Fischer. ADC filed objections and a corresponding motion to dismiss collectively on behalf of all the ADC entities named in the Fischers' suit. The probate court's orders overruling these objections as untimely and denying the motion to dismiss do not distinguish between the original ADC defendant and the four ADC entities added as defendants in 2009. We will calculate statutory deadlines for objections applicable to the original ADC defendant and the four ADC entities based on the timing of their addition as defendants to the Fischers' lawsuit; however, given that the ADC appellants were treated collectively in the orders that are the subject of this appeal, we reserve for the probate court, and express no opinion on, the propriety of the Fischers' addition of these four ADC entities as defendants or the merits of whether those additional entities should be treated distinctly from the original ADC defendant.

### 1. Original ADC defendant's objections to lack of report and late reports

The ADC appellants' first issue, phrased somewhat differently than Minicucci's and Urukalo's issues, similarly contends that the original ADC defendant's objections to the 2009 expert reports were timely and that the original ADC defendant's lack of objection to the 2007 reports did not waive its right to seek dismissal as to the Fischers' health care liability claim asserting the original ADC defendant's direct liability, which was not mentioned by any expert report within the 120–day deadline. The ADC appellants argue that because the 2007 reports did not address the Fischers' direct-liability claim against the original ADC defendant alleging a lack of adequate policies and procedures, the cause of action based on those facts in the Fischers' 2007 original petition was not supported by a timely report and as such, the original ADC defendant had no duty to object.[7] The Fischers contend that because the original ADC defendant did not object to the 2007 reports, it waived all of its objections, including its objections to the 2009 reports and its corresponding right to seek dismissal. Apparently persuaded by this argument, the probate court overruled ADC's collective objections to the 2009 reports, specifically "find[ing] that the objections were untimely under Texas Civil Practice & Remedies Code § 74.351(a)."[8]

[15] [16] [17] A health care liability claimant must serve each party or the party's attorney with an expert report within 120 days of filing the petition asserting a health care liability claim against that defendant. *Humsi,* 342 S.W.3d at 696–97; *Hayes,* 314 S.W.3d at 501; *see also* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(a). Reports are required

for a "health care liability claim," which chapter 74 defines, in relevant part, as a cause of action for treatment, lack of treatment, or other claimed departure **\*522** from accepted standards of medical care or health care, or safety or professional or administrative services directly related to health care, proximately resulting in a claimant's injury. *Id.* § 74.001(a)(13). A "cause of action" is defined as "a fact or facts entitling one to institute and maintain an action, which must be alleged and proved in order to obtain relief" and as a "group of operative facts giving rise to one or more bases for suing; a factual situation that entitles one person to obtain a remedy in court from another person." *In re Jorden,* 249 S.W.3d 416, 421 (Tex.2008) (orig. proceeding). Consequently, the Legislature's use of "cause of action" signals that we are to look at the operative facts to define a particular cause of action, rather than the particular legal theories put forth based on those facts. *Cardwell v. McDonald,* 356 S.W.3d 646, 654 (Tex.App.-Austin 2011, no pet.).

[18] [19] Here, the facts required to establish the defendant's vicarious liability, i.e., the acts of Urukalo and Urukalo's relationship to ADC, differ from the facts required to establish the original ADC defendant's direct liability, i.e., ADC's provision of particular policies and procedures. Under the doctrine of respondeat superior, an employer or principal may be vicariously liable for the tortious acts of an employee or agent acting within the scope of the employment or agency, even though the principal or employer has not personally committed a wrong. *St. Joseph Hosp. v. Wolff,* 94 S.W.3d 513, 541–42 (Tex.2002) (citing *Baptist Mem'l Hosp. Sys. v. Sampson,* 969 S.W.2d 945, 947 (Tex.1998)). If a party's alleged health care liability is purely vicarious, a report that adequately implicates the actions of that party's agents or employees is sufficient. *Gardner v. U.S. Imaging, Inc.,* 274 S.W.3d 669, 671–72 (Tex.2008).

In *Gardner,* the Texas Supreme Court stated its qualified agreement with the claimants' contention that a report as to a doctor who performed a lumbar epidural procedure on a claimant could also suffice to support the alleged liability of the owner and operator of the facility where the claimant's procedure was performed because the facility owner's liability was purely vicarious. *Id.* ("To the extent that the Gardners allege that SADI is liable only vicariously for Dr. Keszler's actions, the expert requirement is fulfilled as to SADI if the report is adequate as to Dr. Keszler."); *see University of Tex. Sw. Med. Ctr. v. Dale,* 188 S.W.3d 877, 879 (Tex.App.-Dallas 2006, no pet.). The converse implication of *Gardner* is that if a party's alleged health care liability is not "purely vicarious" but direct, then a report that implicates only the actions of that party's agents or employees is insufficient to that extent. *Cf. Gardner,* 274 S.W.3d at 671–72.

In *University of Texas Southwestern Medical Center v. Dale*—a decision the supreme court cited in *Gardner*—the court contrasted the expert testimony required when the defendant's alleged health care liability is merely vicarious with the testimony required to support an allegation of health care liability based on the defendant's direct negligence. 188 S.W.3d at 879. The *Dale* claimants did not assert that UT Southwestern was itself negligent but rather, its liability was predicated entirely on its resident physicians' actions. *Id.* UT Southwestern argued that it was not served with a report because it was not named in any report. *Id.* at 878. After observing that the expert report functions to (1) inform the defendant of the specific conduct the plaintiff has called into question, and (2) provide the trial court with a basis from which to conclude the claims have merit, the court reasoned that "what is relevant for purposes of the expert report **\*523** is that it specifically identify the person whose conduct the plaintiff is calling into question and show how that person's conduct constituted negligence." *Id.* at 878–79. The court specified that because the Dales "were not alleging that UT Southwestern was directly negligent," the expert report was not required to mention UT Southwestern by name and would not have explained how UT Southwestern "breached the standard of care and how that breach caused or contributed to the cause of injury." *Id.* at 879.

[20] Here, unlike *Gardner* and *Dale,* the alleged health care liability of the original ADC defendant was not "purely vicarious." The Fischers' original petition alleged not only that liability for Urukalo's acts and omissions should be passed through to ADC—which need not have committed a wrong to have her liability imputed to it—but that ADC itself was negligent based on a separate set of operative facts: its lack of adequate policies and procedures for the appropriate testing of certain types of cysts. The facts that the Fischers alleged to impose direct liability constitute a separate health care liability claim requiring expert support.

The requisite expert testimony on the original ADC defendant's standard of care, the breach of such standard of care, and the causal relationship between any such breach and an injury could not have been fulfilled with testimony in a report addressing only Urukalo's conduct as a podiatrist and wholly failing to identify how the original ADC defendant's conduct amounted to negligence. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(r)(6) (defining "expert report"); *Petty v. Churner,* 310 S.W.3d 131, 138 (Tex.App.-Dallas 2010, no pet.) (affirming trial court's dismissal of health care liability claim alleging direct liability that was unaddressed in expert's report); *RGV Healthcare Assocs. v. Estevis,* 294 S.W.3d 264, 270–71 (Tex.App.-Corpus Christi 2009, pet. denied) (holding that trial court abused its discretion by denying defendant's objection to expert report as it related to claimant's allegation of direct liability because report failed to address how defendant's direct conduct, such as implementation of procedures, policies, or rules, deviated from applicable standard of care); *Obstetrical & Gynecological Assocs., P.A. v. McCoy,* 283 S.W.3d 96, 103 (Tex.App.-Houston [14th Dist.] 2009, pet. denied) (noting that if plaintiff asserts health care liability claim alleging professional association's direct liability, then plaintiff is required to serve report specifically addressing association's conduct, rather than just conduct of physicians for which it is vicariously liable); *Steele,* 274 S.W.3d at 51 (noting that assertion of hospital's vicarious liability for nurse's negligence was distinct from complaints about hospital's negligent hiring, supervision, training, and retention, which concerned hospital's direct negligence and required expert report); *Center for Neurological Disorders, P.A. v. George,* 261 S.W.3d 285, 294 (Tex.App.-Fort Worth 2008, pet. denied) (concluding that expert's report addressing only professional association's vicarious liability was deficient because it made no attempt to address any of claimants' direct-liability allegations); *see also Hendrick Med. Ctr. v. Miller,* No. 11–11–00141–CV, 2012 WL 314062, at \*3–4, 2012 Tex.App. LEXIS 683, at \*10–14 (Tex.App.-Eastland Jan. 26, 2012, no pet.) (mem. op.) (concluding that health care defendant's direct liability and vicarious liability are separate claims requiring independent evaluation and holding that "procedures and protocols" claim alleging medical center's direct liability should have been dismissed for lack of expert report); *contra Certified EMS, Inc. v. Potts,* 355 S.W.3d 683, 693 (Tex.App.-Houston [1st Dist.] 2011, pet. filed) (op. on reh'g) (allowing suit **\*524** against nurse staffing agency to proceed without expert testimony addressing agency's direct liability when claimant had served report addressing agency's vicarious liability arising from same group of operative facts in report). Based on the facts in this record, we conclude that the Fischers pled two health care liability claims—one asserting purely vicarious liability to shift responsibility for Urukalo's conduct to ADC (the vicarious-liability claim) and another asserting that ADC itself was directly negligent because of its alleged failure to put forth adequate policies and procedures (the direct-liability claim)—each requiring supportive expert testimony.[9]

To be timely in this case, a report addressing the Fischers' direct-liability claim against the original ADC defendant should have been served by March 3, 2008—120 days from the filing of the Fischers' original petition containing the cause of action for an alleged lack of adequate policies and procedures. *See* Tex. Civ. Prac. &

Rem.Code Ann. § 74.351(a).[10] The only reports served on the original ADC defendant before March 3, 2008, were the 2007 reports from Bachmann and Johnson, neither of which makes any reference to ADC's direct liability, its alleged lack of adequate policies and procedures, the applicable standard of care for ADC, any breach of that standard, or any causal relationship between an alleged breach and an injury. In fact, both Bachmann's and Johnson's 2007 reports limit their opinions to "the care *rendered only by Ana Urukalo, D.P.M.*" Subsequent reports from Varon and Johnson purporting to address the Fischers' direct-liability claim against the original ADC defendant were not served until September 2009, more than 1 ½ years after the Fischers' 120–day deadline expired.

[21] The 2007 reports failed to address the Fischers' direct-liability claim. A defendant's duty to object to the sufficiency of an expert report and the corollary twenty-one-day deadline is triggered by the service of a report implicating the defendant's complained-of conduct. *See id.* Here, the Fischers' 2007 petition pled the original ADC defendant's liability for its own negligence due to an alleged lack of adequate policies and procedures, but the Fischers served no report within 120 days **\*525** supporting that health care liability claim. They had to serve a *report*—not just a petition—supporting their 2007 direct-liability claim.[11] *See Churner,* 310 S.W.3d at 138 (affirming trial court's dismissal of health care liability claim alleging direct liability that was unaddressed in expert's report); *see also Hendrick Med. Ctr.,* 2012 WL 314062, at \*4, 2012 Tex.App. LEXIS 683, at \*13–14 (dismissing "direct liability claim regarding procedures and protocols" because no expert report addressed it).

No duty to object to the sufficiency of the reports arose until the Fischers served a report addressing their direct-liability claim against the original ADC defendant. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(a) (requiring objections to report's sufficiency within twenty-one days from each defendant health care provider "whose conduct is implicated in a report"); *McCoy,* 283 S.W.3d at 103 (noting that if plaintiff asserts health care liability claim alleging professional association's direct liability, then plaintiff is required to serve report specifically addressing association's conduct, rather than just conduct of physicians for which it is vicariously liable, and if plaintiff serves no such report, association "could not have waived any complaints about [report's] sufficiency"). Because the original ADC defendant had no duty to object in 2007—when the Fischers served no report supporting their direct—liability claim against the original ADC defendant—the absence of a sufficiency objection in 2007 did not result in any waiver.

[22] Further, the 2009 reports served in support of the Fischers' direct-liability claims against the original ADC defendant were untimely. Because belated service of an expert report is an incurable procedural defect, an objection to a late-served report is not subject to the twenty-one-day deadline. *See Grigore,* 249 S.W.3d at 615–16 (noting that procedure for objections in section 74.351(c) is for those that are not based on belated service "because once a report is late, it remains late: no 'cure' exists to render an untimely report timely"); *see Walrath,* 257 S.W.3d at 290 (holding that twenty-one-day deadline applies only to objections about report's "sufficiency" or substance, not to objections about report's untimeliness); *see also Steele,* 274 S.W.3d at 51 (holding that complaint about failure to serve timely expert reports raised in motion to dismiss was not subject to twenty-one-day deadline for objections to expert report's sufficiency). Thus, the objection that the 2009 reports purporting to address the Fischers' direct-liability claim against the original ADC defendant were served too late—more than 1 ½ years after the filing of the 2007 original petition alleging ADC's direct liability—was not subject to the twenty-one-day deadline in section 74.351(a), and raising that objection in 2009 did not result in any waiver.

At the hearing before the probate court, the Fischers acknowledged initially that they did not timely serve the original ADC defendant with the 2009 reports from Varon and Johnson. But they also argued that the 2009 reports were timely for their "current allegations" against the original ADC defendant because they nonsuited the "generically [pled] policies and procedures" claim in their 2007 original petition **\*526** and replaced it with "specific allegations" in their 2009 fifth amended petition. On appeal, they further argue that as to the original ADC defendant, the 2009 reports were "supplemental."

[23] We reject the notions that the Fischers' nonsuit and repleading restarted their expired deadline for serving an expert report addressing their health care liability claim asserting the original ADC defendant's direct liability and that their "supplemental" report may provide essential information for that health care liability claim that was omitted from the previously served expert reports. *See Richburg v. Wolf,* 48 S.W.3d 375, 378 (Tex.App.-Eastland 2001, pet. denied) (holding, under predecessor statute, that unless trial court grants extension of time, supplemental report cannot supply critical information omitted from original report—such as standard of care, breach, and causation—after statutory period has expired, even if original report was timely filed).

The original ADC defendant faced no deadline for objecting to the lack of a report in 2007 and to the 2009 reports' late service; thus its objections could not have

been untimely. The original ADC defendant did have a deadline for objecting to the substance of the 2009 reports, and those objections were timely filed and served. The record reflects that the Fischers served the original ADC defendant with Varon's report on September 25, 2009 and Johnson's supplemental report on September 29, 2009, and ADC collectively filed and served its objections on October 16, 2009, which was "not later than the 21st day after the date [the original ADC defendant] was served" with both of those reports. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(a).

**2. Additional ADC entities' objections to 2009 reports**

After the Fischers missed their 120–day deadline for serving a report supporting their direct-liability claim against the original ADC defendant, they filed a series of amended petitions. On May 29, 2009, the Fischers filed a second amended petition that for the first time pled health care liability claims alleging the direct and vicarious liability of four additional ADC entities that they added as defendants. Assuming without deciding that the addition of these four ADC entities was appropriate, the 120–day deadline for serving expert reports addressing health care liability claims against them was September 28, 2009. *See id.;* Tex.R. Civ. P. 4. Varon's report, filed and served on September 25, 2009, was timely as to these four defendants, but Johnson's supplemental report, filed and served on September 29, 2009, was not. On October 16, 2009, within twenty-one days of being served with both of these reports, ADC collectively filed and served its timely objections.

Nevertheless, the order overruling the ADC defendants' objections specifies that the probate court found the objections untimely. Although we hold here that the objections were timely, and thus should have been considered by the trial court when ruling on the ADC defendants' corresponding motion to dismiss, it would have been improper for the trial court to consider the merits of the objections after ruling that they were untimely. *See Ogletree,* 262 S.W.3d at 322 (holding that because hospital waived its untimely objections, trial court correctly denied hospital's motion to dismiss); *Bakhtari,* 317 S.W.3d at 493 (concluding that trial court could not grant motion to dismiss based on objections that were untimely); *see also* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(a). Thus, although the order denying the ADC defendants' motion to dismiss states that the court reviewed the pleadings, responses, **\*527** and arguments of counsel, we must assume that it did not consider the substance of the ADC defendants' objections, which it found untimely.

Having determined that the ADC defendants' objections were timely under section 74.351(a) of the civil practice and remedies code, we conclude that the probate court abused its discretion in finding to the contrary and that this error caused the objections not to be considered in the ADC defendants' corresponding motion to dismiss. As such, we sustain the ADC appellants' first issue, reverse the probate court's order overruling the ADC defendants' objections as untimely, vacate the order denying the ADC defendants' motion to dismiss, and remand this case so that the court may consider the merits of the ADC defendants' objections and motion to dismiss.

**Dr. Fung's objections and motion to dismiss were based on the merits**

Dr. Fung is an internal medicine physician who referred Kathryn Fischer to Urukalo and issued Fischer's presurgical clearance. The probate court signed an order denying Fung's motion to dismiss and overruling his objections to the 2009 expert reports but did not state that Fung's objections were untimely; thus, Fung is differently situated in that the denial of his motion to dismiss was based on the merits of the arguments presented to the probate court.

The Fischers named Fung for the first time in their June 17, 2009 third amended petition, alleging his negligence, malice, and gross negligence. Fung states, and the Fischers do not deny, that he was added to their suit after they took his deposition and after two years of discovery between the other parties, including electronic medical record documentation and five other physicians' depositions. The Fischers served Fung with Varon's report on September 24, 2009, and with Johnson's supplemental report on September 25, 2009. Fung timely filed his objections to the reports and a motion to dismiss on October 15, 2009. Fung was not a party to the Fischers' suit in 2007 and was not served with or mentioned by the reports from Bachmann and Johnson accompanying the Fischers' original petition. Instead, as previously noted, both of those reports limit their opinions to "the care *rendered only by Ana Urukalo, D.P.M.*"

**Fischers' arguments that Fung's objections were untimely lack merit**

[24] The Fischers argued to the probate court that although Fung was not a party in 2007 and was not served with Bachmann's report and Johnson's initial report, Fung failed to object to the 2007 reports and therefore waived any objection to considering them in conjunction with their 2009 reports.[12] Within his first issue, Fung argues

that his objections to the 2009 reports were timely and that, as to him, the 2007 reports are not before the court and cannot be considered in combination with the 2009 reports because the earlier reports do not implicate him and he was not served with them. *Cf.* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(i) (allowing expert reports to be considered together in determining whether adequate expert report has been served).

The record reflects that the reports from Bachmann and Johnson were filed and served with the Fischers' original petition on November 2, 2007, long before **\*528** Fung was a party to the suit.[13] As previously discussed, a deadline for filing objections to the substance of a report is not triggered until the physician or health care provider becomes a "party" and the claimant serves the expert report on that party or that party's attorney. *See, e.g.,* Humsi, 342 S.W.3d at 698–99; *see also* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(a). Fung was not a party to the Fischers' suit when they served the reports from Bachmann and Johnson in 2007, and the Fischers never served Fung with those reports; thus, he had no duty to object to them. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(b) (authorizing dismissal of claim if after 120–day period "an expert report has not been served"); Humsi, 342 S.W.3d at 698 (noting that Legislature would not have imposed deadline for objections to report's sufficiency on nonparty who "would be outside the court's jurisdiction and have no duty to participate in the action"). As such, no "waiver" resulted from then-nonparty Fung's lack of objection in 2007 to the reports with which he was never served, and the 2007 reports should not be considered in combination with the 2009 reports to meet the Fischers' burden as to Fung.

Further, the Fischers served Fung with Varon's report on September 24, 2009, and Johnson's supplemental report on September 25, 2009. Fung filed his objections to both on October 15, 2009, which was "not later than the 21st day after the date [Fung] was served" with the reports. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(a). Given the facts in this record, Fung's objections to the 2009 reports were timely.

**Sufficiency of Johnson's and Varon's 2009 reports as to Fung**

Unlike its rulings as to the other appellants, the probate court reached the substance of Fung's objections and motion to dismiss, which asserted that the Fischers's health care liability claim against him should be dismissed because Varon's and Johnson's 2009 reports failed to comply with the statutory requirements of chapter 74. *See id.* § 74.351(b); Funderburk, 253 S.W.3d at 207–08;

Bogar, 257 S.W.3d at 360–61. In his first issue, Fung argues that Johnson's supplemental report does not implicate him and that Varon's report requires the court to make inferences about Fung's negligence that are contrary to Varon's own opinions in the report. We consider each of these arguments in turn.

**1. Johnson's supplemental report**

[25] [26] Chapter 74 defines an "expert report" as a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding: (1) applicable standards of care; (2) the manner in which the care rendered by the physician or health care provider failed to meet the standards; and (3) the causal relationship between that failure and the injury, harm, or damages claimed. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(r)(6). A report that omits one or more of these required elements, or states the expert's opinion as mere conclusions without supporting facts, is insufficient to constitute a "good faith effort" at compliance with chapter 74. *See* Samlowski, 332 S.W.3d at 409–10; Palacios, 46 S.W.3d at 879; *see also* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(l ) (requiring court to grant motion challenging adequacy of expert report if report does not **\*529** represent objective good-faith effort to comply with statutory definition of expert report); Scoresby, 346 S.W.3d at 556 (requiring report to address all statutory elements and prohibiting omissions in report from being supplied by inference); Jernigan, 195 S.W.3d at 93–94 (affirming trial court's dismissal of suit because expert reports omitted any allegation about how doctor breached standard of care and causation); Bowie Mem'l Hosp., 79 S.W.3d at 53 (concluding that report must contain all required information within its four corners). "[A] document qualifies as an expert report if it contains a statement of opinion by an individual with expertise indicating that the claim asserted by the plaintiff against the defendant has merit." Scoresby, 346 S.W.3d at 549.

[27] A defendant may be "implicated" in a report even if the defendant is not specifically named. *See* Ogletree, 262 S.W.3d at 317, 321 (concluding that report directed solely to urologist's care implicated defendant urologist although it did not mention him by name); Bogar, 257 S.W.3d at 367; *see* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(a) (setting deadline for defendants "whose conduct is implicated in a report" to file objections). In such cases, the report may be deficient, but it would not be considered the equivalent of "no report." Scoresby, 346 S.W.3d at 556; Bogar, 257 S.W.3d at 367. On the other hand, a report that omits all of the statutorily required elements is not merely deficient, but rather amounts to no report at all. Rivenes v. Holden, 257 S.W.3d 332, 338–39

(Tex.App.-Houston [14th Dist.] 2008, pet. denied); *Garcia v. Marichalar,* 185 S.W.3d 70, 71–72, 74 (Tex.App.-San Antonio 2005, no pet.); *see Ogletree,* 262 S.W.3d at 320 (citing dismissal of claim and ineligibility for extension to cure report in *Marichalar* as example of "seemingly harsh result[ ]" following from service of report that mentioned other defendant doctors but not defendant Dr. Garcia).

[28] Johnson's supplemental report begins by identifying Urukalo as the subject of his opinions:

> The purpose of this supplemental report is to provide a fair summary of my opinions at this time as to the health care provided by Ana Urukalo, DPM to Mrs. Kathryn Fischer in 2006 and 2007.

He proceeds to address only the standard of care owed by "physicians that treat soft tissue masses in the lower extremities[,] including foot surgeons and podiatrists, such as Dr. Urukalo," not the standard of care for a referring primary care physician like Fung. His discussions about the "breaches of standards of care" and "causation" are directed solely at Urukalo's conduct. Further, although Fung's medical records are identified among the materials that Johnson reviewed in the preparation of his report, Johnson expressed no criticism of Fung whatsoever. In fact, the Fischers' response below argued that this report was intended to support their claim against Urukalo.

Because the four corners of Johnson's supplemental report fail to provide any information about Fung's standard of care as a primary care physician, any alleged breach of the standard of care by Fung, and any causal link between an alleged breach by Fung and Kathryn Fischer's injury, the report does not implicate Fung. *See Rivenes,* 257 S.W.3d at 338–39 (holding that trial court abused its discretion by denying doctor's motion to dismiss because expert's report opined only about negligence of another doctor, hospital, and "hospital staff" generally); *Marichalar,* 185 S.W.3d at 71–72, 74 (holding that expert report that focused on acts by other defendants and did not mention Dr. Garcia at all was "no report" as to him and thus, **\*530** trial court erred in granting claimant extension of time to cure that nonexistent report). We conclude that Johnson's supplemental report was not merely deficient in failing to comply with chapter 74 but was the equivalent of "no report" as to Fung.

### 2. Varon's report

Fung contends that Varon's report failed to comply with chapter 74's required discussions of breach of the standard of care and causation because its conclusions are not linked to facts in the report and it requires the court to infer Fung's negligence. Fung argues specifically that Varon's report is conditional and speculative because: (1) it relies on an assumption that Fung was aware of Kathryn Fischer's MRI results and failed to act; (2) it fails to make a causal link between an allegedly breached standard of care and an injury by requiring an inference that if Fung had access to Urukalo's chart notes, then Kathryn Fischer's outcome would have been different; and (3) it is not supported by facts within the four corners of the report. The Fischers respond that Varon's report "clearly identif[ies]" how Fung's conduct fell below the standard of care, and that the "primary breach exists if Fung was aware of Mrs. Fischer[']s MRI and did nothing with this differential diagnosis."

[29] [30] The causal connection in medical malpractice suits must be made "beyond the point of conjecture" and "must show more than a possibility" to warrant submission of the issue to a jury. *Lenger v. Physician's Gen. Hosp.,* 455 S.W.2d 703, 706 (Tex.1970); *see Bowie Mem'l Hosp.,* 79 S.W.3d at 53. Reports providing a "description of only a possibility of causation do[ ] not constitute a good-faith effort to comply with the statute." *Walgreen Co. v. Hieger,* 243 S.W.3d 183, 186–87 (Tex.App.-Houston [14th Dist.] 2007, pet. denied) (holding that expert report stating claimant had symptoms "consistent with" known side effects of medication was insufficient to demonstrate causal link); *see McMenemy v. Holden,* No. 14–07–00365–CV, 2007 WL 4842452, at *5–6, 2007 Tex.App. LEXIS 8830, at *15–16 (Tex.App.-Houston [14th Dist.] Nov. 1, 2007, pet. denied) (mem. op.) (concluding that expert's report expressing uncertainty about possibility of positive outcome for patient failed to make causal link indicating plaintiffs' claim had merit); *Estate of Allen v. Polly Ryon Hosp. Auth.,* No. 01–04–00151–CV, 2005 WL 497291, at *5–6, 2005 Tex.App. LEXIS 1691, at *16–17 (Tex.App.-Houston [1st Dist.] Mar. 3, 2005, no pet.) (mem. op.) (holding that expert's report failed to meet statutory causation requirement by opining merely that breach of standard of care "could have contributed" to decline in claimant's condition).

[31] Further, a court may not fill in gaps in a report by drawing inferences or guessing what the expert meant or intended. *Austin Heart, P.A. v. Webb,* 228 S.W.3d 276, 279 (Tex.App.-Austin 2007, no pet.). Instead, the report must include the required information within its four corners. *Bowie Mem'l Hosp.,* 79 S.W.3d at 53.

[32] Reliable expert opinion should also be free from internal inconsistencies. *See Wilson v. Shanti,* 333 S.W.3d 909, 914 (Tex.App.-Houston [1st Dist.] 2011, pet. denied) (citing *General Motors Corp. v. Iracheta,* 161 S.W.3d 462, 470–72 (Tex.2005)). In *Wilson,* the court affirmed the exclusion of an expert's medical causation testimony because of the inconsistency between the expert's initial report, the claimant's deposition testimony, and the unexplained conclusion in the expert's supplemental report attempting to reconcile the facts in his initial report with the claimant's testimony. *Id.* at 914–15. Because **\*531** of the unexplained inconsistency underlying the expert's conclusion, the court affirmed the trial court's finding that the expert failed to provide a reliable foundation for his causation opinion. *Id.* at 915.

[33] Varon's report contains significant internal inconsistencies and is ambivalent about Fung's liability. Specifically, although Varon's criticisms of Fung are wholly dependent on whether Fung had access to Kathryn Fischer's MRI and differential diagnosis at a certain point in her treatment, the factual background section of Varon's report conveys his uncertainty about whether Fung ever saw a chart entry with the MRI result and whether Fung knew about the differential diagnosis of cancer.

Varon's report says that Fung's negligence depends on Fung:

> (1) having the MRI test available to him by about 1:00 p.m. on April 16, 2007 (when Varon states that Fung completed his examination and report);
>
> (2) knowing of the MRI result by about 1:00 p.m. on April 16, 2007; or
>
> (3) having Dr. Urukalo's April 10th chart information about the MRI and differential diagnosis by about 1:00 p.m. on April 16, 2007; and
>
> (4) knowing that the differential diagnosis included neoplasm, tumor, or sarcoma by about 1:00 p.m. on April 16, 2007.

Varon further opined that the standard of care requires internal medicine physicians like Fung to:

> • review information that is "pertinent" and "available" about the patient's current medical and differential diagnoses, history, medications, physical examination, test studies and results, and evaluate planned procedure[s];
>
> • timely refer the patient for appropriate consultations;

> • adequately inform the patient of "differential diagnoses known," planned treatment, perceptions and expectations of the surgical procedure; and
>
> • confirm and ensure that the planned procedure is "appropriate for the differential diagnosis," that it is scheduled to be performed by appropriate and qualified personnel, and that it is scheduled to be performed at an appropriate and qualified facility.

All of these opinions hinge on the patient information "available" to Fung and the "differential diagnoses known" to him.

Yet Varon's report affirmatively negates Fung's having seen the information that is identified as key to his liability. For instance, when Varon reviews the facts and explains the function of the electronic record system and the timing of the physicians' entries, he states that Fung would not have seen Urukalo's April 10th chart entry because she signed it almost ten hours after Fung signed his report:

> Dr. Fung completed the physical examination of Mrs. Fischer and cleared Mrs. Fischer for surgery for a ganglion cyst and signed his report *at 1:20 pm* on April 16, 2007.... However, after Dr. Fung completed his report and signed the history and physical form, later that night *at 11:12pm* on April 16, Dr. Urukalo signed the chart document she supposedly dictated on April 10.
>
> It is my understanding that the electronic record system used at ADC allowed additions and changes to patient chart documents and all other health care providers are unable to view the chart document until after the document is signed. Then only the final document is available, not prior to any additions or changes.

(Emphases added.) In fact, Varon is unable to state that anyone other than Urukalo **\*532** knew about her April 10th chart entry or the differential diagnosis of neoplasm or sarcoma:

> Dr. Urukalo's April 10, 2007 chart entry had cc: Dr. Fung and Dr. Pytkowski. It is unclear whether Dr. Fung and Dr. Pytkowski received and/or reviewed the April 10, 2007 medical document before the surgery on April 20, 2007; if so, when they received and/or reviewed the medical document and what was on the medical document when received and/or reviewed.... Both Dr. Fung and Dr. Pytkowski testified they never saw or received a copy of Dr. Urukalo's April 10, 2007 chart document, were not aware of the MRI, were not aware of the MRI report of Dr. Chen, and not aware o[f] Dr. Urukalo's differential diagnosis of neoplasm or

sarcoma before the surgery on Mrs. Fischer on April 20, 2007.

....

There are several handwritten records that state a preoperative and postoperative diagnosis of a ganglion cyst that includes a possible neoplasm, but it is unclear when and by whom this information was written in the medical chart.

Further inconsistencies are present in the report's discussion of "*CAUSATION,*" which states that between "February 17, 2006 through December 21, 2006, ADC employees, agents, and servants, including Dr. Urukalo, knew or should have known that Mrs. Fischer's soft tissue mass was probably not a ganglion cyst, and required additional diagnostic testing." However, that time frame was after Fung's referral to Urukalo, when Fung was not treating Kathryn Fischer.

Ultimately, in the "*NEGLIGENCE, GROSS NEGLIGENCE, MALICE AND FRAUD OF DR [.] FUNG,*" section of his report, Varon qualifies his specific criticism of Fung by stating that Fung:

> *was not negligent unless* prior to completing his examination and finalizing his report on April 16, 2007, the MRI test was available to Dr. Fung, Dr. Fung was aware of Mrs. Fischer's MRI test result, or *if* Dr. Urukalo's April 10, 2007 return visit chart document with information regarding the MRI result and her differential diagnosis was available to him, and *if* he unaware [sic] that Mrs. Fischer's differential diagnosis included a neoplasm, tumor, or sarcoma prior to the surgery on April 20, 2007.
>
> However, *if* prior to completing his examination and finalizing his report on April 16, 2007, the MRI test was available to Dr. Fung, Dr. Fung was aware of Mrs. Fischer's MRI test result, or *if* Dr. Urukalo's April 10, 2007 return visit chart document with information regarding the MRI result and her differential diagnosis was available to him, or *if* he unaware [sic] that Mrs. Fischer's differential diagnosis included a neoplasm, tumor, or sarcoma prior to the surgery on April 20, 2007, *then it is my opinion* based on my education, experience, training, review of the material listed, and in reasonable medical probability, that **FREDERICK FUNG, M.D.'s** negligence, gross negligence, malice, and conspiracy to fraud [sic] *was a proximate cause* of Mrs. Fischer's injuries and damages....

(Emphases added.) This section suggests that the preceding facts Varon identified in his report, including the chronology supporting Fung's testimony that he had

not seen Urukalo's April 10th chart entry, may be disregarded in favor of assumptions that are unsupported by the report's four corners—namely, that the MRI test was available to Fung, that Fung was aware of the MRI test result, that Urukalo's chart document was available to Fung, or that Fung was aware of the differential diagnosis including a neoplasm, tumor, or sarcoma **\*533** before Kathryn Fischer's surgery—to create a causal link between Fung's conduct and Fischer's injuries.

Still other sections of Varon's report discount these conditional assumptions by reiterating that Fung lacked access to, and knowledge of, Urukalo's April 10th chart note and the possible cancer diagnosis. Most notably, one of Varon's criticisms of Urukalo is that she "intentionally concealed" the very information that Varon speculates Fung's liability would hinge on:

> Dr. Urukalo referred Mrs. Fischer to Dr. Fung for a preoperative examination and history and physical preoperative to an excision of a ganglion cyst. Dr. Urukalo *intentionally concealed the MRI findings* [suggesting cancer] *from Dr. Fung,* who completed his examination and report at approximately 1 pm on April 16, 2007. However, Dr. Urukalo did not sign her chart note until over 10 hours after Dr. Fung completed his examination and signed his reports. Dr. Urukalo knew that her chart note of April 10, 2007, regarding the MRI findings and Mrs. Fischer's "differential diagnosis includes ... sarcoma" was *not accessible to Dr. Fung* in Mrs. Fischer's electronic medical chart until after she signed the note at 11:12 pm on April 16, 2007.
>
> ....
>
> [I]t is *questionable* as to *when* and *who else was aware* of the preoperative diagnosis of a neoplasm and sarcoma and *when* and *how* this critical information was available to ADC employees involved in the April 20, 2007 surgery, other than Dr. Urukalo.
>
> ....
>
> The medical records confirm that prior to the procedure on April 20, 2007, Mrs. Fischer had a differential diagnosis of a malignant sarcoma, but it is *unclear which health care providers other than Dr. Urukalo were aware* of this critical and important information.

(Emphases added.) Varon's report underscores the significance of Fung's lack of access to the MRI findings and preoperative diagnosis by including the "pertinent finding" that Urukalo "conceal[ed] from everyone involved with the surgery that Mrs. Fischer's mass could be a sarcoma."

In summary, the information on which Varon would hinge Fung's negligence is affirmatively negated by Varon's other opinions in this report that:

- Dr. Urukalo intentionally concealed the MRI findings suggesting cancer from Dr. Fung; and

- Dr. Urukalo's chart note of April 10, 2007 with the MRI findings and differential diagnosis including sarcoma was not accessible to Dr. Fung.

Further, as to Varon's allegation that Fung was negligent if he knew about the differential diagnosis of cancer by the time he completed the exam and his report on April 16, 2007, nothing in the four corners of Varon's report opines that Fung knew, by the time he completed the exam and his report, of a differential diagnosis including neoplasm, tumor, or sarcoma.

Varon's opinions here resemble those from discredited reports that failed to show more than a possibility of a causal link between the defendant's conduct and the claimant's injury. *See Bowie Mem'l Hosp.,* 79 S.W.3d at 53; *Hieger,* 243 S.W.3d at 187; *Christus Spohn Health Sys. v. Trammell,* 13–09–00199–CV, 2009 WL 2462899, at *2–3, 2009 Tex.App. LEXIS 6329, at *7–8 (Tex.App.-Corpus Christi Aug. 13, 2009, no pet.) (mem. op.) (concluding that expert's causation opinion "merely suggest[ing] that *if* an assumption can be made, then 'a causal link can be made' " was "wholly inadequate" and "nothing more than conjecture"); *see also* **\*534** *Alfieri v. United States,* No. SA–08–CV–277–XR, 2009 WL 4059164, at *3–4, 2009 U.S. Dist. LEXIS 108470, at *9–11 & n. 4 (W.D.Tex. Nov. 20, 2009) (order) (ruling that expert's conclusion that "defendant *would be* further negligent *if* in fact" certain conditions were met was speculative) (emphases added). Because Varon's report acknowledges that Fung would not have had information that Urukalo "intentionally concealed" from him, and because nothing in this report indicates Fung's awareness of a differential diagnosis including neoplasm, tumor, or sarcoma by 1:00 p.m. on April 16, 2007, any opinion by Varon that Fung did have such information turns wholly on assumption that is unsupported, if not disputed, by the facts in Varon's report.

The San Antonio Court of Appeals addressed a similar problem with assumptions in one of Varon's previous reports. *See Cooper v. Arizpe,* No. 04–07–00734, 2008 WL 940490, at *3–4, 2008 Tex.App. LEXIS 2506, at *9–10 (Tex.App.-San Antonio Apr. 9, 2008, pet. denied) (mem. op.). In an opinion that issued before the Fischers served Varon's report on Fung, the court concluded that Varon's report was deficient because of its assumptions that an emergency department chart and a certain doctor's notes were in a floor chart that was available for the defendant doctors to review:

> [T]he alleged breach of the standard of care ... w[as] contingent on Dr. Varon's assumption that the [emergency department] chart and Dr. Skeete's progress notes were in the floor chart.... By relying on assumptions instead of facts, the report provides no basis for the trial court to conclude that the claims against [the defendant doctors] have merit.

*Id.* (citing *Bowie Mem'l Hosp.,* 79 S.W.3d at 52; *Murphy v. Mendoza,* 234 S.W.3d 23, 28 (Tex.App.-El Paso 2007, no pet.) (holding that expert's opinion as to breach of the standard of care was speculative and conclusory as it was unsupported by facts in report's four corners and relied on assumption); *Hutchinson v. Montemayor,* 144 S.W.3d 614, 618 (Tex.App.-San Antonio 2004, no pet.) (concluding that report failed to show more than possibility and speculation as to causation)).

We likewise conclude here that Varon's opinions regarding Fung's negligence, breach of the standard of care, and causation—which depend on unsupported assumptions as to what Fung knew and when he knew it—are conditional and speculative at best, and are affirmatively contradicted and negated by Varon's own opinions at worst. As such, they did not provide a basis for the court to conclude that the Fischers' health care liability claim against Fung has merit. *Cf. Bowie Mem'l Hosp.,* 79 S.W.3d at 52.

Under the facts and circumstances of this case, neither Varon's report nor Johnson's supplemental report constituted a "good faith effort" at compliance with chapter 74. We therefore sustain Fung's first issue. We must now determine whether this case should be remanded for the probate court to consider granting the statutory thirty-day extension of time to cure the deficiencies in these reports. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(c).

**Eligibility for extension of time to cure**

In his second issue, Fung argues that, despite two years of discovery and numerous depositions, the deficiencies in the expert reports that the Fischers served in support of their health care liability claim against him were incurable—Johnson's report fails to implicate Fung whatsoever, and Varon's report lacks a factual basis

within its four corners, to the extent that it expresses any opinions regarding Fung. Because neither could be cured without an **\*535** entirely new report, Fung contends that they are ineligible for the statutory thirty-day extension of time to cure their deficiencies. The Fischers argue that remand is appropriate because the reports that they served are not the equivalent of "no report," and if Varon's report lacks a link between his stated conclusions and Fung's conduct, addressing that deficiency would be "an easy fix."

[34] [35] Service of a report that is deficient, but not so deficient as to constitute "no report," need not result in dismissal of the underlying health care liability claim. *See Samlowski,* 332 S.W.3d at 411; *Austin Heart,* 228 S.W.3d at 284–85 & n. 8. Trial courts are afforded discretion under chapter 74 to grant one thirty-day extension so that claimants may, if possible, cure deficient reports. *Samlowski,* 332 S.W.3d at 411 (citing Tex. Civ. Prac. & Rem.Code Ann. § 74.351(c); *Ogletree,* 262 S.W.3d at 320). When we find deficient a report that the trial court considered adequate, we may remand the case for the trial court's consideration of whether to grant the thirty-day extension. *Leland v. Brandal,* 257 S.W.3d 204, 207 (Tex.2008); *see Austin Heart,* 228 S.W.3d at 284–85 & n. 8.

Recently, a majority of the Texas Supreme Court expressed a preference for trial courts to err on the side of granting extensions to cure deficient reports, noting that "[t]he right answer in many cases will be for the trial court to grant one thirty-day extension upon timely request and be done with it." *Samlowski,* 332 S.W.3d at 411–12. The court concluded that a deficient report is eligible for the thirty-day extension if it: (1) is served by the statutory deadline; (2) contains the opinion of an individual with expertise that the claim has merit; and (3) implicates the defendant's conduct. *Scoresby,* 346 S.W.3d at 557. The court acknowledged that "this is a minimal standard, but we think it is necessary if multiple interlocutory appeals are to be avoided, and appropriate to give a claimant the opportunity provided by the Act's thirty-day extension to show that a claim has merit." *Id.*

[36] An inadequate report does not indicate a frivolous claim if the report's deficiencies are readily curable. *Id.* at 556; *see id.* at 558–59 (Willett, J., concurring) (concluding that report "must actually allege that someone committed malpractice," and report that "*never asserts that anyone did anything wrong* " cannot receive extension because bar for report is low "but not subterranean"); *see Samlowski,* 332 S.W.3d at 416 (Guzman, J., concurring) (reasoning that report from qualified health care professional, which explained belief that physician's actions caused claimant's injuries, should

have been eligible for extension to cure because it did not demonstrate on its face that it was incurable). Thus, courts should grant the statutory extension of time when a deficient expert report can be cured readily and deny the extension when it cannot. *Samlowski,* 332 S.W.3d at 411. The court in *Scoresby* determined that the expert's report was deficient in at least one respect because it omitted the standard of care and contained only an implication that the standard was inconsistent with the surgeons' conduct. *Scoresby,* 346 S.W.3d at 557. However, the court concluded that the expert's report was eligible for the statutory extension of time to cure its deficiency because the expert claimed expertise as a neurologist, described plaintiff's brain injury, attributed the effects of such injury to the defendant surgeons' breach of the standards of care, and opined unequivocally that the plaintiff's claim had merit. *Id.* ("[T]here [wa]s no question that in [the expert's] opinion, Santillan's claim against the Physicians has merit.").

**\*536** [37] The report at issue in *Scoresby,* which had readily curable deficiencies and unquestionably opined that the claim against the physicians had merit, is unlike Johnson's and Varon's reports as to Fung. Applying the *Scoresby* three-factor test to Johnson's supplemental report shows that only the first factor is met: the report was timely served on Fung. However, the report does not opine that the Fischers' health care liability claim against Fung has merit and the report does not implicate Fung. *Cf. id.* It omits any discussion about the standard of care for a referring primary care physician like Fung, its only references to "breaches of standards of care" and "causation" are directed solely at Urukalo's conduct, and it simply fails to assert that Fung did anything wrong. *See Rivenes,* 257 S.W.3d at 338–39 (reversing trial court's denial of doctor's motion to dismiss because expert's report opined only about negligence of another doctor, hospital, and "hospital staff" generally); *Marichalar,* 185 S.W.3d at 71–72, 74 (concluding that expert report was ineligible for extension of time to cure because it was directed to acts of other defendant doctors and did not mention Dr. Garcia at all, making it "no report" as to him); *see also Scoresby,* 346 S.W.3d at 558. Johnson's supplemental report was not merely deficient but was effectively "no report" as to Fung.

[38] Likewise, Varon's report was timely served but not much else. Instead of opining that the Fischers' health care liability claim against Fung has merit and implicating Fung's conduct, the report opines that Fung's knowledge of critical information on which his liability hinges is "questionable," or it negates Fung's liability altogether based on information that he could not have known because, according to this same report, it was "intentionally concealed" from him. *Cf. Scoresby,* 346

S.W.3d at 557. Any breach of the standard of care discussed in Varon's report is entirely dependent on the pertinent information "available" to Fung and the "differential diagnoses known" to him; causation is similarly addressed with nothing but speculation. Because Varon's report opines that Fung's liability is either questionable or impossible, it does not actually allege any malpractice and is "no report" as to Fung. *Cf. id.* at 557, 559.

We conclude that as to Fung, neither Varon's report nor Johnson's supplemental report meets *Scoresby's* minimal standard because their deficiencies could only be cured with entirely new reports based on changed facts. They are thus ineligible for the statutory extension, and the probate court abused its discretion in denying Fung's motion to dismiss. Accordingly, Fung's second issue is sustained. We reverse the probate court's order overruling Fung's objections to the expert reports and denying Fung's motion to dismiss, render judgment granting Fung's motion to dismiss the Fischers' health care liability claim against him with prejudice, and remand this case for the probate court's determination of reasonable attorney's fees and costs. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(b)(1).

## CONCLUSION

Having sustained Urukalo's, Minicucci's, and ADC's first issues, we reverse the probate court's three orders overruling these appellants' objections to the expert reports as untimely, vacate the three orders denying these appellants' motions to dismiss, and remand this case for the court's consideration of the merits of Urukalo's, Minicucci's, and ADC's objections and motions to dismiss.

Further, having sustained Fung's first and second issues, we reverse the probate court's order overruling Fung's objections **\*537** to the expert reports, reverse the order denying Fung's motion to dismiss, render judgment dismissing the Fischers' health care liability claim against Fung with prejudice, and remand this case to the probate court for a determination of Fung's reasonable attorney's fees and costs under section 74.351(b)(1) of the civil practice and remedies code.

## Footnotes

1    Bachmann's and Johnson's reports disclaim offering opinions about any defendant besides Urukalo by stating: "The following is a fair summary of my opinions as of the date of this report regarding the applicable standards of care and how the manner in which the care *rendered only by Ana Urukalo, D.P.M.* was deficient and failed to meet these applicable standards." (Emphasis added.)

2    The motion to transfer the suit to probate court is not in the record, but Urukalo's brief explains that "Myron Fischer instituted guardianship proceedings for the person and estate of Kathryn Fischer on December 3, 2009, due to her 'partial incapacity' based on a 'physical limitation.' "

3    This Court allowed post-submission briefing on the Fischers' jurisdictional issue. Matters in the Fischers' post-submission brief unrelated to the jurisdictional issue will be considered based upon their earlier briefing and argument.

4    The exception in section 51.014(a)(9) prohibiting appeal from an order granting a 30–day extension to cure a deficient report under section 74.351 is inapplicable here because the court's orders did not grant any extension. *See* Tex. Civ. Prac. & Rem.Code Ann. §§ 51.014(a)(9) (West Supp. 2011), 74.351(c) (West 2011).

5    Health care providers and podiatrists are within the scope of chapter 74. *See id.* All of the Fischers' petitions and all of Urukalo's answers identified Urukalo as a "D.P.M." (doctor of podiatric medicine). *See* 22 Tex. Admin. Code § 373.3 (2011) (Tex. State Bd. of Podiatric Med. Exam'rs, Practitioner Identification). Also, the Fischers' response to the motions to dismiss and objections refers to Urukalo as a "podiatrist" and to appellants collectively as "defendant health care providers."

6    The Fischers assert, for the first time on appeal and contrary to their response below, that Urukalo's objections were waived. Because the Fischers' response did not raise the waiver issue (instead, they acknowledged that Urukalo's objections to the 2009 reports were timely), it was not before the probate court when it ruled, and we may not consider it on appeal. *See Hansen v. Starr,* 123 S.W.3d 13, 18 (Tex.App.-Dallas 2003, pet. denied) (rejecting waiver issue because claimants failed to raise it in their responses to doctors' motions to dismiss); *see also San Jacinto Methodist Hosp. v. Carr,* No. 01–07–00655, 2008 WL 2186473, at \*3, 2008 Tex.App. LEXIS 3850, at \*8 (Tex.App.-Houston [1st Dist.] May 22, 2008, no pet.) (mem. op.) (holding that hospital could object to expert reports on appeal because claimants failed to raise waiver issue in response to hospital's motion to dismiss).

7    As previously noted, the 2007 reports address only Urukalo's negligence, and the original ADC defendant does not seek dismissal of the health care liability claim asserting its vicarious liability for Urukalo's alleged negligent conduct as pled in the 2007 original petition.

8    Because the probate court's order explicitly stated that the ADC defendants' objections were overruled as untimely (and thus, were waived), we do not reach the Fischers' additional argument that the original ADC defendant waived its objections to the 2007 reports by participating in discovery. *Cf. Jernigan v. Langley,* 111 S.W.3d 153, 157 (Tex.2003) (rejecting argument that doctor's "attempt[ ] to learn more about the case" through discovery demonstrated his intent to waive his right to move for dismissal).

9    The Eleventh Court of Appeals noted that five of our sister courts evaluate direct-liability claims and vicarious-liability claims as separate health care liability claims, but the First Court of Appeals has instead reasoned that the two are merely alternative legal theories for imposing liability in the same health care liability claim and that "if at least one liability theory within a cause of action is shown by the expert report, then the claimant may proceed with the entire cause of action against the defendant, including particular liability theories that were not originally part of the expert report." *Hendrick Med. Ctr. v. Miller,* No. 11–11–00141–CV, 2012 WL 314062, at *3–4, 2012 Tex.App. LEXIS 683, at *9–11 (Tex.App.-Eastland Jan. 26, 2012, no pet.) (mem. op.) (collecting cases and declining to follow *Certified EMS, Inc. v. Potts,* 355 S.W.3d 683, 692 (Tex.App.-Houston [1st Dist.] May 19, 2011, pet. filed) (op. on reh'g)). To the extent *Potts* takes the position that an expert report which solely addresses a vicarious-liability claim against a health care provider suffices to support a direct-liability claim against that provider arising, as here, from a different group of operative facts, we decline to follow it.

10   The Fischers filed several amended petitions in 2009, but their amended pleadings against the original ADC defendant, based on the same underlying facts, did not restart their 120–day deadline for serving expert reports. *See Maxwell v. Seifert,* 237 S.W.3d 423, 426 (Tex.App.-Houston [14th Dist.] 2007, pet. denied); *see also Davis v. Baker,* No. 03–10–00324–CV, 2010 WL 5463864, at *2–3, 2010 Tex.App. LEXIS 10317, at *5–7 (Tex.App.-Austin Dec. 22, 2010, no pet.) (mem. op.).

11   The Fischers' response to the defendants' objections and motions contains a chart reflecting the Fischers' mistaken belief that the deadline for defendants' objections to the reports ran from the date that the defendants were served with the petition. The Fischers miscalculated the deadline for the defendants' objections—and erroneously argued that the objections were waived—by adding twenty-one days to the date that the defendants were served with the petition instead of the date that the defendants were served with the *report. See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(a) (emphasis added).

12   The Fischers appear to have abandoned this argument, which is unaddressed in their brief. *See* Tex.R.App. P. 38.2(a)(2).

13   The Fischers served only the original pair of defendants, ADC and Urukalo, with the first set of expert reports.

---

**End of Document**     © 2015 Thomson Reuters. No claim to original U.S. Government Works.

---

189 S.W.3d 855
Court of Appeals of Texas,
Houston (1st Dist.).

Sylvia GRAY, Appellant,
v.
CHCA BAYSHORE L.P. d/b/a Bayshore Medical
Center and Ira H. Rapp, M.D., Appellees.

No. 01–04–00918–CV. | Jan. 26, 2006.

**Synopsis**
**Background:** Patient brought medical malpractice action against hospital and doctor, seeking to recover damages resulting from the injury to her knee during surgical treatment of chronic sinusitis and nasal septal deformity. The 281st District Court, Harris County, David Jorge Bernal, J., dismissed patient's suit, and patient appealed.

**[Holding:]** The Court of Appeals, Evelyn V. Keyes, J., held that expert report did not satisfy statutory requirements of medical liability statute, and thus, dismissal of patient's medical malpractice action was warranted.

Affirmed.

**Attorneys and Law Firms**

**\*856** Michael D. Farmer, Plummer & Farmer, Houston, TX, for Appellant.

Larry D. Thompson and Robert G. Smith, Lorance & Thompson, P.C., Griffin Vincent and Solace Kirkland Southwick, Andrews Kurth LLP, Houston, TX, for Appellees.

Panel consists of Justices NUCHIA, KEYES, and HANKS.

**OPINION**

EVELYN V. KEYES, Justice.

This appeal arises from a medical malpractice claim brought by appellant, Sylvia Gray, against appellees,

CHCA Bayshore L.P. d/b/a Bayshore Medical Center (Bayshore) and Ira H. Rapp, M.D. The trial court dismissed Gray's suit with prejudice after concluding that the expert report she filed failed to satisfy the requirements set forth in section 74.351 of the Texas Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351 (Vernon Supp.2005). In her sole issue on appeal, Gray argues that the trial court erred in finding that her expert report did not comply with the statute.

We affirm.

**BACKGROUND**

In 2001, Gray was admitted to Bayshore for surgical treatment of chronic sinusitis and nasal septal deformity. For the surgery, Gray was administered a general anesthetic by Dr. Rapp. Upon regaining consciousness after the operation, Gray became aware of severe pain in her left knee. Subsequent examination by an orthopedist and a neurologist revealed a dislocation of the knee's patella. Gray, age 39, had no prior history of knee injuries.

In November 2003, Gray brought suit against Bayshore, Dr. Rapp, and Phillip A. Matorin, M.D., seeking to recover damages resulting from the injury to her knee.[1] Gray's suit alleged that the injury was caused by the flexing of her left leg during surgery and that the injury could have **\*857** been prevented had Dr. Rapp and the Bayshore's nursing staff properly monitored Gray's extremities during the operation. In March 2004, Gray filed the report of her medical expert, Dr. Richard F. Toussaint, M.D., as required by section 74.351 of the Texas Civil Practice and Remedies Code. *See id.* Both Bayshore and Dr. Rapp moved to dismiss Gray's suit, arguing that Dr. Toussaint's expert report failed to comply with the requirements of section 74.351. *See id.* The trial court then granted Gray a 30–day extension to cure any deficiencies in her expert report. *See id.* § 74.351(c).

Gray filed her amended expert report in June 2004. The report, again by Dr. Toussaint, reads in pertinent part:

> Ms. Gray was administered a general anesthetic for the sinus surgery by Ira H. Rapp, M.D. During the surgery, Ms. Gray's knees and arms had become flexed, and when she awoke from the anesthetic, she noted severe pain upon attempting to move from a bedpan. She was

noted to have a negative history of knee injury. Ms. Gray was seen by John H. Ownby, M.D., neurologist, and Ronald B. Heisey, M.D., orthopedist, who upon subsequent workup of Ms. Gray's knee pain determined that her left patella had become dislocated.

Based on the forgoing and my education, training, experience, and reasonable medical probability, it is my opinion that Dr. Ira H. Rapp, M.D., Dr. Phillip A. Matorin, M.D., and the nursing staff of Bayshore Medical Center breached the standard of care for failing to properly monitor, treat, and prevent the resultant left knee injury and dislocation of the left patella.

Based on the Texas definitions, Dr. Ira H. Rapp, M.D., Dr. Phillip A. Matorin, M.D., and the Bayshore Medical Center perioperative nursing staff were negligent by failing to properly monitor, treat, and prevent Ms. Gray's left patella dislocation. The negligence was in the following:

1. Dr. Ira H. Rapp, M.D. failed to monitor the positioning of Ms. Gray's left knee to prevent the subsequent dislocation of the patella while under a general anesthetic. The standard of care in this circumstance would be for a physician to monitor the positioning of the patient's extremities to prevent injury during surgery and post operatively.

2. The Bayshore Medical Center perioperative nursing staff failed to monitor the positioning of Ms. Gray's left knee to prevent the subsequent dislocation of the patella while in the operating room. The standard of care in this circumstance would be for the perioperative nursing staff to monitor the positioning of the patient's extremities to prevent injury during surgery and post operatively.

In the above instance, had Dr. Ira H. Rapp, M.D., Dr. Phillip A. Matorin, M.D., and the Bayshore Medical Center perioperative nursing staff monitored and detected the flexing of Ms. Gray's arms and legs during general anesthesia in a timely fashion, then in reasonable medical probability, the pain and suffering experienced by Ms. Gray from the dislocated left patella would not have occurred along with the resultant necessary treatments. The failure to monitor, detect, diagnose, and timely treat a malpositioned left knee during a general anesthetic was negligence and proximately caused the dislocated left patella and subsequent pain and suffering experienced by Ms. Gray on December 5, 2001.

This opinion is based on the available medical records that you have provided for my review. I understand that

negligence is the failure to use ordinary care, **\*858** failure to do what a physician, or operating room nurse, of ordinary prudence would have done under the same or similar circumstances. I also understand that proximate cause is a cause which in a natural and continuous sequence produces an event, and without which, such an event would not have occurred. I also understand that in order to be a proximate cause, an act or omission complained of must be such that a person using ordinary care would have foreseen that the event, or some similar event, might reasonably result therefrom.

Based on these definitions, and on a reasonable degree of medical probability, Dr. Ira H. Rapp, M.D., Dr. Phillip A. Matorin, M.D., and the Bayshore Medical Center perioperative nursing staff failed to meet the standard of care when they neglected to monitor and detect a malpositioned left knee resulting in a dislocated left patella on December 5, 2001. The failure to monitor and detect the malpositioned left knee resulted in a dislocated left patella, severe pain and suffering, and subsequent medical treatment.

After receiving Gray's amended expert report, Bayshore and Dr. Rapp again moved to dismiss the suit, arguing that the report still did not comply with section 74.351. After a hearing, appellees' supplemental motions to dismiss were granted, and Gray timely appealed.

## DISCUSSION

In her sole issue on appeal, Gray contends that the trial court erred in its determination that Dr. Toussaint's report did not comply with section 74.351 of the Civil Practice and Remedies Code. Specifically, she argues that Dr. Toussaint's report constituted an objective good faith effort to comply with the requirements of section 74.351, and thus contends that the trial court acted improperly in dismissing her suit. *See id.* § 74.351(*l* ) (stating that a court shall grant a challenge to an expert report "only if it appears to the court, after hearing, that the report does not represent an objective good faith effort" at compliance).

### *Standard of Review*
[1] [2] [3] [4] We review all section 74.351 rulings under an abuse of discretion standard. *Am. Transitional Care Ctrs. v. Palacios,* 46 S.W.3d 873, 877 (Tex.2001). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to guiding rules or principles. *See Garcia v. Martinez,* 988 S.W.2d 219,

222 (Tex.1999). When reviewing matters committed to the trial court's discretion, we may not substitute our own judgment for that of the trial court. *Walker v. Packer,* 827 S.W.2d 833, 839 (Tex.1992). A trial court does not abuse its discretion merely because it decides a discretionary matter differently than an appellate court would in a similar circumstance. *See Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985).

### *Section 74.351 of the Texas Civil Practice and Remedies Code*

Pursuant to section 74.351, medical malpractice plaintiffs must provide each defendant physician and health care provider with an expert report or voluntarily nonsuit the action. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351. If a claimant timely furnishes an expert report, a defendant may file a motion challenging the report's adequacy. *See id.* at § 74.351(a). The trial court shall grant the motion only if it appears, after hearing, that the report does not represent a good faith effort to comply with the statutory definition of an expert report. *See id.* § 74.351(*l* ). The statute defines an expert report as a written report by an expert that provides, as to each defendant, a fair summary of the **\*859** expert's opinions as of the date of the report regarding: (1) applicable standards of care; (2) the manner in which the care provided failed to meet the standards; and (3) the causal relationship between that failure and the injury, harm, or damages claimed. *See id.* § 74.351(r)(6); *Palacios,* 46 S.W.3d at 878–79.

**[5] [6] [7] [8]** Although the report need not marshal all the plaintiff's proof, it must include the expert's opinions on the three statutory elements—standard of care, breach, and causation. *See Palacios,* 46 S.W.3d at 878–79. In detailing these elements, the report must provide enough information to fulfill two purposes if it is to constitute a good faith effort. First, the report must inform the defendant of the specific conduct the plaintiff has called into question. *Id.* at 879. Second, the report must provide a basis for the trial court to conclude that the claims have merit. *Id.* A report that merely states the expert's conclusions as to the standard of care, breach, and causation does not fulfill these two purposes. *Id.* The expert must explain the basis for his statements and must link his conclusions to the facts. *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002). Furthermore, in assessing the report's sufficiency, the trial court may not draw any inferences, and must instead rely exclusively on the information contained within the report's four corners. *See Palacios,* 46 S.W.3d at 879.

### *Dr. Toussaint's Report*

Dr. Toussaint's amended report essentially states that, as to both Bayshore and Dr. Rapp: (1) the applicable standard of care required monitoring the positioning of Gray's extremities; (2) appellees failed to monitor the positioning of Gray's left knee; and (3) had appellees monitored the knee's position, Gray, within reasonable medical probability, would not have suffered a dislocated patella. Although the report, at first glance, thus appears to articulate the three statutorily required elements of an expert report, we are compelled, under an abuse of discretion standard, to conclude that the trial court did not act unreasonably in granting appellees' motions to dismiss.

**[9] [10]** The supreme court held in *Palacios* that medical malpractice plaintiffs must provide an expert report detailing standard of care, breach, and causation as to each defendant. *Id.* Here, the report states, without explanation, that a single standard of care applied to both Bayshore and Dr. Rapp. While it is possible that an identical standard of care regarding limb monitoring during and after surgery attaches to an anesthesiologist (Dr. Rapp) and a perioperative nursing staff (Bayshore), such generic statements, without more, can reasonably be deemed conclusory. Conclusory statements regarding standard of care, breach, or causation, do not constitute a good faith effort to comply with section 74.351 in that they fail to adequately inform each defendant of the specific conduct called into question by the plaintiff's claims. *See id.*

**[11]** Similar weaknesses undermine Dr. Toussaint's report in regard to how appellees breached the applicable standard of care. Whether a defendant breached the standard of care due a patient cannot be determined without "specific information about what the defendant should have done differently." *See id.* at 880. Here, Dr. Toussaint's report contains only a general statement that appellees failed to monitor Gray's left knee properly. The report provides no specific information concerning what actions appellees should have taken in the event they observed Gray's knee flexing. Indeed, a literal reading of the report's most direct statements concerning breach leads to the conclusion that simply monitoring Gray's extremities, **\*860** and taking no corrective action, would have prevented her injury. In view of such general and conclusory statements concerning breach, we cannot conclude that the trial court abused its discretion in dismissing Gray's suit.[2] *See id.* at 879.

Conclusory statements also plague the report's efforts to satisfy the statutory element of causation. Specifically, Dr. Toussaint's report does not state with any specificity how appellees departure from the stated standard of care

caused Gray's knee injury. Instead, the report provides only the conclusory statement that the failure to monitor caused Gray's injury. By not fleshing out how appellees' failure to monitor Gray's extremities caused her injury, the report does not convincingly tie the alleged departure from the standard of care to specific facts of the case. Such a failure has been found to be a sufficient reason for concluding that an expert report is statutorily inadequate. *See Bowie Mem'l Hosp.,* 79 S.W.3d at 53.

We further note that the report appears to be inconsistent with respect to the relationship among the standard of care, breach, and the cause of Gray's injury. Specific language in the report indicates that the applicable standard of care breached by the defendants was "monitor[ing] the positioning of the patient's extremities." The report then appears to depart from this limited standard of care and breach, stating, "The failure to *monitor, detect, diagnose, and timely treat* a malpositioned left knee during general anesthetic was negligence, and proximately caused the dislocated left patella." (Emphasis added.) The report thus fails to put the appellees on notice as to who had what responsibility and how that person or persons departed from the standard of ordinary medical care of a patient under anesthesia in failing to do some specific act required by a

person in that position, causing damage that would not have happened had ordinary professional care been used. Considering that the trial court is limited to the four corners of the report in making its determination, one could reasonably conclude that the conclusory language in the report, together with the inconsistency as to appellant's complaint, convinced the trial court that the report failed to satisfactorily inform each appellee of the specific conduct being challenged. *Palacios,* 46 S.W.3d at 878–79.

In view of the conclusory, and at times inconsistent, statements within Dr. Toussaint's expert report, we cannot conclude that the trial court abused its discretion in granting appellees' motion for dismissal. We thus overrule Gray's sole issue on appeal.

## CONCLUSION

We affirm the trial court's order of dismissal.

Footnotes

1    Dr. Matorin was the admitting physician. He was non-suited in July 2004.

2    We note that in *Strom v. Mem'l Hermann Hospt. Sys.,* this court upheld a trial court's decision to dismiss a remarkably similar suit due to the filing of an inadequate expert report. 110 S.W.3d 216 (Tex.App.-Houston [1st Dist.] 2003, pet. denied). In *Strom,* the plaintiff similarly alleged that she sustained an injury to her left knee due to improper positioning of her extremities during surgery. *Id.* at 219. The expert report Strom provided contained considerably more detail than Dr. Toussaint's report, referring specifically to the need to properly pad, strap, and place a patient's extremities during surgery. *Id.* at 224.

232 S.W.3d 170
Court of Appeals of Texas,
Houston (1st Dist.).

HARRIS COUNTY HOSPITAL DISTRICT,
Appellant,
v.
Autrey GARRETT, Individually and as Next Friend
of J.G., D.G., and S.G., Minor Children, Appellees.

No. 01–06–00782–CV. | May 3, 2007.

**Synopsis**
**Background:** Patient brought malpractice action against physicians and hospital for failure to timely disclose breast cancer biopsy results. The 152nd District Court, Harris County, Kenneth P. Wise, J., denied hospital's motion to dismiss based on patient's expert report, and hospital filed interlocutory appeal.

**Holdings:** The Court of Appeals, Terry Jennings, J., held that:

[1] an expert report did not have to set forth the expert's curriculum vitae as a separate document in order to comply with expert report statute;

[2] physician who submitted report was qualified to serve as an expert on issue of whether hospital departed from the standards of care in failing to disclose results of breast cancer biopsy;

[3] report satisfied requirements of expert report statute on identifying a standard of care; and

[4] report satisfied causation requirements of expert report statute.

Affirmed.

**Attorneys and Law Firms**

**\*172** John Arlen Pruitt, Assistant County Attorney, Houston, TX, for Appellant.

Chad Bassett Matthews, League City, TX, for Appellees.

Panel consists of Chief Justice RADACK and Justices JENNINGS and BLAND.

**OPINION**

TERRY JENNINGS, Justice.

In this interlocutory appeal,[1] appellant, Harris County Hospital District ("HCHD"), challenges the trial court's order denying its motion to dismiss the health care liability claim[2] of appellees, **\*173** Autrey Garrett, individually and as next of friend of J.G., D.G., and S.G., her minor children.

We affirm the trial court's order.

**Factual and Procedural Background**

In their original petition, the Garretts allege that HCHD and others[3] were negligent in failing to notify her of her diagnosis of ductal carcinoma of the breast until July 2005, even though pathology findings establishing this diagnosis were made on December 1, 2003, resulting in a significant delay of Garrett's treatment and the advancement of her cancer.

In October 2003, Garrett sought obstetrics and gynecology care at Lyndon B. Johnson Hospital ("LBJ"), and Dr. John Riggs "assumed care of [Garrett]." Riggs "discovered a breast mass" in Garrett's left breast and ordered a breast ultrasound, which was performed on October 6, 2003 and revealed that the mass was "possibly suspicious for malignancy." Garrett followed up on the results with the Breast Clinic at LBJ, which scheduled a biopsy. The biopsy was performed on November 25, 2003, and Garrett was "given a follow up appointment with the Breast Clinic for December 10, 2003 to discuss the results." Although a "pathology report was ready" on December 1, 2003, Garrett was not informed of the results of the biopsy until July 2005.

Garrett "transferred her care to Dr. Enrique Ortega," and, during her first visit with him on November 13, 2003, Ortega also "noted a left breast mass." At a January 15, 2004 appointment, Dr. Ortega told Garrett that he "would obtain her biopsy report from LBJ" because Garrett had informed him that LBJ "was charging $90 for same." Although Ortega delivered Garrett's baby on April 23, 2004, and Garrett returned to Ortega for two more

appointments, he never informed Garrett of the biopsy results.

In July 2005, Garrett went to the LBJ emergency room complaining of "worsening pain" in her left breast, and she was told, for the first time, of her diagnosis of ductal carcinoma "from the initial November 25, 2003 needle biopsy." During this visit, the LBJ oncology clinic evaluated Garrett and informed her that she had "metastic breast cancer which had spread to her lumbar spine and lymph nodes in her chest."

The Garretts allege that the defendants were negligent in failing to (1) "timely inform [Garrett] of her cancer"; (2) "procure the results of the November 25, 2003 biopsy"; and (3) "follow appropriate American College of Radiology ('ACR') guidelines." Garrett contends that as a result of defendants' negligence, her "cancer spread beyond the confines of her breast," rendering her "treatment options and the effectiveness of treatment ... much more limited" and "resulting in injuries from an acceleration and metastatis of her cancer, a significantly reduced life expectancy, lost effective medical treatment and therapy, and medical and surgical treatment that was unnecessary." The Garretts seek damages for physical pain, impairment, mental anguish, disfigurement, medical expenses, **\*174** lost earnings, and loss of consortium.

The Garretts timely served HCHD with an expert report[4] by Dr. Robert McWilliams, M.D. In his report, McWilliams details his qualifications as follows:

> I am a board-certified OBGYN and a Fellow of the American College of Obstetricians and Gynecologists. I am also board eligible in Reproductive Endocrinology. I have practiced obstetrics and gynecology as a private practitioner in Denver, Colorado from July 1979 through June, 1998, following my residency at Los Angeles County/USC Medical Center. I completed a 2–year fellowship in Reproductive Endocrinology at Baylor College of Medicine in Houston in June 1990. I was an assistant professor in the Department of Obstetrics and Gynecology, Division of Reproductive Endocrinology at the University of Texas Medical School at Houston from 1990 through 1992. I was Head of the Division of Reproductive Endocrinology, Department of Obstetrics and Gynecology at MacGregor Medical Association in Houston from January, 1993 until October, 1999. I reentered private practice in 2000, and am currently a solo practitioner in Gynecology and Reproductive Endocrinology in Houston, Texas.

In preparing his report, Dr. McWilliams reviewed the pertinent office and clinical notes and lab and radiology reports of Dr. Ortega, Dr. Riggs, and LBJ. These records reveal that Garrett began receiving obstetrical care at LBJ in September 2003 and "underwent her first obstetrical exam with L. Hunt, WNPC on October 3, 2003." Hunt, a nurse practitioner, recorded a nodule on Garrett's left breast and made notes "reflecting appropriate assessment and plans for referral." Furthermore, "the attending physician," Riggs, "also made a note ... reflecting knowledge of the breast exam and nodule."

These records reveal that Garrett had an ultrasound performed at LBJ on October 6, 2003, and, as a result, LBJ's "radiology staff" recommended a biopsy. Dr. Riggs was notified of the findings of the ultrasound on October 10, 2003, and, on that same date, a "referral note [was] made for [Garrett] to go to the breast clinic." Garrett attended her second prenatal visit at the "LBJ obstetrical clinic" on October 31, 2003, and Hunt again examined her. Hunt's notes reflect that Hunt "continued surveillance" of Garrett's breast nodule and that Garrett had a biopsy appointment in November 2003. Garrett attended her third prenatal visit at the "LBJ obstetrical clinic" on November 26, 2003, and Hunt again examined her. Notes from this exam indicate that Garrett's biopsy was performed on November 25, 2003 and that a follow-up appointment was scheduled for December 10, 2003.

The records of the LBJ radiology department also show that Garrett's biopsy was performed on November 25, 2003 and that samples "were obtained and sent to pathology for review." The LBJ pathology department's report indicates a "final pathologic diagnosis" of ductal carcinoma.[5]

Dr. Ortega's notes and Garrett's medical records show that Garrett transferred her **\*175** care to Ortega in late 2003 and that Ortega provided Garrett obstetrical care until April 20, 2004. On November 13, 2003, during Ortega's initial physical of Garrett, he noted her abnormal breast mass. Furthermore, an "authorization for release of information" was completed, authorizing LBJ to release Garrett's records to Ortega. Although Ortega's notes from Garrett's December 18, 2003 visit show that the results of Garrett's biopsy were "to be given on 12/23/03," on January 15, 2004, Ortega noted that he was "[u]nable to obtain Bx. Results (LBJ.), last mo., (Hospital Reportedly charging pt. $90.00 to give her results!?). Report requested." Thus, as Dr. McWilliams notes in his report, there is some evidence that, despite their requests, Ortega and Garrett were not able to obtain the biopsy results from LBJ.

Dr. McWilliams further states in his report that Garrett visited the LBJ emergency room on July 11, 2005 "with a 6 month history of left breast pain and swelling." LBJ's

notes reveal that a breast ultrasound and a surgical consult with the oncology clinic was ordered, and a specific note from the emergency room to the oncology service stated "no follow up on this ever, please evaluate." McWilliams reviewed Garrett's subsequent medical records, which confirmed the existence of "advanced disease ... with metastasis." Garrett initiated treatment soon after she learned of her diagnosis.

Based upon the above facts, Dr. McWilliams opines in his report that "the medical care provided by LBJ Hospital and the physicians providing care to Garrett fell below the standard of care." McWilliams further opines that "[n]umerous physicians and support staff personnel at LBJ Hospital were involved in Ms. Garrett's diagnosis and confirmation by breast biopsy of breast cancer[,] [y]et notification of this unfortunate diagnosis to Ms. Garrett soon after the diagnosis" was never made "via phone call or certified letter." In response to any potential defenses to be raised by LBJ and its staff, McWilliams concludes that "[t]he fact that Ms. Garrett transferred her care to an obstetrician outside the LBJ hospital system [did] not absolve them from notifying Ms. Garrett of her breast cancer diagnosis." Also, accepting the truth of Dr. Ortega's notes regarding his inability to obtain the biopsy's results from LBJ and LBJ's attempt to charge Garrett $90 before releasing her results, "the medical records department of LBJ Hospital was also liable in contributing to the failure to notify Ms. Garrett of her diagnosis of cancer before it continued to advance to a stage of poorer prognosis." With regard to the LBJ Hospital system, McWilliams stated,

> Where the greatest degree of medical liability within the LBJ hospital system lies with respect to notification of this diagnosis to Ms. Garrett is difficult to say. From
>
> > (1) Dr. Riggs, her obstetrician who first made the diagnosis of a left breast mass to[;]
> >
> > (2) L. Hunt, her nurse practitioner who initially examined Ms. Garrett's left breast mass and continued her surveillance of the mass and recommended Ms. Garrett keep her appointments with the radiology department for a diagnosis of this mass to[;]
> >
> > (3) the radiology staff or physicians who performed the needle biopsy of the breast mass to[;]
> >
> > (4) the pathology department where the tissue diagnosis was initially made to[;]
> >
> > (5) the medical records department who may or may not have refused to give Ms. Garrett her medical records,

**\*176** a combination of factors more than likely contributed to the failure to notify Ms. Garrett of her breast cancer diagnosis.

....

Without a diagnosis of breast cancer then, no effective diagnostic measure and therapeutic options were considered or offered Ms. Garrett. The inevitable consequence of Ms. Garrett's breast cancer and its advancement to a poor prognosis with metastasis over an approximate 20 month delay could most likely have been prevented with confirmation of the disease at the time of her biopsy.

HCHD filed objections to Dr. McWilliams's report and a motion to dismiss, which the trial court denied.

### Standard of Review

[1] We review a trial court's decision on a motion to dismiss under section 74.351 for an abuse of discretion. *See Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 875 (Tex.2001) (predecessor statute); *Gray v. CHCA Bayshore L.P.,* 189 S.W.3d 855, 858 (Tex.App.-Houston [1st Dist.] 2006, no pet.). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to guiding rules or principles. *See Garcia v. Martinez,* 988 S.W.2d 219, 222 (Tex.1999). When reviewing matters committed to the trial court's discretion, we may not substitute our own judgment for that of the trial court. *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002). A trial court does not abuse its discretion merely because it decides a discretionary matter differently than an appellate court would in a similar circumstance. *Gray,* 189 S.W.3d at 858.

### Expert Report

In its sole issue, HCHD argues that the trial court abused its discretion in denying its motion to dismiss because Dr. McWilliams's expert report (1) "included no curriculum vitae and nowhere in the body of the report did it show the author was a competent expert as to [HCHD]"; (2) "failed to identify the standard of care applicable to [HCHD]"; and (3) "failed to show that any conduct of [HCHD] caused any damages."

A plaintiff bringing a healthcare liability claim must provide each defendant health care provider with an expert report or voluntarily nonsuit the action. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351 (Vernon Supp.2006); *Gray,* 189 S.W.3d at 858. The expert report is defined as a fair summary of the expert's opinions as of the date of the report regarding the applicable standards of care, the manner in which the care rendered by the health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(6) (Vernon Supp.2006). If a plaintiff timely files an expert report, a defendant may then file an objection challenging the sufficiency of the report. *Id.* § 74.351(a). The trial court shall grant a motion to dismiss only if it appears to the court, after hearing, that the report does not represent an objective good-faith effort to comply with the definition of an expert report. *Id.* § 74.351(*l* ).

[2] [3] [4] [5] [6] [7] [8] The only information relevant to the inquiry is within the four corners of the document. *Palacios,* 46 S.W.3d at 878. Although the report need not marshal all the plaintiff's proof, it must include the expert's opinion on each of the elements identified in the statute. *See Palacios,* 46 S.W.3d at 878–79; *Gray,* 189 S.W.3d at 859. In setting out the expert's opinions, the report must provide enough information to fulfill two purposes if it is to constitute a good-faith effort. *Palacios,* 46 S.W.3d at 879. First, the report must **\*177** inform the defendant of the specific conduct the plaintiff has called into question. *Id.* Second, the report must provide a basis for the trial court to conclude that the claims have merit. *Id.* A report that merely states the expert's conclusions does not fulfill these two purposes. *Id.* Rather, the expert must explain the basis of his statements to link his conclusions to the facts. *Bowie,* 79 S.W.3d at 52. However, a plaintiff need not present evidence in the report as if she were actually litigating the merits. *Palacios,* 46 S.W.3d at 879. Furthermore, the report can be informal in that the information in the report does not have to meet the same requirements as the evidence offered in a summary judgment proceeding or at trial. *Id.*

*Curriculum Vitae and Qualifications*
HCHD first contends that it was not permissible for Dr. McWilliams to set forth his curriculum vitae in a paragraph contained in his expert report. Alternatively, HCHD contends that the curriculum vitae is "grossly inadequate" because it fails to establish Dr. McWilliams's credentials as an expert "on the operation of a major metropolitan hospital's records systems or pathology labs."

[9] In regard to the Garretts' service of Dr. McWilliams's curriculum vitae, HCHD has failed to cite any authority for the proposition that a curriculum vitae must be furnished as a separate document.[6] Section 74.351(a) provides merely that a claimant shall serve "one or more expert reports, *with a curriculum vitae of each expert.*" TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(a) (Vernon Supp.2006) (emphasis added). Section 74.402, which addresses the qualifications of an expert in a suit against a health care provider, also does not include a requirement that a curriculum vitae be served as a separate document. *Id.* § 74.402 (Vernon 2005).

[10] In regard to Dr. McWilliams's qualifications, section 74.351 defines "expert," with respect to a person giving opinion testimony regarding whether a health care provider departed from accepted standards of health care, to mean "an expert qualified to testify under the requirements of Section 74.402." *Id.* § 74.351. Under section 74.402, a person may qualify as an expert witness on the issue of whether the health care provider departed from accepted standards of care only if the person,

(1) is practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, if the defendant health care provider is an individual, at the time the testimony is given or was practicing that type of health care at the time the claim arose;

(2) has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

(3) is qualified on the basis of training or experience to offer an expert **\*178** opinion regarding those accepted standards of health care.

*Id.* § 74.402(b) (Vernon 2005).

"Practicing health care" is defined as including (1) training health care providers in the same field as the defendant health care provider at an accredited educational institution or (2) serving as a consulting health care provider and being licensed, certified, or registered in the same field as the defendant health care provider. *Id.* § 74.402(a)(1), (2). To determine whether an expert "is qualified on the basis of training or experience" under subsection (b)(3), a court is to consider whether the expert (1) is certified by a licensing agency of one or more states of the United States or a national professional certifying agency, or has other substantial training or experience, in the area of health care relevant to the claim

and (2) is actively practicing health care in rendering health care services relevant to the claim. *Id.* § 74.402(c)(1), (2) (Vernon 2005).

As stated in his expert report, Dr. McWilliams is "a board-certified OBGYN and a Fellow of the American College of Obstetricians and Gynecologists" and is also "board eligible in Reproductive Endocrinology." Following his residency, McWilliams practiced obstetrics and gynecology from July 1979 through June 1988. Then, after completing a two-year fellowship in Reproductive Endocrinology at Baylor College of Medicine, he served as an assistant professor at the University of Texas Medical School in the Department of Obstetrics and Gynecology for two years. McWilliams subsequently served as the head of the reproductive endocrinology division for the department of obstetrics and gynecology at a medical association for approximately seven years. Finally, he reentered private practice in 2000, and currently practices as a solo practitioner in gynecology and reproductive endocrinology in Houston.

We note that the specific nature of the Garretts' claims is that HCHD employees and staff failed to inform Garrett of her diagnosis and failed to release her medical records to both her and her doctor. The pertinent standard of care identified in Dr. McWilliams's report is that HCHD employees and staff should have timely informed Garrett of her cancer diagnosis and should have released her medical records, including her biopsy results, to both her and her doctor upon their respective requests. In regard to the nature of the Garretts' claims and the pertinent standard of care, HCHD has provided us with no authority that would require McWilliams to possess expertise "on the operation of a major metropolitan hospital's records systems or pathology labs."

We conclude that Dr. McWilliams is qualified to serve as an expert on the issue of whether HCHD departed from the accepted standards of care in regard to the Garretts' claims. McWilliams established his expertise in the fields of obstetrics and gynecology and satisfied the statutory requirements by showing that he is practicing health care in a field of practice that involves the same type of care or treatment as that delivered by HCHD; has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care. Accordingly, we hold that the trial court did not err in denying HCHD's motion to dismiss the health care liability claims of the Garretts on the grounds that Dr. McWilliams set forth his curriculum vitae in his expert report and that he did not establish his credentials as an expert "on **\*179** the operation of a major metropolitan hospital's records systems or pathology labs."

***Standard of Care***
HCHD next argues that Dr. McWilliams's report is inadequate because "it fails to identify the standard of care that was allegedly breached" and "never states what should have been done." HCHD asserts that McWilliams's statements in his report that no person notified Garrett of her diagnosis does not establish that the standard of care required such notification. HCHD also asserts that Garrett was being treated by multiple health care providers, including nurses and physicians, "who all may or may not have had access to the information," and that the complaint that all of those providers failed to inform her of her cancer diagnosis does not show a duty owed by any one provider.

**[11] [12] [13]** In identifying the standard of care, whether a defendant breached his or her duty to a patient cannot be determined absent specific information about what the defendant should have done differently. *Palacios,* 46 S.W.3d at 880. While a "fair summary" is something less than a full statement of the applicable standard of care and how it was breached, even a fair summary must set out what care was expected, but not given. *Id.* When a plaintiff sues more than one defendant, the expert report must set forth the standard of care for each defendant and explain the causal relationship between each defendant's individual acts and the injury. *See Doades v. Syed,* 94 S.W.3d 664, 671–72 (Tex.App.-San Antonio 2002, no pet.); *Rittmer v. Garza,* 65 S.W.3d 718, 722–23 (Tex.App.-Houston [14th Dist.] 2001, no pet.).

**[14]** The pertinent standard of care identified by Dr. McWilliams is that an HCHD employee should have informed Garret of her biopsy results and should have released those results upon Garrett's or Dr. Ortega's request. *See Columbia Rio Grande Regional Healthcare, L.P. v. Hawley,* 188 S.W.3d 838, 843–44, 848–51 (Tex.App.-Corpus Christi 2006, pet. filed) (affirming jury verdict against hospital for its negligence in failing to timely and properly convey cancer diagnosis to patient for almost full year); *see also Bowie,* 79 S.W.3d at 52 (recognizing that report fairly summarized standard of care because it stated that hospital should have established procedures to read and interpret x-rays in timely manner and to inform patients about results). HCHD asserts that no one, other than the pathology department and records department, are even mentioned in the report in relation to the hospital. However, although the report primarily focuses on the actions of Garrett's treating physicians, including Dr. Riggs, the attending physician at LBJ, the

report also specifically references both the conduct of nurse practitioner Hunt and the conduct of LBJ's medical records department in refusing or failing to release Garrett's biopsy results when Dr. Ortega and Garrett requested those results. Thus, we conclude, from our review of the four corners of the report, and in light of the specific nature of the Garretts' claims, that the report informs HCHD of the specific conduct that the Garretts have called into question, the standards of care that should have been followed, and what HCHD should have done. Accordingly, we hold that the trial court did not err in denying HCHD's motion to dismiss the health care liability claims of the Garretts on the ground that McWilliams's report fails to identify HCHD's standard of care and state what HCHD should have done.

### *Causation*

[15] Finally, HCHD asserts that Dr. McWilliams's report "never identifies what caused the alleged damages" and does not show that Garrett "actually sustained" any damages. HCHD also asserts that the **\*180** report indicates only that the delay in informing her of her diagnosis led to a "a *poor forecast* for the disease," which "is not an actual damage." Further, HCHD asserts that the report did not show "that anything different would have happened." As noted above, an expert report must provide a fair summary of the expert's opinions regarding the causal relationship between the failure of the health care provider to provide care in accord with the pertinent standard of care and the injury, harm, or damages claimed. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(6). Here, Dr. McWilliams states in his report that Hunt, a nurse practitioner who examined Garrett during her prenatal visits, was assisting in "continued surveillance" of Garrett's breast nodule, was aware of the biopsy, and failed to inform Garrett of her diagnosis. McWilliams also states in his report that the LBJ radiology department performed a biopsy of Garrett's left breast on November 25, 2003, the biopsy samples were sent to LBJ's pathology department for review, and a "final pathologic diagnosis" of ductal carcinoma was made on December 1, 2003, yet Garrett was never notified of this diagnosis by any LBJ employee. McWilliams opined that nurse Hunt as well as LBJ employees in the pathology department and LBJ's "radiology staff" had a responsibility to notify Garrett of this diagnosis. McWilliams also cited in his report a note from LBJ's emergency room to the oncology service, made after Garrett visited the LBJ emergency room in July 2005, that stated "*no follow up on this ever, please evaluate.*" (emphasis added).

Furthermore, Dr. McWilliams's report indicates that after Garrett transferred her care to Dr. Ortega, an OBGYN outside of the LBJ system, Ortega and Garrett sought to obtain the biopsy results from LBJ, but were unable to obtain them. McWilliams opined that LBJ staff in the medical records department had a responsibility to provide Garrett her medical records, including her biopsy results, and that the failure to provide those results violated HCHD's standard of care. Again, in response to any potential claim by HCHD that Dr. Ortega, or another treating physician for which HCHD was not liable, was solely charged with the responsibility to notify Garrett, McWilliams asserted that HCHD was not absolved of its responsibility to notify Garrett of her diagnosis because she transferred her care to a doctor outside the LBJ system. McWilliams also noted in his report, despite HCHD's apparent failure or refusal to release Garrett's records, that a form authorizing the release of her medical records to Dr. Ortega had been completed.

In regard to whether Garrett sustained any harm as a result of the approximately one and one-half year delay in learning of her cancer diagnosis, Dr. McWilliams stated in his report that when Garrett finally visited the LBJ emergency room, she presented "with a 6 month history of left breast pain and swelling." At this point, Garrett had developed "advanced disease ... with metastasis." McWilliams further stated that because of the delay in communicating the diagnosis, "no effective diagnostic measure and therapeutic options were considered or offered Ms. Garrett," with the "consequence" of the cancer's "advancement to a poor prognosis with metastasis." McWilliams opined that such advancement with metastasis[7] "could most likely have been prevented with confirmation of the disease at the time of her biopsy" and absent the "approximate 20 month delay."

**\*181** In support of its causation argument, HCHD relies on *Bowie,* where the plaintiff alleged that a hospital's physician's assistant misread or misplaced an x-ray and, therefore, did not discover that the plaintiff had fractured her foot. *Bowie,* 79 S.W.3d at 50. Approximately one month later, the plaintiff's orthopedic surgeon discovered the fractured foot. *Id.* The plaintiff filed an expert report, which stated that had the x-ray been properly read, she "would have had the possibility of a better outcome." *Id.* at 51. The supreme court, after recognizing that a report need not use any particular magical words, held that the trial court could have reasonably determined that the report did not represent a good-faith effort to summarize the causal relationship. *Id.* at 53. The court noted that the report simply opined that the plaintiff had a "possibility of a better outcome," and did not sufficiently "[link] the expert's conclusion (that [the plaintiff] might have had a

better outcome) to [the hospital's] alleged breach (that it did not correctly read and act upon the x-rays)." *Id.*

Here, in contrast, Dr. McWilliams opined in his expert report that HCHD's breach of its standard of care permitted Garrett's cancer to advance and metastasize. *See Linan v. Rosales,* 155 S.W.3d 298, 305–06 (Tex.App.-El Paso 2004, pet. denied) (affirming verdict in favor of plaintiff for doctor's failure to timely diagnose cancer based on evidence that during two-month period cancer "involved the lymph vessels" and caused edema and that advancement of cancer eliminated option of breast conserving therapy); *In re Barker,* 110 S.W.3d 486, 491 (Tex.App.-Amarillo 2003, no pet.) (finding expert report stating that negligent failure to recognize medical condition and delay in treatment increased severity of plaintiff's injuries to be sufficient). McWilliams further noted in his report that as a result of the failure to timely inform Garrett of her cancer, Garrett, in July 2005, presented herself at LBJ's emergency room with a six month history of pain and swelling in her breast. Furthermore, McWilliams opined that the failure to timely

inform Garrett of her diagnosis eliminated the availability of effective diagnostic measures and therapeutic options.

We conclude that Dr. McWilliams, in his report, provided a fair summary of the causal relationship between HCHD's failure to meet the pertinent standard of care and the Garretts' damages. Accordingly, we hold that the trial court did not err in denying HCHD's motion to dismiss the health care liability claims of the Garretts' on the ground that McWilliams's report does not show that HCHD's conduct actually caused the Garretts' any damages.

We overrule HCHD's sole issue.

### Conclusion

We affirm the order of the trial court.

Footnotes

1       *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(9) (Vernon Supp.2006).

2       " 'Health care liability claim' means a cause of action against a health care provider or physician for treatment, lack of treatment, or other claimed departure from accepted standards of medical care, or health care, or safety or professional or administrative services directly related to health care, which proximately results in injury to or death of a claimant, whether the claimant's claim or cause of action sounds in tort or contract." *Id.* § 74.001(a)(13) (Vernon 2005). "Health care provider" includes any person, partnership, professional association, corporation, facility, or institution duly licensed, certified, registered, or chartered by the State of Texas to provide health care, including a registered nurse or a health care institution. *Id.* § 74.001(a)(12)(A). "Health care institution" includes a hospital or a hospital system. *Id.* § 74.001(a)(11).

3       The Garretts sued HCHD doing business as Lyndon B. Johnson Hospital ("LBJ"). Thus, references in this opinion to LBJ implicate HCHD. The Garretts also sued Michelle Lesslie, D.O., Marian Bonner, M.D., Emily Robinson, M.D., Enrique Ortega, M.D., the University of Texas System, and the University of Texas Health Science Center at Houston, none of whom are parties to this appeal.

4       *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(a) (Vernon Supp.2006).

5       Dr. McWilliams summarizes the report as follows: "A final pathological diagnosis of the biopsied left breast nodule to be 'breast with ductal carcinoma, modified Black's Nuclear Grade: 3 (poorly differentiated), focus suspicious for lymphovascular invasion identified, and ductal carcinoma in situ: possible foci present, await immunostains for confirmation.' "

6       *Papkov v. Schiffman,* No. 01–00–01099–CV, 2002 WL 1041118, at \*1 (Tex.App.-Houston [1st Dist.] May 23, 2002, no pet.) (mem. op.), the case cited by HCHD in support of its argument, is not on point as the appellant in that case wholly failed to file a curriculum vitae. *Id.* Moreover, we note that the Corpus Christi Court of Appeals has rejected a similar complaint. *See Carreras v. Marroquin,* No. 13–05–082–CV, 2005 WL 2461744, at \*2 (Tex.App.-Corpus Christi Oct. 6, 2005, pet. filed) (mem. op.) ("The statute does not expressly prohibit a claimant from including the curriculum vitae within the body of the report, as was done in this case.").

7       "Metastasis" means "the development of secondary malignant growths at a distance from a primary site of cancer." THE NEW OXFORD AMERICAN DICTIONARY 1074 (1st ed.2001).

End of Document

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

395 S.W.3d 884
Court of Appeals of Texas,
Austin.

Richard HEBERT and Janet Hebert, Appellants
v.
Timothy E. HOPKINS, M.D., and Shannon Clinic,
Appellees.

No. 03–11–00419–CV. | March 1, 2013.

**Synopsis**
**Background:** Patient filed health care liability claim (HCLC) against neurosurgeon and clinic in connection with spinal-fracture surgery that purportedly rendered patient a quadriparetic. The District Court, Tom Green County, 391st Judicial District, Thomas J. Gossett, J., dismissed claim after concluding patient had failed to serve an expert report meeting statutory requirements. Patient appealed.

**Holdings:** The Court of Appeals, Bob Pemberton, J., held that:

[1] trial court did not abuse its discretion in concluding that patient's expert report did not adequately describe standard of care or alleged breach thereof;

[2] statutory requirements applicable to expert reports in support of HCLCs were rationally related to legitimate state purpose and therefore did not violate equal protection based on disparate treatment of health care liability claimants and other litigants;

[3] those requirements did not violate separation-of-powers principles; and

[4] patient failed to demonstrate that those requirements, as applied to him, violated open-courts provision of Texas constitution.

Affirmed.

J. Woodfin Jones, C.J., filed a dissenting opinion

**Attorneys and Law Firms**

**\*888** Dana D. Banks, Smith Rose Finley, P.C., San Angelo, TX, for appellee.

William E. Zook, Jr., David W. Townend, Ted B. Lyon & Associates, P.C., Mesquite, TX, for appellant.

Before Chief Justice JONES, Justices PEMBERTON and ROSE.

*OPINION*

BOB PEMBERTON, Justice.

Richard Hebert and his wife, Janet Hebert, appeal from a district court judgment dismissing, for failure to serve the expert report required by chapter 74 of the civil practice and remedies code, a health care liability claim they asserted against Timothy Hopkins, M.D., and Shannon Clinic.[1] The Heberts bring two issues, urging respectively that (1) the district court abused its discretion in concluding that they failed to serve an expert report complying with chapter 74; and (2) chapter 74's expert-report requirement violates various constitutional protections. We will overrule these contentions and affirm the district court's judgment.

**BACKGROUND**

The Heberts filed the underlying suit alleging that Dr. Hopkins, a neurosurgeon, committed professional negligence in performing spinal surgery on Richard Hebert at Shannon in September 2008 after Richard broke his neck in a fall. Specifically, they pled that Richard had presented with a fracture of the cervical 6(C6) vertebra that was "very unstable" due to a preexisting condition known as ankylosing spondylitis that had self-fused his spinal vertebrae on either side of the fracture; that the standard of care in such circumstances had required Hopkins to perform "an anterior and posterior fusion surgery" to ensure stability; that Hopkins had performed "an anterior fusion with plates and screws at C4–C7 but took no appropriate surgical measures to stabilize the fusion posteriorly;" and that the anterior-only fusion had subsequently "failed as one or more of the screws had pulled out causing the vertebral segments to move and compress the spinal cord at C4–C7," rendering Richard a quadriparetic (i.e., paralyzed in all four limbs). The Heberts asserted that Shannon was vicariously liable for Hopkins's negligence by virtue of Hopkins's status as a "partner or member" of the clinic.

Within 120 days thereafter, in an attempt to comply with chapter 74's expert-report requirement, the Heberts served a report from P. Merrill White, M.D., along with Dr. White's curriculum vitae.[2] Hopkins **\*889** and Shannon timely objected to the sufficiency of Dr. White's report, asserting that the report had failed to adequately set forth, and was "conclusory" with respect to the underlying factual bases of, opinions regarding the applicable standard of care for Hebert in light of his underlying medical conditions, the manner in which Hopkins's care had failed to meet that standard, or a causal linkage to the fusion failure and Richard's injuries.[3] By now, the 120–day period for serving an "expert report" had expired, so appellees also moved to dismiss the Heberts' suit with prejudice and sought a mandatory award of attorney's fees.[4] Both sides submitted briefing on the merits of appellees' objections. Following a hearing at which the parties presented argument, the district court sustained appellees' objections but granted the Heberts a thirty-day extension to cure any deficiencies.[5]

Within the extension period, the Heberts served a supplemental report from White. Contending that White's supplemental report had failed to cure the deficiencies in his original report, appellees again moved to dismiss the Heberts' suit with prejudice.[6] The Heberts filed a response joining issue regarding the sufficiency of the two reports and also asserting that chapter 74's expert-report requirement violates various protections of the U.S. or Texas constitutions. Following a hearing, the district court granted appellees' motion to dismiss. Subsequently, after hearing evidence, the district court awarded appellees attorney's fees as required by chapter 74,[7] and this order also served to make the court's prior dismissal order final. The Heberts then timely perfected this appeal.

## ANALYSIS

**Sufficiency of expert reports**
In their first issue, the Heberts urge that the district court abused its discretion in holding that Dr. White's report, either in its original form or as supplemented, did not represent an objective good faith effort to comply with the statutory definition of an expert report.

[1] [2] The standards governing the contents of the expert report or reports required by chapter 74 are well established. Chapter 74 defines an "expert report" as "a fair summary of the expert's opinion as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care

provider failed to **\*890** meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed."[8] "A court shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply" with this definition of "expert report."[9] To constitute a "good faith effort," as the Texas Supreme Court has explained, the report must include the expert's opinion on "each of the three main elements: standard of care, breach, and causation," and must provide enough information to fulfill two purposes with respect to each element: (1) it must inform the defendant of the specific conduct the plaintiff has called into question; and (2) it must provide a basis for the trial court to conclude that the claims have merit. *See Jelinek v. Casas,* 328 S.W.3d 526, 538–40 & n. 9 (Tex.2010); *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002) (per curiam); *American Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 878–79 (Tex.2001). Although these requirements do not require a plaintiff to marshal all of his or her proof or to present expert testimony in a form that would be admissible at trial, *see Jelinek,* 328 S.W.3d at 539–40 & n. 9, they do necessitate that "the expert must explain the basis for his statements to link his conclusions to the facts" and not merely state conclusions. *Id.* (quoting *Wright,* 79 S.W.3d at 52 (quoting *Earle v. Ratliff,* 998 S.W.2d 882, 890 (Tex.1999))); *see also id.* at 539–40 (observing, with respect to the causation element, "the expert must ... explain, to a reasonable degree, how and why the breach caused the injury based on the facts presented"). This is so, in the supreme court's view, because " '[a] report that merely states the expert's conclusions about the standard or care, breach, and causation' does not fulfill the two purposes of a good-faith effort." *Id.* at 539 (quoting *Palacios,* 46 S.W.3d at 879); *see also id.* at 540 (expert "must include sufficient detail" regarding how breach caused plaintiff's injuries "to allow the trial court to determine if the claim has merit").

[3] Importantly, the only information relevant to determining whether an expert report complies with these requirements is that contained within "the four corners" of the report itself. *Palacios,* 46 S.W.3d at 878. Consequently, neither the trial court nor this Court may infer additional opinions or underlying facts to fill in gaps that the report itself leaves open. *See Wright,* 79 S.W.3d at 53; *see also Austin Heart, P.A. v. Webb,* 228 S.W.3d 276, 279 (Tex.App.-Austin 2007, no pet.) (this requirement "precludes a court from filling gaps in a report by drawing inferences or guessing as to what the expert likely meant or intended" (citing *Wright,* 79 S.W.3d at 53)).

[4] Our standard of review is likewise limited. Chapter 74 imposes a mandatory duty on a trial court to grant a motion challenging the adequacy of an expert report "if it appears to the court" that the report does not meet the above-described requirements. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(*l* ) ("A court *shall* grant a motion challenging the adequacy of an expert report only if it appears to the court ... that the report does not represent an objective good faith effort to comply with the definition of an expert report in Subsection (r)(6).") (emphasis added). **\*891** Conversely, the trial court is prohibited from granting such a motion unless such noncompliance "appears to the court." *Id.* ("A court shall grant a motion challenging the adequacy of an expert report *only* if it appears to the court ....") (emphasis added). But the linchpin determination that controls which of these two alternative sets of mandatory duties applies—whether "it appears to the court" that the report does not comply with the requirements—has been committed to the trial court's sound discretion by the Legislature. *See Palacios,* 46 S.W.3d at 877–78. Consequently, we review the trial court's determination for abuse of that discretion. *See Wright,* 79 S.W.3d at 52 (citing *Palacios,* 46 S.W.3d at 878).

A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles. *See id.* (citing *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985)). "When reviewing matters committed to the trial court's discretion, a court of appeals may not substitute its own judgment for the trial court's judgment." *Id.* (citing *Flores v. Fourth Court of Appeals,* 777 S.W.2d 38, 41 (Tex.1989)). We do not, in other words, examine the contents of Dr. White's reports and make our own de novo determination as to whether he has provided sufficient information, with respect to his opinions regarding standard of care, breach, and causation, to (1) inform appellees of the specific conduct the Heberts have called into question; and (2) provide a basis for the district court to conclude that the claims have merit. *See Jelinek,* 328 S.W.3d at 538–40 & n. 9; *Wright,* 79 S.W.3d at 52; *Palacios,* 46 S.W.3d at 878–79. Instead, we determine only whether the district court acted arbitrarily, unreasonably, and without reference to guiding rules and principles in determining that the reports failed to provide that information. *See Wright,* 79 S.W.3d at 52; *see also Jelinek,* 328 S.W.3d at 542 (Jefferson, C.J., dissenting) ("The dividing line between a sufficient and an inadequate report is impossible to draw precisely. We have said, therefore, that the determination must be made in the first instance by the trial court, and review of that decision asks not how an appellate court would have resolved that issue, but instead whether the trial court abused its discretion.") (citing *Jernigan v. Langley,* 195 S.W.3d 91, 93 (Tex.2006); *Walker v. Gutierrez,* 111 S.W.3d 56, 63 (Tex.2003)).

[5] Applying this deferential abuse-of-discretion standard of review, we cannot conclude that the district court acted arbitrarily, unreasonably, and without guiding rules and principles in determining that Dr. White's reports did not supply it sufficient information regarding his opinions concerning standard of care and breach, as they relate to the underlying facts, to enable it to determine whether the Heberts' claims had merit.

In his initial report, White summarized medical records reflecting that Richard Hebert sought treatment at Shannon in the early morning hours of September 7, 2008, following a fall in which he injured his neck, and that Richard was placed under Hopkins's care. According to White, CT scans and other evaluations revealed that Richard had suffered "a trace traumatic subarachnoid hemorrhage" (i.e., bleeding on the brain) and a "fracture through the superior vertebral body of C6 with a fracture extending through the posterior elements of C5–6." The injury "was initially managed in a cervical collar which was changed to a Philadelphia collar and spinal precautions were ordered" within about five hours. That same evening, White indicated, Hopkins performed a surgical procedure in which the neurosurgeon **\*892** fused Richard's C5–C6 vertebrae and implanted "C4 through C7 anterior instrumentation"—a plate over or along the front of Richard's spine, attached by screws to his bone—to provide stability and support while the fracture healed. On the following day, White continued, the medical records indicated that Richard had showed signs of recovery progress and that "[c]ervical collar is discontinued per Dr. Hopkins'[s] order." But four days later, during the afternoon of September 12, Richard had a decline in neurological function and subsequent CT scans "confirm[ed] failure of implant fixation at C6 and C7" and injury to the spinal cord. Although another neurosurgeon, Dr. Duarte, operated on Richard thereafter to remove the failed anterior instrumentation and implement a different type of fixation method, Richard ended up with "increased neurological deficit (quadriparesis)."

The medical records, as summarized by White, additionally reflected that Richard had a history of "coronary artery disease treated with cardiac stints, Plavix, and aspirin; cerebrovascular accident [ (i.e., a stroke) ] on two occasions with residual left hand paraesthesias [ (tingling or prickling sensations) ] treated with Plavix and aspirin; and hypertension," as well as "ankylosing spondylitis," a degenerative condition of the spine that causes both brittleness of bones and self-fusion of vertebrae.

Although he did not indicate whether or how Richard's other medical conditions impacted the standard of care, White emphasized his opinion that a patient with ankylosing spondylitis warranted special precautions when performing surgery to address spinal fracture:

In the surgical treatment of cervical spine fractures complicating ankylosing spondylitis, the prudent spine surgeon must recognize the unstable nature of these fractures. The instability is contributed to by the long level arms cranial and caudal to the fracture site resulting from the multilevel autofusion and poor bone quality associated with ankylosing spondylitis. These two factors result in increased susceptibility to spine fractures as a result of relatively minor trauma, greater instability, and a greater likelihood of neurologic deficit resulting from a cervical fracture than found in patients with cervical spine fractures and otherwise normal spinal anatomy.

The prudent spine surgeon should design a surgical plan of care allowing decompression of the spinal cord, reduction of the traumatic deformity, and immediate stabilization of the spinal column to protect the spinal cord and to facilitate mobilization and nursing care to the patient in the short term and healing of the spinal fusion in the longer term.

As for the standard of care regarding the specific means by which these objectives should be achieved, White initially suggested that anterior-only internal instrumentation was inconsistent with the standard of care and that some form of posterior internal instrumentation, either additionally or as an alternative to anterior instrumentation, would instead be preferable:

Over the recent years, the debate of the spinal community has been in which circumstances fusion with posterior only fixation or fusion with anterior and posterior fixation is appropriate. Anterior instrumentation only is predictably inadequate in a fracture pattern with gross anterior and posterior column instability such as Mr. Hebert's. Adequate treatment of Mr. Herbert's [sic] fracture requires anterior and posterior instrumentation in order to meet the standard of care.

In Mr. Herbert's [sic] situation, the standard of care requires fixation stable **\*893** enough to allow mobilization of the patient without loss of fixation resulting in increased neurological deficits. This goal is more likely to be achieved by multilevel posterior internal fixation in addition to at least single level anterior internal fixation with fusion at appropriate levels.

However, in the next sentence, within the same paragraph, White acknowledged that "clinical situations" could arise in which anterior-only instrumentation, coupled with "supplemental protection" other than posterior implementation, would be consistent with the standard of care:

If the clinical situation in which the surgeon finds himself and the patient allows only inadequate internal fixation, the surgeon is obligated to protect the patient supplementing the internal fixation with external bracing and/or activity limitations. The supplemental protection should continue until the patient can be returned to the operating room for additional internal fixation or the fracture becomes stable through healing.

Following these statements regarding standard of care, White turned to whether or how Hopkins breached an applicable standard. Consistent with the first portion of his explanation of the standard of care, White began by asserting that Hopkins breached the standard by utilizing "anterior only plate/screw fixation":

Dr. Timothy Hopkins'[s] choice of anterior only plate/screw fixation fails to meet the applicable standard of care. Constrained anterior cervical plates function as tension band devices and require relative stability of the posterior elements. In extension these devices resist distraction of the anterior column. These devices do not effectively resist flexion forces and require stable posterior elements to limit deformity resulting from flexion forces. In the absence of adequate posterior stability, anterior plate/screw constructs typically fail in flexion by plate breakage or, as in this case, by screw pullout. Mr. Herbert's [sic] fracture resulted in significant instability of both the anterior and posterior elements at the C5–6 level. Anterior only plate/screw fixation, in this setting, is predictably doomed to failure.

But in the next sentence, White seemed to allude to his previously expressed view that a surgeon could act within the standard of care by "supplementing" otherwise "inadequate internal fixation" with some form of "external bracing and/or activity limitations" as an alternative to posterior surgical fixation:

> The prudent spine surgeon must recognize the limitations of the various internal fixation constructs available and if necessary must compensate for the predictable weaknesses by adequate external bracing and/or activity limitation.

Then White ended his discussion of breach with the following conclusion:

> The standard of care for the surgical treatment of this fracture requires a multilevel posterior fixation and a fusion in conjunction with anterior fixation and fusion with or without supplemental external fixation as was ultimately performed by Dr. Duarte on September 12, 2008.

White then offered the following opinions as to causation, now referencing perceived inadequacies in internal *and* external fixation without elaborating as to the nature or identity of any of the latter category:

> The failure to choose the internal and external fixation construct capable of providing stability to allow mobilization of the patient, prevent spinal displacement, and protect the spinal cord is the proximate cause of Mr. Herbert's [sic] **\*894** increased neurologic deficit (quadriparesis). This occurred as a result of the constrained anterior plate/screw construct's predictable inability to neutralize flexion forces resulting in screw pullout at C6 and C7 levels followed by displacement of the spinal column through the C5–6 fracture/allograft site with subsequent spinal cord injury and deterioration of neurologic function.

Among their objections to the sufficiency of White's initial report, appellees urged that the report did not represent an objective good faith attempt to comply with chapter 74's requirements—i.e., that it discussed the standard of care, breach, and causation with sufficient specificity to (1) inform them of the conduct called into question and (2) provide a basis for the district court to determine that the claims have merit—because it was internally inconsistent as to the standard of care that applied and did not address whether or not Hopkins complied with the standard of care through the use of the "external bracing and/or activity limitation" White had contemplated. And these asserted deficiencies, appellees further suggested, in turn undermined any factual bases underlying White's assertions that the standard of care either required Hopkins's use of anterior-only internal fixation or was breached by his choice not to use posterior interior fixation.

In arguing that the district court abused its discretion in sustaining appellees' objections, the Heberts emphasize the portions of White's initial report focusing on the relative merits of anterior versus posterior internal fixation. But the district court was within its discretion also to consider White's recognition of an apparent exception, qualification, or limitation to his broader criticisms of anterior fixation: "the clinical situation in which the surgeon finds himself and the patient" may "allow[ ] only inadequate internal fixation," in which case the standard of care could be met by "supplementing the internal fixation with external bracing and/or activity limitations." Along with White's recognition of this aspect of the standard of care, the court also could have reasonably considered that White never elaborated on the nature or type of "clinical situation" that would "allow [ ] only inadequate internal fixation" or whether such a situation did or did not exist in regard to Richard, a patient who, as White acknowledged in his report, had a history of coronary artery disease, two strokes, and hypertension, not to mention bleeding on the brain from his fall. The court likewise could reasonably have viewed White's references to "external bracing" or "activity limitations" as an alternative to further internal fixation as begging the question as to whether the unspecified "spinal precautions" Hopkins had ordered, the cervical collar Richard wore following surgery, or other "external bracing" or "activity limitations" Hopkins imposed had or had not satisfied the standard of care.

In short, we cannot conclude that the district court acted arbitrarily, unreasonably, or without regard to guiding principles in determining that White's initial report fell short of describing the applicable standard or care or breach thereof, as applicable to the underlying facts, with sufficient specificity to provide the court a basis to

determine that White's claims have merit. *See Jelinek,* 328 S.W.3d at 538–40 & n. 9; *Wright,* 79 S.W.3d at 52; *Palacios,* 46 S.W.3d at 878–79. And in the face of such deficiencies regarding standard of care and breach, the district court would have acted within its discretion in determining that any assertions by White to the effect that anterior-only internal fixation breaches the standard of care or that only posterior internal fixation can suffice lack an underlying factual basis— **\*895** i.e., are "conclusory"—and fail to satisfy chapter 74. *See Wright,* 79 S.W.3d at 52 ("the expert must explain the basis of his statements to link his conclusions to the facts" (quoting *Earle,* 998 S.W.2d at 890)).

The Heberts urge us to indulge a "fair reading" that White's opinions regarding unspecified "clinical situations" refers to a surgeon who is attempting to perform a combined anterior and posterior procedure but gets interrupted by "surgical complications such as delays or blood loss," and that no such complications arose here. The dissent similarly relies on inferences or implications that such "extraordinary circumstances" were not present. But the problem with these arguments is that White never actually says any of this in his initial report, and the established rule is that the report must stand or fall on the contents within its "four corners." *Palacios,* 46 S.W.3d at 878. This requirement, again, "precludes a court from filling gaps in a report by drawing inferences or guessing as to what the expert likely meant or intended." *Austin Heart, P.A.,* 228 S.W.3d at 279 (citing *Wright,* 79 S.W.3d at 53).

Nor did the district court abuse its discretion in holding that such deficiencies were not cured by White's supplemental report. In his supplement, although White reiterates and emphasizes at length his conclusions and assertions regarding anterior versus posterior fixation generally, nowhere does he address the deficiencies concerning the standard of care and breach that the district court could have perceived in his initial report.

We overrule the Heberts' first issue.

## Constitutional claims

[6] [7] In their second issue, the Heberts bring forward constitutional challenges to chapter 74's expert-report requirement. While not appearing to quarrel with the general concept that the Legislature can validly impose some form of threshold report requirement for asserting health care liability claims or other types of civil claims, the Heberts complain about three basic features of chapter 74's expert-report requirement: (1) the fixed deadline of 120 days to serve an expert report, subject to a single 30–day extension; (2) the requirements focusing judicial analysis of a report's sufficiency solely on the "four corners" of the report and prohibiting courts from considering extrinsic evidence of a claim's merits; and (3) the mandatory requirement that courts dismiss health care liability claims with prejudice for failing to serve an adequate expert report and also award attorney's fees. The Heberts contend that these mechanisms unfairly "single out" health care liability claimants for unconstitutional "disparate treatment," deprive courts of judicial discretion in violation of the separation-of-powers protections of the Texas Constitution, and deprive claimants of access to the courts in violation of due-process or open-courts protections.[10]

**\*896** When reviewing the constitutionality of a statute, we begin with a presumption that it is constitutional. *Herrera v. Seton Nw. Hosp.,* 212 S.W.3d 452, 460–61 (Tex.App.-Austin 2006, no pet.) (citing *Walker,* 111 S.W.3d at 66; *see also* Tex. Gov't Code Ann. § 311.021(1) (West 2005). The wisdom or expediency of the law is the Legislature's prerogative, not ours. *Smith v. Davis,* 426 S.W.2d 827, 831 (Tex.1968). We presume that the Legislature has not acted unreasonably or arbitrarily. *Sax v. Votteler,* 648 S.W.2d 661, 664 (Tex.1983) (quoting *Davis,* 426 S.W.2d at 831). The party challenging a statute's constitutionality has the burden of proving that the statute fails to meet constitutional requirements. *Walker,* 111 S.W.3d at 66. A party must show that a statute is unconstitutional either on its face or as applied to that party. *Texas Workers' Comp. Comm'n v. Garcia,* 893 S.W.2d 504, 518 n. 16 (Tex.1995); *see also City of Corpus Christi v. Public Util. Comm'n,* 51 S.W.3d 231, 240–41 (Tex.2001) (per curiam) (Owen, J., concurring). To sustain a facial challenge, the party must show that the statute, by its terms, always operates unconstitutionally. *Garcia,* 893 S.W.2d at 528 n. 16. To sustain an as-applied challenge, the party must show that the statute is unconstitutional when applied to that particular person or set of facts. *Id.*

We note at the outset that the Heberts face an uphill battle because every court that has considered similar challenges to chapter 74's expert-report requirement, including this Court, has rejected them. *See, e.g., Stockton v. Offenbach,* 336 S.W.3d 610, 618 (Tex.2011) (denying open-courts challenge); *Hightower v. Baylor Univ. Med. Ctr.,* 348 S.W.3d 512, 521–22 (Tex.App.-Dallas 2011, pet. denied) (rejecting special-law, vagueness, due-course-of-law, and separation-of-powers challenges); *Broxterman v. Carson,* 309 S.W.3d 154, 159 (Tex.App.-Dallas 2010, pet. denied) (rejecting due-process challenge); *Gulf Coast Med. Ctr., LLC v. Temple,* No. 13–09–00350–CV, 2010 WL 196972, at \*6 (Tex.App.-Corpus Christi Jan.21, 2010, no pet.) (mem. op.) (rejecting due-process and due-course-of-law

challenges); *Bogar v. Esparza,* 257 S.W.3d 354, 372–73 (Tex.App.-Austin 2008, no pet.) (same); *Wilson–Everett v. Christus St. Joseph,* 242 S.W.3d 799, 802–04 (Tex.App.-Houston [14th Dist.] 2007, pet. denied) (rejecting separation-of-powers challenge); *Ledesma v. Shashoua,* No. 03–05–00454–CV, 2007 WL 2214650, at *9 (Tex.App.-Austin Aug. 3, 2007, pet. denied) (mem. op.) (rejecting due-process and open-courts challenges); *Thoyakulathu v. Brennan,* 192 S.W.3d 849, 855–56 (Tex.App.-Texarkana 2006, no pet.) (due process does not require "exceptions [to the expert-report requirement] that would encompass any conceivable complication in order to pass constitutional muster"); *Herrera,* 212 S.W.3d at 461–62 (rejecting equal-protection, due-process, due-course-of-law, and open-courts challenges). Texas courts also uniformly rejected constitutional challenges to an expert-report requirement under chapter 74's predecessor statute, article 4590i. *See, e.g., Strom v. Memorial Hermann Hosp. Sys.,* 110 S.W.3d 216, 227 (Tex.App.-Houston [1st Dist.] 2003, pet. denied) (rejecting due-process, equal-protection, and jury-trial challenges); *Villa v. Hargrove,* 110 S.W.3d 74, 81 (Tex.App.-San Antonio 2003, pet. denied) (rejecting due-process and equal-protection challenges); *Walker,* 111 S.W.3d at 66 (rejecting due-process challenge); **\*897** *Perry v. Stanley,* 83 S.W.3d 819, 825 (Tex.App.-Texarkana 2002, no pet.) (rejecting open-courts challenge); *Mocega v. Urquhart,* 79 S.W.3d 61, 64 (Tex.App.-Houston [14th Dist.] 2002, pet. denied) (same); *Gill v. Russo,* 39 S.W.3d 717, 718–19 (Tex.App.-Houston [1st Dist.] 2001, pet. denied) (same); *Knie v. Piskun,* 23 S.W.3d 455, 467 (Tex.App.-Amarillo 2000, pet. denied) (rejecting equal-protection, due-process, open-courts and free-speech challenges); *Schorp v. Baptist Mem'l Health Sys.,* 5 S.W.3d 727, 736–38 (Tex.App.-San Antonio 1999, no pet.) (rejecting due-process, open-courts, and jury-trial challenges).[11]

The Heberts acknowledge the constitutional validity of the expert-requirement in chapter 74's predecessor statute, article 4590i, but attempt to distinguish it as "less draconian." *See* Act of May 5, 1995, 74th Leg., R.S., ch. 140, § 1, sec. 13.01, 1995 Tex. Gen. Laws 985, 985–88, *repealed and recodified as amended* by Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.01, sec. 74.351, 2003 Tex. Gen. Laws 847, 875–77 (amended 2005) (current version at Tex. Civ. Prac. & Rem.Code Ann. § 74.351). They emphasize differences in the deadlines article 4590i imposed for serving expert reports and the extent of discretion vested in trial courts to extend deadlines. Specifically, article 4590i allowed claimants to either serve an expert report within 90 days of filing suit or file a cost bond. *See* former art. 4590i, § 13.01(a). An expert report was required within 180 days of suit, though the court could grant a 30–day extension if the failure to serve was not intentional or the result of conscious indifference,

but was the result of an accident or mistake. *Id.* § 13.01(d), (g).

The Heberts also assert that "4590i did not mandate what had to be included in the contents of the report," and that "there was no requirements or authorization for the court to summarily dismiss the case based on the deficiencies in the language of the report." They also contend that parties opposing an article 4590i expert report had to "satisfy summary judgment procedures to secure a dismissal with prejudice." To the contrary, a court considering the sufficiency of an expert report under article 4590i, as under chapter 74, was limited to the "four corners" of the report. *See Palacios,* 46 S.W.3d at 878. Likewise, if a claimant failed to serve a report, or served a report that the trial court concluded did not represent a good faith effort to comply with the statutory definition of expert report, the trial court was required to dismiss the case with prejudice and award costs and attorney's fees to the opposing party. *See* former art. 4590i, § 13.01(e), (*l* ), (r)(6); *see also Palacios,* 46 S.W.3d at 877.

**"*Disparate treatment* "**

[8] The Heberts contend that chapter 74 irrationally singles them out for disparate treatment in violation of their rights to due process and equal protection. The due-course-of-law guarantee of the Texas Constitution provides: "No citizen of this State shall be deprived of liberty, property, privileges or immunities, or in any manner disenfranchised, except by due course of the law of the land." Tex. Const. art. I, § 19. Similarly, the federal due- **\*898** process clause provides: "No state shall make or enforce any law which shall abridge the privileges or immunities of the citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law;...." U.S. Const. amend. XIV, § 1. While the Texas Constitution is textually different in that it refers to "due course" rather than "due process," Texas courts regard these terms as without substantive distinction unless and until a party demonstrates otherwise, and the Heberts suggest no reason to construe them differently here. *See University of Tex. Med. Sch. at Houston v. Than,* 901 S.W.2d 926, 929 (Tex.1995) (citing *Mellinger v. City of Houston,* 68 Tex. 37, 3 S.W. 249, 252–53 (1887)).

[9] [10] [11] [12] [13] Under federal and state guarantees of due process, legislation that does not affect a fundamental right or interest is valid if it bears a rational relationship to a legitimate state interest. *Rylander v. B & A Mktg. Co. ex rel. Atl. Richfield Co.,* 997 S.W.3d 326, 333–34 (Tex.App.-Austin 1999, no pet.) (citing *Williamson v. Lee Optical,* 348 U.S. 483, 491, 75 S.Ct. 461, 99 L.Ed. 563

(1955); *Garcia,* 893 S.W.2d at 525). Similarly, the constitutional guarantee of equal protection requires only that disparate treatment of different classifications be rationally related to a legitimate state purpose, unless the classification impinges on the exercise of a fundamental right or distinguishes between people on a "suspect" basis, such as race or national origin.[12] The Heberts have not demonstrated that chapter 74 impinges on a fundamental or important right or a suspect class. By its terms, chapter 74 is facially neutral and applies to any party asserting a health care liability claim. Consequently, in addressing the Heberts' due-process and equal-protection claims, we must determine whether chapter 74 bears a rational relationship to a legitimate state interest and whether the Legislature had a rational basis in differentiating between health care liability claimants and other litigants. "In so doing, we must uphold the law if we can conceive of any rational basis for the Legislature's action." *Owens Corning v. Carter,* 997 S.W.2d 560, 581 (Tex.1999).

In enacting chapter 74, the Legislature made a number of findings about the state of the health care system in Texas. *See* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.11, 2003 Tex. Gen. Laws 847, 884–85. Specifically, it found the frequency of claims and the amounts paid out by insurers in judgments and settlements had risen inordinately since 1995, which created a public problem in the availability and affordability of adequate medical professional liability insurance. *Id.* § 10.11(a)(1), (3), (4). This "crisis" increased costs to physicians, hospitals, patients, and the public. *Id.* § 10.11(a)(5), (7). As a result, the Legislature concluded the "adoption of certain modifications in the medical, insurance and legal systems" would "have a positive effect on the rates charged by insurers for medical professional liability insurance." *Id.* § 10.11(a)(12). In enacting various measures, including chapter 74, the Legislature intended to reduce the frequency and severity of health care liability claims, decrease costs of claims, and ensure **\*899** that awards were rationally related to costs, but "do so in a manner that will not unduly restrict a claimant's rights any more than necessary to deal with the crisis." *Id.* § 10.11(b)(1), (2), (3).

In *Smalling v. Gardner,* the Fourteenth Court of Appeals recognized that the "legislature has broad authority to create classifications for legislative purposes, so long as they have a reasonable basis and operate equally on all persons within the class." 203 S.W.3d 354, 371 (Tex.App.-Houston [14th Dist.] 2005, pet. denied) (addressing special-law challenge to constitutionality of article 4590i).[13] The expert report is required only for claims against healthcare providers for departures from accepted standards of medical or health care or safety. *Id.*

Accordingly, the expert-report requirement applies equally to all physicians and health care providers and rationally relates to the interests of the State "in ensuring that medical practitioners were not 'being placed in the situation of defending frivolous claims at a high cost' to the health care system." *Id.* (quoting *Schorp,* 5 S.W.3d at 737). Recently, the Dallas Court of Appeals adopted the *Smalling* analysis and applied it to chapter 74. *See Hightower,* 348 S.W.3d at 521.

While *Smalling* and *Hightower* dealt with special-law challenges, we previously rejected an equal-protection challenge to chapter 74's predecessor for similar reasons. *Fields v. Metroplex Hosp. Found.,* No. 03–04–00516–CV, 2006 WL 2089171, at \*4 (Tex.App.-Austin July 28, 2006, no pet.) (mem. op.) ("[T]he legislature determined that medical liability plaintiffs should be treated differently because of the negative effects of the numbers and cost of their lawsuits had on the provision of health care."). In that case, the claimant failed to show article 4590i's expert-report requirement was not rationally or substantially related to the government's interest in reducing the aggregate costs of defending against frivolous costs and reducing the costs of insurance and medical care to all. *Id.; see also Bogar,* 257 S.W.3d at 373 (in addressing due-process challenge to chapter 74: "We disagree that it is irrational, in light of the legislature's goal of curtailing frivolous health care liability claims, for it to require that appellees serve an expert report explaining why or how this outcome was actually caused by the conduct of [the defendant], as opposed to some other person or health care provider.").

The Heberts challenge the Legislature's rationale as "pretextual, not supported by empirical data and refuted by surveys showing there aren't excessive frivolous medical malpractice suits." They reason that because the Legislature had previously acted to curb frivolous medical malpractice claims by enacting article 4590i, its subsequent enactment of chapter 74 reflects intent to "single out medical malpractice claimants for special and harsh treatment by making it so onerous to file and prosecute [a claim] that they or their counsel will not take the case, or once it is filed, to make it so difficult to prosecute the case that they or their counsel will just give up." The Heberts likewise complain that chapter 74 strips them "of all the rights accorded to other litigants in the Texas Rules of Civil Procedure," but does not place similar restrictions on "major corporations like insurance companies and banks suing for breach of contract, or on individual or corporate clients suing attorneys, **\*900** accountants, bankers and brokers." According to the Heberts, no compelling state interest or rational basis supports this "arbitrary" classification.

**[14]** **[15]** We find no merit in the Heberts' argument that the Legislature, evaluating the impact of 4590i, could not have rationally concluded that a problem had nonetheless persisted in the cost and availability of health care due to the prevalence of medical-malpractice suits. To the extent the Heberts challenge the underlying policies of chapter 74, it is not our place to question the Legislature's policy decisions when conducting a rational basis review. *See Bell v. Low Income Women of Tex.,* 95 S.W.3d 253, 264 (Tex.2002) ("The restriction clearly serves [the act's] purposes, and it is not for us to second-guess the Legislature's policy choices."). The Heberts fail to demonstrate that the Legislature lacked any rational basis in differentiating between health care liability claimants and other litigants. Accordingly, we reject the Heberts' "disparate treatment" constitutional challenges.

*Separation of powers*

**[16]** **[17]** For similar reasons, the Heberts' other constitutional challenges fail. They claim the Legislature has impermissibly interfered with the judicial branch through chapter 74. The Texas Constitution vests the judicial power of the State in the courts. Tex. Const. art. V, § 1. The separation-of-powers requirement prohibits one branch of government from exercising a power inherently belonging to another branch. *Id.* art. II, § 1; *Wilson–Everett,* 242 S.W.3d at 802 (citing *General Servs. Comm'n v. Little–Tex Insulation Co.,* 39 S.W.3d 591, 600 (Tex.2001)). Only when the executive or legislative branch interferes with the functioning of the judicial process in a field constitutionally committed to the control of the courts does a constitutional problem arise. *Wilson–Everett,* 242 S.W.3d at 802.

Chapter 74's expert report imposes a threshold procedural requirement aimed at filtering out meritless or premature lawsuits from proceeding until a claimant makes a good-faith effort to demonstrate that at least one expert believes that a breach of the applicable standard of care caused the claimed injury. *Id.* at 802–04 (rejecting argument that chapter 74 "interefere[d] with the judiciary's constitutional power to decide when and how to render judgments" (citing *Murphy v. Russell,* 167 S.W.3d 835, 838 (Tex.2005) (per curiam); *Walker,* 111 S.W.3d at 66). Though the Heberts contend chapter 74 "prohibits the courts from using the rules of procedure and directs the courts in every respect," in actuality, the courts retain the judicial power to determine whether a timely served report is adequate in this regard and to render a decision accordingly. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(*l* ), (r)(6); *see also Carrick v. Summers,* 294 S.W.3d 886, 891 (Tex.App.-Beaumont 2009, no pet.) ("[I]mposing a strict, non-discretionary time limit on

serving the expert report does not restrict the trial court's power to hear evidence, determine the facts of a case and the rights of the parties, apply the law to the facts and to enter a judgment appropriate to the case, any more than a statute of limitations does."). The same is true of chapter 74's requirement that courts award attorney's fees upon dismissal. *Hightower,* 348 S.W.3d at 522 (rejecting separation-of-powers challenge based on attorneys' fees provision because "court still retains its constitutional authority to determine the reasonable fees based on the law and the evidence presented by the parties"). The Heberts offer no persuasive authority to the contrary. Accordingly, we reject the **\*901** Heberts' separation-of-powers constitutional challenge.

*Right of access*

**[18]** **[19]** **[20]** **[21]** Finally, the Heberts argue chapter 74 violates their right of access to the courts and due course of law. The open-courts provision of the Texas Constitution guarantees litigants the right to redress their grievances. Tex. Const. art. I, § 13; *LeCroy v. Hanlon,* 713 S.W.2d 335, 341 (Tex.1986). It protects a person from having his or her right to sue cut off by a legislative act before the individual has been afforded a reasonable opportunity to discover the wrong and bring suit. *Shah v. Moss,* 67 S.W.3d 836, 842 (Tex.2001). It is premised on the rationale that the Legislature has no power to make a remedy by due course of law contingent upon an impossible condition. *Hightower,* 348 S.W.3d at 522 (citing *Moreno v. Sterling Drug, Inc.,* 787 S.W.2d 348, 355 (Tex.1990)); *see also Stockton,* 336 S.W.3d at 618 (rejecting open-courts challenge based on chapter 74's 120–day deadline). To prove that the statute violates the open-courts provision, the Heberts must show that: (1) a cognizable common law cause of action is being restricted, and (2) the restriction is unreasonable or arbitrary when balanced with the statute's purpose and basis. *Sax,* 648 S.W.2d at 666.

**[22]** A claimant bringing an as-applied open-courts challenge to chapter 74 must show that the expert-report requirements actually prevented him from bringing his claims. *Herrera,* 212 S.W.3d at 461; *McGlothlin v. Cullington,* 989 S.W.2d 449, 453 (Tex.App.-Austin 1999, pet. denied). The Heberts failed to prove how the provisions of chapter 74, as opposed to their own failure to provide an adequate report, prevented them from pursuing their claims. *See Ledesma,* 2007 WL 2214650, at *9 (rejecting open-courts challenge when plaintiff failed to serve sufficient reports); *see also Stockton,* 336 S.W.3d at 618–19 (rejecting as-applied open-courts challenge when plaintiff failed to exercise due diligence in serving expert report on defendant physician).

[23] [24] As discussed above, the Heberts have also failed to show chapter 74 is unreasonable or arbitrary when balanced with the statute's purpose and basis. Health care liability claims require expert testimony at trial. *See Smalling,* 203 S.W.3d at 371. The expert-report requirement " 'does not violate the open-courts provision by requiring an expert report sooner rather than later in the litigation.' " *Id.* (addressing article 4590i (quoting *Mocega,* 79 S.W.3d at 64)); *see also Gill,* 39 S.W.3d at 718–19 (article 4590i expert-report requirement did not violate open-courts provision because plaintiff raising medical negligence claim required to prove claim by competent expert testimony to avoid summary judgment and/or prevail at trial); *Bankhead v. Spence,* 314 S.W.3d 464, 466 (Tex.App.-Waco 2010, pet. denied) ("This Court and others have determined that the expert-report requirement itself does not violate the open-courts guarantee because it 'is rationally related to the purpose of the statute to discourage frivolous malpractice suits.' " (quoting *Powell v. Clements,* 220 S.W.3d 138, 140 (Tex.App.-Waco 2007, pet. denied))); *Fields,* 2006 WL 2089171, at *4 (holding report requirement not so onerous that it "effectively deprived the litigant of access to the court").[14]

**\*902** [25] [26] The Heberts have failed to demonstrate a constitutional defect in chapter 74's expert-report requirement.[15] Accordingly, we overrule their second issue.[16]

## CONCLUSION

Having overruled the Heberts' issues on appeal, we affirm the district court's judgment.

**\*903** Jones, C.J., dissent.

J. WOODFIN JONES, Chief Justice, dissenting.

Because I believe the expert report in this case represents a good-faith effort to comply with the statutory definition of an expert report, I respectfully dissent.

The three significant Texas Supreme Court opinions that address the issue of determining the adequacy of an expert report are *American Transitional Care Centers of Texas, Inc. v. Palacios,* 46 S.W.3d 873 (Tex.2001); *Bowie Memorial Hospital v. Wright,* 79 S.W.3d 48 (Tex.2002);

and *Jelinek v. Casas,* 328 S.W.3d 526 (Tex.2010). Together, those three cases describe and clarify the standards by which courts are to evaluate an expert report. Because those standards are appropriately set forth in the majority opinion, I will not repeat them all. But it is crucial to remember that all that is necessary to avoid dismissal is that the report represent a "good faith effort" to comply with the statutory definition of an expert report, which in turn requires only that the report provide "a fair summary of the expert's opinions" regarding standard of care, breach, and causation. Most important, the supreme court has defined "good faith effort" as "one that provides information sufficient to (1) 'inform the defendant of the specific conduct the plaintiff has called into question,' and (2) 'provide a basis for the trial court to conclude that the claims have merit.' " *Jelinek,* 328 S.W.3d at 539 (quoting *Wright,* 79 S.W.3d at 52). I believe the report in the present case easily meets that test.

The first prong of the good-faith test is that the report must "inform the defendant of the specific conduct the plaintiff has called into question." In this regard, the expert report in this case could not be clearer: the standard of care requires that a spinal fracture complicated by pre-existing ankylosing spondylitis must be treated by posterior internal fixation, either alone or in combination with anterior internal fixation, ***not*** by anterior fixation alone, as was done by the defendant physician here. By my count, the medical expert's report contains no less than nine separate statements and/or explanations of this requirement, four in his original report and five more in his supplemental report.

- "Anterior instrumentation only is predictably inadequate in a fracture pattern with gross anterior and posterior column instability such as Mr. Hebert's. Adequate treatment of Mr. Herbert's fracture requires anterior and posterior instrumentation in order to meet the standard of care."

- "Dr. Timothy Hopkins' choice of anterior only plate/screw fixation fails to meet the applicable standard of care."

- "In the absence of adequate posterior stability, anterior plate/screw constructs typically fail in flexion by plate breakage or, as in this case, by screw pullout.... Anterior only plate/screw fixation, in this setting, is predictably doomed to failure."

- "The standard of care for the surgical treatment of this fracture requires a multilevel posterior fixation and a fusion in conjunction with anterior fixation and

**Westlaw**Next © 2015 Thomson Reuters. No claim to original U.S. Government Works.

fusion with or without supplemental external fixation...."

• "Dr. Hopkins performed an anterior (front) only plate and screw fixation.... The standards of care governing a prudent surgeon require that he not perform anterior only fixation with plate and screws...."

• "The standards of care governing a prudent surgeon require that he perform a multilevel posterior instrumented fusion alone or in conjunction with an anterior instrumented fusion...."

**\*904** • "My opinion is that Dr. Hopkins breached the standard of care by performing a multi-level anterior only fusion and fixation with plate/screws without also performing a multi-level posterior fusion and fixation with instrumentation."

• "The factual basis for this opinion is that a prudent surgeon following the standards of care would not have performed an anterior only fusion with instrumentation to attempt to stabilize this very unstable fracture but would have performed an anterior instrumented fusion with plates/screws and a multilevel posterior instrumented fusion or a multilevel posterior instrumented fusion alone."

• "[P]erforming an anterior only fusion with instrumentation without also performing the posterior fusion and fixation was a breach of the standard of care because the standards of care require performing both procedures to adequately stabilize the very unstable fracture and anterior only surgery was doomed to fail...."

There can be no doubt what conduct is being called into question.

The second prong of the supreme court's good-faith definition is that the report must "provide a basis for the trial court to conclude that the claims have merit." Here, the expert report goes into great detail in explaining the standard of care, why the actions of the defendant physician constituted a breach of the standard, and "how and why the breach caused the injury based on the facts presented." *Jelinek,* 328 S.W.3d at 539–40. The report does not contain mere conclusions of the expert. Quite the contrary. As to causation, for example, the report explains at length the process by which the breach of the standard of care resulted in the plaintiff's paralysis:

> My opinion is that performing an anterior only fusion with instrumentation without also

performing a multilevel posterior instrumented fusion caused permanent and irreversible spinal cord injury when the screw predictably pulled out in the post perioperative period.... When the screw pulled out of the vertebral segments of C–6 and C–7, the C–5 vertebral body was allowed to move on C–6 resulting in cord compression. The screw predictably failed because the anterior only approach was insufficient in the absence of inherent or surgically created posterior element stability, to stabilize the fracture and resist deformation due to flexion forces. When the screws failed, the vertebral segments moved resulting in cord compression. As a result, Mr. Hebert is now a quadraparetic, meaning he is nearly completely paralyzed from the chest down. If, instead of the anterior only surgery, Dr. Hopkins had performed an anterior and posterior instrumented fusion, like Dr. Duarte did on 9/12/08, it is highly probable the anterior implants would not have failed as they did, the resulting cord compression would have been avoided and Mr. Hebert would not have sustained his spinal cord injury and paralysis.

In the face of the expert report's highly detailed explanation of all of the elements required by *Palacios, Wright,* and *Jelinek,* the majority holds that a single sentence from the original report was so "internally inconsistent" as to the applicable standard of care that all of the report's detailed explanations and opinions were vitiated:

> If the clinical situation in which the surgeon finds himself and the patient allows only inadequate internal fixation, the surgeon is obligated to protect the patient supplementing the internal fixation **\*905** with external bracing and/or activity limitations.

There are several things to note about this sentence. First, it does not say that anterior only internal fixation could

*ever* meet the standard of care in treating a patient with the conditions existing here. Indeed, the sentence does not explicitly reference anterior internal fixation at all. It is simply a general reference to a hypothetical situation in which "inadequate internal fixation" is, temporarily, the only available option under some presumably extraordinary circumstances. Second, whatever the general references to "clinical situation" and "inadequate internal fixation" mean, the report goes on to specify that the defendant breached the standard of care in *this case,* as to *this patient.* This is an implicit statement that, to the best of the expert's knowledge, there were no extraordinary circumstances in this case. Third, and perhaps most important, the possible existence of extraordinary circumstances that might—or might not— justify the defendant physician's temporary use of anterior only internal fixation is a matter to be fleshed out

during discovery and possibly trial, not as part of a gatekeeper effort to deter frivolous lawsuits. This is especially true in light of the fact that the medical records available to the expert in preparing his report may not have reflected whether any such extraordinary circumstances existed at the time of the surgery.[1] To require a report to negate possible defenses at this stage of the litigation creates an extra-statutory burden and is unfair to both the plaintiff and the medical expert.

I believe the expert report in this case constituted a good-faith effort to comply with the definition of an expert report, as required by the applicable statutes and supreme court precedent. Accordingly, I respectfully dissent.

## Footnotes

[1]  The parties have advised us that Richard Hebert died shortly after the Heberts perfected their appeal. As contemplated by rule 7.1 of the rules of appellate procedure, the parties have proceeded on appeal as if all parties are alive, and so have we. *See* Tex.R.App. P. 7.1(a)(1).

[2]  *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(a) (West 2011) ("In a health care liability claim, a claimant shall, not later than the 120th day after the date the original petition was filed, serve on each party or the party's attorney one or more expert reports, with a curriculum vitae of each expert listed in the report for each physician or health care provider against whom a liability claim is asserted.").
    In the absence of material intervening substantive changes, we have cited the current version of chapter 74 for convenience.

[3]  *See id.* ("Each defendant physician or health care provider whose conduct is implicated in a report must file and serve any objection to the sufficiency of the report not later than the 21st day after the date it was served, failing which all objections are waived.").

[4]  *See id.* § 74.351(b) ("If, as to a defendant physician or health care provider, an expert report has not been served within the period specified by Subsection (a), the court, on the motion of the affected physician or health care provider, shall ... enter an order that: (1) awards to the affected physician or health care provider reasonable attorney's fees and costs of court incurred by the physician or health care provider; and (2) dismisses the claim with respect to the physician or health care provider, with prejudice to the refiling of the claim."); *see also id.* § 74.351(c) (recognizing that "an expert report has not been served within the period specified by Subsection (a)" when "elements of the report are found deficient").

[5]  *See id.* § 74.351(c).

[6]  *See id.* § 74.351(b), (c).

[7]  *See id.* § 74.351(b)(1).

[8]  *See id.* § 74.351(r)(6). Chapter 74 also imposes requirements regarding the qualifications of the "expert" who may prepare an "expert report," *see id.* § 74.351(r)(5), but appellees have not disputed that White meets those standards here.

[9]  *Id.* § 74.351(*l* ).

[10]  The Heberts acknowledge that Richard's death during the pendency of this appeal may have terminated his open-courts claim. "[W]rongful-death and survival claimants cannot establish an open-courts violation because they 'have no common law right to bring either.' " *Horizon/CMS Healthcare Corp. v. Auld,* 34 S.W.3d 887, 903 (Tex.2000) (quoting *Bala v. Maxwell,* 909 S.W.2d 889, 893 (Tex.1995)). The Texas Supreme Court also has declined to rule on an open-courts argument in a similar situation when the claimant died during the pendency of the appeal. *Kallam v. Boyd,* 232 S.W.3d 774, 776 (Tex.2007) (per curiam).

While we have similar reservations, we will address the Heberts' open-courts argument to the extent its substance implicates due-process and due-course-of-law protections they have also raised. *See, e.g., Bogar v. Esparza,* 257 S.W.3d 354, 370 n. 6 (Tex.App.-Austin 2008, no pet.) (noting open-court protections not directly implicated in statutory wrongful-death and survivor action before conducting similar due-process analysis).

11    In their reply brief, the Heberts attempt to distinguish some of these cases on the basis that they involved "a complete failure to file an expert report," instead of "addressing the legislature's restriction placed on the courts in deciding the issue" of a report's sufficiency. However, Texas courts, including this Court, have rejected constitutional challenges where, as here, an expert report was served, but found deficient. *See, e.g., Hightower v. Baylor Univ. Med. Ctr.,* 348 S.W.3d 512, 520 (Tex. App.-Dallas 2011, pet. denied) (upholding dismissal of deficient reports); *Ledesma v. Shashoua,* No. 03–05–00454–CV, 2007 WL 2214650, at *7–8 (Tex.App.-Austin Aug. 3, 2007, pet. denied) (mem. op.) (same).

12    Classifications that impinge upon the exercise of a fundamental right or distinguish between people on a suspect basis (i.e., race, national origin, and alienage) "are subject[ ] to strict scrutiny and will be sustained only if they are suitably tailored to serve a compelling state interest." *City of Cleburne v. Cleburne Living Ctr. Inc.,* 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (plurality opinion). When a statute burdens a sensitive class or impinges on an important right, the statute is subject to an intermediate level of scrutiny, which requires a showing that the statute is substantially related to an important state interest. *Id.* at 440–41, 105 S.Ct. 3249.

13    Though the Heberts did not explicitly claim chapter 74 was an unconstitutional special law prohibited by the Texas Constitution, many of their complaints track arguments raised by parties who have raised such claims. Accordingly, we find cases addressing special-law challenges instructive.

14    The Heberts also argue that chapter 74 "effectively revives the general demurrer practice which permitted judges to dismiss cases on the pleadings." They argue that summary judgment is the preferred method for defendants to obtain a dismissal on the merits. Our rules of procedure prohibit the use of general demurrers. Tex.R. Civ. P. 90. However, "[w]hen a rule of procedure conflicts with a statute, the statute prevails unless the rule has been passed subsequent to the statute and repeals the statute...." *Johnstone v. State,* 22 S.W.3d 408, 409 (Tex.2000) (per curiam). The current version of chapter 74 was passed in 2003 and amended in 2005; rule 90 was approved in 1940 and amended in 1980. Thus, to the extent chapter 74 and rule 90 conflict, chapter 74 controls. *See Mitchell v. Berry,* No. 05–06–01328–CV, 2007 WL 4111923, at *4 (Tex.App.-Dallas Nov. 20, 2007, pet. denied) (mem. op.) (rejecting argument Tex. Civ. Prac. & Rem.Code Ann. § 13.001 allowing for dismissal in inability-to-pay cases was a general demurrer in contravention of Rule 90); *see also Smalling v. Gardner,* 203 S.W.3d 354, 367 n. 8 (Tex.App.-Houston [14th Dist.] 2005, pet. denied) (distinguishing dismissal under general demurrer from dismissal for failure to serve expert report).

15    The Heberts make passing reference to infringement of their right to trial by jury, but provide no authority or argument in support of any challenge based on that provision that is distinct from their other arguments. To the extent the Heberts intended to advance a distinct challenge based on their right to jury trial, it too would fail. The right to a jury trial is not an absolute right in civil cases, but is subject to certain procedural rules. *Schorp v. Baptist Mem'l Health Sys.,* 5 S.W.3d 727, 738 (Tex.App.-San Antonio 1999, no pet.) (citing *Wooten v. Dallas Hunting & Fishing Club, Inc.,* 427 S.W.2d 344, 346 (Tex.Civ.App.-Dallas 1968, no writ)). "Imposing the requirement to file an expert report and the failure to meet that requirement allows the trial court to dismiss the case. This dismissal is not based on the merits, but merely operates to dismiss the case on a procedural requirement which is directly related to the statute's purpose of limiting the number of frivolous suits." *Id.* (addressing article 4590i (citing *Buckholts Indep. Sch. Dist. v. Glaser,* 632 S.W.2d 146, 149 (Tex.1982) (holding that failure of plaintiff to fulfill bonding requirement for challenging school board election did not deny taxpayer right to jury trial on merits))).

16    The Heberts point to decisions from other jurisdictions that, in their view, struck down expert-report requirements similar to chapter 74 based on constitutional provisions analogous to the protections on which they rely here. *See, e.g., Putman v. Wenatchee Valley Med. Ctr.,* 166 Wash.2d 974, 216 P.3d 374, 378–79 (2009) (law requiring certificate of merit from expert at time of filing violated separation of powers and right of access as it cut off rights of discovery and abrogated pleading requirements in rules of procedure); *Wimley v. Reid,* 991 So.2d 135, 138 (Miss.2008) (law requiring certificate of merit violated separation of powers); *Summerville v. Thrower,* 369 Ark. 231, 253 S.W.3d 415, 421 (2007) (law requiring expert affidavit within 30 days of suit violated separation of powers); *Zeier v. Zimmer, Inc.* 152 P.3d 861, 873 (Okla.2006) (law requiring affidavit of merit with petition barred right of access). They also acknowledge that courts in at least two jurisdictions upheld laws similar to chapter 74. *See McAlister v. Schick,* 147 Ill.2d 84, 167 Ill.Dec. 1021, 588 N.E.2d 1151, 1157–58 (1992); *Mahoney v. Doerhoff Surgical Servs. Inc.,* 807 S.W.2d 503, 512–13 (Mo.1991). Additionally, they favorably cite cases from other jurisdictions that upheld similar laws "so long as the Legislature [does] not direct[ ] the Courts how to decide the legitimacy of the case." Texas decisions regarding chapter 74 are consistent with that reasoning. *See, e.g., Wilson–Everett v. Christus St. Joseph,* 242 S.W.3d 799, 803 (Tex.App.-Houston [1st Dist.] 2007, pet. denied) (rejecting argument that chapter 74 "interfere[d] with the judiciary's constitutional power to decide when and how to render judgments"). In any event, cases from other jurisdictions have no precedential value for this Court. Instead, we are bound to follow the Supreme Court of Texas and

our own precedent, as well as the persuasive cases of our sister courts. Texas authorities have consistently rejected constitutional challenges similar to those advanced by the Heberts.

[1]     Medical issues, like legal ones, are seldom black and white. One can imagine a hypothetical conversation between a plaintiff's attorney and the plaintiff's medical expert, in which the expert says something like, "In the overwhelming majority of cases like this, the standard of care is X. But I have to be candid: in a very small percentage of such cases, extraordinary circumstances may call for a different treatment approach. Nothing in the medical records I have seen indicates that such extraordinary circumstances existed in this case, but I would not be completely honest if I did not at least mention that possibility."

---

**End of Document**
© 2015 Thomson Reuters. No claim to original U.S. Government Works.

328 S.W.3d 526
Supreme Court of Texas.

Michael T. JELINEK, M.D. and Columbia Rio
Grande Healthcare, L.P. d/b/a Rio Grande
Regional Hospital, Petitioners,
v.
Francisco CASAS and Alfredo DeLeon, Jr., as
Personal Representatives of the Estate of Eloisa
Casas, Deceased, Respondents.

No. 08–1066. | Argued Feb. 18, 2010. | Decided Dec.
3, 2010.

**Synopsis**
**Background:** Patient's surviving family members
brought medical malpractice action against hospital and
physician, arising out of treatment of patient at hospital.
Following non-suiting of physician, and following jury
trial, the 275th District Court, Hidalgo County, Juan R.
Partida, J., entered judgment for family members.
Hospital and physician appealed. The Corpus Christi
Court of Appeals, 2008 WL 2894889, affirmed. Hospital
and physician petitioned for review.

**Holdings:** The Supreme Court, Guzman, J., held that:

[1] lay testimony of family members did not present some
evidence in support of finding that hospital's alleged
negligence caused patient's additional pain and suffering;

[2] expert testimony did not present some evidence in
support of finding that hospital's alleged negligence
caused patient's additional pain and suffering; and

[3] expert report was conclusory with regard to causation
and, thus, was deficient.

Reversed and rendered in part; reversed and remanded in
part.

Jefferson, C.J., dissented in part, and filed opinion in
which Green and Lehrmann, JJ., joined.

Lehrmann, J., filed opinion dissenting in part.

**Attorneys and Law Firms**

**\*529** Ronald G. Hole, Ida Cecilia Garza, Hole & Alvarez,
L.L.P., McAllen, for Michael T. Jelinek, M.D.

John N. Mastin, San Antonio, Francisco J. Rodriguez,
Rodriguez Tovar & Lopez, LLP, McAllen, for Francisco
Casas.

Mike A. Hatchell, Sarah B. Duncan, Elissa Gail
Underwood, Locke Lord Bissell & Liddell, LLP, Austin,
Raul Javier Guerra, Green, DuBois & Guerra, San
Antonio, Susan A. Kidwell, Locke Lord Bissell &
Liddell, LLP, Austin, for Columbia Rio Grande
Healthcare, L.P.

**Opinion**

Justice GUZMAN delivered the opinion of the Court, in
which Justice HECHT, Justice WAINWRIGHT, Justice
MEDINA, Justice JOHNSON, and Justice WILLETT
joined, and in which Chief Justice JEFFERSON, Justice
GREEN, and Justice LEHRMANN joined as to Parts I
and II.A.

When circumstantial evidence is consistent with several
possible medical conclusions, only one of which
establishes that the defendant's negligence caused the
plaintiff's injury, an expert witness must explain why,
based on the particular facts of the case, that conclusion is
medically superior to the others. If the expert fails to give
any reason beyond an unsupported opinion, the expert's
testimony is legally insufficient evidence of causation. In
this case, we determine whether legally sufficient
evidence supports the jury's verdict in favor of the estate
of Eloisa Casas[1] against Rio Grande Regional Hospital
(the Hospital).[2] Following her admission to the Hospital
with abdominal pain, doctors placed Casas on antibiotics
used to treat and prevent certain intra-abdominal
infections. Two days later she underwent major
abdominal surgery and continued on the antibiotics for
another five days, but the Hospital allowed the
prescriptions to lapse for four-and-a-half days. The
Hospital admits it should have continued the antibiotics
but denies that the lapse caused Casas any additional pain.
We hold that the Casases failed to present legally
sufficient evidence that Casas suffered from an infection
the omitted antibiotics would have treated. Accordingly,
we reverse the court of appeals' judgment and render
judgment that the Casases take nothing.[3]

In a separate petition, Dr. Michael Jelinek, one of Casas's
treating physicians sued by the Casases, argues that the
trial court should have granted his motion for sanctions
and dismissal because the Casases' expert report was
deficient. We agree and hold that an award of attorney's

fees is proper. Therefore, we reverse and remand to the trial court for an award of attorney's fees and costs.

## *530 I. Background

In 2000, Eloisa Casas was diagnosed with colon cancer and underwent surgery, radiation, and chemotherapy. A year later, doctors told her that the cancer appeared to be in remission, and she thought she was cured. But on July 10, 2001, she was admitted to the Hospital with abdominal pains; she also had a fever and a mildly elevated white-blood-cell count, potentially indicating an infection. To treat this possible infection, her surgeon and primary physician, Dr. Carlos Garcia–Cantu, consulted with an infectious disease specialist at the Hospital, Dr. Michael Jelinek, who on July 11 prescribed two medications, Maxipime (a broad-spectrum antibiotic), and Flagyl (an antibiotic used to treat anaerobic bacteria).

The Hospital performed several diagnostic tests, which revealed abnormal collections of fluid in Casas's abdomen. On July 13, she underwent major abdominal surgery during which Dr. Garcia–Cantu discovered that "fairly extensive" metastatic cancer had perforated Casas's colon and allowed material to leak into her abdominal cavity, causing an intra-abdominal abscess. Dr. Garcia–Cantu drained the abscess, repaired Casas's colon, and inserted a Jackson–Pratt drain to prevent further problems. Following the surgery, Dr. Garcia–Cantu continued the Maxipime and Flagyl prescriptions, and a culture of the removed abscess revealed an E. coli infection, which is effectively treated with Maxipime. Casas received Maxipime and Flagyl for another five days, but hospital staff inadvertently failed to place a prescription renewal form on Casas's chart, resulting in a four-and-a-half-day period between July 18 and 23 during which Casas did not receive either medication. Even so, Casas never tested positive for E. coli again and a culture of the incision site on July 18 instead grew Candida (a fungus) for which Diflucan (an antifungal) was prescribed. Then, on July 21, a second culture from a blood sample grew coagulase-negative staph, for which Vancomycin was prescribed.[4] Neither Maxipime nor Flagyl would have treated the Candida or coagulase-negative staph infection.

On July 23, Dr. Garcia–Cantu noted an abscess in the wound, which he drained by removing the staples and opening the wound. The next day, records indicate that a foul smell was emanating from the wound site, and hospital staff brought fans into the room to dissipate the odor. When Dr. Jelinek learned of the lapsed prescription on July 23, he informed Casas and then prescribed different antibiotics, Levaquin and Vancomycin. On July 25, after a CAT scan showed no abscess, Dr. Garcia–Cantu removed the drain. Casas left the Hospital on August 23, but she returned in early September and died two months later.

In May 2003, several members of Casas's family, including her husband and son, filed suit against the Hospital, Dr. Garcia–Cantu, and Dr. Jelinek. The plaintiffs claimed that the defendants' negligence caused Eloisa Casas to "suffer grievous embarrassment and humiliation, as well as excruciating pain the remainder of her life which she would not have suffered to such degree or extent if properly diagnosed, treated and cared for." The plaintiffs sought to recover damages for Casas's injuries and mental anguish. They twice amended their petition, ultimately leaving the Casases as the sole plaintiffs.

*531 As required by former article 4590i § 13.01 of the Medical Liability and Insurance Improvement Act, *see* TEX.REV.CIV. STAT. art. 4590i § 13.01,[5] the Casases filed an expert report within 180 days of filing the original petition. In the report, Dr. John Daller opined that Dr. Garcia–Cantu and Dr. Jelinek were negligent in failing to discover that the antibiotics were not being given to Casas and that within "reasonable medical probability" this negligence resulted in a prolonged hospital stay and increased pain and suffering. Dr. Jelinek later filed a motion for sanctions and dismissal under article 4590i § 13.01(e), alleging that the expert report was deficient because, among other things, it failed to explain any causal connection between the negligence and the purported injury. The trial court denied the motion. Before trial began, however, the Casases nonsuited Dr. Jelinek and Dr. Garcia–Cantu.

At trial, Dr. Daller testified as the Casases' medical expert. During direct examination, he analyzed the Hospital's daily patient notes regarding Casas and identified the significant events. He noted changes in Casas's vital signs on July 21 and 22, such as increased heart rate and temperature, inflammation, and tenderness of the surgery site. Dr. Daller stated that "in medical probability" there was an infection in the abdomen, but on cross-examination he admitted that "there was no objective evidence present to demonstrate that intra-abdominal infection." When reviewing the patient notes for July 24, which noted the presence of a foul smell, he suggested that the smell was consistent with an anaerobic infection that would be difficult to culture because anaerobic bacteria die when exposed to air. Dr. Carl Berkowitz, the Hospital's expert, offered several other

explanations for the smell, such as the Candida infection or dying tissue.

The Casases also called Casas's relatives to testify about her condition. Consistent with Dr. Daller's testimony, Casas's son linked the smell with the opening of the wound to drain the abscess: "The odor that I noticed was after they had taken out the staples on her incision, and one day that I went to see her as soon as they opened the door the whiff of this putrid smell just engulfed me." He also testified that Casas was upset upon learning that she had not received the antibiotics but was even more upset when the incision had to be opened and drained: "Well, after she was told and I was told that she wasn't getting antibiotics, like I said, she was upset. What really upset her more was when they had to—they had to take out the staples out of her incision, and they had to open her incision up again." Casas's husband testified that, while she was upset and did not trust the nurses or doctors after learning of the lapsed prescription, "she was still fighting. She ... wanted to beat this cancer she had." The son testified that Casas did not lose hope until she witnessed the events of September 11, 2001, following her re-admission to the Hospital: "That's why I remember that day so vividly in my mind because that was the turning point in my mom. She seemed to just give up, not fight, not want to fight anymore like she used to. And that was a very, very sad day."

**\*532** The jury found that the negligence of the Hospital, Dr. Jelinek, and Dr. Garcia–Cantu proximately caused Casas's injury. The jury apportioned ninety percent of the negligence to the Hospital, five percent to Dr. Jelinek, and five percent to Dr. Garcia–Cantu. It awarded $250,000 in damages to the Casases as compensation for Casas's pain and mental anguish.

The Hospital appealed, arguing that the evidence was legally and factually insufficient to prove causation or damages for mental anguish. Dr. Jelinek also appealed, challenging the trial court's denial of his motion for sanctions and dismissal. The court of appeals affirmed on all issues. ––– S.W.3d ––––.

### II. Analysis

We address in turn the two issues raised in this appeal: the legal sufficiency of the causation evidence and the sufficiency of the Casases' expert report.

### A. Sufficiency of the Evidence

[1] The facts of this case are unfortunate: a woman with advanced colon cancer underwent surgery to repair her cancer-perforated and infected colon, and in the course of treatment for her many symptoms the Hospital failed to renew her antibiotic prescriptions for a four-and-a-half-day period. The Hospital admits it should have continued the antibiotics. Even so, the plaintiff bears the burden to prove that the negligence caused an injury: "[A]t trial the plaintiff must establish two causal nexuses in order to be entitled to recovery: (a) a causal nexus between the defendant's conduct and the event sued upon; and (b) a causal nexus between the event sued upon and the plaintiff's injuries." *Morgan v. Compugraphic Corp.,* 675 S.W.2d 729, 731 (Tex.1984). Only the second nexus is at issue here.

[2] [3] [4] In *City of Keller v. Wilson,* we considered at length the parameters of legal sufficiency review, quoting with approval Chief Justice Calvert's seminal article on the topic:

> "No evidence" points must, and may only, be sustained when the record discloses one of the following situations: (a) a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; (d) the evidence establishes conclusively the opposite of the vital fact.

168 S.W.3d 802, 810 (Tex.2005) (quoting Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 TEX. L.REV. 361, 362–63 (1960)). "When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence." *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983). The same is true when the evidence equally supports two alternatives: " 'When the circumstances are equally consistent with either of two facts, neither fact may be inferred.' " *City of Keller,* 168 S.W.3d at 813 (quoting *Tubelite, a Div. of Indal, Inc. v. Risica & Sons, Inc.,* 819 S.W.2d 801, 805 (Tex.1991)). When considering such cases, "we must 'view each piece of circumstantial evidence, not in isolation, but in light of all the known circumstances,' " *id.* at 813–14 (quoting *Lozano v. Lozano,* 52 S.W.3d 141, 167 (Tex.2001) (per curiam)),

and we "must consider not just favorable but all the circumstantial evidence, and competing inferences as well." *Id.* at 814.

[5] To meet the legal sufficiency standard in medical malpractice cases "plaintiffs are required to adduce evidence of a **\*533** 'reasonable medical probability' or 'reasonable probability' that their injuries were caused by the negligence of one or more defendants, meaning simply that it is 'more likely than not' that the ultimate harm or condition resulted from such negligence." *Kramer v. Lewisville Mem'l Hosp.,* 858 S.W.2d 397, 399–400 (Tex.1993) (citations omitted). Thus, we examine the record to determine if the Casases presented legally sufficient evidence that "in reasonable medical probability" the Hospital's negligence caused Casas additional pain and suffering.

When distilled to its essence, the Casases' claim is predicated on the presence of an infection—treatable by the lapsed antibiotics—that caused Casas pain and mental anguish above and beyond that caused by the cancer, the surgery, and the other known infections. The absence of an infection treatable by Maxipime and Flagyl would undermine the Casases' claim, for then the prescription lapse would amount to an unfortunate, but harmless, occurrence. The Hospital argues that the Casases presented no evidence that the Hospital's negligence caused such an infection. The Casases' expert admitted there is no direct evidence of an anaerobic infection, leaving the jury to consider the circumstantial evidence and make proper inferences from it. In reviewing the record, we initially decide if jurors can determine causation under these facts unaided by expert testimony—that is, whether lay testimony regarding causation is legally sufficient.

## 1. Lay Testimony of Causation

[6] [7] [8] [9] Lay testimony may be used as evidence of causation in certain circumstances, but "[w]hen expert testimony is required, lay evidence supporting liability is legally insufficient." *City of Keller,* 168 S.W.3d at 812. In medical malpractice cases, expert testimony regarding causation is the norm: "The general rule has long been that expert testimony is necessary to establish causation as to medical conditions outside the common knowledge and experience of jurors." *Guevara v. Ferrer,* 247 S.W.3d 662, 665 (Tex.2007); *see also Bowles v. Bourdon,* 148 Tex. 1, 219 S.W.2d 779, 782 (1949) ("It is definitely settled with us that a patient has no cause of action against his doctor for malpractice, either in diagnosis or

recognized treatment, unless he proves by a doctor of the same school of practice as the defendant: (1) that the diagnosis or treatment complained of was such as to constitute negligence and (2) that it was a proximate cause of the patient's injuries."). We have allowed lay evidence to establish causation "in those cases in which general experience and common sense will enable a layman to determine, with reasonable probability, the causal relationship between the event and the condition." *Morgan,* 675 S.W.2d at 733 (citing *Lenger v. Physician's Gen. Hosp., Inc.,* 455 S.W.2d 703, 706 (Tex.1970)). Care must be taken to avoid the *post hoc ergo propter hoc* fallacy, that is, finding an earlier event caused a later event merely because it occurred first. Stated simply, correlation does not necessarily imply causation. As we noted in *Guevara,* "[e]vidence of an event followed closely by manifestation of or treatment for conditions which did not appear before the event raises suspicion that the event at issue caused the conditions. But suspicion has not been and is not legally sufficient to support a finding of legal causation." 247 S.W.3d at 668.

[10] When lay testimony is credited as evidence of causation, it usually highlights a connection between two events that is apparent to a casual observer. In *Morgan,* for example, a previously healthy employee, upon exposure to leaking chemicals, suffered watering of the eyes, blurred **\*534** vision, headaches, and swelling of the breathing passages. 675 S.W.2d at 733. In such a circumstance, lay testimony sufficed to connect the specific injury to the negligence with no evidence of causation beyond the leaking chemicals. *Id.* Likewise in *Guevara,* we stated that determining causation of "certain types of pain, bone fractures, and similar basic conditions" following an automobile accident was within the competence of lay jurors. 247 S.W.3d at 668. But we held that expert testimony was required to prove that a patient's medical expenses resulted from the accident, noting that "[p]atients in hospitals are often treated for more than one condition brought on by causes independent of each other." *Id.* at 669. These cases illustrate this basic premise: "[N]on-expert evidence alone is sufficient to support a finding of causation in limited circumstances where both the occurrence and conditions complained of are such that the general experience and common sense of laypersons are sufficient to evaluate the conditions and whether they were probably caused by the occurrence." *Id.* at 668.

The present case does not fall within this rule. Unlike in *Morgan,* an otherwise healthy person did not suddenly experience health difficulties following the defendant's negligent conduct when the plaintiff's symptoms were reasonably attributable to the negligence and to nothing else. Rather, a patient with terminal colon cancer did not

receive antibiotics for four-and-a-half days following major abdominal surgery and after having received the medications for eight days. There is no direct evidence that she suffered from an infection treatable by the omitted antibiotics, but there is evidence that she had two other infections that accounted for all of her symptoms during that time. Given Casas's medical condition, expert testimony was crucial to link the prescription lapse to an infection causing additional pain and suffering beyond what she would otherwise have experienced. *See Kaster v. Woodson,* 123 S.W.2d 981, 983 (Tex.Civ.App.-Austin 1938, writ ref'd) ("What is an infection and from whence did it come are matters determinable only by medical experts."); *see also Hart v. Van Zandt,* 399 S.W.2d 791, 792 (Tex.1966) ("In determining negligence in a case such as this, which concerns the highly specialized art of treating disease, the court and jury must be dependent on expert testimony. There can be no other guide, and where want of skill and attention is not thus shown by expert evidence applied to the facts, there is no evidence of it proper to be submitted to the jury.").

The Casases point to testimony by Casas's husband and son to support their argument that she deteriorated rapidly after discovering she did not receive the antibiotics. But this characterization overstates the evidence. While Casas's husband testified she was upset and did not trust her doctors following the discovery, she was still determined to fight her cancer. The son also observed Casas's anger and lack of trust but testified that the opening of her wound, which occurred the same day she learned of the lapse, upset her even more. As Dr. Daller admitted, Candida likely caused the abscess that required Dr. Garcia–Cantu to drain the wound. Further, based on his experience at Casas's bedside, her son pinpointed the tragic events of September 11, 2001, and their effect on his mother as the turning point in her mental state. The latter event was some seven weeks after discovery of the lapsed prescriptions and after Casas's discharge from and re-admission to the Hospital. This evidence does not bear out the Casases' claim of a marked shift in Casas's mental resilience following the omission of the medications.

**\*535** More importantly, Casas's husband and son were unable to precisely identify the cause of her suffering. While they could accurately describe her discomfort, they were unable to say if it was the cancer, the surgery, the other infections, or the lapse that caused it. Even testimony that Casas suffered after learning of the omission raises no more than a mere suspicion of causation, and that is not enough, *see Guevara,* 247 S.W.3d at 668, particularly in light of the evidence that Casas thought she was cured of cancer before the surgery and then learned that not only was it "back with a vengeance," it was terminal. The testimony of Casas's

husband and son is evidence of her suffering, but not of its cause. Thus, we hold that the lay testimony presented by the Casases is legally insufficient to establish that the Hospital's negligence caused Casas additional pain and suffering.

## 2. Expert Testimony

[11] The Casases also presented expert testimony regarding causation. The Casases' expert, Dr. Daller, testified that the Hospital's negligence "in medical probability" caused Casas additional pain and suffering. He based this opinion on the presence of an intra-abdominal infection that could have been treated using Maxipime and Flagyl. Admitting that no direct evidence indicated such an infection, Dr. Daller pointed to various circumstantial indicators that suggested an infection. These indicators were primarily Casas's changed vital signs, such as fever and increased heart rate: "Well, given the fact that two to three days after the antibiotics had been mistakingly [sic] stopped her fever curve went up and her heart rate went up, to me that suggests the presence of on going [sic] infection."[6] But on cross-examination, he conceded these data were equally consistent with two other infections cultured from Casas's incision and blood—Candida and coagulase—negative staph—neither of which is treatable by Maxipime or Flagyl:

> Q. Now, Candida, infection of a wound like this, they can cause high temperatures. Correct?
>
> A. Fungal infections can cause a high temperature, yes.
>
> Q. It can cause increased heart rate?
>
> A. That is correct.
>
> Q. And inflammation?
>
> A. That is correct.
>
> Q. Pain?
>
> A. That is correct.
>
> Q. How about an abscess?
>
> A. It caused or is part of the abscess in that wound that was present, that wound infection that needed to be opened.

Q. So when Doctor Garcia went in on 7/23 ... and drained that wound at bedside that abscess was within a reasonable degree of medical probability caused by the Candida?

**\*536** A. That was one of the organisms that was there. It was the organism that was cultured. That is correct.

....

Q. ... This coagulase negative staph causes fever?

A. Correct.

Q. Increased heart rate?

A. The fever will cause increased heart rate.

....

Q. It can cause pain?

A. Depending upon the site. Correct.

Q. Okay. All of these things can be caused by coagulase negative staph and Candida, which we know were present 7/18 through 7/23, the time period she did not get antibiotics?

A. That's correct.

Q. Neither one would have been killed by Maxipime or Flagyl?

A. That's correct.

[12] [13] It is not enough for an expert simply to opine that the defendant's negligence caused the plaintiff's injury. The expert must also, to a reasonable degree of medical probability, explain how and why the negligence caused the injury. We have rejected expert opinions not grounded in a sound evidentiary basis: "[I]f no basis for the opinion is offered, or the basis offered provides no support, the opinion is merely a conclusory statement and cannot be considered probative evidence, regardless of whether there is no objection. '[A] claim will not stand or fall on the mere *ipse dixit* of a credentialed witness.' " *City of San Antonio v. Pollock,* 284 S.W.3d 809, 818 (Tex.2009) (quoting *Burrow v. Arce,* 997 S.W.2d 229, 235 (Tex.1999)); *see also Whirlpool Corp. v. Camacho,* 298 S.W.3d 631, 637 (Tex.2009) ( "Conclusory or speculative opinion testimony is not relevant evidence because it does not tend to make the existence of material facts more probable or less probable."). When the only evidence of a vital fact is circumstantial, the expert cannot merely draw possible inferences from the evidence and state that "in medical probability" the injury was caused by the

defendant's negligence. The expert must explain why the inferences drawn are medically preferable to competing inferences that are equally consistent with the known facts. Thus, when the facts support several possible conclusions, only some of which establish that the defendant's negligence caused the plaintiff's injury, the expert must explain to the fact finder why those conclusions are superior based on verifiable medical evidence, not simply the expert's opinion. *See Lenger,* 455 S.W.2d at 707 ("[E]xpert testimony that the event is a possible cause of the condition cannot ordinarily be treated as evidence of reasonable medical probability except when, in the absence of other reasonable causal explanations, it becomes more likely than not that the condition did result from the event."); *Hart,* 399 S.W.2d at 792 ("The burden of proof is on the plaintiff to show that the injury was negligently caused by the defendant and it is not enough to show the injury together with the expert opinion that it might have occurred from the doctor's negligence and from other causes not the fault of the doctor. Such evidence has no tendency to show that negligence did cause the injury.").

By conceding that Casas's symptoms were consistent with infections not treatable by Maxipime or Flagyl, Dr. Daller undermined his conclusion that an undetected infection was also present. While it is possible that Casas did have such an infection, its presence can only be inferred from facts that are equally consistent with the Candida and coagulase-negative staph infections. " 'When the circumstances are **\*537** equally consistent with either of two facts, neither fact may be inferred.' " *City of Keller,* 168 S.W.3d at 813 (quoting *Tubelite,* 819 S.W.2d at 805). Here, objective data—the cultures—support the Candida and staph infections but not the supposed anaerobic infection.[7]

[14] [15] Based on the record evidence, an anaerobic infection cannot be proved or disproved. It is equally plausible that Casas had such an infection or that she did not. Dr. Daller opined that she did, but he did not explain why that opinion was superior to the opposite view. Such evidence raises no more than a possibility of causation, which is insufficient. As we said in *Bowles v. Bourdon,* " '[t]he proof must establish causal connection beyond the point of conjecture. It must show more than a possibility. Verdicts must rest upon reasonable certainty of proof. Where the proof discloses that a given result may have occurred by reason of more than one proximate cause, and the jury can do no more than guess or speculate as to which was, in fact, the efficient cause, the submission of such choice to the jury has been consistently condemned by this court and by other courts.' " 219 S.W.2d at 785 (quoting *Ramberg v. Morgan,* 209 Iowa 474, 218 N.W. 492, 498–99 (1928)).

The Casases argue that the foul smell, which is consistent with an anaerobic infection, is strong evidence of such an infection. Looking at the patient notes for July 24, Dr. Daller commented on the smell:

A. The text says something about drainage to the abdomen with moderate amount of drainage. And it says that it is foul smelling.

....

Q. The [previous notes] that I remember that we have gone over didn't say anything about foul smelling?

A. That's correct. They were just described as I recall as being purulent and looking like puss [sic].

Q. What does that mean when it says "foul smelling"?

A. When you have foul smelling, it suggests that the organism is an anaerobe. In other words, one of those bacteria that didn't need oxygen in order to grow that, for example, Flagyl would treat.

Q. Okay. Does that give you clinical evidence that had she been continued on Maxipime and Flagyl that they would have had some effect with regards to the condition as we see it on the 24th?

A. Well, like I said, most anaerobes are sensitive or susceptible to Flagyl. And she had previously been on Flagyl and at this time she is not. So I would have expected that that would be an appropriate antibiotic that would have covered the organism that's causing that foul smell.

Dr. Berkowitz, the Hospital's expert, offered several other explanations for the smell, including necrotic tissue, dead cancer tissue, and the Candida infection.[8] As **538** noted, Casas's son noticed the smell after the incision was opened to drain the abscess, which Dr. Daller admitted was likely caused by Candida.

[16] [17] Here again, there are competing explanations for the smell, which amounts to no more than circumstantial evidence of some kind of infection or possibly dying tissue. Because there is no direct evidence of the infection and the circumstantial evidence is meager, we "must consider not just favorable but all the circumstantial evidence, and competing inferences as well." *City of Keller,* 168 S.W.3d at 814. Courts should not usurp the jury's role as fact finder, nor should they question the jury's right to believe one witness over another. But when reviewing a verdict for sufficiency of the evidence, courts need not—indeed, must not—defer to the jury's findings when those findings are not supported by credible evidence. When the evidence compels the jury to guess if a vital fact exists, a reviewing court does not undermine the jury's role by sustaining a no-evidence challenge. The evidence in this case—being consistent with an anaerobic infection that was treatable by Flagyl, a fungal infection that was not, or even with dying tissue, cancerous or otherwise—did not provide the jury a reasoned basis from which to infer the presence of a negligence—induced infection. Because the jury could not reasonably infer an infection caused by the Hospital's negligence, we agree with the Hospital that no evidence supports the jury's verdict.

We understand the Casas family's predicament and frustration at the Hospital's conduct, and we recognize the difficulty of proving that the lapsed prescriptions caused a painful infection. But the Casases shouldered that burden and must prove the causal link with reasonable certainty. In that quest, the Casases offered the testimony of Dr. Daller, but he did not explain why an undetected, anaerobic infection is medically more probable than one based on the known infections and the dying tissue, leaving the jury to guess if the lapsed prescriptions caused additional pain and suffering. Without probative medical testimony that the lapse caused—by means of an infection treatable by Maxipime and Flagyl—more pain than the cancer, the surgery, and the other infections already inflicted, there is no legally sufficient evidence of causation. Dr. Daller did not provide that causal link; accordingly, we hold that his testimony is legally insufficient to support the jury's verdict. Because the Casases failed to prove causation, we reverse the judgment of the court of appeals and render judgment that the Casases take nothing.

### B. Adequacy of the Expert Report

[18] [19] In his petition, Dr. Jelinek raises a single issue: whether the trial court abused its discretion by denying his motion for sanctions and dismissal because the Casases' expert report was deficient under former article 4590i § 13.01, the statute in effect at the time. *See* TEX.REV.CIV. STAT. art. 4590i § 13.01. Article 4590i required the report to provide "a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that **539** failure and the injury, harm, or damages claimed." *Id.* § 13.01(r)(6). "If a plaintiff timely files an expert report and the defendant moves to dismiss because of the report's inadequacy, the trial court must grant the motion '*only if* it appears to the court, after hearing, that

the report does not represent a *good faith effort* to comply with the definition of an expert report in Subsection (r)(6) of this section.' " *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 51–52 (Tex.2002) (per curiam) (quoting § 13.01(*l* )). Dismissal for failure to serve an adequate expert report also carried mandatory sanctions, requiring an award to the defendant of his costs and attorney's fees against the plaintiff or the plaintiff's attorney. *See Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 877 (Tex.2001) (citing § 13.01(e)).

[20] [21] We have defined a "good-faith effort" as one that provides information sufficient to (1) "inform the defendant of the specific conduct the plaintiff has called into question," and (2) "provide a basis for the trial court to conclude that the claims have merit." *Wright,* 79 S.W.3d at 52 (citing *Palacios,* 46 S.W.3d at 879). All information needed for this inquiry is found within the four corners of the expert report, which need not "marshal all the plaintiff's proof" but must include the expert's opinion on each of the three main elements: standard of care, breach, and causation. *Id.* Importantly for this case, the "report cannot merely state the expert's conclusions about these elements," but " 'the expert must explain the basis of his statements to link his conclusions to the facts.' " *Id.* (quoting *Earle v. Ratliff,* 998 S.W.2d 882, 890 (Tex.1999)). "A report that merely states the expert's conclusions about the standard of care, breach, and causation" does not fulfill the two purposes of a good-faith effort. *Palacios,* 46 S.W.3d at 879.

[22] [23] We review the trial court's grant or denial of a motion for sanctions and dismissal under the abuse-of-discretion standard. *Palacios,* 46 S.W.3d at 877–78. A district court "abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles." *Wright,* 79 S.W.3d at 52 (citing *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985)).

Dr. Jelinek argues that the Casases' report is deficient in two ways, failing (1) to state the applicable standard of care, and (2) to provide more than conclusory statements of causation. We focus on the latter. Dr. Daller's report concluded that Dr. Jelinek's breach of the appropriate standard of care in "reasonable medical probability, resulted in a prolonged hospital course and increased pain and suffering being experienced by Ms. Casas." Aside from repeating essentially the same phrase twice more, the report says nothing more regarding causation. The Casases argue this statement is sufficient to meet the good-faith requirement. We disagree.

An expert cannot simply opine that the breach caused the injury. Stated so briefly, the report fails the second

*Palacios* element—it does not give the trial court any reasonable basis for concluding that the lawsuit has merit. *See* 46 S.W.3d at 879. An expert's conclusion that "in medical probability" one event caused another differs little, without an explanation tying the conclusion to the facts, from an *ipse dixit,* which we have consistently criticized. *See Pollock,* 284 S.W.3d at 818 (citing *Burrow,* 997 S.W.2d at 235); *Earle,* 998 S.W.2d at 890 ("An expert's simple *ipse dixit* is insufficient to establish a matter; rather, the expert must explain the basis of his statements to link his conclusions to the facts."). Instead, the expert must go further and explain, to a reasonable degree, **\*540** how and why the breach caused the injury based on the facts presented. While we have said that no "magical words" need be used to meet the good-faith requirement, mere invocation of the phrase "medical probability" is likewise no guarantee that the report will be found adequate. *See Wright,* 79 S.W.3d at 53.

Under these standards, the Casases' report is conclusory on causation. It offers no more than a bare assertion that Dr. Jelinek's breach resulted in increased pain and suffering and a prolonged hospital stay. Beyond that statement, the report offers no explanation of how the breach caused the injury. Again, the plaintiff need not marshal all of his proof in the report, but he must include sufficient detail to allow the trial court to determine if the claim has merit. Because the Casases' report lacks any explanation linking the expert's conclusion to the relevant facts, we hold that the trial court abused its discretion by denying Dr. Jelinek's motion and the court of appeals erred by affirming that ruling.[9] *See id.* at 52. Accordingly, we remand the case to the trial court for an award of attorney's fees and costs[10] under former article 4590i § 13.01(e) against the Casases and their counsel.[11]

#### **\*541 III. Conclusion**

For the foregoing reasons, we reverse the court of appeals' judgment, render judgment that the Casases take nothing, and remand to the trial court for an award of Dr. Jelinek's attorney's fees and costs consistent with this opinion.

Chief Justice JEFFERSON filed an opinion, dissenting in part, in which Justice GREEN and Justice LEHRMANN joined.

Justice LEHRMANN filed an opinion, dissenting in part.

Chief Justice JEFFERSON, joined by Justice GREEN and Justice LEHRMANN, dissenting in part.

We must decide whether an expert report gave a "fair summary" of the expert's opinions regarding standard of care, failure to meet the standard, and the link between that failure and the patient's damages. We must consider the expert's opinions "as of the date of the report." TEX.REV.CIV. STAT. art. 4590i § 13.01(r)(6) (repealed 2003). To do so, we must disregard today's holding that, at trial, there was no evidence linking the discontinuation of antibiotics to increased suffering by Casas. The expert report submitted in this case gave fair notice of a meritorious claim—that the doctor failed to ensure that his patient received antibiotics, thereby increasing her pain and suffering. I would affirm the court of appeals' judgment with respect to the doctor.

### I. Background

Eloisa Casas, a patient recently diagnosed with colon cancer, was admitted to Rio Grande Hospital for abdominal pain. The cancer had perforated her colon, the contents of which leaked into her abdominal cavity, causing an abscess. After the doctor drained and surgically removed the abscess, he discovered that Casas had an E. coli infection, for which the doctor prescribed two antibiotics. Although those prescriptions were supposed to have been renewed five days later, they lapsed. Casas contends this mistake occurred because the doctor failed to ensure that hospital staff complied with his renewal order. During the four days after the prescriptions expired, Casas's surgical incision began to emit a putrid odor. She developed several infections in addition to E. coli, exacerbating her pain and extending her stay in the hospital. Casas died two months after she was discharged.

Casas's estate sued the Hospital and two of the treating doctors, Dr. Garcia–Cantu and Dr. Jelinek, for negligently causing Mrs. Casas "grievous embarrassment and humiliation, as well as excruciating pain the remainder of her life which she would not have suffered to such degree if properly diagnosed, treated and cared for...." The trial court denied Dr. Jelinek's motion to dismiss the case against him. Nevertheless, the estate nonsuited both doctors more than a year before Casas's claim against the Hospital was tried to a jury. At that trial, the jury found the hospital 90% negligent, and each doctor 5% negligent. The trial court rendered judgment against the hospital, and the court's order non-suiting Dr. Jelinek "with prejudice" merged into that final judgment.

Dr. Jelinek and the hospital appealed the trial court's judgment. The hospital complained that the evidence was legally insufficient to support the verdict. Dr. Jelinek complained that the trial court improperly denied him attorney's fees, as the expert report was not a good faith effort to comply with statutory requirements. The court of appeals affirmed, 2008 WL 2894889, *9–*10, 2008 Tex.App. LEXIS 5647, *28–*29 (Tex.App.-Corpus Christi July 29, 2008), and the appellants below are now petitioners here. I fully join the **\*542** Court's rendition of judgment for the hospital. I disagree with the Court's holding as to the doctor.

### II. Good faith effort; fair summary

Former article 4590i provided that "[a] court shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent a good faith effort to comply with the definition of an expert report in [the statute]." TEX.REV.CIV. STAT. art. 4590i § 13.01(*l*). "That definition requires, as to each defendant, a fair summary of the expert's opinions about the applicable standard of care, the manner in which the care failed to meet that standard, and the causal relationship between that failure and the claimed injury." *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 878 (Tex.2001) (citing TEX.REV.CIV. STAT. art. 4590i § 13.01(r)(6)). Because an expert report is filed long before discovery is complete, we cannot judge it according to what subsequent discovery reveals or how the evidence develops at trial. The question is whether the report fairly summarizes the malpractice elements before the case is tested in a full adversary process. For that reason, "to avoid dismissal, a plaintiff need not present evidence in the report as if it were actually litigating the merits. The report can be informal in that the information in the report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial." *Id.* at 879.

The report must also give the defendant notice of the conduct the plaintiff challenges, and the trial court must have a basis to determine whether the claim has merit. *Id.* The dividing line between a sufficient and an inadequate report is impossible to draw precisely. We have said, therefore, that the determination must be made in the first instance by the trial court, and review of that decision asks not how an appellate court would have resolved the issue, but instead whether the trial court abused its discretion. *See, e.g., Jernigan v. Langley,* 195 S.W.3d 91, 93 (Tex.2006); *Walker v. Gutierrez,* 111 S.W.3d 56, 63 (Tex.2003).

### III. Dr. Daller's report

Dr. Daller is a physician and an expert on intra-abdominal abscesses and infection. His report states that a doctor treating a patient like Casas must ensure that the antibiotics he prescribes are actually administered. Despite that standard, Dr. Daller states that antibiotics prescribed for Ms. Casas were not administered from July 17 through July 23, even though "[t]here [wa]s no order to discontinue the antibiotic therapy." He concluded that Dr. Jelinek breached the standard of care by his "failure to recognize that the antibiotics were not being administered as ordered." Dr. Daller concludes that "[t]his breach in the standard of care ..., within reasonable medical probability, resulted in a prolonged hospital course and increased pain and suffering...."

### IV. Dr. Daller gave a "fair summary" of the required standard of care and how the allegedly inadequate care fell below that standard.

The Court concludes that Dr. Daller's report lacks the detail necessary to conclude that the estate's lawsuit has merit. But the cases it cites as support involve situations in which a hindsight view is entirely appropriate. *Earle v. Ratliff,* for example, is a summary judgment case; it presents the higher evidentiary standard that *Palacios* rejected for expert reports. *Earle v. Ratliff,* 998 S.W.2d 882, 890 (Tex.1999) ("Summary judgment can be granted on the affidavit of an interested expert **\*543** witness, ... but the affidavit must not be conclusory.... [R]ather, the expert must explain the basis of his statements to link his conclusions to the facts."). Similarly, the standard employed in *City of San Antonio v. Pollock,* 284 S.W.3d 809, 817–18 (Tex.2009), also cited by the Court, is inapplicable here, since it examined an expert report under the "no evidence" standard of review. *See* ——— S.W.3d at ———.

In *Palacios* we held that an expert report that failed to articulate a standard of care or explain how the defendant hospital breached that standard was not a good faith effort to comply with the statutory requirements. *Palacios,* 46 S.W.3d at 880. The expert in that case blamed the hospital for taking no action to prevent a patient from falling out of his bed, even though the patient "had a habit of trying to undo his restraints." *Id.* at 879–880. The report, as such, was not a fair summary of the evidence because it neglected to articulate what actions the hospital *should* have taken that it did not. *Id.* at 880. Thus, the trial court

did not abuse its discretion by dismissing the plaintiff's claim for lack of a good faith effort to summarize the expert's opinions.

Subsequently, in *Bowie Memorial Hospital v. Wright,* we held that the trial court did not abuse its discretion in concluding that an expert report failed to comply with the statute, as the report did not "establish how any act or omission of employees of Bowie Memorial Hospital caused or contributed to [the patient's] injuries." *See Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 51–53 (Tex.2002) (quoting the expert in that case as speculating, "I do believe that it is reasonable to believe that if the x-rays would have been correctly read and the appropriate medical personnel acted upon those findings then [the plaintiff] would have had the possibility of a better outcome."). We observed that a report must satisfy *Palacios*'s two-part test. *Id.* at 52. Because the report "lack[ed] information linking the expert's conclusion (that [the plaintiff] might have had a better outcome) to [the defendant's] alleged breach (that it did not correctly read and act upon the x-rays), the trial court could have reasonably determined that the report was conclusory." *Id.* at 53.

In each of those cases, the trial court could not have evaluated the claim's merit without speculating about actions the defendant could have taken to prevent injury. No such speculation is required here. Dr. Daller states that had the antibiotics been administered from July 17 through July 23, Eloisa Casas would have suffered less. Dr. Daller could have stated that conclusion in greater detail, of course, but "[a] report need not marshal all the plaintiff's proof." *Palacios,* 46 S.W.3d at 878. Daller's report includes his opinions on (1) the applicable standard of care (to maintain vigilance over a patient's treatment), (2) the manner in which the care failed to meet that standard (failing to ensure the treatment he ordered was actually administered), and (3) the causal connection between the failure and the claimed injury (without the antibiotics, the patient's pain and suffering increased and she required additional hospitalization).

A "good faith effort" does not require that the report "meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial"; therefore, an expert report does not fail the good faith effort test merely because it may not later prove legally sufficient to support a judgment. *Id.* at 879. So, here, whether the Casas estate ultimately amassed sufficient proof in an adversarial trial is beside the point; the claim itself was far from frivolous. *See id.* at 878 (noting that "one purpose of the expert-report requirement is to deter frivolous **\*544** claims"). The law imposes a penalty for filing a frivolous suit. Only by today's decree does it also punish a claimant for failing

to win an arguably meritorious case. *Cf. TransAmerican Natural Gas Corp. v. Powell,* 811 S.W.2d 913, 918 (1991) (holding that "sanctions cannot be used to adjudicate the merits of a party's claims or defenses unless a party's hindrance of the ... process justifies a presumption that its claims or defenses lack merit.").

I agree with the Court that the Estate failed to prove causation at trial; I disagree that, as to Dr. Jelinek, the expert report was not a good faith attempt to comply with the statute. I respectfully dissent in part from the Court's judgment.

Justice LEHRMANN, dissenting in part.

I fully join Chief Justice Jefferson's dissent. I write separately, however, to highlight the incongruity inherent in the Court's decision to remand the case for an award of attorney's fees and costs under former article 4590i § 13.01(e), given this case's circumstances. *See* TEX.REV.CIV. STAT. art. 4590i § 13.01(e) (repealed 2003)[1]. The Court presumes that Dr. Michael Jelinek is entitled to attorney's fees because the expert report filed by Eloisa Casas's estate[2] was, on appeal, determined to be insufficient. But, after a pre-trial hearing was held on the defendant's motion to dismiss the lawsuit, the trial court rejected Dr. Jelinek's contention that the report was inadequate; consequently, the Casases had no opportunity to rectify any deficiencies as the statute and our precedent would have allowed.

Section 13.01(e) of article 4590i provided for an order awarding attorney's fees and costs if a health care claimant failed to supply an expert report within the time required under subsection (d)—180 days. But the statute provided several avenues for health care claimants to obtain an extension of the 180–day deadline, including section 13.01(g). That provision required the trial court to grant a thirty-day extension of the statutory deadline if a claimant's failure to provide an expert report was not intentional or the result of conscious indifference. And we have expressly held that "a party who files a timely but inadequate expert report may seek relief under the grace

period provisions of section 13.01(g)." *Walker v. Gutierrez,* 111 S.W.3d 56, 62 (Tex.2003). Thus, health care claimants could receive an opportunity to rectify deficiencies in a report if they could show that they did not intentionally, or with conscious indifference, submit an inadequate report.

Here, the Casases never had the chance to request an opportunity to cure any deficiencies in their report because the trial court determined that the report adequately complied with section 13.01(d). In *Gutierrez,* we were guided by our recognition that it would be "perverse" to allow a claimant who filed no report a second chance to comply with the statute's expert report requirement, while "punishing those who attempt to comply with the statute but fail." *Id.* In this case, perversely, the Casases may have been in a better position **\*545** than they are now if the trial court had found that the report was inadequate; they might have had an opportunity to eliminate any deficiencies.

I agree fully with Chief Justice Jefferson that the report represents a good-faith effort to comply with section 13.01. Even if it did not, however, I would remand the case to allow the Casases an opportunity to show that their failure to present an adequate report was not intentional or the result of conscious indifference. *See City of DeSoto v. White,* 288 S.W.3d 389, 401 (Tex.2009) (remanding in the interest of justice *sua sponte* to allow police officer "to make an appellate election with full knowledge of his appellate rights and with knowledge of" the guidance provided in Court's opinion). In my view, the Casases should not be assessed attorney's fees and costs if they can make the showing section 13.01(g) requires and then submit a report complying with the statute. For these reasons, as well as those expressed by Chief Justice Jefferson, I respectfully dissent in part.

**Parallel Citations**

54 Tex. Sup. Ct. J. 272

Footnotes

[1]     Francisco Casas and Alfredo DeLeon Jr., Casas's husband and son, respectively, serve as personal representatives of her estate. We refer to them collectively as "the Casases."

[2]     Columbia Rio Grande Regional Healthcare, L.P., d/b/a/ Rio Grande Regional Hospital.

[3]     Because we conclude legally insufficient evidence supports the jury's verdict, we do not reach the Hospital's second issue— whether the Hospital preserved error regarding its proposed unavoidable accident instruction.

4    There was a several-day lag between taking the culture and ordering the prescription, presumably to allow the culture to grow and to transmit the results to the treating physicians. Thus, the Diflucan was prescribed on July 21 and the Vancomycin on July 23.

5    *See* Act of May 5, 1995, 74th Leg., R.S., ch. 140, § 1, 1995 Tex. Gen. Laws 985, 986, *amending* the Medical Liability and Insurance Improvement Act of Texas, Act of May 30, 1977, 65th Leg., R.S., ch. 817, 1977 Tex. Gen. Laws 2039, 2041, *repealed by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.09, 2003 Tex. Gen. Laws 847, 884. Former article 4590i § 13.01 was replaced by Texas Civil Practice and Remedies Code § 74.351, as amended.

6    When asked if the lapsed prescriptions affected Casas's hospital stay, Dr. Daller equivocated:
     A. I think that it certainly did impact it. However, I cannot quantitate that because there are multiple variables that are present in a clinical condition. Whether it lengthened her stay by one day, two days, three days, I cannot say that. What I would say from a scientific standpoint is that for four and a half days she did not receive appropriate therapy. Had she received the appropriate therapy then *you would expect* her length of stay to be shortened somewhat. To quantitate that, I could not do that.
     ....
     A. Obviously, not receiving antibiotics is not going to shorten your stay. Therefore, *if it impacted the stay* it must have lengthened it. (emphases added).

7    Admittedly, anaerobic bacteria are hard to culture because they are averse to oxygen.

8    Dr. Berkowitz testified:
     I think that there are a number of things that can cause things smelling bad besides just infection. Tissue that dies doesn't smell good. There's bacteria and products released by the dead tissue that don't smell good.
     And we know based on the pathology report of the cancer that they took out of her abdomen, that this had grown enough that it was dying. In other words, it was probably outgrowing it's [sic] blood supply and was starting to die. That in and of itself can smell bad. Then you have a wound that is infected; although Candida itself does not typically smell bad, not like something dead. It smells funky and people don't like the way it smells. The wound itself when it wasn't healing was probably having some necrotic tissue, as well, or dead tissue that is in the wound. I'm sure that smelled bad, as well. And they were never able to completely get rid of all that dead cancer tissue that was in her abdomen.
     I think there's a number of reasons why she would have had a bad smell, none of which can be explained by four or five days of not getting Flagyl [or] Maxipime.

9    In his dissent, CHIEF JUSTICE JEFFERSON argues that an expert report need not meet the legal sufficiency requirements necessary to support a judgment and suggests that we hold it must. We agree that an expert report need not "meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial." *Palacios,* 46 S.W.3d at 879. But, as we stated earlier, the report must provide more than conclusory statements concerning applicable standards of care, breach of those standards, and causation. *See id.* An expert report must instead, within its four corners, provide some explanation as to each of these elements. TEX.REV.CIV. STAT. art. 4590i § 13.01(r)(6); *Wright,* 79 S.W.3d at 52. The report here offered only a conclusory statement concerning causation with no explanation as to how the lapse in antibiotic treatment resulted in longer hospitalization, increased pain and suffering, or ultimately Casas's death.

10   In her dissent, JUSTICE LEHRMANN indicates that (1) she would remand the case to allow the Casases an opportunity to show that their failure to present an adequate report was not intentional or the result of conscious indifference, and (2) Dr. Jelinek should not be entitled to attorney's fees and costs if the Casases can make this showing and submit an adequate report. We note that the Casases did not request a remand of this nature, nor brief the attorney's fees issue. *See State v. Brown,* 262 S.W.3d 365, 370 (Tex.2008) (observing that "[a] party generally is not entitled to relief it does not seek" and refusing to sua sponte grant relief that was not sought); *Fed. Sign v. Tex. S. Univ.,* 951 S.W.2d 401, 410 (Tex.1997) (noting that ordinarily, failure to brief an argument waives error on appeal); TEX.R.APP. P. 38.1(h).

11   We briefly note that under former article 4590i a trial court's order denying a motion to dismiss premised on an inadequate expert report was not immediately appealable, as it now is under Texas Civil Practice and Remedies Code §§ 51.014 and 74.351. Nor did we definitively say that mandamus review was appropriate for such orders until almost four years after the trial court denied Dr. Jelinek's motion for dismissal and sanctions. *See In re McAllen Med. Ctr., Inc.,* 275 S.W.3d 458, 461–62 (Tex.2008). Thus, we do not fault Dr. Jelinek for waiting until final judgment to seek review of the trial court's order. *See Hernandez v. Ebrom,* 289 S.W.3d 316, 318 (Tex.2009) ("Generally, appeals may only be taken from final judgments...."). We mention this point because we have since cautioned that a defendant—having foregone the interlocutory appeal now available—risks losing the right to appeal following final judgment if, after a trial on the merits, the jury finds the defendant liable. *See id.* at 321. Even if the present statute applied here, this caution would not bar Dr. Jelinek's appeal because he was not a party at trial, having been nonsuited earlier. We will not bar a nonsuited defendant's appeal after final judgment because the jury finds him liable at a former codefendant's trial. Such a defendant did not call or cross-examine witnesses, present

evidence, or otherwise participate at trial and should not be bound by what happens there.

[1]     *See* Act of May 5, 1995, 74th Leg., R.S., ch. 140, § 1, 1995 Tex. Gen. Laws 985, 986, *amending* the Medical Liability and Insurance Improvement Act of Texas, Act of May 30, 1977, 65th Leg., R.S., ch. 817, 1977 Tex. Gen. Laws 2039, 2041, *repealed by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.09, 2003 Tex. Gen. Laws 847, 884. For ease of reference, I will refer to the relevant provisions as they were identified in article 4590i.

[2]     I refer to the estate, which was represented by Casas's husband and son, as "the Casases."

---

**End of Document**                                              © 2015 Thomson Reuters. No claim to original U.S. Government Works.

---

195 S.W.3d 91
Supreme Court of Texas.

Floyd E. JERNIGAN, M.D., Petitioner,
v.
Marie LANGLEY, Individually and as
Representative of the Estate of John Langley and
Mariah Langley, a Minor, Respondent.

No. 05–0299. | June 9, 2006.

**Synopsis**
**Background:** Wife of patient who died two days after
emergency surgery brought medical malpractice action
against attending physician and others. The 19th District
Court, McLennan County, Ralph Strother, J., dismissed
action against attending physician for failure to provide an
expert report that satisfied the requirements of the
Medical Liability and Insurance Improvement Act. Wife
appealed. The Court of Appeals, 76 S.W.3d 752, reversed.
Attending physician petitioned for further review. The
Supreme Court, 111 S.W.3d 153, reversed. On remand,
the Court of Appeals initially affirmed the district court's
dismissal, but upon grant of wife's motion for rehearing,
the Court of Appeals, 2005 WL 486759, reversed.
Attending physician petitioned for review.

**Holdings:** The Supreme Court held that:

[1] expert reports failed to identify with specificity any
action or inaction by attending physician that breached the
applicable standard of care, and thus reports failed to
comply with the Act, and

[2] expert reports could not constitute a good faith effort to
comply with the Act, and thus trial court had no discretion
but to dismiss claims against attending physician.

Judgment of Court of Appeals reversed.

**Attorneys and Law Firms**

**\*92** Greg White, Nancy Napier Morrison, Waco, Bob
Burleson, Naman, Howell, Smith & Lee, L.L.P., Temple,
for Petitioner.

Thomas B. Cowart, Law Offices of Windle Turley, P.C.,
Dallas, for Respondent.

**Opinion**

PER CURIAM.

The issue in this medical malpractice case is whether the
plaintiff's expert reports meet the specificity requirements
of section 13.01 of the Medical Liability and Insurance
Improvement Act (the "MLIIA"). Former TEX. REV.
CIV. STAT. art. 4590i, § 13.01.[1]

In September 1998, Marie Langley brought suit alleging
that the death of her 46–year–old husband, John Langley,
resulted from the negligence of Providence Hospital in
Waco and several physicians, including Dr. Floyd
Jernigan. The trial court dismissed Langley's suit against
Dr. Jernigan for failure to provide an expert report that
satisfied the requirements of section 13.01 of the MLIIA.
The court of appeals reversed the trial court's dismissal.
We reverse the judgment of the court of appeals and
dismiss with prejudice Langley's claims against Dr.
Jernigan.

On the morning of October 6, 1996, John Langley went to
Providence Hospital complaining of stomach pain. An
abdominal x-ray was performed, and John was diagnosed
with fecal impaction. He was given a gallon of
GoLYTELY to drink at home and was instructed to return
that evening. He returned a few hours later in acute pain
and was admitted to the hospital. John's condition
worsened, and he underwent emergency surgery that
evening. He fared poorly overnight and was operated on
again the following day. John died the next morning,
October 8, 1996.

Marie Langley filed this suit in September 1998, and filed
two timely expert reports thereafter. In June 2000, Dr.
Jernigan filed a motion to dismiss with prejudice under
section 13.01(e) of the MLIIA based on alleged
deficiencies in Langley's expert reports. At the hearing on
the motion to dismiss, Langley argued that Dr. Jernigan
had waived his statutory right to seek dismissal because
he had waited more than 600 days to challenge the
reports. Langley also moved for an extension of time to
allow the late filing of a third expert report. The trial court
denied Langley's motion for an extension of time, and
then severed and dismissed Langley's claims against Dr.
Jernigan. The court of appeals reversed, holding that Dr.
Jernigan had impliedly waived his rights under section
13.01. 76 S.W.3d 752 (Tex.App.—Waco 2002). This
Court disagreed, reversing and remanding the case back
to the court of appeals. 111 S.W.3d 153 (Tex.2003).

On remand, the court of appeals initially affirmed the trial court's dismissal, **93** No. 10–00–00373–CV, 2004 WL 1211607, 2004 Tex.App. LEXIS 4972 (June 2, 2004), but nine months later issued a new opinion holding that Langley's reports were adequate under section 13.01, and therefore the trial court abused its discretion in dismissing Langley's claims against Dr. Jernigan, 2005 WL 486759, 2005 Tex.App. LEXIS 1687 (Mar. 2, 2005). Alternatively, the court concluded that the trial court abused its discretion in refusing to grant Langley a 30–day grace period under section 13.01(g) because Langley's failure to comply was not intentional or the result of conscious indifference. Id. 2005 WL 486759, at *5, 2005 Tex.App. LEXIS 1687 at *10–18.

[1] Under section 13.01(d)(1) of the MLIIA, a plaintiff bringing a health care liability claim must furnish an expert report within 180 days of filing suit. Former TEX. REV. CIV. STAT. art. 4590i, § 13.01(d)(1). The expert report need not marshal every bit of the plaintiff's evidence, but it must provide "a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm or damages claimed." Id. § 13.01(r)(6). If a claimant fails to file an adequate expert report timely, the trial court must dismiss a claimant's suit with prejudice upon motion by the defendant. Id. § 13.01(e). The trial court must grant a motion challenging the adequacy of an expert report only if the report does not represent a good faith effort to comply with section 13.01(r)(6)'s definition of an expert report. Id. § 13.01(l). Finally, upon timely motion, the trial court must grant the claimant a 30–day grace period to comply with the statute if the trial court finds that the claimant's failure to comply was "not intentional or the result of conscious indifference but was the result of an accident or mistake." Id. § 13.01(g).

[2] [3] A trial court's decision to dismiss under section 13.01(e) is reviewed for abuse of discretion. Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios, 46 S.W.3d 873, 877–78 (Tex.2001). Denial of a section 13.01(g) grace period is also reviewed for abuse of discretion. Walker v. Gutierrez, 111 S.W.3d 56, 63 (Tex.2003).

We held in Palacios that in order to constitute a good-faith effort under section 13.01(l), an expert report must "discuss the standard of care, breach, and causation with sufficient specificity to inform the defendant of the conduct the plaintiff has called into question and to provide a basis for the trial court to conclude that the claims have merit." 46 S.W.3d at 875.

[4] Limiting our section 13.01(l) adequacy analysis to the four corners of Langley's two timely-filed expert reports, id. at 878, it is notable that one report does not mention Dr. Jernigan at all, and the other report only mentions him in this single sentence: "At 4:30 p.m. [John Langley's] case was discussed with Dr. Jernigan and at 4:50 p.m. a lactulose enema was ordered."

Dr. Jernigan appears in only one line of one report. This passing reference does not identify with specificity any action or inaction by Dr. Jernigan that breached the applicable standard of care. This perfunctory mention alleges no misconduct whatsoever, much less discusses the required elements with "sufficient specificity" to inform Dr. Jernigan of "the conduct the plaintiff has called into question." Id. at 875.

As to the standard of care applicable to Dr. Jernigan, the court of appeals found that the following stand-alone statement in one of the reports captured the standard **94** of care for each defendant-physician: "surgical consultation should have been obtained once the x-rays demonstrated obstruction." 2005 WL 486759, at *2, 2005 Tex.App. LEXIS 1687 at *8–9. Even assuming arguendo that the standard of care applicable to every doctor reviewing such x-ray results is to obtain an immediate surgical consult, neither of Langley's expert reports asserts that Dr. Jernigan was ever provided with the x-ray results or had any independent duty to review them. Instead, the court of appeals indulges multiple inferences that are simply unsupported by the scant reports.

Moreover, according to the reports, the x-rays were taken on John Langley's first visit to Providence Hospital at 6:40 a.m. on October 6, 1996, whereas Dr. Jernigan did not become involved in John's treatment until the case was "discussed" with him at 4:30 p.m., nearly ten hours later. The expert reports state that the surgeons were called at 6:40 p.m., but do not assert that Dr. Jernigan personally failed to order a surgical consult prior to that time or that the roughly two-hour gap between when the surgeons were called and when they arrived at 8:30 p.m. was attributable to Dr. Jernigan.

We agree with the dissent below that Langley's expert reports failed to comply with section 13.01 because "[e]ven if we assume that the reports address the standard of care with respect to each doctor, ... neither report addresses how Dr. Jernigan breached the standard or how his unstated breach of duty caused John's death with sufficient specificity for the trial court, and Jernigan, to determine that the allegations against Jernigan had any merit." 2005 WL 486759, at *14, 2005 Tex.App. LEXIS 1687 at *51–52 (Gray, C.J., dissenting). A glancing

statement that John's case was "discussed" with Dr. Jernigan sheds no light whatsoever on what Dr. Jernigan allegedly did wrong, much less how his alleged error(s) proximately caused John's death. Thus, we conclude that the reports omitted statutory elements of Marie Langley's claim against Dr. Jernigan.

[5] Because Langley's expert reports omit at least one of the three specifically enumerated requirements of section 13.01(r)(6), they cannot constitute a good faith effort to meet the statutory requirements. *Palacios,* 46 S.W.3d at 879. Accordingly, the trial court had no discretion but to conclude, as it did here, that Langley's claims against Dr. Jernigan must be dismissed. *Id.* at 880.

The trial court did not abuse its discretion in dismissing Langley's claims against Dr. Jernigan. Accordingly, without hearing oral argument, we reverse the court of appeals' judgment and dismiss with prejudice Langley's claims against Dr. Jernigan. TEX. R. APP. P. 59.1.

**Parallel Citations**

49 Tex. Sup. Ct. J. 717

Footnotes

[1]   Act of May 5, 1995, 74th Leg., R.S., ch. 140, § 1, 1995 Tex. Gen. Laws 985, 985–87 (adding expert report requirement, at former TEX. REV. CIV. STAT. art. 4590i, § 13.01(d)), *repealed and recodified as amended by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, §§ 10.01, 10.09, 23.02(a), (d), 2003 Tex. Gen. Laws 847, 864, 884, 898–99 ("House Bill 4") (adopting chapter 74 of the Texas Civil Practice and Remedies Code, applicable only to actions filed on or after September 1, 2003, and continuing prior law in effect for actions filed before that date) (current version at TEX. CIV. PRAC. & REM CODE § 74.351).

**End of Document**   © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 4179454
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR DESIGNATION
AND SIGNING OF OPINIONS.

*MEMORANDUM OPINION*
Court of Appeals of Texas,
Austin.

Kristen KOCUREK, M.D., and Texas MedClinic,
Appellants
v.
Anthony D. COLBY, Appellee.

No. 03–13–00057–CV. | Aug. 22, 2014.

From the District Court of Travis County, 419th Judicial
District No. D–1–GN–12–000186, Tim Sulak, Judge
Presiding.

**Attorneys and Law Firms**

Anthony D. Colby, Austin, TX, pro se appellee.

Laura A. Macom, George F. Evans Jr., Brett B. Rowe,
Evans & Rowe, PC, San Antonio, TX, for appellant.

Before Chief Justice JONES, Justices GOODWIN and
FIELD.

*MEMORANDUM OPINION*

SCOTT K. FIELD, Justice.

**\*1** Appellants Kristen Kocurek, M.D., and Texas
MedClinic appeal from the trial court's denial of their
motion to dismiss appellee Anthony D. Colby's[1] suit for
medical malpractice based on Colby's alleged failure to
provide an adequate expert report as required by chapter
74 of the Texas Civil Practice and Remedies Code. *See*
Tex. Civ. Prac. & Rem.Code § 74.351. We will reverse
the trial court's judgment and remand for dismissal and a
determination of attorneys' fees.

**FACTUAL AND PROCEDURAL BACKGROUND**

Colby was under Kocurek's care for approximately two
months after sustaining injuries on the job; his primary
medical complaints were numbness and pain in his left
hip and tingling in his right hand. According to Colby,
Kocurek performed no physical examination on him and
instead had only oral conferences with him. Further,
Kocurek indicated to him orally that she would refer him
to a specialist, but never did.

After receiving treatment from Kocurek, Colby moved
out of state and transferred his care to an orthopedic
specialist there. Shortly thereafter, however, Colby
returned to see Kocurek, claiming new symptoms.
According to Colby's petition, at that visit Kocurek again
failed to examine him physically, ignored his symptoms,
and displayed an inappropriate demeanor toward him.

Colby filed suit against Kocurek and Texas MedClinic,[2]
alleging departures from accepted standards of medical
care that proximately resulted in injuries to him. Colby
alleged that Kocurek failed to meet the applicable
standards of care in failing to (1) perform a thorough
examination of him; (2) secure appropriate treatment for
him; (3) properly diagnose and treat him; (4) refer him to
or consult with a specialist; and (5) monitor his condition.
Colby also made a claim for fraudulent
misrepresentation/common-law fraud relating to
Kocurek's documentation of his injuries and treatment. In
addition, Colby claimed that Kocurek's actions caused (1)
a pinched nerve in his right hand to become entrapped, (2)
his left hip to develop bursitis and soft-tissue nerve
damage, (3) limited range of motion in his hip, as well as
constant pain and nerve damage that will worsen with
age, and (4) a need for surgery in his right hand due to
numbness, tingling, and serious pain.

After filing suit, Colby served appellants with the expert
report of Dr. Ronald Devere, a neurologist, to comply
with the expert-report requirement of section 74.351 of
the Texas Civil Practice and Remedies Code. *See id.*
Appellants then filed a motion to dismiss the suit,
claiming that Devere's expert report failed to satisfy the
statutory elements under section 74.351. After a hearing,
the trial court agreed with appellants that Devere's expert
report was deficient, but granted Colby a 30–day
extension to cure the deficiencies. In response to the trial
court's ruling, Colby served appellants with an amended
report from Devere. Appellants again filed a motion to
dismiss, contending that Devere's amended report
remained deficient. After a hearing, the trial court denied
appellants' motion to dismiss.[3] Appellants then filed this
interlocutory appeal. *See id.* § 51.014(a)(9).

**ANALYSIS**

**Jurisdiction**

**\*2** In response to appellants' appeal, Colby contends that this Court lacks jurisdiction over the appeal. Colby appears to argue that once a trial court grants a 30–day extension for a plaintiff to file an amended report and the plaintiff files an amended report, no appeal may be taken with regard to the trial court's ruling on the adequacy of the amended report. Colby argues that, in any event, a party may not appeal the denial of a motion to dismiss relating to the *adequacy* of the expert report. In support of his argument, Colby relies on this Court's opinion in *Academy of Oriental Med., L.L.C. v. Andra,* 173 S.W.3d 184 (Tex.App.-Austin 2005, no pet.). Our opinion in *Andra,* however, does not support Colby's position. In *Andra,* the defendant filed an interlocutory appeal of a denial of a motion to strike an expert report, not a motion to dismiss as in this case. *Id.* at 186. Because of the unique procedural posture in the *Andra* case, we concluded that the motion for relief was a motion under section 74.351(*l* ), for which there is no provision for an interlocutory appeal when denied. *Id.* at 189; *see* Tex. Civ. Prac. & Rem.Code § 51.014(a)(10) (allowing interlocutory appeal of order granting relief under section 74.351(*l* )). That is not the type of motion appellants filed in this case.

Appellants filed a motion to dismiss and request for attorneys' fees under section 74.351(b). *See* Tex. Civ. Prac. & Rem.Code § 74.351(b) (providing that physician provider may move to dismiss when sufficient expert report not served and 120–day deadline has expired). The denial of a motion to dismiss and request for attorneys' fees under section 74.351(b) is subject to interlocutory appeal under section 51.014(a)(9) of the Texas Civil Practice and Remedies Code. *Lewis v. Funderburk,* 253 S.W.3d 204, 208 (Tex.2008). Colby's jurisdictional complaint is overruled, and we now turn to the merits of this appeal.

**Sufficiency of Expert Report**

In a health-care-liability claim, a claimant must provide each defendant with an expert report and curriculum vitae for each expert within 120 days of filing suit. Tex. Civ. Prac. & Rem.Code § 74.351(a). The expert report must summarize the expert's opinions "regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." *Id.* § 74.351(r)(6). After an expert report is filed, the defendant may object to the sufficiency of the report and move to

dismiss the plaintiff's claims. *See id.* § 74.351(a), (b). In two appellate issues, appellants contend that the trial court abused its discretion in denying their motion to dismiss because (1) Devere is not a qualified expert to provide a report in this case, and (2) Devere's report is conclusory with regard to the element of causation. We will begin with analysis of whether Devere's report adequately demonstrates causation.

**\*3** When a party challenges the adequacy of an expert report, the trial court should sustain the objection only if it determines that the report does not represent an "objective good faith effort to comply with the definition of an expert report." *Id.* § 74.351(*l* ). To constitute a good-faith effort, the report must inform the defendant of the specific conduct called into question and provide a basis for the trial court to determine whether the claims have merit. *American Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 879 (Tex.2001). A report does not fulfill these purposes if it fails to address the standard of care, breach of the standard of care, and causation, or if it merely states the expert's conclusions regarding these elements. *Id.* The expert must link his conclusions to the facts of the case. *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002). We review a trial court's denial of a motion to dismiss under section 74.351 under an abuse-of-discretion standard. *Palacios,* 46 S.W.3d at 878. However, "if an expert report contains only conclusions about the statutory elements, the trial court has 'no discretion but to conclude ... that the report does not represent a good-faith effort' to satisfy the statute." *Smith v. Wilson,* 368 S.W.3d 574, 577 (Tex.App.-Austin 2012, no pet.) (quoting *Palacios,* 46 S.W.3d at 877, 880). To perform its review, the trial court must look only to the four corners of the report itself. *Palacios,* 46 S.W.3d at 878.

Devere's eight-page report contains a paragraph on his qualifications, lists the issues he is reviewing and the materials used in that review, and states the background facts. The report then turns to a discussion of the standards of care for Kocurek's treatment of Colby and a discussion applying those standards of care to the facts presented. Finally, it contains a conclusion section. The report contains some detail of Colby's complaints, the standards of care applicable to those complaints, and an opinion as to whether Kocurek breached the applicable standards of care. Devere's report, however, contains nearly no discussion of causation to link Colby's alleged harm to Kocurek's actions.

Looking only to the four corners of the report, the following are the only statements from Devere's report that could potentially be considered as touching on causation:

• "Based on Dr. Kocurek's failure to act, secure treatment and properly execute a referral for Mr. Colby, his condition has worsened and he has suffered tremendously and unnecessarily." (from Background Facts section of report)

• "By not making this referral [to a specialist], Defendant, Dr. Kocurek, deceived Mr. Colby, created anxiety in Mr. Colby by making him think that a referral to a specialist was coming when it was not and resulted in a delay in Mr. Colby receiving any needed care, treatment or therapy that might have been recommended by a specialist, if that referral had been made." (from Application of Standard of Care section)

**\*4** • "In my expert opinion, the Defendant violated the applicable standard of care for physician's [sic] operating in the State of Texas based on the reasons mentioned above. Based on her actions or failures to act, Mr. Colby suffered and her actions or failures to act were a direct cause of worsening pain and numbness to Mr. Colby. Her violations of the standard of care resulted in a delay of Mr. Colby receiving appropriate care for his injuries, and the worsening of his symptoms." (from the Conclusion section)

• "Based on these worsening injuries, Mr. Colby has endured and will continue to endure significant pain, numbness and incapacity until he can receive the appropriate treatment to correct these conditions." (from the Conclusion section)

The issue is whether these statements, which appear to be the only attempts made at establishing causation in Devere's report, are sufficient to meet the requirements of section 74.351. We conclude they are not.

The problem with Devere's report is that it fails to show, within its four corners, what specific actions Kocurek did or did not take, or could have taken, that would have prevented Colby's symptoms or injuries. *See* Tex. Civ. Prac. & Rem.Code § 74.351(r)(5) (expert report must include "fair summary" or expert's opinion as to "causal relationship" between medical defendant's failure to meet standard of care and injury). Nowhere in the report does Devere actually state what specific violation of which standard of care led to a particular health problem of Colby's. The report lists five standards of care that Kocurek allegedly violated in her treatment of Colby and the specific ways Devere believes Kocurek violated those standards of care. Devere, however, did not provide facts that would explain a causal link between any of those

alleged breaches of the standards of care to any one of Colby's injuries.

An expert report must explain, to a reasonable degree, how and why the alleged breach caused the injury based on the facts presented. *See Jelinek v. Casas,* 328 S.W.3d 526, 539–40 (Tex.2010). The closest Devere's report comes to providing a causal link is in his statement that "[b]ased on [Kocurek's] actions or failures to act, Mr. Colby suffered and [Kocurek's] actions or failures to act were a direct cause of worsening pain and numbness to Mr. Colby. Her violations of the standard of care resulted in a delay of Mr. Colby receiving appropriate care for his injuries, and the worsening of his symptoms." This statement, however, never identifies which breach of which standard of care by Kocurek led to a worsening of Colby's pain and numbness. Further, the statement fails to identify how any specific injury sustained by Colby would have been prevented or lessened had he received "appropriate care" sooner. Devere's statement that referring Colby to a specialist might have made a difference in Colby's condition—"treatment or therapy that might have been recommended by a specialist, if that referral had been made"—amounts to nothing more than speculation. *See id.* at 539 (concluding that statement in expert report that breach of standard of care "in reasonable medical probability resulted in [injury]" was insufficient). The report does not explain what treatment or therapy a specialist would have provided had Colby been referred earlier or how such treatment or therapy would have prevented Colby's injuries. As a result, the statements in Devere's report regarding causation amount to "no more than a bare assertion that [Kocurek's] breach resulted in increased pain and suffering." *See id.* at 540.

**\*5** This Court has consistently required more than what Devere has provided in terms of expert testimony on causation in the context of section 74.351. *See Smith,* 368 S.W.3d at 577–78 (holding that expert report failed to show how doctor's alleged breach of standard of care caused patient to commit suicide); *Constancio v. Bray,* 266 S.W.3d 149, 157–58 (Tex.App.-Austin 2008, no pet.) (holding that expert report that alleged that breach of standard of care by doctor caused patient's death is insufficient when report did not explain how increased monitoring of patient, detection of hypoxemia, and other actions would have prevented patient's death); *Perez v. Daughters of Charity Health Servs. of Austin,* No. 03–08–00200–CV, 2008 WL 4531558, at \*4 (Tex.App.-Austin Oct. 10, 2008, no pet.) (mem.op.) (concluding expert report insufficient on causation because it did not link hospital's actions to patient's death or any cause of death and did not identify any specific injury that would have been prevented had hospital complied with standard of care). To find Devere's report sufficient on causation, we

would have to make inferences from beyond the four corners of his report; this we are not allowed to do.

Based on the record before us and the four corners of the expert report, we are left with no choice but to conclude that the report does not provide an adequate causal link between Kocurek's alleged shortcomings and Colby's symptoms or injuries. Because the report is insufficient as to Kocurek, it is also insufficient as to Texas MedClinic, which Colby sued solely on the basis of its alleged vicarious liability for Kocurek's actions. *See Smith,* 368 S.W.3d at 579. Accordingly, we sustain the appellants' second issue on appeal.[4]

**CONCLUSION**

We reverse the trial court's order denying appellants' motion to dismiss. We remand the cause to the trial court for a determination of attorneys' fees, *see* Tex. Civ. Prac. & Rem.Code § 74.351(b), and for entry of a final order dismissing Colby's claims against appellants.

Footnotes

[1]     Colby represents himself in this appeal as he did in the trial court proceedings.

[2]     Colby's claims against Texas MedClinic were solely for vicarious liability arising from Kocurek's actions.

[3]     The trial judge who denied appellants' motion to dismiss Devere's amended expert report was not the same trial judge who ruled that Devere's expert report was deficient in the context of appellants' first motion to dismiss.

[4]     Because appellants' second issue is dispositive of this appeal, we need not reach appellants' first appellate issue challenging the trial court's conclusion that the expert report adequately demonstrated Devere's qualifications as an expert.

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2006 WL 728068
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR DESIGNATION
AND SIGNING OF OPINIONS.

**MEMORANDUM OPINION**
Court of Appeals of Texas,
Eastland.

Kelly KUYKENDALL and Husband, Terry
Kuykendall, Appellants
v.
Michael J. DRAGUN, M.D. and West Texas
Urology, Appellees.

No. 11-05-00230-CV. | March 23, 2006.

**Synopsis**
**Background:** Patient filed medical malpractice action
against surgeon who was brought in during surgery to
address complications from perforation of patient's
bladder. The 142nd District Court, Midland County,
granted surgeon's motion to dismiss. Patient appealed.

**Holdings:** The Court of Appeals, Rick Strange, J., held
that

[1] expert report submitted by patient did not satisfy
statutory requirements, and

[2] trial court did not abuse its discretion when it denied
patient's request for a 30-day grace period to amend
report.

Affirmed.

On Appeal from the 142nd District Court, Midland
County, Texas, Trial Court Cause No. CV45114.

**Attorneys and Law Firms**

Rick Dunbar, for Appellants.

Jack Tidwell, for Appellees.

Panel consists of WRIGHT, C.J., and McCALL, J., and
STRANGE, J.

**MEMORANDUM OPINION**

RICK STRANGE, Justice.

**\*1** This is a medical malpractice action. Michael J.
Dragun, M.D. and West Texas Urology filed a motion to
dismiss contending that Kelly and Terry Kuykendall's
expert report did not satisfy the requirements of
TEX.REV.CIV. STAT. art. 4590i, § 13.01 (2001).[1] The
trial court granted appellees' motion to dismiss and
denied appellants' request for an extension of time to file
an amended report. We find no error and affirm.

*Facts*

Kelly Kuykendall underwent a bilateral salphingo-
oophorectomy and a laparoscopic-assisted vaginal
hysterectomy on June 24, 2002. The surgery was
performed by Dr. Brady Locke. Kelly's bladder was
perforated during the surgery. Dr. Dragun was contacted
and was asked to repair the injury. He performed a
laparotomy and was assisted in the procedure by Dr.
Locke.

The original surgery was scheduled for two hours.
Because of the bladder complication, the surgery lasted
six hours. Appellants allege that Kelly's peripheral nerves
were damaged during the extended surgery.

Appellants filed a medical malpractice action against Dr.
Dragun and other health care providers on May 29, 2003.
They timely filed the expert report and curriculum vitae
of Dr. Mearl A. Naponic. Appellees filed a motion to
dismiss, contending the expert report did not satisfy the
requirements of Article 4590i, section 13.01. Appellants
responded that Dr. Naponic's expert report was sufficient
and, alternatively, requested an Article 4590i, section
13.01(g) thirty-day extension. The trial court conducted a
hearing and granted appellees' motion to dismiss and
denied appellants' request for an extension.

*Issues*

In two issues, appellants contend that their expert report
satisfies the requirements of Article 4590i, section 13.01

or, alternatively, that the trial court abused its discretion by denying their request for an Article 4590i, section 13.01(g) thirty-day grace period to amend their report.

### Standard of Review

A trial court's decision to dismiss a lawsuit because of an inadequate expert report is reviewed under an abuse of discretion standard. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 878 (Tex.2001). A trial court's decision to grant or deny an Article 4590i, section 13.01(g) grace period is also reviewed under an abuse of discretion standard. *Walker v. Gutierrez,* 111 S.W.3d 56, 62 (Tex.2003).

A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241-42 (Tex.1985). A reviewing court is not allowed to substitute its judgment for that of the trial court when reviewing a discretionary decision. *Flores v. Fourth Court of Appeals,* 777 S.W.2d 38, 41-42 (Tex.1989). The mere fact that a trial court may decide a matter within its discretionary authority in a different manner than an appellate court in a similar circumstance does not demonstrate that an abuse of discretion has occurred. *Downer,* 701 S.W.2d at 241-42.

### Does Dr. Naponic's Report Satisfy Article 4590i?

**\*2** [1] In *Palacios,* 46 S.W.3d at 878-79, the supreme court outlined the criteria for evaluating the efficiency of expert reports. Specifically, the court wrote:

> [T]he expert report must represent only a good-faith effort to provide a fair summary of the expert's opinions. A report need not marshal all the plaintiff's proof, but it must include the expert's opinion on each of the elements identified in the statute. In setting out the expert's opinions on each of those elements, the report must provide enough information to fulfill two purposes if it is to constitute a good-faith effort. First, the report must inform the defendant of the specific conduct the plaintiff has called into question. Second, and equally important, the report must provide a basis for the trial court to conclude that the claims have merit.

> A report that merely states the expert's conclusions about the standard of care, breach, and causation does not fulfill these two purposes. Nor can a report meet these purposes and thus constitute a good-faith effort if it omits any of the statutory requirements. However, to avoid dismissal, a plaintiff need not present evidence in the report as if it were actually litigating the merits. The report can be informal in that the information in the report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial. (citations omitted)

Courts have identified additional considerations when multiple defendants are sued. In that instance, the expert report must provide an explanation of how each defendant specifically breached the applicable standard of care and how that breach caused or contributed to the cause of injury. *Taylor v. Christus Spohn Health Sys. Corp.,* 169 S.W.3d 241, 244 (Tex.App.-Corpus Christi 2004, no pet.).

That portion of Dr. Naponic's expert report which addressed Dr. Dragun's actions contained the following language:

> On June 24, 2002, Kelly Kuykendall underwent bilateral salphingo-oophorectomy, as well as a laparoscopic assisted vaginal hysterectomy. Theses [sic] surgical treatments were performed in an effort to relieve pre-operative symptoms of pelvic pain, dysmenorrhea and menorrhagia and failed medical management of same. The initial procedure scheduled for two hours was performed by Dr. Brady Locke and was complicated by an intra-operative injury to the bladder. The perforation of the bladder necessitated surgical repair; and, thus this two hour surgery evolved into a six hour surgery, involving a laparotomy to repair an incision into the bladder of approximately eight to nine centimeters. This second surgery was performed by Dr. Michael Dragun and assisted by Dr. Brady Locke.

> The standard of care for such procedures as described above, necessarily require[s] that the peripheral nerves in and adjacent to the operative site be identified and protected. This is particularly true when a self-retaining retractor is used and the length of the surgery is prolonged. Complications, including nerve injuries, from self-retaining retractors are well-known and well-described in the relevant literature. Failing to properly pad the self-retaining retractor, failure to adequately position the patient and/or leaning on the patient during this prolonged surgery are the most likely cause of the intra-operative injuries and complications suffered by Kelly Kuykendall and are below the accepted standard of care for these procedures. As both Dr. Locke and Dr. Dragun performed the bladder repair, they shared the

responsibility to protect Kelly Kuykendall against this injury.

**\*3** A fair summary is something less than a full statement of the applicable standard of care and how it was breached. A fair summary must set out what care was expected but not given. *Palacios,* 46 S.W.3d at 880 ("[w]hether a defendant breached his or her duty to a patient cannot be determined absent specific information about what the defendant should have done differently"). An expert report must show causation beyond mere conjecture. *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002). Knowing what specific conduct the plaintiff's expert has called into question is critical to both the defendant's ability to prepare for trial and the trial court's ability to evaluate the viability of the plaintiff's claims. *Palacios,* 46 S.W.3d at 876-77. Dr. Naponic's report does not provide this level of information because his analysis is premised on several assumptions and because he fails to distinguish between the actions of Dr. Locke and Dr. Dragun.

Dr. Naponic's analysis is similar to a res ipsa approach. Because Kelly suffered from peripheral nerve damage and because the relevant literature documents a connection between that injury and the failure to properly pad self-retaining retractors, improperly positioning the patient, or leaning on the patient, Dr. Naponic assumes that these are the "most likely" causes of her injury. He assumes further that Dr. Locke and Dr. Dragun are collectively responsible for one or more of these actions.[2]

There are several problems with this approach. First, Dr. Naponic's report does not document that a self-retaining retractor was even used or, if so, by whom. This is not a question of mere semantics. Dr. Dragun cannot be held responsible for any actions taken before he arrived in the operating room, nor can he be held responsible for improperly using equipment that was never utilized. Knowing what Dr. Naponic alleges Dr. Locke did during the initial portion of the procedure and what Dr. Naponic alleges happened during Dr. Dragun's portion of the procedure are vital.

Second, even assuming Dr. Dragun used a self-retaining retractor, Dr. Naponic did not document how it was padded or how it should have been padded. Third, the report does not document how Kelly was positioned at any point in time during her surgical procedure, nor how she should have been positioned during Dr. Dragun's procedure. Finally, the report provides no support for his hypothesis that Dr. Dragun leaned on Kelly beyond his contention that this is frequently the cause of her type of injury.

The supreme court's holding in *Palacios,* 46 S.W.3d at 873, that a trial court's decision to grant a motion to dismiss is subject to an abuse of discretion review, mandates that we provide trial courts with some deference when determining what constitutes a good faith effort to comply with the statute in a particular case. Because Dr. Naponic's report failed to provide specific information concerning Dr. Dragun's conduct, because he assumed the two doctors were equally responsible for Kelly's injury, and because Dr. Naponic relied upon assumptions to determine the "most likely" cause of her injury, we hold the trial court did not abuse its discretion when it granted appellees' motion to dismiss. Appellants' first issue is overruled.

### *Were Appellants Entitled To A Thirty-Day Extension To Amend Their Report?*

**\*4** [2] Article 4590i, section 13.01(d) required claimants to furnish an expert report within 180 days after the claim was filed. Article 4590i, section 13.01(g) gave trial courts the discretion to provide a thirty-day grace period to file an amended report if the failure to timely file an adequate report "was not intentional or the result of conscious indifference but was the result of an accident or mistake."

In their response to appellees' motion to dismiss, appellants included an alternative request for a thirty-day extension based upon their belief that Dr. Naponic's report was adequate and, if not, contended that their failure to provide an adequate report was due to accident or mistake and not an intentional act or conscious indifference. Appellants' request was supported by the testimony of their trial counsel who stated that he contacted Dr. Naponic based upon the referral of a general surgeon, that he provided Dr. Naponic with the relevant records and caselaw, that they discussed this case, that Dr. Naponic indicated that it would be difficult to distinguish from the medical records which defendant caused the intraoperative injuries absent an admission, but that Dr. Naponic informed him that all the health care providers shared a duty to protect Kelly. Counsel testified that he relied upon Dr. Naponic, who was a board-certified obstetrician and gynecologist, to provide him with a sufficient report and that he believed Dr. Naponic had done so.

The Texas Supreme Court faced a similar situation in *Walker,* 111 S.W.3d at 56. There, as here, claimant's counsel mistakenly believed that his expert's report was sufficient. The supreme court comprehensively reviewed intermediate court decisions on Article 4590i, section

13.01(g) extensions, finding that some courts were erroneously holding that any mistake of law was sufficient to support an extension while others were impermissibly applying a standard that precluded an extension because of a mistake of law. *Id.* at 63-64. According to the supreme court, some-but not all-mistakes of law may negate a finding of intentional conduct or conscious indifference and, therefore, support an extension. The distinction turns on the knowledge and acts of the claimant. *Id.* at 64.

The supreme court concluded that counsel's belief that his expert's report was sufficient, despite clear statutory requirement to the contrary, "does not establish a 'sufficient excuse' necessary to support a finding that a party made a mistake of law." *Id.* at 64-65. This follows because a medical malpractice claimant is charged with knowledge of Article 4590i, section 13.01 and its requirements. *Id.* Appellants distinguish *Walker* by alleging it involved a report which was absent the relevant standard of care and how the defendants breached that standard. Appellants contend that, if their report is inadequate, it is not because of the absence of a critical element but simply insufficient information.

**\*5** The trial court is best positioned to assess what appellants knew and to evaluate their actions. The extent and quality of the information available to a medical-malpractice claimant will vary from case to case. That information directly impacts the report a good faith effort will produce. We have found that the trial court did not abuse its discretion when it held Dr. Naponic's report was insufficient because Dr. Naponic failed to distinguish between the actions of the two doctors and because his analysis relies heavily on assumption. During oral argument, appellants' counsel pointed out that physicians are unlikely to admit to errors in their medical records and, therefore, that one cannot expect doctors to affirmatively state that they leaned on their patient during surgery. Even if we accept this as true, the medical

records would contain information on the surgical equipment utilized, the manner in which the patient was positioned, and the surgery conducted. Because two different doctors operated on Kelly, their respective records would provide information unique to each doctor and their procedures. The trial court could have reasonably concluded that in this case appellants had the ability to distinguish between the actions of the two doctors and determine what surgical equipment and procedures were utilized and that their failure to do so precluded a thirty-day grace period.

The cases decided since *Walker* indicate that the trial court's decision to grant or deny a thirty-day grace period when counsel argues that his mistaken belief that a report was sufficient constitutes a mistake of law, are afforded great deference due to their individual factual patterns. *Compare In re Zimmerman,* 148 S.W.3d 214, 217 (Tex.App.-Texarkana 2004, orig. pro-ceeding) (affirming the trial court's decision to grant a thirty-day grace period based upon mistake of law) *with Sandles v. Howerton,* 163 S.W.3d 829, 838 (Tex.App.-Dallas 2005, no pet.)(affirming the trial court's decision to not grant a thirty-day grace period based upon a mistake of law).

We cannot say that the trial court abused its discretion when it denied appellants' request for a thirty-day grace period. Appellants' second issue is overruled.

### *Conclusion*

The trial court did not abuse its discretion when it granted appellees' motion to dismiss and denied appellants' request for a thirty-day grace period. The trial court's judgment is affirmed.

Footnotes

1    Although applicable to this case, Article 4590i was repealed effective September 1, 2003; and the subject matter is now governed by TEX. CIV. PRAC. & REM.CODE ANN. § 74.351 (Vernon Supp.2005).

2    In *Palacios,* the supreme court noted that, as a general rule, *res ipsa loquitur* does not apply in medical malpractice cases. 46 S.W.3d at 880. Consequently, an expert report must do more than simply assume that a health care provider is responsible for any surgical complication.

---

**End of Document**                                                     © 2015 Thomson Reuters. No claim to original U.S. Government Works.

300 S.W.3d 343
Court of Appeals of Texas,
San Antonio.

REGENT CARE CENTER OF SAN ANTONIO II,
LTD. PARTNERSHIP d/b/a Regent Care Center of
Oakwell Farms and RCCSA II, Inc., Appellant,
v.
Barbara HARGRAVE, Individually and as
Executrix of the Estate of Dorothy Montgomery,
and Vernon Lloyd Pierce, Individually, Appellees.

No. 04–05–00274–CV. | Aug. 31, 2009.

**Synopsis**
**Background:** Executrix of nursing home resident's estate filed medical malpractice action against hospital. Hospital motioned to dismiss based on inadequate expert report. The 150th Judicial District Court, Bexar County, Lori Massey, J., denied hospital's motion. Hospital appealed.

**[Holding:]** The Court of Appeals, Rebecca Simmons, J., held that expert report did not contain necessary elements of causation.

Reversed and remanded.

Opinion, 2009 WL 902233, superseded.

See also 251 S.W.3d 517.

**Attorneys and Law Firms**

**\*344** D. Ann Comerio, Law Offices of Ann Comerio, San Antonio, TX, for Appellant.

Alex M. Miller, Mikal C. Watts, Francisco Guerra, IV, Watts Guerra Craft LLP, San Antonio, TX, for Appellee.

Sitting: Chief Justice ALMA L. LÓPEZ[1], SANDEE BRYAN MARION, Justice, REBECCA SIMMONS, Justice.

**OPINION**

**ON APPELLEES' MOTION FOR REHEARING**

Opinion by: REBECCA SIMMONS, Justice.

The motion for rehearing filed by appellees Barbara Hargrave, Individually and as Executrix of the Estate of Dorothy Montgomery, and Vernon Lloyd Pierce, Individually, is denied. This court's opinion and judgment dated April 3, 2009, are withdrawn, and this opinion and judgment are substituted.

This case is on remand from the Texas Supreme Court. *See Regent Care Ctr. of San Antonio II, Ltd. P'ship v. Hargrave, 251 S.W.3d 517 (Tex.2008).* On original submission, we dismissed the appeal for lack of jurisdiction holding that this Court lacked subject matter jurisdiction to review the denial of the motion to dismiss and for sanctions which was rendered moot by the trial court's subsequent nonsuit. This court, however, never reached the merits of the appeal. On remand, the sole remaining issue is the adequacy of the expert report.

Appellants Regent Care Centers of San Antonio II, Limited Partnership d/b/a Regent Care Center of Oakwell Farms and RCCSA II, Inc. (Regent Care) appeal the **\*345** trial court's denial of its motion to dismiss based on an inadequate expert report under former article 4590i of the Texas Revised Civil Statutes. Appellees Barbara Hargrave, Individually and as Executrix of the Estate of Dorothy Montgomery and Vernon Lloyd Pierce, Individually (collectively Hargrave) contend that the expert report, taken in its entirety, provided sufficient information for the trial court to determine that the allegations against Regent Care had merit. On remand, we hold the trial court erred in denying Regent Care's motion to dismiss in accordance with the requirements set forth in article 4590i. *See* Act of May 30, 1977, 65th Leg., R.S., ch. 817, § 1, sec. 13.01(d), 1995 Tex. Gen. Laws 985, 986, repealed by Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.09, 2003 Tex. Gen. Laws 847, 884.

**FACTUAL BACKGROUND**

On November 15, 2000, Dr. Rafael Parra performed back surgery on seventy-two year old Dorothy Montgomery. Approximately six days later, Mrs. Montgomery was discharged for rehabilitation into the custody of Regent Care. On December 18, 2000, Mrs. Montgomery was transferred from Regent Care back to the hospital with acute renal failure. By the time of her transfer, Mrs. Montgomery was suffering from a staphylococci infection

and was septic due to an open and draining surgical wound on her back. Mrs. Montgomery was transferred back and forth between the hospital and Regent Care several times before her death on February 18, 2001.

Hargrave filed a medical malpractice lawsuit against two physicians and Regent Care. In order to comply with the Texas Medical Liability and Insurance Improvement Act (the Act), Hargrave timely filed an expert report prepared by Dr. Christopher M. Davey. *See id.*[2] Regent Care subsequently moved to dismiss the lawsuit, with prejudice, claiming the report did not comply with the statutory requirements. *See id.* sec. 13.01(e), (*l*), (r)(6), 1995 Tex. Gen. Laws 985, 986–87. The trial court denied Regent Care's motions to dismiss, and this appeal followed.

## ADEQUACY OF EXPERT REPORT

Regent Care asserts that the trial court abused its discretion in denying Regent Care's Motion to Dismiss with Prejudice and for Statutory Sanctions and the motion to reconsider the same because the expert report inadequately explains causation. Hargrave contends the expert report contains sufficient information regarding causation for the court to have reasonably concluded the claims against Regent Care had merit.

### A. Standard of Review

[1] The standard of review of a trial court's order either dismissing or refusing to dismiss a medical malpractice claim for failure to comply with the expert report provisions of section 13.01(d) of article 4590i is abuse of discretion. *See Walker v. Gutierrez,* 111 S.W.3d 56, 62 (Tex.2003); *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 877 (Tex.2001). An abuse of discretion occurs when a trial court acts arbitrarily or unreasonably and "without reference to any guiding rules or principles." *Walker,* 111 S.W.3d at 62. A clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion. *Baylor Univ. Med.* **\*346** *Ctr. v. Biggs,* 237 S.W.3d 909, 916 (Tex.App.-Dallas 2007, pet. denied).

### B. Sufficiency of the Expert Report

[2] The Act defines an expert report as a written report by an expert that provides a fair summary of the expert's opinions regarding: (1) applicable standards of care, (2) the manner in which the care rendered failed to meet the

standards, and (3) the causal relationship between that failure and the injury, harm, or damages claimed. *See* Act of May 30, 1977, 65th Leg., R.S., ch. 817, § 1, sec. 13.01(r)(6), 1995 Tex. Gen. Laws 985, 987 (repealed 2003). If a plaintiff fails to comply with section 13.01(d), a defendant may seek sanctions pursuant to section 13.01(e) and the trial court shall grant the motion to dismiss with prejudice and award costs and attorneys' fees to the defendant. *See id.* sec. 13.01(e), (f), 1995 Tex. Gen. Laws 985, 986. The dispositive question is whether the expert report represents a good-faith effort to comply with section 13.01(r)(6). *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 51–52 (Tex.2002) (citing Act of May 30, 1977, 65th Leg., R.S., ch. 817, § 1, sec. 13.01(r)(6), 1995 Tex. Gen. Laws 985, 987 (repealed 2003)).

[3] [4] [5] [6] [7] To constitute a good-faith effort to establish the causal relationship element under the Act, the expert "report need not marshal all the plaintiff's proof," or present evidence as if the plaintiff was actually litigating the merits. *See Bowie Mem'l Hosp.,* 79 S.W.3d at 52–53; *accord Palacios,* 46 S.W.3d at 878. No magic words such as "reasonable medical probability" are required for the report to comply with the Act. *Bowie Mem'l Hosp.,* 79 S.W.3d at 53. The report must (1) "inform the defendant of the specific conduct the plaintiff has called into question," and (2) "provide a basis for the trial court to conclude that the claims have merit." *Palacios,* 46 S.W.3d at 879. A report that merely sets forth the expert's conclusions is insufficient to satisfy these two purposes. *Bowie Mem'l Hosp.,* 79 S.W.3d at 53. In assessing the adequacy of the report, the trial court may not make inferences and is confined to the four corners of the report. *Id.*

### C. Causation

Regent Care argues that the expert report filed by Dr. Davey is inadequate and, consequently, dismissal was mandatory. Regent Care challenges only the causation element of the report, and contends the report does not meet the statutory requirements because it is conclusory and based upon mere conjecture and possibility.[3] In particular, Regent Care complains that Dr. Davey's report: (1) contains conclusory statements as to causation and fails to link the alleged breaches to the injuries and damages alleged, and (2) fails to address the numerous allegations contained in the First Amended Original Petition. *See* Act of May 30, 1977, 65th Leg., R.S., ch. 817, § 1, sec. 13.01(*l*), 1995 Tex. Gen. Laws 985, 987 (repealed 2003).

[8] [9] As to causation, in the concluding paragraph, Dr. Davey opines "the Breach of the Standard of Care as set

forth for each Physician and[/]or Nursing Home in this report was a proximate cause of the death of Dorothy Montgomery." Regent Care argues that the one sentence conclusion on causation is insufficient to satisfy article 4590i. We agree. While a claimant is not required to conclusively prove her case through a preliminary expert report, the report may not merely state conclusions **\*347** about any of the elements. *Palacios,* 46 S.W.3d at 879. " '[T]he expert must explain the basis of his statements to link his conclusions to the facts.' " *Bowie Mem'l Hosp.,* 79 S.W.3d at 52 (quoting *Earle v. Ratliff,* 998 S.W.2d 882, 890 (Tex.1999)). *Bowie* cautions that no " 'magical words' " are required to establish the necessary causal link. *See Bowie Mem'l Hosp.,* 79 S.W.3d at 53. But, to avoid being conclusory, "the expert must explain the basis of his statements to link his conclusions to the **facts.**" *Bowie,* 79 S.W.3d at 52 (emphasis added) (quoting *Earle v. Ratliff,* 998 S.W.2d 882, 890 (Tex.1999)).

Hargrave responds that the report provides "several statements about causation of Mrs. Montgomery's injuries (renal failure and sepsis) and eventual death, and provides factual information to allow the court to understand his causation opinions." Specifically Hargrave identifies the following two standards of care breached by Regent Care:

> (i) The nursing home staff did not adequately and timely inform the physician of the increasing amount of drainage from her back incision in December 2000, which reasonable staff in a similar situation would do[, and;]

> (ii) The nursing home allowed [Mrs. Montgomery] to become so dehydrated that she actually went into renal failure by 12/18/00. Her initial lab results indicate severe dehydration, which most likely occurred over several days and should have been physically apparent—i.e., not taking fluids, dry tongue, increasing lethargy. A reasonable nursing home in a similar situation would have noted her decline and alerted the physician much earlier.

In essence, Hargrave criticizes the nursing staff for failing to inform the doctors about Mrs. Montgomery's increased drainage and for allowing her to become dehydrated.

Dr. Davey's report provides that: "the cause of the renal failure was most likely dehydration, as it **resolved** just with fluid replacement" (emphasis added) thereby refuting dehydration as the cause of Mrs. Montgomery's death. Additionally, he fails to link Regent Care's failure to timely inform a physician of increased drainage in December 2000 to Mrs. Montgomery's subsequent death in February 2001 due to sepsis.[4] This is particularly true considering Mrs. Montgomery's admission to the hospital

and care provided by Dr. Wilcox in December. *See Costello v. Christus Santa Rosa Health Care Corp.,* 141 S.W.3d 245, 247 (Tex.App.–San Antonio 2004, no pet.) (criticizing the expert report as insufficient because it does not "explain the causal connection between [the hospital's] claimed omissions (failed to appropriately triage and evaluate) and [the patient's] death"). Dr. Davey's opinion fails to articulate facts connecting the criticized deviations from the standard of care by Regent Care with Mrs. Montgomery's dehydration, sepsis, or death.

*Bowie* cautions that no " 'magical words' " are required to establish the necessary causal link. *See Bowie Mem'l Hosp.,* 79 S.W.3d at 53. But, to avoid being conclusory, "the expert must explain the basis of his statements to link his conclusions to the **facts.**" *Bowie,* 79 S.W.3d at 52 (emphasis added) (quoting **\*348** *Earle v. Ratliff,* 998 S.W.2d 882, 890 (Tex.1999)). Dr. Davey's opinion contains no information about the cause of Mrs. Montgomery's dehydration; we are, therefore, left to infer that because Mrs. Montgomery presented at the hospital with severe dehydration, Regent Care violated a standard that caused the dehydration. *See Villa v. Hargrove,* 110 S.W.3d 74, 79 (Tex.App.–San Antonio 2003, pet. denied) (noting that the expert report's statement that defendants should have " 'recognized' imminent sepsis and 'hospitalized' [plaintiff] does not explain how each failed to meet the explicable standard of care" and is conclusory). Accordingly, we conclude that Dr. Davey's expert report fails to establish a causal relationship between the alleged departure from a standard of care and Mrs. Montgomery's dehydration, sepsis, or death.

Dr. Davey's expert report required the trial court to infer causation, and under the four corners rule, the trial court is prohibited from doing so. *See Bowie Mem'l Hosp.,* 79 S.W.3d at 52. It, therefore, follows that Dr. Davey's report was deficient as to causation and "the report does not represent a good-faith effort to comply with the [statutory requirements]." *See id.* at 51. Because we hold the expert report was inadequate as to causation, we need not address the allegations concerning negligence. *See* TEX.R.APP. P. 47.1 (requiring concise opinions addressing only those issues "necessary to find disposition of the appeal").

### CONCLUSION

The expert report fails to link Regent Care to Mrs. Montgomery's dehydration, sepsis, or subsequent death; thus, it does not contain the necessary elements of

causation. Accordingly, because the expert report is inadequate, the trial court abused its discretion in failing to dismiss the case against Regent Care, with prejudice, and award reasonable attorney fees. *See* Act of May 30, 1977, 65th Leg., R.S., ch. 817, § 1, sec. 13.01(e), (*l* ), 1995 Tex. Gen. Laws 985, 986–87 (repealed 2003). We, therefore, reverse the order of the trial court and remand this matter to the trial court for further proceedings consistent with this opinion.

Footnotes

[1] Chief Justice Alma L. López, retired, not participating.

[2] All health care liability claims filed before September 1, 2003, must comply with section 13.01(d) of article 4590i. *See* Act of May 30, 1977, 65th Leg., R.S., ch. 817, § 1, sec. 13.01(d), 1995 Tex. Gen. Laws 985, 986, *repealed by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.09, 2003 Tex. Gen. Laws 847, 884.

[3] Because Regent Care does not dispute that the expert report fairly summarizes the elements of applicable standard of care and breach, we review Dr. Davey's report as to the causation element only.

[4] Although Hargrave suggests that Dr. Davey's report includes several statements regarding causation of "Mrs. Montgomery's injuries (renal failure and sepsis) and eventual death," the report clearly provides that Mrs. Montgomery "died of sepsis under palliative Hospice care 2/18/01."

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 6938538
Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR DESIGNATION
AND SIGNING OF OPINIONS.

**MEMORANDUM OPINION**
Court of Appeals of Texas,
Houston (1st Dist.).

Vasudev SHENOY and Dario Zuniga, Appellant
v.
Penny JEAN, Individually, and as Wrongful Death
Beneficiary of Willie Ann Jean, Deceased, and on
Behalf of the Estate of Willie Ann Jean, Deceased,
and on Behalf of all Wrongful Death Beneficiaries
of Willie Ann Jean, Deceased, Appellee.

No. 01–10–01116–CV. | Dec. 29, 2011.

On Appeal from the 151st District Court, Harris County,
Texas, Trial Court Case No.2010–28302.

**Attorneys and Law Firms**

John G. Myers, Dee L. Dawson, Myers Doyle, Houston,
for Appellant Vasudev Shenoy.

Robert G. Smith, David O. Cluck, Scott B. Novak,
Lorance & Thompson, P.C., Houston, for Appellant Dario
Zuniga.

Monica C. Vaughan, for Penny Jean, Individually, and as
Wrongful Death Beneficiary of Willie Ann Jean,
Deceased, and on Behalf of the Estate of Willie Ann Jean,
Deceased, and on Behalf of all Wrongful Death
Beneficiaries of Willie Ann Jean, Deceased.

Panel consists of Chief Justice RADACK and Justices
SHARP and BROWN.

**MEMORANDUM OPINION**

HARVEY BROWN, Justice.

**\*1** In this interlocutory appeal,[1] Dr. Shenoy and Dr.
Zuniga appeal the trial court's orders denying their
motion to dismiss Penny Jean's healthcare liability claim
for failure to serve an adequate expert report. *See* TEX.
CIV. PRAC. & REM.CODE ANN. § 74.351(a) (West
2011). Penny's mother, Willie Ann Jean, died

approximately three weeks after gallbladder surgery as a
result of hypoxic encephalopathy. Dr. Zuniga performed
the surgery. Dr. Shenoy, a cardiologist, cleared Jean for
the surgery.

In two issues, Shenoy contends that the trial court abused
its discretion in denying his motion to dismiss because
Jean's expert, Dr. Mazzei, an anesthesiologist, is not
qualified to opine on the applicable standard of care for a
cardiologist, breach of that standard or causation, and his
report does not adequately address standard of care,
breach, or causation. In his sole issue, Zuniga contends
that the trial court abused its discretion because (1)
Mazzei is not qualified to offer an opinion on the
applicable standard of care for a surgeon, (2) the report
does not address how Zuniga caused Willie Ann's death
beyond mere conclusions, and (3) it is "impermissibly
cumulative"—that is, it does not adequately identify the
particular breaches of the standard of care or causation
with respect to each separate defendant. We reverse and
render an order dismissing the claims against Shenoy and
Zuniga.

**Background**

Mazzei's expert report provides the background facts in
this case. The medical records are not before us, and we
accept the factual statements for the limited purpose of
this appeal.[2]

Willie Ann Jean, age 57, was taken by ambulance to the
emergency room of Doctor's Hospital on February
15,2008, complaining of abdominal pain, vomiting, chest
pain of three hours' duration, and difficulty breathing. As
part of her admission, Willie Ann gave an extensive
medical history that included diabetes, hypertension,
angina, surgery for a brain aneurysm, coronary artery
disease, chronic obstructive pulmonary disease,
hypercholesterolemia, and a prior myocardial infarction.
Willie Ann reported she had experienced abdominal and
chest pain for years without treatment. Based on a
physical examination and ultrasound, the emergency
room physician, Dr. Mireles, determined that she had
polyps and diagnosed symptomatic gallstones in her
gallbladder. He recommended that she undergo surgery to
remove her gallbladder. He ordered a surgical
consultation and a cardiology consultation.

Shenoy, a cardiologist, saw her that same day, and noted
that Willie Ann had a two- to three-year history of
epigastric and right upper quadrant abdominal pain as

well as a history of a previous myocardial infarction and a cereberovascular accident (i.e., a stroke). Shenoy noted that Willie Ann had suffered chest pain, accompanied by shortness of breath and sweating for four to six hours earlier that day. Willie Ann also had an abnormal electrocardiogram (EKG). Shenoy's diagnosis was that Willie Ann had sufferedan acute myocardial infarction, symptomatic gallstones, hypertension, and diabetes.

**\*2** Zuniga, a surgeon, performed the surgical consultation three days after her initial admission, on February 18, 2008. Zuniga confirmed the presence of gallstones, diagnosed inflammation of the gallbladder, and cleared Willie Ann for surgery to remove her gallbladder the next day, February 19, subject to a cardiology assessment. Dr. Shenoy saw Willie Ann again on February 18. A nuclear test was negative for ischemia. Shenoy also ordered an EKG, the results of which are included in Mazzei's report but the significance of which are not explained. Shenoy cleared Willie Ann for the gallbladder surgery.

Dr. Amin–Sankar, an anesthesiologist, performed a preoperative anesthesia assessment on February 19. He noted Willie Ann's past medical history, including her acute myocardial infarction and abnormal EKG. Amin–Sankar cleared Willie Ann for surgery.

On February 19, 2008, Zuniga performed the surgery. The surgery was an "uneventful" procedure. After leaving the post-anesthesia careunit (PACU), Willie Ann was to be sent to the intensive care unit because she had fluctuating oxygen saturation levels, inadequate ventilation, and shallowness of breath. Shortly thereafter, she was transported back to the PACU and was placed on a ventilator. According to Mazzei's report, Amin–Sankar prematurely extubated Willie Ann ten minutes later.Within a few minutes, Willie Ann was in respiratory arrest. She received CPR and medications, and Amin–Sankarreintubated her.

Thirty minutes later, Willie Ann was returned to the ICU. According to Mazzei's report, Jean became "agitated" and had trouble with the ventilator. She extubated herself and suffered a second respiratory arrest. She was re-intubated and given medications. An EEG the following day showed possible hypoxic encephalopathy—brain damage caused by lack of oxygen. A follow-up EEG the next day also indicated hypoxic encephalopathy. Mazzei's report does not discuss whether the EEGs differentiate between any damage caused by the first extubation and arrest and the second extubation and arrest. Willie Ann was unresponsive to stimuli, including painful stimuli. On February 25, Willie Ann was transferred to another facility for long-term care. She died on March 5, 2008 due to the hypoxic encephalopathy.

Penny filed a wrongful death medical malpractice suit against Doctor's Hospital, Mireles, Amin–Sankar, Shenoy, and Zuniga.[3] Penny alleged that Shenoy and Zuniga were negligent in clearing her mother for surgery. Specifically, Penny alleged that there was no emergency or urgent reason to remove her mother's gallbladder and that her mother had experienced abdominal and chest pain for years without treatment. In addition, Willie Ann had suffered an acute myocardial infarction before the gallbladder surgery and had a history of numerous health problems. Although she was stable, her history created additional risks that made her a poor candidate for surgery, and therefore Shenoy and Zuniga negligently cleared Willie Ann for the surgery.

**\*3** Penny timely served an expert report from Mazzei, an anesthesiologist.[4] Mazzei's report focused primarily on the anesthesiologist, Amin–Sankar. Concerning Shenoy and Zuniga, Mazzei stated that if Willie Ann "had not undergone elective surgery on February 19, 2008, she would not have experienced the respiratory arrests that resulted from her extubation and she would have, in all probability, survived."

Concerning Amin–Sankar, Mazzei's report states, "In reasonable medical probability, if Ms. Jean had not been prematurely extubated, she would not have had the increased demands placed on her body which caused her subsequent respiratory arrest, anoxic brain injury and death." He further explained in his general discussion of causation that the anesthesiologist should have been aware of the risks of premature extubation. A fair reading of Mazzei's report is that the premature extubation was the immediate cause of death:

> The time it takes for a patient's anesthesia effect to lessen enough for them to be able to breathe independently varies from patient to patient and is affected by a patient's physiology and underlying disease processes. For a patient like Ms. Jean who had recently suffered a MI, it should have been expected that it would take her a significant period of time before she was capable of being extubated to breathe on her own. This was not taken into account nor was her clinical picture when she was untimely extubated [by the anesthesiologist]. This caused her to suffer a respiratory arrest which further stressed Ms. Jean's ability

to recover from surgery and lead to another respiratory arrest with anoxic encephalopathy and death.... When Ms. Jean extubated herself, the failure to address her increasing respiratory distress resulted in a subsequent respiratory arrest causing the anoxic encephalopathy which lead to her death.

Shenoy and Zuniga moved to dismiss, asserting that the report was inadequate to them. The trial court granted Penny an opportunity to amend the report. After receiving the amended report, Shenoy and Zuniga again moved to dismiss due to inadequacies in the report. The trial court denied the motions to dismiss, and this interlocutory appeal followed.

### Standard of Review

We review a trial court's ruling on a motion to dismiss a healthcare liability lawsuit pursuant to Chapter 74 of the Texas Civil Practice and Remedies Code under an abuse of discretion standard. *See Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 875 (Tex.2001) (reviewing dismissal under predecessor statute, section 13(e) of article 4590i); *Runcie v. Foley,* 274 S.W.3d 232, 233 (Tex.App.-Houston [1st Dist.] 2008, no pet.). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to guiding rules or principles or if it clearly fails to analyze or apply the law correctly. *Runcie,* 274 S.W.3d at 232. In reviewing whether an expert report complies with Chapter 74, we evaluate whether the report "represents a good-faith effort" to comply with the statute. *Strom v. Mem'l Hermann Hosp. Sys.,* 110 S.W.3d 216, 221 (Tex.App.-Houston [1st Dist.] 2003, pet. denied). In making this evaluation, we must look only at the information contained within the four corners of the report. *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 53 (Tex.2002).

### Adequacy of Dr. Mazzei's report

**\*4** In their respective appeals, Shenoy and Zuniga attack various aspects of the adequacy of Mazzei's report, asserting it fails to meet the requirements of section 74.351 of the Texas Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM.CODE § 74.351(a).

### I. Chapter 74 expert report requirements
Pursuant to section 74.351, medical-malpractice plaintiffs must provide each defendant physician and health care provider with an expert report or voluntarily nonsuit the action. *Id.* If a claimant timely furnishes an expert report, a defendant may file a motion challenging the report's adequacy. *Id.* The trial court shall grant the motion only if it appears, after hearing, that the report does not represent a good faith effort to comply with the statutory definition of an expert report. *See id.* § 74.351(*l* ). The statute defines an expert report as a written report by an expert that provides, as to each defendant, a fair summary of the expert's opinions, as of the date of the report, regarding: (1) the applicable standards of care; (2) the manner in which the care provided failed to meet the standards; and (3) the causal relationship between that failure and the injury, harm, or damages claimed. *See id.* § 74.351(r)(6); *Gray v. CHCA Bayshore, L.P.,* 189 S.W.3d 855, 85859 (Tex.App.-Houston [1st Dist .] 2006, no pet.).

Although the report need not marshal all the plaintiff's proof, it must include the expert's opinions on the three statutory elements—standard of care, breach, and causation. *See Palacios,* 46 S.W.3d at 878; *Gray,* 189 S.W.3d at 859. In detailing these elements, the report must provide enough information to fulfill two purposes if it is to constitute a good faith effort: first, it must inform the defendant of the specific conduct the plaintiff has called into question, and, second, it must provide a basis for the trial court to conclude that the claims have merit. *Scoresby v. Santillan,* 346 S.W.3d 546, 556 (Tex.2011) (citing *Palacios,* 46 S.W.3d at 879). A report that merely states the expert's conclusions as to the standard of care, breach, and causation does not fulfill these two purposes. *Id.* " '[T]he expert must explain the basis of his statements and link his conclusions to the facts.' " *Wright,* 79 S.W.3d at 52 (quoting *Earle v. Ratliff,* 998 S.W.2d 882, 890 (Tex.1999)). Furthermore, in assessing the report's sufficiency, the trial court may not draw any inferences, and instead must rely exclusively on the information contained within the report's four corners. *See Scoresby,* 346 S.W.3d at 556 (citing *Palacios,* 46 S.W.3d at 878).

### II. Adequacy of report concerning causation
Within his second issue, Shenoy contends that Mazzei's report does not adequately address causation of Jean's injuries as a result of any negligence by Shenoy. As part of his sole issue, Zuniga similarly argues that the report is inadequate in its statement of causation for his alleged malpractice.

**\*5** An expert report must include a fair summary of the causal relationship between the defendant's failure to meet the appropriate standard of care and the injury, harm, or damages claimed. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(6). An expert cannot merely state his conclusions or "provide insight" about the plaintiffs' claims, but must instead "explain the basis of his statements to link his conclusions to the facts." *Wright,* 79 S.W.3d at 52.In explaining causation, the report must explain how the physician's conduct caused the plaintiff's injuries. *Id.* at 53.

### A. Assertions in Mazzei's expert report regarding causation

Mazzei's report asserts that the applicable standard of care breached by Shenoy included the responsibility to consider all of Willie Ann's co-morbidities because these conditions placed Willie Ann "at an unacceptably high risk for complications from surgery and anesthesia." The report identifies two risks from the surgery and anesthesia: (1) the stresses placed upon the cardiovascular and respiratory system during surgery and anesthesia and (2) the depression of the central nervous system and the resulting risk of "experiencing cardiovascular and respiratory problems." It also generally states that a patient's medical history may increase these risks. It does not, however, quantify or otherwise describe the magnitude of risk for respiratory problems for a person undergoing this surgery with normal health or compare that risk to the risk for a person with pre-existing medical conditions like Willie Ann's. According to the report, these risks are addressed by intubating the patient "so the anesthesiologist can ventilate the patients while their central nervous system is depressed" and that intubation normally continues "until the patient is able to again breathe on [his] own." The report continues:

> .... Although complications arose as Ms. Jean was extubated following surgery, these complications occurred because of the medical conditions that should have lead Dr. Shenoy to conclude that Ms. Jean was not an appropriate surgical candidate. If Ms. Jean had not undergone elective surgery on February 19, 2008, she would not have experienced the respiratory arrests that resulted from her extubation and she would have, in all probability, survived.

In the "Causation" section, the report further states:

> Ms. Jean was a patient who was still recovering from her MI who never should have undergone elective surgery. By continuing to recommend the gallbladder removal surgery, clearing her for surgery and performing surgery, Ms. Jean's healthcare providers breached and violated the standards of care as set forth above and proximately caused her death.

Finally, Mazzei states for a patient like Willie Ann "it should have been expected that it would take her a significant period of time before she was capable of being extubated to breathe on her own ."

### B. Adequacy of the report concerning Shenoy

**\*6** Mazzei's report states that the medical conditions that rendered Willie Ann unfit for surgery caused the complications that arose when she was extubated ("these complications occurred because of the medical conditions"). What he fails to do is provide a factual underpinning for that conclusion explaining why or how this occurred and whether it was all her medical conditions listed in his report or her myocardial infarction in particular that made the risk unacceptable and caused her respiratory arrest. These omissions make the report conclusory and deficient for purposes of section 74.351.

### *1. Expert reports cannot be conclusory to satisfy section 74.351.*

An opinion on causation stated without the underlying facts is conclusory. *Jelinek v. Casas,* 328 S.W.3d 526, 536 (Tex.2010); *Arkoma Basin Exploration Co., Inc. v. FMF Assocs. 1990–A, Ltd.,* 249 S.W.3d 380, 389 n. 32 (Tex.2008). A conclusory opinion is not probative. *City of San Antonio v. Pollock,* 284 S.W.3d 809, 818 (Tex.2009); *see Zamecnik v. Indian Prairie Sch. Dist. No. 204,* 636 F.3d 874, 881 (7th Cir.2011) (stating that mere conclusions are useless to the court).

This rule is not a mere procedural hurdle. Juries—or in the case of expert reports, judges—are often confronted with conflicting expert testimony. One expert may testify that X caused the plaintiff's injuries while a different expert may testify that X did not cause the plaintiff's injuries. The factfinder typically lacks the expertise necessary to form an opinion without expert assistance—

this is why expert testimony is admitted in the first place. *See* TEX.R. EVID. 702. It is the expert's explanation of "how" and "why" causation exists that allows the factfinder to weigh the credibility of the expert's opinion and, when expert opinions conflict, to decide which testimony to disregard. *Cf. In re Christus Spohn Hosp. Kleberg,* 222 S.W.3d 434, 440 (Tex.2007) (detailing reasons why it is essential that the jury have access to the facts and data underlying an expert's testimony in order "to accurately assess the testimony's worth."). With respect to expert reports in healthcare liability claims, the expert's explanation is what allows the trial court to determine whether the claim has merit. *See Jelinek,* 328 S.W.3d at 539; *see also Scoresby,* 346 S.W.3d at 552 (observing that Legislature enacted expert report requirement to elicit expert opinions at an early stage of the litigation to allow the trial court to determine that a basis exists for concluding that the claims have merit). Expert testimony that merely states a final conclusion on an essential element of a cause of action—such as causation—without providing a factual basis for that conclusion does not aid the jury in its role as factfinder but, rather, supplants it. This, an expert may not do. *See Greenberg Traurig of N.Y., P.C.v. Moody,* 161 S.W.3d 56, 97 (Tex.App.-Houston [14th Dist.] 2004, no pet.) ("Expert testimony is admissible to aid the jury in its decision, but it may not supplant the jury's decision."). Similarly, an expert report that merely asserts that a defendant physician's breach caused the plaintiff's injury without providing a factual basis does not provide the trial court with the information necessary to evaluate the merits of the plaintiff's claim. *See Jelinek,* 328 S.W.3d at 529.

**\*7** The requirement that the expert's opinion must not be conclusory applies not only to trial testimony, but to expert reports required by section 74.351(a). *See Jelinek,* 328 S.W.3d at 539–40; *Wright,* 79 S.W.3d at 53.In *Jelinek,* the Texas Supreme Court found the trial court abused its discretion in denying a motion to dismiss because the expert's opinion on causation was conclusory. 328 S.W.3d at 539–40. The expert's report stated that "[the defendant's] breach of the appropriate standard of care in 'reasonable medical probability, resulted in a prolonged hospital course and increased pain and suffering being experienced by [the plaintiff].' " *Id.* at 539. The Court emphasized, "[T]he report says nothing more regarding causation." *Id.* The Court faulted the report for offering no explanation "tying the conclusion to the facts" or of "how and why the breach caused the injury based on the facts presented." *Id.* at 539–40. This is precisely the information missing here: the how and the why.

In *Gray,* this court held that the expert report contained a conclusory statement concerning causation. 189 S.W.3d at 860. The report stated that "[t]he failure to monitor and detect the malpositioned left knee resulted in a dislocated left patella, severe pain and suffering, and subsequent medical treatment." *Id .* at 858. Like the Supreme Court in *Jelinek,* this court faulted the causation opinion for failing to "convincingly tie the alleged departure from the standard of care to specific facts of the case." *Id.* at 860.

### 2. Mazzei's report was conclusory on the issue of causation

Mazzei's causation opinion regarding Shenoy's decision to clear Willie Ann for surgery was conclusory. Although Mazzei's report states that anesthesia depresses the respiratory system and places stress on the heart, the report does not state that Willie Ann's history of heart problems or other conditions somehow made her more likely to suffer respiratory arrest after premature extubation than a person without those medical conditions. It does not state that her risks for the complications that she experienced—respiratory arrest— were enhanced because of her medical conditions. The report does generally discuss why Willie Ann's other conditions affected her suitability for surgery, but does not link her medical conditions to the complication she experienced, respiratory arrest. It recognizes that a depressed central nervous system and the resulting risk of respiratory problems are normal byproducts of anesthesia for even a person with normal health. In other words, Mazzei's report shows that the surgery itself created the risk and does not state how or why Willie Ann's pre-existing conditions changed those risks except in conclusory terms. The report also states that those risks can be addressed by leaving her intubated for "a significant period of time" before extubation. Mazzei's report makes it clear that he believes that the premature extubation was the immediate cause of her death.

**\*8** A report may be sufficient if it states a chain of events that begin with a health care provider's negligence and end in a personal injury. *See Patel v. Williams,* 237 S.W.3d 901, 905 (Tex.App.-Houston [14th Dist.] 2007, no pet.); *see also Engh v. Reardon,* No. 01–09–00017– CV, 2010 WL 4484022, at \*8 (Tex.App.-Houston [1st Dist.] Nov. 10, 2010, no pet.) (mem.op.). But neither case involved an event as remote as that involved here.

In *Patel,* the Fourteenth Court of Appeals held that an expert report sufficiently set forth causation when it presented a chain of events beginning with an allegedly negligent prescription and ending with the patient's death. *Patel,* 237 S.W.3d at 905–06. Patel prescribed Williams

an anti-dementia drug. *Id.* at 903. The report explained that the drug was not FDA-approved for patients with Williams's ailment and that known side-effects of the drug included restlessness or a need to keep moving. *Id.* Williams's family withdrew consent for the drug, but Patel continued to prescribe it. *Id.* Williams was being fed via feeding tube, and allegedly due to the restlessness from the drug, she removed the tube. *Id.* The report identified nurses' notes that described Williams as agitated and stated that she kept pulling at her feeding tube. *Id.* The nursing staff improperly re-inserted the tube, causing a small cut, which became infected because of the contents of the feeding tube entering the cut. *Id.* The cut developed into an abscess requiring multiple surgeries. *Id.* The report concluded that Williams's death was caused by the infection from the improperly re-inserted feeding tube. *Id.* at 904. The Fourteenth Court held that the trial court did not abuse its discretion in determining the report was not conclusory or speculative concerning causation. *Id.* at 905–06.

The report in this case is distinguishable. The report identifies the alleged breach—clearing Willie Ann for surgery with her medical history—as did the report in *Patel*—prescribing an unapproved drug without consent. *See id.* But there the similarities end. In *Patel,* the report explained that a known side effect of the drug was restlessness, and the restlessness caused Williams to become agitated and remove her feeding tube. *Id* . Willie Ann likewise became agitated and removed her breathing tube. The report, however does not explain any connection between clearing Willie Ann for surgery or her medical history and her agitation. While the report in *Patel* explained each step on the path of causation, the report in this case does not.[5]

There were "many links in the chain of events" that began with the pre-surgical clearance and ended with her death, but Mazzei failed to explain and support each link. While Mazzei explains how Willie Ann's premature extubation prevented her from "maintain[ing] the oxygenation in the blood," increasing her risk for respiratory arrest, he fails to explain what role her pre-existing medical conditions played in her respiratory arrest. It is here that we part company with the trial court and find that it abused its discretion. Mazzei does not link the alleged negligence—clearing Jean for surgery—with the premature extubation except that one occurred before the other. That is not enough; it is only a statement of "but for" causation. If that is all that section 74.351 requires to demonstrate causation, almost any prior action taken by a health care provider could be said to cause the ultimate outcome. For example, the referral by the emergency room physician for the surgical consultation with Dr. Shenoy also was a

cause of Willie Ann's death if all that is necessary is for an event to have preceded the injury.

**\*9** To establish cause in fact, Mazzei had to discuss why the act or omission was a substantial factor in causing the injury and without which the harm would not have occurred. *W. Invs., Inc. v. Urena,* 162 S.W.3d 547, 551 (Tex.2005); *see also Transcon. Ins. Co. v. Crump,* 330 S.W.3d 211, 214 (Tex.2010) (stating that plaintiff must prove "cause in fact (or substantial factor)"); *Ford Motor Co. v. Ledesma,* 242 S.W.3d 32, 46 (Tex.2007) (stating that producing cause requires that (1) the cause must be a substantial cause of the event in issue and (2) it must be a but-for cause, namely one without which the event would not have occurred). The report does not do so. Mazzei's report does not link facts from the alleged negligence in clearing her for surgery to Willie Ann's death. Willie Ann did not suffer a cardiac arrest during or after the surgery; she suffered respiratory arrest and only after a premature extubation. Mazzei does not state that Willie Ann suffered any unusual respiratory issue during the surgery itself; the surgical procedure was "uneventful." And based on Mazzei's report, it appears that any patient—healthy or with a history of medical conditions—who is prematurely extubated will not sufficiently "maintain the oxygenation in the blood" and therefore is at risk for respiratory arrest. The mere fact that Willie Ann was cleared for surgery before her death does not mean that the clearance for surgery caused her death. *Jelinek,* 328 S.W.3d at 533 (cautioning against the *post hoc ergo propter hoc* fallacy, that is, reasoning that an earlier event caused a later event simply because it occurred first).

A causal link can be too attenuated to satisfy the causation requirement for an expert report. *See Gonzalez v. Sebile,* No. 09–09–00363–CV, 2009 WL 4668892, at \*4 (Tex.App.-Beaumont Dec. 10, 2009, pet. denied) (mem.op.). In *Gonzalez,* the physician was sued for clearing the patient for surgery without obtaining a cardiologist consultation despite an earlier open heart surgery. 2009 WL 4668892at \*2. According to the plaintiffs, the defendant anesthesiologist fell below the standard of care by failing to disqualify the plaintiff as not fit for surgery in part because of the risks of general anesthesia. *Id.* The court held that the report's statement that the plaintiff would not have been injured if he had not undergone surgery in the first place was "too attenuated to set forth evidence of causation with sufficient specificity to inform" the physician of the alleged misconduct and to allow the trial court to conclude that the plaintiff's claims had merit. *Id* . at \*3. Mazzei's report suffers from the same defect.

While Mazzei's report "provides insight" concerning the claims surrounding Jean's death, it does not link the facts

of the decision to clear her for surgery to the conclusion that Shenoy's alleged breach of the standard of care caused Jean's death. It does not, therefore, provide a basis for the trial court to have concluded that causation was demonstrated for Shenoy's decision to clear Willie Ann for surgery. *See Palaciois,* 46 S.W.3d at 879 (report must provide basis for concluding that claims have merit). We conclude, therefore, that the report is conclusory and inadequate with respect to Shenoy. *See Gray,* 189 S.W.3d at 860; *see also Jelinek,* 328 S.W.3d at 539–40 (finding report inadequate concerning causation because it did not explain "how and why the breach caused the injury based on the facts presented").

**\*10** We sustain this portion of Shenoy's second issue.

**B. Adequacy of the report concerning Zuniga**

Penny has not alleged, and Mazzei's report does not assert, that Zuniga negligently performed surgery; rather, the surgery is described as "uneventful." For the same reasons that the report is inadequate as to causation for Shenoy, we conclude that, with respect to Zuniga, the report fails to explain how and why Zuniga's clearing of Willie Ann for surgery caused her death, fails to demonstrate the causal link necessary to have a meritorious claim, and is conclusory and inadequate. *See Gray,* 189 S.W.3d at 860; *Jelinek,* 328 S.W.3d at 539–40.

We sustain this portion of Zuniga's sole issue.[6]

### Conclusion

We reverse and render an order dismissing the claims against Shenoy and Zuniga.

SHARP, J., dissenting. Dissent to follow.

Footnotes

1    *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(9) (West 2011).

2    *See Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 53 (Tex.2002) (review of Chapter 74 report is limited to four corners of report).

3    Only Shenoy and Zuniga are parties to this appeal.

4    *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(a).

5    The report in this case is similarly distinguishable from the report in *Engh.* In *Engh,* the report identified the alleged breach-placing a surgical clip on the ureter during surgery. 2010 WL 4484022 at *6. The report also explained the consequences of a clipped ureter. Specifically, the report detailed how damage to and, eventually, loss of the kidney would result from clipped ureter. *Id.* Thus, this court found the report adequate, although Engh saw multiple other doctors and several months passed after his surgery and before he lost his kidney. *Id.* at *10. The report explained how the alleged breach caused the loss of Engh's kidney, while the report here contains no explanation of how clearing a patient with a history like Willie Ann's causes premature extubation, self-extubation, or the eventual death of the patient.

6    Because we have sustained Shenoy's second issue in part and Zuniga's sole issue in part, we do not address the other arguments raised by the parties. *See* TEX.R.APP. P. 47.1.

368 S.W.3d 574
Court of Appeals of Texas,
Austin.

Ted SMITH, D.O.; and Austin Regional Clinic,
P.A., Appellants,
v.
Janet Lynn WILSON, Appellee.

No. 03–10–00387–CV. | Jan. 11, 2012. | Rehearing
Overruled May 7, 2012.

## Synopsis
**Background:** Medical malpractice action was brought against physician and clinic, after patient who had been prescribed anti-depressant committed suicide. The 53rd Judicial District Court, Travis County, Suzanne Covington, J., denied defendants' motion to dismiss due to deficient expert report, and defendants appealed.

**[Holding:]** The Court of Appeals, David Puryear, J., held that expert's medical report was not good faith attempt to comply with medical expert report requirements.

Reversed and remanded.

## Attorneys and Law Firms

**\*575** Diana L. Faust, R. Brent Cooper, Richard C. Harrist, Cooper & Scully, PC, Dallas, TX, for Appellant.

Dan Ballard, Stacey J. Simmons, Ballard & Simmons, LLP, Austin, TX.

Jay Harvey, Winckler & Harvey, LLP, Austin, TX, for Appellee.

Before Chief Justice JONES, Justices PURYEAR and PEMBERTON.

## OPINION

DAVID PURYEAR, Justice.

Appellants Ted Smith, D.O., and Austin Regional Clinic ("ARC") appeal from the denial of their motion to dismiss appellee Janet Lynn Wilson's suit for medical malpractice. We reverse the trial court's order and remand for dismissal and determination of attorney's fees.

## Factual and Procedural Background

On August 6, 2007, Wilson's son, Keith Michael Harris, went to see Dr. Smith, complaining of depression and stress. Harris was twenty-three years old and had recently broken up with his girlfriend. Smith prescribed fluoxetine[1] with twelve refills and did not schedule a follow-up visit. On September 5, 2007, Harris committed suicide.

Wilson sued appellants, alleging that Smith was negligent in prescribing fluoxetine and in not scheduling a follow-up visit with Harris, that ARC was vicariously liable as Smith's employer, and that their negligence was a proximate cause of Harris's death. Wilson timely served an expert report by Dr. John T. Maltsberger. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351 (West 2011). In his report, Maltsberger stated that the accepted standard of care that should be employed when prescribing fluoxetine required a doctor to obtain a description of the patient's "anxious and depressive symptoms" and a full psychiatric history. He opined that Smith breached that standard of care because he did not "obtain and record" Harris's symptoms of anxiety and depression or his full psychiatric history. Maltsberger stated that there was a generally recognized relationship between fluoxetine and suicide in adolescents and young adults and that "adolescents with psychiatric disorders" had a greater risk of suicidal thoughts and behavior in "the first few months of treatment" when prescribed fluoxetine. Maltsberger **\*576** concluded by stating, "[I]t is my opinion that more likely than not, had Keith Harris not been prescribed fluoxetine, he would not have committed suicide."

Appellants objected to the report, asserting it was deficient because it was conclusory with regard to causation. Appellants also noted that the report did not mention ARC at all, much less level any criticism against it, and argued that it therefore amounted to no expert report at all as to ARC. The trial court found that Maltsberger's report qualified as a report but was inadequate, denied appellants' motion to dismiss, and gave Wilson thirty days to remedy the report's deficiencies. Wilson filed an amended report providing essentially the same opinions, but adding more detail to the causation paragraph.[2] Maltsberger changed his statements about the relationship between fluoxetine and suicidal thinking and behavior to refer only to

adolescents, removing his prior inclusion of "young adults."[3] Maltsberger concluded:

> Based on the information provided to me to date, it is my opinion that Keith Harris was a suicide-vulnerable, depressed young man. As outlined in the studies described above, fluoxetine worsened his depression and agitated this patient, driving him beyond his capacity for endurance. It is my opinion that more likely than not, fluoxetine was a significant cause that worsened the emotional burden of Mr. Harris's illness and that without it he would not have committed suicide.

Appellants filed another motion to dismiss, asserting that the new report was deficient because Maltsberger "never connects the dots and says that based on the history or presentation that existed had Dr. Smith obtained an adequate history, he *should not* have prescribed Prozac." Appellants further asserted:

> [Maltsberger] never states that based on the information available to Dr. Smith at the time that he was treating Mr. Harris, Dr. Smith should have concluded that Mr. Harris was suicide-vulnerable. As an expert, he is supposed to analyze Dr. Smith's actions based on the information that was available to him at the time. His failure to do so renders his opinions conclusory, and therefore, not adequate.

Appellants also reasserted that because Maltsberger's report made no reference to or criticism of ARC, it did not qualify as an expert report on those claims. The trial court denied appellants' motion to dismiss, and appellants filed this appeal. *See id.* § 51.014(a)(9) (West 2008).

## Analysis

[1] Within 120 days of the date a plaintiff files a health-care-liability claim, she must serve each physician or health care provider against whom claims are asserted ("medical defendant") with at least one expert report that summarizes the expert's opinions "regarding applicable standards **\*577** of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." *Id.* § 74.351(a), (r)(6). After an expert report is filed, a medical defendant may file an objection to the report's sufficiency and a motion to dismiss the plaintiff's liability claims. *See id.* § 74.351(a), (b).

[2] When the adequacy of a report is challenged, the trial court should only sustain the objections if it determines "that the report does not represent an objective good faith effort to comply with the definition of an expert report." *Id.* § 74.351(*l* ); *see American Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 878 (Tex.2001). The trial court should confine its inquiry to the four corners of the report, which must include the expert's opinion on all three statutory elements and " 'must explain the basis of [the expert's] statements to link his conclusions to the facts.' " *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002) (quoting *Earle v. Ratliff,* 998 S.W.2d 882, 890 (Tex.1999)). If the trial court finds a report deficient, the plaintiff's claims against the medical defendant are subject to dismissal unless the court grants "one 30–day extension to the claimant in order to cure the deficiency." Tex. Civ. Prac. & Rem.Code Ann. § 74.351(c), (*l* ). If an expert report is not timely served, the trial court *must* dismiss the claims against the medical defendant if the defendant files a motion to dismiss. *Id.* § 74.351(b).

[3] [4] "A report need not marshal all the plaintiff's proof," but to be considered a good-faith effort to satisfy the statute, it must do more than simply provide the expert's conclusions as to standard of care, breach, and causation. *Palacios,* 46 S.W.3d at 878–79. Instead, the report "must discuss the standard of care, breach, and causation with sufficient specificity to inform the defendant of the conduct the plaintiff has called into question and to provide a basis for the trial court to conclude that the claims have merit." *Id.* at 875. We review a trial court's denial of a motion to dismiss under section 74.351 for an abuse of discretion, but if an expert report contains only conclusions about the statutory elements, the trial court has "no discretion but to conclude ... that the report does not represent a good-faith effort" to satisfy the statute. *Id.* at 877, 880.

After appellants objected to the sufficiency of Maltsberger's original report, the trial court gave Wilson the opportunity to provide an amended report. The new report, however, added very little to Maltsberger's statements related to Smith's alleged breach of the standard of care and causation, including only one additional paragraph that stated that Harris was "a suicide-vulnerable, depressed young man" and that fluoxetine worsened his depression and led to his suicide.[4] Wilson asserts that this report "provides, in its four corners, that but for prescribing the medication the patient would not have committed suicide." That may be true, but

despite Maltsberger's opinion that fluoxetine worsened Harris's mental state and "without it he would not have committed suicide," the report does not explain how taking more complete medical records from Harris would have made Smith aware that fluoxetine would put Harris at risk for suicidal thoughts or action and **\*578** would have dissuaded Smith from prescribing fluoxetine. In other words, the report does not show how Smith's alleged breach of the standard of care caused the tragic result. *See Taylor v. Fossett,* 320 S.W.3d 570, 577–78 (Tex.App.-Dallas 2010, no pet.) (report did not provide a factual explanation of how doctor's delay in diagnosis or treatment caused complications); *Estorque v. Schafer,* 302 S.W.3d 19, 28–29 (Tex.App.-Fort Worth 2009, no pet.) (expert report left "gaps by not explaining how or why the physicians' failure to consult a urologist or gynecologist caused worsening or progression of Shirley's listed conditions" and did not explain how plaintiff would not have been injured had defendants obtained consults from specialists); *Johnson v. Willens,* 286 S.W.3d 560, 565 (Tex.App.-Beaumont 2009, pet. denied) (report did not explain what "normal dose" would have been, why prescribed dose was excessive, what patient complained of, or what proper treatment would have been); *see also Wright,* 79 S.W.3d at 53 (affirming trial court's determination that report was insufficient because it lacked "information linking the expert's conclusion ... to Bowie's alleged breach"); *Gray v. CHCA Bayshore L.P.,* 189 S.W.3d 855, 859–60 (Tex.App.-Houston [1st Dist.] 2006, no pet.) (affirming trial court's finding that report was insufficient because it did not provide any specific information about what defendants should have done or "convincingly tie the alleged departure from the standard of care to specific facts of the case").

Maltsberger's report essentially states that (1) the applicable standard of care required Smith to obtain and record a description of Harris's symptoms and a complete psychiatric history, (2) Smith neglected to get a description of the symptoms or a complete psychiatric history in deciding to prescribe fluoxetine, and (3) fluoxetine worsened Harris's emotional state to the point where he committed suicide. Maltsberger does not, however, provide even the roughest summary of the information Smith should have gleaned from Harris's psychiatric past or symptoms that would have stopped Smith from prescribing fluoxetine or whether Harris's symptoms or history actually contained information that would have indicated that fluoxetine was not an appropriate prescription.[5] He does not provide facts to explain the causal link between Smith's alleged breach

and Harris's suicide, one of the required statutory elements of an expert report. *See* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(r)(6) (expert report must include "fair summary" of expert's opinion as to "causal relationship" between medical defendant's failure to meet standard of care and injury).

Further, Maltsberger states that studies have shown a relationship between fluoxetine and suicide in adolescents and that fluoxetine increases the risk of suicidal thoughts and behavior in adolescents with psychiatric disorders. He does not, however, state that fluoxetine should never be prescribed to adolescents, nor does he explain whether fluoxetine is always inappropriate **\*579** for all adolescents, whether some adolescents can safely take it, or, more importantly, whether the findings related to adolescents could even be applied to Harris, who at twenty-three was not an adolescent. Without more, Maltsberger's statement that a correlation exists between fluoxetine and suicide in adolescents does not supply a causal link between the prescribing of fluoxetine and Harris's suicide.

To be sure, Maltsberger was not required to provide an exhaustive, lengthy summary of how Smith's omissions caused Harris's suicide or what aspects of Harris's medical records led Maltsberger to conclude that fluoxetine was an inappropriate and dangerous prescription, but he provides literally no summary of such information. We are left with no choice but to conclude that the report does not provide a fair summary of the causal link between Smith's alleged shortcomings and Harris's death. *See Taylor,* 320 S.W.3d at 577–78; *Estorque,* 302 S.W.3d at 28–29; *Johnson,* 286 S.W.3d at 565. Because the report is insufficient as to Smith, it is also insufficient as to ARC, which Wilson sued solely for vicarious liability for Smith's conduct. *See Kettle v. Baylor Med. Ctr.,* 232 S.W.3d 832, 842–43 (Tex.App.-Dallas 2007, pet. denied) (affirming dismissal of suit against professional association due to deficiencies in report about doctor's conduct, stating that whether association was directly or vicariously liable, "liability still depends on conduct" of doctor).

We reverse the trial court's order denying appellants' motion to dismiss. We remand the cause to the trial court for the determination of attorney's fees, *see* Tex. Civ. Prac. & Rem.Code Ann. § 74.351(b), and for entry of a final order dismissing Wilson's claims against appellants.

Footnotes

1    Fluoxetine is the generic name for Prozac, an anti-depressant. We will refer to the drug as fluoxetine except when quoting the

record, in which the terms seem to be used interchangeably.

2    The amended report is two and one-half pages long, and the actual summaries of the standard of care, breach, and causation are covered in slightly over one page.

3    This is a noteworthy omission, since Harris, as a twenty-three-year-old man, was not what is generally considered an adolescent. *See Webster's Third New Int'l Dictionary* 28 (2002) (defining adolescence as "the period of life from puberty to maturity terminating legally at the age of majority"); *see also* medical-dictionary.thefreedictionary.com/adolescence (last visited January 5, 2012, citing *Mosby's Med. Dictionary* (2009), *Miller–Keane Encyclopedia & Dictionary of Med., Nursing, & Allied Health* (2003)) (defining adolescence as time between puberty and adulthood, usually running from between eleven and thirteen and between eighteen and twenty).

4    Although Wilson alleged in her petition that Smith breached the standard of care by not scheduling a follow-up visit with Harris, neither of Maltsberger's reports discusses follow-up visits or states whether a follow-up should have been scheduled, when such a visit would have been appropriate, or whether it would have made a difference in this case.

5    Wilson cites to *Bakhtari v. Estate of Dumas,* 317 S.W.3d 486 (Tex.App.-Dallas 2010, no pet.), stating *Bakhtari* is a "strikingly similar case." The expert report in *Bakhtari,* however, provided substantially more information than the report presented here. The *Bakhtari* report explained that the medication in question should only have been prescribed for very short-term use, no refills should have been given, the patient should have been warned of possible side-effects, the doctor should have consulted with or referred the patient to a mental-health professional, and the doctor should have provided or arranged for "on-going assessment and monitoring" of the patient's condition. *Id.* at 496–97 nn. 9, 10. Maltsberger's cursory report bears very little similarity to the specificity and explanations provided in the *Bakhtari* report.

---

**End of Document**                                                            © 2015 Thomson Reuters. No claim to original U.S. Government Works.

110 S.W.3d 216
Court of Appeals of Texas,
Houston (1st Dist.).

Florence M. STROM, Appellant,
v.
MEMORIAL HERMANN HOSPITAL SYSTEM
d/b/a Memorial Hospital Southwest and
Memorial Hospital System, and Dr. Henry Blum,
Individually and d/b/a Sugar Land Orthopedic
Associates, P.A., Appellees.

No. 01–01–00756–CV. | May 29, 2003.

Patient brought health-care liability claims against hospital and doctor. The 164th District Court, Harris County, Martha Hill Jamison, J., dismissed claims. Patient appealed. The Court of Appeals, Tim Taft, J., held that: (1) reports of patient's experts failed to provide a "fair summary" of the experts' opinions as to the elements of standard of care and causation; (2) patient was not entitled to additional time to amend insufficient expert reports; (3) award of $5,000 in attorney fees as a sanction against patient was proper; (4) dismissal of patient's action did not violate constitutional guarantees.

Affirmed.

Mirabal, J., dissented and filed opinion.

**Attorneys and Law Firms**

**\*218** John H. Holloway, Houston, for Appellant.

Sam A. Houston, Cruse, Scott, Henderson & Allen, Solace H. Kirkland, Andrews & Kurth, David W. Hodges, Mayor, Day, Caldwell & Keeton, L.L.P., Houston, for Appellee.
Panel consists of Justices TAFT, HANKS,[*] and MIRABAL.[**]

**\*219 OPINION**

TIM TAFT, Justice.

Appellant, Florence M. Strom, filed health-care liability claims against appellees, Memorial Hermann Hospital System d/b/a Memorial Hospital Southwest and Memorial Hospital System (the hospital) and Dr. Henry Blum,

individually and d/b/a Sugar Land Orthopedic Associates (Dr. Blum). Strom appeals to challenge orders that dismissed those claims, with prejudice, on the grounds that the expert reports she provided to support those claims under section 13.01(d) of article 4590i, the Medial Liability and Insurance Improvement Act, did not comply with section 13.01(r)(6) of that statute.[1] We address (1) whether Strom's expert reports constituted a fair summary of the standard of care required by Dr. Blum and the Hospital, (2) whether the trial court erred by refusing to grant Strom an extension of time to amend her expert reports, (3) whether Dr. Blum waived his challenge to the adequacy of Strom's expert reports by not asserting the challenge until 180 days after Strom filed suit, (4) whether the trial court erred in awarding $5,000 in attorney's fees to the hospital, (5) the constitutionality of article 4590i, section 13.01(d), and (6) whether the trial court erred in dismissing Strom's claims of fraud, intentional and fraudulent misrepresentations, and "unnecessary surgery" against Dr. Blum. We affirm.

**Background**

Strom sued the hospital claiming that hospital surgical nursing staff improperly positioned her in preparation for neck surgery performed at the hospital October 4, 1996, and caused injury to her left knee. Strom also sued Dr. Blum, an orthopedic surgeon who later treated the left knee and performed a total knee replacement, claiming he was negligent and grossly negligent because the surgery was unnecessary. Strom sued the hospital in October 1998 and sued Dr. Blum a year later.

On April 25, 2001, the hospital moved the trial court to either dismiss Strom's case against the hospital or require her to file a cost bond, on the grounds she had missed the 90–day and the 180–day requirements of article 4590i, section 13.01 by not filing expert reports in compliance with that statute. See TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(a), (d), (e)(3) (Vernon Supp.2003). With respect to the 180–day requirement, the hospital acknowledged that Strom had provided expert reports in attempted compliance with section 13.01(d),[2] but argued that the reports were "insufficient as a matter of law" under section 13.01(r)(6) because they did not provide a "fair summary" of the applicable standard of care, how it was breached, or the causal relationship between the alleged breach and Strom's injuries, as required by that section. See TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(d), (r)(6) (Vernon Supp.2003). The hospital also requested attorney's fees, as authorized by section

13.01(e)(1). *See* TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(e)(1) (Vernon Supp.2003). After conducting a hearing on May 14, 2001, the trial court dismissed Strom's claims against the hospital, with prejudice, and awarded the hospital $5,000 in attorney's fees and costs.

**\*220** Four days later, on May 18, 2001, Dr. Blum filed a similar motion to dismiss. The trial court granted this motion and dismissed Strom's claims against Dr. Blum in an order signed on August 18, 2001. This order recites that the trial court considered Strom's counsel's sworn testimony, and also reflects the trial court's findings and conclusions in granting relief.

### Standard of Review

[1] The abuse-of-discretion standard governs all article 4590i, section 13.01 rulings. *American Transitional Care Ctrs. v. Palacios,* 46 S.W.3d 873, 877 (Tex.2001); *De Leon v. Vela,* 70 S.W.3d 194, 197 (Tex.App.-San Antonio 2001, pet. denied). This standard inquires whether the trial court acted without reference to any guiding rules or principles. *Garcia v. Martinez,* 988 S.W.2d 219, 222 (Tex.1999); *Mueller v. Beamalloy, Inc.,* 994 S.W.2d 855, 858 (Tex.App.-Houston [1st Dist] 1999, no pet.). We may not reverse a discretionary decision simply because we might have reached a different one. *Mueller,* 994 S.W.2d at 858. When resolving factual issues or matters committed to the trial court's discretion, we may not substitute our judgment for that of the trial court. *Walker v. Packer,* 827 S.W.2d 833, 839 (Tex.1992).

[2] Dismissals with prejudice for lack of compliance with section 13.01 of article 4590i are sanctions. *See* TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(e) (Vernon Supp.2003) ("... [T]he court shall, on the motion of the affected physician or health care provider, enter an order awarding as sanctions...."); *Palacios,* 46 S.W.3d at 877. In contrast to findings entered in support of a judgment after a bench trial under rule 296 of the Rules of Civil Procedure, findings entered in support of a sanction dismissing a cause, as entered here in the order granting Dr. Blum's motion, are not binding on the reviewing court, although they are "helpful" in determining whether the trial court exercised its discretion in a reasonable and principled manner. *See IKB Indus., Ltd. v. Pro–Line Corp.,* 938 S.W.2d 440, 442 (Tex.1997) (appeal from dismissal as a sanction); *Chrysler Corp. v. Blackmon,* 841 S.W.2d 844, 852 (Tex.1992) (mandamus review of dismissal as a sanction).

### Dismissals with Prejudice for Insufficient Reports

Strom's first four points of error challenge dismissal of her claims against Dr. Blum as an abuse of discretion. In points of error five through seven, Strom challenges the dismissal against the hospital on the same grounds.

All health-care liability claims must comply with section 13.01(d) of article 4590i. TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(d) (Vernon Supp.2003). Section 13.01(d) requires that a plaintiff asserting a health-care liability claim must, not later than 180 days after filing suit, either: (1) furnish an expert report, with supporting curriculum vitae, to counsel for each defending physician or health-care provider; or (2) voluntarily nonsuit the claim. TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(d) (Vernon Supp.2003). Article 4590i defines "expert report" as a written report that:

> provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed.

TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(r)(6) (Vernon Supp.2003).

Section 13.01 acknowledges that medical-malpractice cases require expert testimony **\*221** and the statute was enacted to curtail frivolous lawsuits. *See Palacios,* 46 S.W.3d at 877; *Hart v. Wright,* 16 S.W.3d 872, 876 (Tex.App.-Fort Worth 2000, pet. denied). If the plaintiff does not comply with section 13.01(d), and the defendant seeks sanctions pursuant to section 13.01(e), the trial court must grant the relief authorized by that section, as follows: dismiss the claim against that defendant with prejudice; award costs and attorney's fees to that defendant; and require that any bond filed under section 13.01 be forfeited to pay that award. TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(e)(1)-(3) (Vernon Supp.2003); *Palacios,* 46 S.W.3d at 877; *see also* TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(*l* ) (Vernon Supp.2003) ("A court shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent a good faith effort to comply with the definition of an expert report in Subsection (r)(6) of this section."); *In re Collom & Carney Clinic Ass'n,* 62 S.W.3d 924, 928 (Tex.App.-Texarkana 2001, orig. proceeding) (holding

that, because noncompliance with section 13.01(d) mandates dismissal with prejudice, trial court had no discretion to grant extension of time to comply; granting mandamus relief to compel dismissal).

[3] [4] In assessing an expert report for compliance with sections 13.01(d) and (r)(6) on a defendant's section 13.01(e) motion, the dispositive inquiry is whether the report "represents a good-faith effort" to comply with section 13.01(r)(6). *See Palacios,* 46 S.W.3d at 878 (citing TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(r)(6)). Because section 13.01 focuses on the report, the only information relevant to this inquiry lies within the four corners of the report. *Id.* The trial court may not look beyond the report, therefore, in determining compliance with the statute. *Id.*

[5] [6] [7] [8] The report need not marshal all the plaintiff's proof or meet the requirements for evidence offered to support a summary judgment or at trial. *Palacios,* 46 S.W.3d at 878–79. The report must, however, include the expert's opinion on each of the elements defined by section 13.01(r)(6), specifically, the standards of care, how the defendant breached those standards, and the causal relationship between the breach and the plaintiff's injury. TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(r)(6). In setting out these elements, the report must: (1) inform the defendant of the specific conduct called into question by the plaintiff's claims and (2) provide a basis from which the trial court may conclude the claims have merit. *See Palacios,* 46 S.W.3d at 879 (citing *Palacios v. American Transitional Care Ctrs.,* 4 S.W.3d 857, 865 (Tex.App.-Houston [1st Dist.] 1999), *rev'd,* 46 S.W.3d 873 (Tex.2001) (Taft, J., dissenting)). A report that merely states the expert's conclusions about the standard of care, breach, and causation falls short of accomplishing these two purposes. *Palacios,* 46 S.W.3d at 879. When the expert report provided in attempted compliance with sections 13.01(d) and (r)(6) contains conclusory statements that do not alert the trial court or the defendant to the conduct the plaintiff complains of, section 13.01(*l* ) affords the trial court no discretion but to conclude that the report does not represent the "good-faith effort," under section 13.01(*l* ), to provide "a fair summary" of the three elements required by section 13.01(r)(6), and no discretion but to dismiss the cause as a sanction, as provided by section 13.01(e). *Palacios,* 46 S.W.3d at 880.

[9] Strom contends that the requirement of providing a "fair summary" is akin to providing "fair notice" in pleadings pursuant **\*222** to rule 47 of the Texas Rules of Civil Procedure. *See* TEX.R. CIV. P. 47. It is apparent, however, from the cases Strom cites that the *Palacios* standard for making a good-faith effort to provide a fair

summary of the expert's opinions as to the elements of standard of care, breach, and causation is higher than the "fair notice" requirement of rule 47.

[10] [11] Standard of care, the first element required by section 13.01(r)(6) for health-care liability claims, is defined by what an ordinarily prudent health-care provider or physician would have done under the same or similar circumstances. *Palacios,* 46 S.W.3d at 880. Whether a defendant breached the standard of care due a patient cannot be determined without "specific information about what the defendant should have done differently." *See id.* ("While a 'fair summary' is something less than a full statement of the applicable standard of care and how it was breached, even a fair summary must set out what care was expected, but not given.") (quoting from *Palacios,* 4 S.W.3d at 865 (Taft, J., dissenting)).

### A. Standard of Care—Dr. Blum

Regarding Dr. Blum, Strom relies upon the following excerpts from the reports of Doctors Robert A. Callewart and George W. Sibley:

#### Dr. Callewart's Report

I have reviewed the medical records furnished in the case of Myrna Strom....

In February of 1997, she was seen by Dr. Henry Blum, an orthopedic surgeon, with her chief complaint involving her left knee. X-rays showed degenerative changes with medial joint space narrowing and some calcification in the notch, and his impression of torn medial maniscus and chondromalacia. Again, he reports that she had no prior history of knee related complaints prior to surgery in question [neck surgery when the patient suffered a knee injury due to improper positioning by the operating room nurses]. Dr. Blum performed the manisectomy on February 12, 1997. On March 3, 1997, it is reported that she is doing fantastic after surgery. However, on April 19, 1997, Dr. Blum indicates the patient needs a total knee replacement, and on July 28, 1997, reports that she is scheduled for a total knee replacement on August 1, 1997. The total knee and carpal tunnel release were performed by Dr. Blum on August 1, 1997....

**Based upon the records, it is my expert opinion that the total knee and carpal tunnel release were not medically indicated.** There is no justification or very clear indication in the chart for the surgery. There is some suggestion she had severe arthritis in the knee; however, this is not consistent with what was reported

in the knee at the time of the prior surgery [manisectomy by Dr. Blum] or other evaluations of the knee. If she had severe degenerative joint disease, this could not have occurred in several months time frame from when she had the surgery of the neck or from the time of the February 12, 1997, surgery [manisectomy by Dr. Blum].

**Based upon a reasonable medical probability, the records indicate no medical basis of [sic] reason for the total knee replacement in a woman in her middle 50's who weighs 240 lbs, who had reportedly a normal knee prior to the operative room injury.** *The surgery would therefore violate the standards of care which would be expected to be exercised by a reasonable and prudent orthopedic surgeon under the same or similar circumstances, and gross negligence to submit such a patient to an unnecessary surgery.*

**\*223 Dr. Sibley's Report**

Based upon the medical records, the surgery of 8/1/97 [total knee and carpal tunnel syndrome surgeries] was not indicated medically. **This apparently was unnecessary surgery. The medical records do not contain adequate indications for the surgery performed on 8/1/97. A markedly obese 52–year–old lady with a short right leg is not a candidate one would expect to have a good result from a total knee replacement. The diagnosis of carpal tunnel syndrome seems to be inadequate grounds to justify the surgery of 8/1/97.** *The surgeries of 8/1/97 to the knee and to the wrist were unnecessary.*

(Emphases added by Strom's brief for both reports.)

[12] Examining the two reports for a showing of what an ordinarily prudent physician would have done under the same or similar circumstances, there simply is no statement of the standard of care. *See Palacios,* 46 S.W.3d at 880. To the extent that the reports state what an ordinarily prudent physician would not have done, i.e., what Dr. Blum did, the reports are addressing a breach of the standard of care rather than the applicable standard of care itself. Because the reports fail to provide an adequate statement of the standard of care, it is unnecessary to examine further whether they fulfill the other two requirements for expert reports pursuant to article 4590i, section 13.01(r)(6). *See De Leon v. Vela,* 70 S.W.3d at 199.

Accordingly, we overrule Strom's first four points of error.

**B. Standard of Care—The Hospital**

Regarding the Hospital, Strom relies upon the following excerpts from the reports of Doctors Sibley and Callewart:

**Dr. Sibley's Report**

On 10/4/96, Dr. Berry operated on Florence and decompressed the C7–T1 area. He noted that postoperatively, the patient for the first time complained of her left knee.

On 11/1/96, an MRI of the left knee showed a tear of the posterior horn of the medial meniscus. Dr. Staewen examined her and made the diagnosis of the dislocated patella on the left with mild sprain of the lateral collateral ligament. The medical records suggest that the patient, while being strapped in the prone position for a posterior cervical operative procedure on 10/4/96, was placed in an untoward position. The result was injury of the left knee....

On 2/3/97, Florence saw Dr. Blum complaining of her left knee....

On 2/12/97 Dr. Blum did arthroscopic surgery of the left knee and did a partial medial meniscectomy and chondroplasty of the left knee....

**CONCLUSION: Based upon the medical records, it appears that the patient went into the operation of 10/4/96 without complaints of her left knee and came out of the surgery with complaints of the left knee. It is also noted that the patient had a short right leg and degenerative disease of the left knee prior to the 10/4/96 surgery. Based on the medical records, the patient's left knee was negligently injured while under anesthesia when she was moved from the supine position on the gurney to the prone position on the operating table (a twisting injury) and/or when she was placed on the operating table with the left knee inadequately padded.**

**Dr. Callewart's Report**

On May [2]8, 1996, Dr. Cech performed what is described as inferior L4 and superior L5 hemilaminectomies, bilateral **\*224** L4–5 medial facetectomies and foraminotomies with decompression of the L4/L5 nerve roots and thecal sac. The patient complained of continuing problems post-operatively; however, in a report dated July 8, 1996, she denied any trouble with pain in the lower extremities. Based upon evaluation by MRI, x-ray, and a cervical myelogram in August and September 1996, Dr. John Berry suggested a cervical decompression bilaterally of C7–T1, and

possibly re-explore C5–6 bilaterally. This surgery was performed on October 4, 1996, at the Memorial Hospital Southwest in Houston, Texas. **This surgery resulted in the patient sustaining an acute traumatic injury in the patient's left knee/leg; the patient being presumably in a sitting position. The patient suffered immediate pain and swelling of the knee postoperatively, with difficulty in walking.**

On October 23, 1996, it is reported that the patient complains of left knee pain and hobbling on the left knee, which is swollen, with decreased range of motion and tenderness. A MRI of the left knee on November 1, 1996, showed a horizontal tear through the posterior horn of the medial meniscus, extending to the inferior articular surface near the free edge, and a small interior surface tear of the medial meniscus at the junction of the posterior horn and body segment, and a grade I medial collateral ligament sprain.

The knee injuries described in the MRI do not occur when the customary and usual standards of care are exercised in the positioning and strapping a patient on the operative table. However, the injuries can occur when the hospital's operating room personnel fail to take necessary precautions to pad and avoid the placement of the leg/knee in an abnormal position by strapping the patient to prevent movement during surgery. It is my expert opinion, based upon a reasonable medical probability, that the knee injuries suffered by the patient were due to the failure of the operating room personnel to exercise ordinary care, or negligence of the operating room personnel, in placing and maintaining her position on the operating room table. On a follow up of her knee pain January 8, 1997, it was noted that 'apparently during her recent surgery, her knees were taped in an untoward position, resulting in some problems. Difficult to know exactly what, but it is felt that she has some cartilage torn in the left knee.'

(Emphases added by Strom's brief for both reports.)

[13] Although the above reports mention that Strom's knee injury does not normally occur when the usual standards of care are exercised, and even note that the left knee must not have been properly positioned or padded, the reports nevertheless fail to set out the applicable standard of care. *See Palacios,* 46 S.W.3d at 880. Once again, the most that can be said is that the reports address a breach of the standard of care by not properly positioning or padding the leg and knee. Moreover, the reports are conclusory regarding causation, by failing to set out the manner in which a failure to properly pad and position the leg and knee resulted in Strom's knee injury.

Accordingly, we overrule Strom's fifth through seventh points of error.

### Failure to Grant Additional Time to File Complying Expert Report

In points of error eight through ten, Strom contends the trial court abused its discretion by refusing to grant her an additional 30 days to either amend the reports **\*225** of her experts, Drs. Sibley and Callewart, or permit Strom to file their depositions as supplements to their reports. Strom relies on section 13.01(g) of article 4590i, which provides as follows:

> Notwithstanding any other provision of this section, if a claimant has failed to comply with a deadline established by Subsection (d) of this section and after hearing the court finds that the failure of the claimant or the claimant's attorney was not intentional or the result of conscious indifference but was the result of an accident or mistake, the court shall grant a grace period of 30 days to permit the claimant to comply with that subsection. A motion by a claimant for relief under this subsection shall be considered timely if it is filed before any hearing on a motion by a defendant under Subsection (e) of this section.

TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(g) (Vernon Supp.2003).

[14] The record contains two requests by Strom for additional time. The first request appears in the concluding paragraphs of Strom's response to the hospital's motion to dismiss. This request refers to possible secretarial or post-office error and appears to presume that the hospital was contending Strom did not furnish the reports on a timely basis, as well as moving to dismiss pursuant to section 13.01(e)(3) because the reports were insufficient. Citing section 13.01(h) of article 4590i,[3] which authorizes agreements of counsel to extend the deadlines of sections 13.01(a) or (d), Strom's counsel provided an affidavit documenting his and the hospital's February 10, 1999 rule 11 agreement to extend the

deadline to provide an expert report an additional day, to April 1, 1999. The affidavit also documented Strom's counsel's instructions to his support staff in accordance with that agreement. Nothing in the record suggests that the hospital was disputing timeliness of receipt. Rather, the record shows that, in contending Strom had not complied on a timely basis, the hospital had taken the position that Strom had not provided complying expert reports by the 180–day deadline, which had therefore expired. Moreover, in later documents filed with the trial court, Strom's counsel referred to his timely compliance with the agreed, extended deadline as "undisputed." Thus, there was no basis on which to invoke section 13.01(h).

Strom also cited section 13.0 *2* (g) of article 4590i in support of her first request for additional time. Section 13.0 *2* (g) does not pertain, however, to expert reports. *See* TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.02(g) (Vernon Supp.2003). Strom may have mistakenly cited section 13.0 *2* (g) instead of section 13.0 *1* (g), on which she relies in her brief to this Court. But the "accident or mistake" documented in the affidavit supporting Strom's first request refers only to Strom's having erroneously presumed, as we have just addressed, that the hospital did not receive Strom's reports by the agreed, extended deadline. The first request does not refer to the "accident or mistake" on which Strom later relied and on which she relies in this appeal.

Strom's second request for additional time appears in her June 15, 2001 motion for rehearing of the trial court's May 24, 2001 order dismissing her case against the hospital, with prejudice. In addition to claiming that her expert reports complied with section 13.01 of article 4590i, Strom alternatively requested that the trial court "extend the time to file or furnish an amended report or the depositions of Dr. Sibley and Dr. Callewart as an amendment **\*226** to the prior reports." Strom again cited section 13.01(h) of article 4590i, governing agreements of counsel to extend preliminary deadlines for filing expert reports. Section 13.01(h) does not apply to relief requested of a court.

Strom again cited "accident or mistake" in her second request, but asserted reasons that differed from her first request. Here, Strom clearly invoked the provisions of section 13.01(g) of article 4590i by asserting that her failure to comply with section 13.01(d) was neither intentional nor the result of conscious indifference, but the result of accident or mistake. *See* TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(g). Strom's claim of "accident or mistake" is premised on her attorney's sworn affidavit attesting to his "reasonable belief" that the expert reports he provided complied with article 4590i. Strom reasserts that contention on appeal.

To comply with section 13.01(g), however, Strom had to file her request for additional time before any hearing on a defendant's motion to dismiss under section 13.01(e). *See* TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(g); *see also Jackson v. Reardon,* 14 S.W.3d 816, 819 (Tex.App.-Houston [1st Dist.] 2000, no pet.) (holding that trial court did not abuse its discretion by denying motion, which sought additional time to file section 13.01(d) expert report, but was filed after hearing on section 13.01(e) motion to dismiss). Here, Strom did not request additional time to comply with section 13.01(d) on the grounds she raises in this appeal until after the hearing on the hospital's motion to dismiss. Accordingly, her request was not timely.

Because Strom's request for additional time was not timely, the trial court did not abuse its discretion by refusing to grant relief. We need not address, therefore, whether Strom's counsel's "reasonable belief," that the expert reports provided to support Strom's claims complied with sections 13.01(d) and (r)(6) of article 4590i, constituted "accident or mistake" that warranted granting additional time to comply.

We overrule points of error eight through ten.

### Deadline to Challenge Expert Reports

[15] In point of error 11, Strom contends Dr. Blum waived his right to challenge Strom's expert reports by waiting until 180 days after Strom filed suit. Strom maintains that Dr. Blum had the reports and was aware of their contents, but "sat on his hands" and waited until after the last possible date for Strom to provide a complying expert report. Article 4590i imposes no deadline for challenging an expert report under section 13.01(d). *See Gonzalez v. El Paso Hosp. Dist.,* 68 S.W.3d 712, 717 (Tex.App.-El Paso 2001, no pet.); *Chisholm v. Maron,* 63 S.W.3d 903, 908 (Tex.App.-Amarillo 2001, no pet.); *Hargrove v. Denno,* 40 S.W.3d 714, 716 (Tex.App.-San Antonio 2001, no pet.).

Accordingly, we overrule point of error 11.

### Award of Attorney's Fees to Hospital

[16] In point of error 12, Strom contends that the trial court abused its discretion in awarding the Hospital $5,000 for attorney's fees without evidence to support the claim.

Strom also argues that she was entitled to a jury trial on the issue of reasonable attorney's fees.

Article 4590i, section 13.01(e)(1) provides that the trial court shall award reasonable attorney's fees as a sanction for a plaintiff's failure to comply with the requirements of section 13.01(d). TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(e)(1) (Vernon Supp.2003). By providing that the trial court assess the sanction, the plain language **\*227** of the statute does not contemplate that a jury determine what is reasonable as attorney's fees. Strom does not provide any authority that would permit the jury to determine this issue.

[17] In contending that no evidence supported the trial court's award of attorney's fees, Strom ignores affidavit testimony that $7,500 represented a reasonable award of attorney's fees in this case. This suggested fee was $2,500 more than the amount the trial court actually awarded. In disputing the evidentiary support for the award of attorney's fees, Strom appears to argue that something more than an affidavit is required, but again offers no authority to support that contention.

We hold that the trial court did not err by awarding attorney's fees without convening a jury or requiring testimony beyond proof by affidavit. Accordingly, we overrule point of error 12.

### Constitutional Challenges to Section 13.01

In two points of error 13, Strom contends that (1) the dismissal of her suit with prejudice violates her state and federal constitutional guarantees of due process of law, equal protection of the law, and right to a jury trial; and (2) the trial court abused its discretion in dismissing Strom's claims for fraud, intentional and fraudulent misrepresentations, and "unnecessary surgery" because these causes of action are not issues relating to a "medical standard" under article 4590i.

[18] Strom correctly asserts that article 4590i places a heavy burden on medical malpractice plaintiffs to comply with very specific requirements and that the sanction for failing to comply is severe, but neither violates constitutional guarantees. *See Schorp v. Baptist Mem'l Health Sys.,* 5 S.W.3d 727, 737–38 (Tex.App.-San Antonio 1999, no pet.); *McGlothlin v. Cullington,* 989 S.W.2d 449, 452–53 (Tex.App.-Austin 1999, pet. denied).

[19] As for Strom's contention that her claims exceeded the scope of article 4590i, settled law compels that all claims

for medical negligence be brought under article 4590i. Strom's attempt to recast her claims of negligence in advising her of the necessity of surgery as fraud and intentional and fraudulent misrepresentations regarding unnecessary surgery do not remove those claims from article 4590i. *See Gomez v. Matey,* 55 S.W.3d 732, 735 (Tex.App.-Corpus Christi 2001, no pet.) (holding claims of fraud and misrepresentation regarding unnecessary surgery fell within scope of article 4590i).

Accordingly, we overrule both of Strom's points of error thirteen.

### Conclusion

We affirm the judgment of the trial court. We deny all pending motions.

Justice MARGARET GARNER MIRABAL, dissenting.

MARGARET GARNER MIRABAL, Justice, dissenting.

In my opinion, the timely-filed expert report of Dr. Robert A. Callewart, M.D., represents a good faith effort to comply with the definition of an expert report in Subsection (r)(6) of the Medical Liability and Insurance Improvement Act,[1] and therefore the trial court abused its discretion when it dismissed the plaintiff's claims with prejudice. Accordingly, I respectfully dissent.

I note that this is *not* a case involving the *failure* to file an expert report, and **\*228** this is *not* a case involving the filing of a *late* expert report. Rather, this case involves a timely-filed expert report. The issue is whether the defendants' challenges to the adequacy of the expert report should have been granted, resulting in the dismissal of plaintiff's case with prejudice.

If a plaintiff timely files an expert report and the defendant moves to dismiss because of the report's inadequacy, the trial court must grant the motion "*only if* it appears to the trial court, after hearing, that the report does not represent a *good faith effort* to comply with the definition of an expert report in Subsection (r)(6) of this section." TEX.REV.CIV. STAT. ANN.. Art. 4590i, § 13.01(*l* ) (Vernon Supp.2003) (emphasis added); *Bowie Memorial Hosp. v. Wright,* 79 S.W.3d 48, 51–52 (Tex.2002). To constitute a "good-faith effort," the report must provide enough information to fulfill two purposes:

(1) it must inform the defendant of the specific conduct the plaintiff has called into question, and (2) it must provide a basis for the trial court to conclude that the claims have merit. *Bowie,* 79 S.W.3d at 52. A Court reviews the information contained within the four corners of the report to determine whether it constitutes a "good-faith effort" to provide a fair summary of the expert's opinions about the standard of care, breach, and causal connection between breach and injury. *Id.*

### Claims against the Hospital

Dr. Callewart's report reads, in relevant part:

#### A. Injury

Based upon evaluation by MRI, x-ray, and a cervical myelogram in August and September 1996, Dr. John Berry suggested a cervical decompression bilaterally of C7–T1, and possibly re-explore C5–6 bilaterally. This surgery was performed on October 4, 1996, at the Memorial Hospital Southwest in Houston, Texas. This surgery resulted in the patient sustaining an acute traumatic injury in the patient's left knee probably associated with improper positioning of padding of the knee/leg, the patient being presumably in a sitting position. The patient suffered immediate pain and swelling of the knee postoperatively, with difficulty walking.

On October 23, 1996, it is reported that the patient complains of left knee pain and hobbling on the left knee, which is swollen, with decreased range of motion and tenderness. A MRI of the left knee on November 1, 1996, showed a horizontal tear through the posterior horn of the medial meniscus, extending to the inferior articular surface near the free edge, and a small inferior surface tear of the medial meniscus at the junction of the posterior horn and body segment, and a grade I medial collateral ligament sprain.

#### B. Standard of Care

The knee injuries described in the MRI do not occur when the customary and usual standards of care are exercised in the positioning and strapping a patient on the operative table. However, the injuries can occur when the hospital's operating room personnel

fail to take necessary precautions to pad and avoid the placement of the leg/knee in an abnormal position by strapping the patient to prevent movement during surgery.

#### C. Breach

It is my expert opinion, based upon a reasonable medical probability, that the knee injuries suffered by the patient were due to the failure of the operating room personnel to exercise **\*229** ordinary care, or negligence of the operating room personnel, in placing and maintaining her position on the operating room table.

#### D. Causal Connection

The knee injuries described in the MRI do not occur when the customary and usual standards of care are exercised in the positioning and strapping a patient on the operative table. However, the injuries can occur when the hospital's operating room personnel fail to take necessary precautions to pad and avoid the placement of the leg/knee in an abnormal position by strapping the patient to prevent movement during surgery.... On a follow up of her knee pain January 8, 1997, it was noted that 'apparently during her recent surgery, her knees were taped in an untoward position, resulting in some problems. Difficult to know exactly what, but it is felt that she has some cartilage torn in the left knee.'.... It is my expert opinion, based upon a reasonable medical probability, that the knee injuries suffered by the patient were due to the failure of the operating room personnel to exercise ordinary care, or negligence of the operating room personnel, in placing and maintaining her position on the operating table.

**Does Dr. Callewart's report provide enough information to inform the defendant Hospital of the specific conduct the plaintiff has called into question, and to provide a basis for the trial court to conclude that the claims have merit?**

Clearly, Dr. Callewart's report gives notice that the manner in which the hospital personnel strapped the plaintiff to the operating table was called into question. The standard of care requires hospital personnel to take necessary precautions to pad and avoid the placement of the leg/knee in an abnormal position by strapping (**standard of care**); a medical report indicated that plaintiff's knees were taped in an untoward position on the operating table, and based on a reasonable medical

probability, it was Dr. Callewart's expert opinion that the plaintiff's knee injuries were due to the failure of the hospital personnel to properly place and maintain plaintiff's position on the operating table (**breach and causal connection**).

This case is unlike the *Palacios* case. *American Transitional Care Centers v. Palacios,* 46 S.W.3d 873 (Tex.2001). In *Palacios,* the patient fell from his bed, and the expert opined that "precautions to prevent [the patient's] fall were not properly utilized." *Id.* at 880. The supreme court held that this was not a statement of a standard of care because neither the trial court nor the defendant would be able to determine from this statement if the doctor "believes that the standard of care required [defendant] to have monitored Palacios more closely, restrained him more securely, or done something else entirely." *Id.* In contrast, the expert's report in the present case puts the trial court and the defendant on notice of the conduct complained of, *i.e.* that the hospital personnel failed to properly pad and place the leg/knee in a normal position when strapping the plaintiff to the operating table—by taping the leg in an untoward and abnormal position, a tearing injury was caused to the plaintiff's knee.

Under the guiding principles set out in *Bowie* and *Palacios,* Dr. Callewart's report constitutes a good-faith effort to provide a fair summary of the doctor's opinions about the standard of care, breach and causal connection. Accordingly, the trial court abused its discretion when it granted the defendant's motion challenging the adequacy of the report resulting in a dismissal, **\*230** with prejudice, of the plaintiff's claims against the hospital.

### Claims against Dr. Blum

Dr. Callewart's report reads, in relevant part:

#### A. Injury

"I have reviewed the medical records furnished in the case of Myrna Strom...."

In February of 1997, she was seen by Dr. Henry Blum, an orthopedic surgeon, with her chief complaint involving her left knee. X-rays showed degenerative changes with medial joint space narrowing and some calcification in the notch, and his impression of torn medial meniscus and chondromalacia. Again, he

reports that she had no prior history of knee related complaints prior to surgery in question. Dr. Blum performed the meniscectomy on February 12, 1997. **On March 3, 1997, it is reported that she is doing fantastic after surgery.** However, on April 19, 1997, Dr. Blum indicates the patient needs a total knee replacement, and on July 28, 1997, reports that she is scheduled for a total knee replacement on August 1, 1997.

(Emphasis added). Dr. Blum performed the total knee replacement surgery on the plaintiff.

#### B. Standard of Care

The surgery would ... violate the standards of care which would be expected to be exercised by a reasonable and prudent orthopedic surgeon under the same or similar circumstances.

#### C. Breach

Based upon the records, it is my expert opinion that the total knee and carpal tunnel releases were not medically indicated. There is no justification or very clear indication in the chart for the surgery. There is some suggestion she had severe arthritis in the knee; however, this is not consistent with what was reported in the knee at the time of the prior surgery or other evaluations of the knee. If she had severe degenerative joint disease, this could not have occurred in a several months time frame from when she had the surgery of the neck or from the time of February 12, 1997, surgery.

Based upon a reasonable medical probability, the records indicate no medical basis of reason for the total knee replacement in a woman in her middle 50's who weighs 240 lbs, who had reportedly a normal knee prior to the operative room injury. The surgery would therefore violate the standards of care which would be expected to be exercised by a reasonable and prudent orthopedic surgeon under the same or similar circumstances, and gross negligence to submit such a patient to unnecessary surgery.

#### D. Causal Connection

Based upon the records, it is my expert opinion that the total knee and carpal tunnel releases were not medically indicated. There is no justification or very

clear indication in the chart for the surgery.... Based upon a reasonable medical probability, the records indicate no medical basis of reason for the total knee replacement....

**Does Dr. Callewart's report provide enough information to inform the defendant Doctor of the specific conduct the plaintiff has called into question, and to provide a basis for the trial court to conclude that the claims have merit**?

**\*231** It is clear from Dr. Callewart's report that the conduct called into question is the performance of a total knee replacement operation, when such surgery was unnecessary. The report provides a fair summary of Dr. Callewart's opinions about the **standard of care** (that which would be expected to be exercised by a reasonable and prudent orthopedic surgeon under the same or similar circumstances), **breach** (performing "unnecessary" knee replacement surgery, which is "not medically indicated", for which there is "no justification ... in the chart"), and **causal connection** (the breach of the applicable standard of care caused the injury of unnecessary knee replacement surgery).

With regard to standard of care, the Texas Supreme Court stated in *Palacios:*

> The standard of care for a hospital is what an ordinarily prudent hospital would do under the same or similar circumstances. .... Identifying the standard of care is critical: Whether a defendant

breached his or her duty to a patient cannot be determined absent specific information about what the defendant should have done differently.

*Id.* at 880. In the present case, the expert's report identified the standard of care for an orthopedic surgeon, and specifically stated what care was expected, but not given, *i.e.,* a diagnosis and action based on what is medically indicated, not the performance of unnecessary major surgery.

Once again, under the guiding principles set out in *Bowie* and *Palacios,* Dr. Callewart's report constitutes a good-faith effort to provide a fair summary of his opinions about the standard of care, breach, and causal connection. Accordingly, the trial court abused its discretion when it granted the defendant doctor's motion challenging the adequacy of the report resulting in a dismissal, with prejudice, of the plaintiff's claims against the defendant, Dr. Blum.

### CONCLUSION

We should sustain appellant Strom's points of error one through seven, reverse the judgment, and remand the case to the trial court.

---

Footnotes

\*  This case was originally submitted to a panel consisting of Justices Taft, Mirabal, and retired Justice Jackson B. Smith, Jr. Upon Justice Smith's recusal, Justice George C. Hanks, Jr., who was appointed to this Court on December 31, 2002, is participating by assignment.

\*\*  The Honorable Margaret Garner Mirabal, former Justice, Court of Appeals, First District of Texas at Houston, participating by assignment.

1   *See* TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(d), (r)(6) (Vernon Supp.2003).

2   Strom provided her experts' reports to counsel for the hospital on April 1, 1999. It is undisputed that the experts' reports were timely by agreement of counsel signed in accordance with rule 11 of the Rules of Civil Procedure and as authorized by section 13.01(h) of article 4590i. *See* TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(h) (Vernon Supp.2003); TEX.R. CIV. P. 11.

3   TEX.REV.CIV. STAT. ANN.. art. 4590i, § 13.01(h) (Vernon Supp.2003)

1   TEX.REV.CIV. STAT. ANN.. Art. 4590i, § 13.01(r)(6) (Vernon Supp.2003).

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

169 S.W.3d 241
Court of Appeals of Texas,
Corpus Christi–Edinburg.

Sherrie TAYLOR, Appellant,
v.
CHRISTUS SPOHN HEALTH SYSTEM
CORPORATION, d/b/a Christus Spohn Hospital
Shoreline, Team Health Southwest, L.P., Arthur G.
Wright, Jr., M.D., Coastal Cardiology Association,
Charles J. Schecter, M.D., Raymond H. Graf, M.D.
a/k/a Ray Graf, M.D., Appellees.

No. 13–03–368–CV. | July 29, 2004. | Rehearing
Overruled Aug. 30, 2005.

**Synopsis**
**Background:** Widow, individually and as heir and
representative of deceased husband's estate, brought
medical malpractice action against various health care
defendants for alleged negligent failure to manage and
timely diagnose husband's cardiac condition and for
failure to perform tests necessary for diagnosis.
Defendants filed motion to dismiss based on expert
report. Following a hearing, the 319th District Court,
Nueces County, Thomas Greenwell, J., granted the
motion. Widow appealed.

**[Holding:]** The Court of Appeals, Garza, J., held that
expert report was not good faith effort to comply with
statutory requirements.

Affirmed.

**Attorneys and Law Firms**

**\*242** Cage Wavell, Corpus Christi, for appellant.

William A. Abernethy, John S. Langley, Meredith,
Donnell & Abernethy, Clay E. Coalson, Donnell &
Abernethy, Thomas F. Nye, Douglas M. Kennedy, Brin &
Brin, P.C., Corpus Christi, for appellees.

Before Justices YÃNEZ, RODRIGUEZ, and GARZA.

**OPINION**

Opinion by Justice GARZA.

Sherrie Taylor appeals from the decision of the trial court
to grant a motion to dismiss her cause of action for
medical malpractice based on the inadequacy of her
expert report. Because the trial court did not abuse its
discretion in determining that Taylor's expert report failed
to comply with the statutory requirements established by
the Medical Liability Insurance Improvement Act,[1] we
affirm.

Taylor, individually and as heir and representative of the
estate of Ronald C. Taylor, deceased, brought suit against
appellees, Christus Spohn Health System d/b/a Christus
Spohn Hospital Shoreline, Team Health Southwest, L.P.,
Arthur G. Wright Jr., M.D., Coastal Cardiology
Association, Charles J. Schecter, M.D., and Raymond H.
Graf, M.D. Taylor alleged that the death of her husband,
Ronald, was due to appellees' negligence in failing to
manage and timely and accurately diagnose Ronald's
cardiac condition and in failing to perform tests necessary
to diagnose and recognize Ronald's condition. In
compliance with article 4590i, section 13.01 of the Texas
civil statutes, Taylor filed an expert report by James
Watson, M.D., accompanied **\*243** by Dr. Watson's
curriculum vitae. *See* TEX. CIV. PRAC. & REM.CODE
ANN. § 74.351 (Vernon Supp.2004).[2]

The defendants filed a motion to dismiss based on Dr.
Watson's expert report. The trial court granted their
motion after a hearing.[3] Taylor now brings this appeal
alleging that the trial court abused its discretion by
granting the motion to dismiss. Specifically, Taylor
argues that she demonstrated the required good faith
effort to show compliance with the requirements of article
4590i, section 13.01. Appellees respond that the report
was conclusory and that it improperly grouped all the
defendants together, thereby failing to specifically address
the standard of care and breach of duty with respect to
each defendant.

**Applicable Law and Standard of Review**

In order to bring a medical malpractice claim, a plaintiff
must comply with the requirements for filing an expert
report. Under the statute applicable at the time this report
was filed, a claimant had to provide for each physician or

health care provider one or more expert reports within one hundred and eighty days of filing a health care liability claim. *See* Act of May 5, 1995, 74th Leg., R.S., ch. 140, § 1, 1995 Tex. Gen. Laws 985 (repealed 2003).[4] An expert report is defined as "a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(6).

[1] [2] [3] [4] When presented with an expert report, the trial court must determine whether it represents a good faith effort to comply with the statutory definition of expert report. *American Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 878 (Tex.2001). The statute requires that the report include a fair summary of the expert's opinions for each defendant. *Palacios,* 46 S.W.3d at 878. If the court finds, after a hearing, that the report does not represent a good faith effort to comply with the statute, the court shall "grant a motion challenging the adequacy of [the] expert report." TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(*l* ). Although an expert report does not need to marshal and present all the plaintiff's proof of malpractice, it must include the expert's opinion on each of the elements identified in the statute. *Palacios,* 46 S.W.3d at 878. Essentially, the report must: (1) inform the defendant of the specific conduct the plaintiff has called into question; and (2) provide a basis for the trial court to conclude that the claims have merit. *Id.* at 879. A report that merely states the expert's conclusions about each element (standard of **\*244** care, breach, and causation) does not fulfill these purposes. *Id.*

[5] An expert report may not assert that multiple defendants are all negligent for failing to meet the standard of care without providing an explanation of how each defendant specifically breached the standard and how that breach caused or contributed to the cause of injury. *See Eichelberger v. St. Paul Med. Ctr.,* 99 S.W.3d 636, 638 (Tex.App.-Dallas 2003, pet. denied) ("the expert report must provide, for each defendant, a fair summary of the expert's opinions with respect to ... standard of care, breach of that standard and causation."); *Wood v. Tice,* 988 S.W.2d 829, 831 (Tex.App.-San Antonio 1999, pet. denied) ("The report must specifically refer to the defendant and discuss how that defendant breached the applicable standard of care."). Collective assertions of negligence against various defendants are inadequate. *See, e.g., Doades v. Syed,* 94 S.W.3d 664, 671–72 (Tex.App.-San Antonio 2002, no pet.) (expert report inadequate because it failed to set forth standard of care for each defendant individually and contained mere conclusions

regarding breach and causation); *Rittmer v. Garza,* 65 S.W.3d 718, 722–23 (Tex.App.-Houston [14th Dist.] 2001, no pet.) (expert report inadequate because it referred to defendants collectively and did not explain causal relationship between each defendant's individual acts and injury); *Whitworth v. Blumenthal,* 59 S.W.3d 393, 396 (Tex.App.-Dallas 2001, no pet.) ("the report ... does not identify any particular defendant to which it applies and instead generally asserts 'the health care providers' failed to meet the standard of medical care.").

[6] [7] We review the trial court's ruling on the adequacy of an expert report under an abuse of discretion standard. *Palacios,* 46 S.W.3d at 877; *Doades,* 94 S.W.3d at 671. Under this standard, the appellate court may not disturb the trial court's resolution, even if the appellate court would have decided differently, unless the resolution is shown to be arbitrary and unreasonable. *Doades,* 94 S.W.3d at 671; *see Walker v. Packer,* 827 S.W.2d 833, 839–40 (Tex.1992). A trial court's resolution of a factual issue is arbitrary and unreasonable if the appellant establishes that the trial court could reasonably have reached only one decision. *Doades,* 94 S.W.3d at 671.

### Analysis

[8] Taylor asserts that the expert report she submitted adequately fulfilled the requirements of article 4590i, section 13.01. Appellees argue in response that the report was inadequate because it lumped all of them together, failed to delineate what each individual party was supposed to do, and failed to identify how each failed to perform. Appellees also allege that the report is conclusory with regard to negligence and causation.

Dr. Watson's expert report opined generally that:

> [T]he cause of death in the case of Ronald Clayton Taylor was myocardial infarction due to coronary artery disease and ... his death, more likely than not, would have been avoided had the patient undergone diagnostic cardiac imaging and cardiac catheterization prior to his demise, as should have been done, but was not done. The failure to diagnose and treat this condition was negligence by Dr. Wright (ER Physician), Team Health Southwest, L.P., Coastal Cardiology, Charles Schecter, M.D.

(cardiologist), Raymond Graf, M.D. (cardiologist), and Spohn Hospital Shoreline Emergency Room, and that negligence was a proximate cause of the injury and death of Ronald Clayton Taylor.

**\*245** The report goes on to describe what occurred when Ronald came to the emergency room at Spohn Hospital complaining of chest pains.

Ronald was apparently examined in the emergency room by Dr. Wright and sent to the cardiologist without being discharged. Dr. Watson asserts that it was negligent of Dr. Wright, Team Health Southwest, and Spohn Hospital to fail to complete discharge procedures and patient education with Ronald before sending him to cardiology. He does not, however, present the standards of care relevant to each of the three different parties. Dr. Watson further asserts that such negligence was a proximate cause of Ronald's death. However, he fails to explain what each of these three parties should have done and what they failed to do. This portion of the expert report fails to meet the standard because it is both conclusory in nature and fails to specify each defendant's individual negligent conduct. *See Palacios,* 46 S.W.3d at 879.

In the next paragraph of the report, Dr. Watson discusses the interaction between the various doctors and asserts that the standard of care required effective communication between the various care providers regarding the patient's condition. He concludes without further explanation:

> In the case of Ronald Clayton Taylor, such communication was not effectively achieved and as such was negligent and below the ordinary standard of care and this negligence was a proximate cause of the death of Ronald Clayton Taylor. Specifically, there is no record of the patient's chart accompanying him to the consultative appointment.

Dr. Watson names all six appellees as having failed to meet this standard of medical care.

Again, this portion of the report does not meet the statutory requirements for expert opinions, as Dr. Watson fails to address the standard of care for each defendant and how each defendant failed to meet such standard. He does not explain which defendant should have communicated information about Ronald's condition, or

to whom the information should have been directed, nor does he explain who should have been responsible for transmission of Ronald's chart to cardiology. *See Rittmer,* 65 S.W.3d at 722–23. Dr. Watson also fails to explain how the failure to achieve effective communication was a proximate cause of Ronald's death; he asserts that the information should have been included on Ronald's assessment prior to his undertaking an exercise stress test administered by a cardiologist, but does not explain how, if at all, this information would have altered the outcome of the cardiology assessment and stress test, and, further, how any of this relates to the cause of Ronald's death. *See Palacios,* 46 S.W.3d at 879.

At the end of the report, Dr. Watson asserts that, given Ronald's patient history, the standard of care requires that diagnostic imaging be undertaken to assess the presence of existent myocardial damage and that an eight-to-twelve-hour period of assessment should have elapsed prior to discharge in order to have definitively determined whether there was a need to proceed with cardiac catheterization. He notes that this was not done for Ronald and concludes, "[a]s such the care of Dr. Wright (ER Physician), Team Health Southwest, L.P., Coastal Cardiology, Charles Schecter, M.D. (cardiologist), Raymond Graf, M.D. (cardiologist), and Spohn Hospital Shoreline Emergency Room was negligent, and this negligence was a proximate cause of the death of Ronald Clayton Taylor." This portion of the report fails to state what each defendant should have done in order to meet the standard of care, what each defendant failed to do, and how **\*246** such failure led to Ronald's death. *See id.* Dr. Watson simply states that various procedures that should have occurred did not, without specifying which party was responsible for undertaking which procedures. The parties he lists include an emergency room physician, a hospital, and a cardiology association, among others, each of which owed different duties to the deceased; however, Dr. Watson presents only a single standard of care and asserts that it is equally applicable to all parties involved.

Under our appellate standard of review, we may not reverse a trial court's determination regarding an expert report unless that determination is clearly arbitrary and unreasonable. *See Doades,* 94 S.W.3d at 671. Having reviewed the expert report provided by Taylor, we find it was not an abuse of discretion for the trial court to conclude that the report did not represent a good faith effort to comply with section 13.01(r)(6). *See Palacios,* 46 S.W.3d at 880. Thus, the trial court did not err in dismissing the case. Accordingly, we affirm.

Footnotes

1     Act of May 5, 1995, 74th Leg., R.S., ch. 140, § 1, 1995 Tex. Gen. Laws 985, 986 (former TEX.REV.CIV. STAT. ANN.. art. 4509i § 13.01) (repealed 2003) (current version at TEX. CIV. PRAC. & REM.CODE ANN. § 74.351 (Vernon Supp.2004)).

2     Taylor filed her report in March of 2003. At the time, section 13.01 of article 4509i established the statutory requirements for expert reports. *See* Act of May 5, 1995, 74th Leg., R.S., ch. 140, § 1, 1995 Tex. Gen. Laws 985 (repealed 2003). Article 4590i was repealed in September of 2003, and the requirements for filing an expert report now appear in section 74.351 of the Texas Civil Practice and Remedies Code. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351.

3     Taylor filed a motion requesting that she be granted an additional thirty days in order to file a compliant expert report. The trial court denied this motion after a hearing, a decision that Taylor has not appealed to this Court.

4     Under the current version of the statute, a claimant has one hundred and twenty days to file this report. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(a).

---

**End of Document**                                      © 2015 Thomson Reuters. No claim to original U.S. Government Works.

**WestlawNext**® © 2015 Thomson Reuters. No claim to original U.S. Government Works.     4

320 S.W.3d 570
Court of Appeals of Texas,
Dallas.

Roosevelt TAYLOR, Jr., M.D., Appellant,
v.
LaToya FOSSETT, Appellee.

No. 05–09–01271–CV. | Aug. 25, 2010.

**Synopsis**
**Background:** Patient brought healthcare liability action against physician, arising out of contraction of methicillin resistant staphylococcus aureus (MRSA). The County Court at Law No. 4, Dallas County, William Ken Tapscott, Jr., denied physician's motion to dismiss. Physician appealed.

**[Holding:]** The Court of Appeals, Fillmore, J., held that expert's report failed to adequately establish causation element required in action.

Reversed and remanded with instructions.

**Attorneys and Law Firms**

**\*571** J. Wade Birdwell, D. Michael Wallach, Leslie Ann Dillon Thomas, Wallace, Andrews & Stouffer, P.C., Fort Worth, TX, for Appellant.

Douglas Michael Wood, Law Firm of Douglas Wood, Dallas, TX, for Appellee.

Before Justices MOSELEY, BRIDGES and FILLMORE.

**OPINION**

Opinion By Justice FILLMORE.

This interlocutory appeal follows the trial court's refusal to dismiss LaToya Fossett's health care liability claims against Roosevelt Taylor, Jr., M.D. Dr. Taylor contends the trial court erred by denying his motion to dismiss, which challenged the sufficiency of Fossett's initial and supplemental expert reports, and by denying him attorney's fees and costs. We reverse the trial court's

order and remand to the trial court for the limited purposes of determining Dr. Taylor's reasonable attorney's fees and costs and for entry of a final order dismissing Fossett's claims with prejudice.

**Background**

Given the procedural posture of this case, we draw the facts from the allegations in Fossett's petition. On November 1, 2006, Fossett was admitted under Dr. Taylor's care to Mesquite Community Hospital for induction of labor. There were complications with the delivery and Dr. Taylor performed a cesarean section birth. A few days later, an infection developed in the cesarean section incision. According to Fossett, Dr. Taylor failed to culture the infection and failed to document abdominal fascial integrity during Fossett's hospitalization. Fossett was discharged from the hospital on November 4, 2006. She was seen by Dr. Taylor in his office three days later on November 7, 2006. Dr. Taylor evaluated Fossett's condition and prescribed the oral antibiotic Keflex. According to Fossett, Dr. Taylor failed at that time to culture the incision infection and to document abdominal fascial integrity. On November 9, 2006, Fossett went to the Baylor Hospital Emergency Department. She was diagnosed with cellulitis, hospitalized, and placed on intravenous antibiotics. A bacterial culture showed the infection to be methicillin resistant staphylococcus aureus (MRSA). Fossett was hospitalized for two weeks. While hospitalized, Fossett underwent two surgical procedures relating to wound dehiscence and drainage from the incision. According to Fossett, she continues to suffer bowel and abdominal pain, has permanent scarring and disfigurement of her abdomen, and will require plastic surgery.

Fossett filed suit against Dr. Taylor. Fossett alleges that Dr. Taylor's failure **\*572** following a caesarian section to timely diagnose and treat her for an incision infection, wound dehiscence and cellulitis involving MRSA proximately caused her to suffer injuries and otherwise avoidable surgical intervention. Fossett contends Dr. Taylor was negligent in (1) failing to diagnose incision infection, wound dehiscence and cellulitis; (2) failing to timely communicate with the patient and document cellulitis; and (3) failing to document abdominal fascial integrity, obtain bacterial cultures, evaluate for and administer appropriate medical care, including hospitalization, and treat spreading cellulitis.

Pursuant to section 74.351 of the Texas Civil Practice and Remedies Code, Fossett served Dr. Taylor with an expert report prepared by Dr. Adam S. Levine, a practicing obstetrician and gynecologist, in support of her claims. In his expert report, Dr. Levine asserted that Dr. Taylor deviated from the accepted standard of care for post-operative surgical wound infection and his deviations from the standard of care were the proximate cause of Fossett's complications and injuries. In his report, Dr. Levine stated:

Dr. Taylor provided LaToya Fossett with ante- and post- natal care. Dr. Taylor performed LaToya Fossett's cesarean section, which included making the surgical incision which ultimately became infected. Dr. Taylor breached the standard of care because: 1) neither a weight nor a blood pressure were recorded on the first post-operative visit for LaToya Fossett; 2) aside from a foul odor and draining, no information was recorded with regard to when the pain became worse, when the drainage began, or whether there was any redness or swelling; 3) no documentation was provided with regard to the size or extent of the wound infection and there was no documentation regarding fascial integrity; 4) no bacterial wound cultures were taken; 5) Dr. Taylor prophylactically prescribed the same antibiotics that had no impact earlier in LaToya Fossett's pregnancy; 6) Dr. Taylor failed to order re-evaluation within 24 to 48 hours and instead ordered it for a week later; 7) Dr. Taylor ordered wound compresses but failed to document or instruct LaToya Fossett any (sic) form of wound care, irrigation or cleaning.

Because Dr. Taylor documented a surgical wound infection with "copious pus" and failed to provide LaToya Fossett with treatment in accord with the standard of care, Fossett required admission to Baylor Hospital. Unfortunately, this admission was within 48 hours of Dr. Taylor's evaluation and order to follow-up one week later. At Baylor Hospital, LaToya Fossett was evaluated according to the standard of care and ultimately subjected to two surgical wound explorations, a prolonged hospital stay, a larger incision and scar, and long-standing abdominal pain. Had Dr. Taylor appropriately evaluated and treated LaToya Fossett in a timely fashion according to the standard of care, she might have been admitted to the hospital earlier and required only one, if any, surgical wound explorations (sic). She would most likely not have required two surgeries. Had Dr. Taylor appropriately evaluated and treated LaToya Fossett she would not have required as prolonged a hospital stay because the infection got worse each day and smaller infections are easier to treat than larger infections.

Dr. Taylor's failure to meet to (sic) the applicable standard of care, as described above, in all medical probability, was the proximate cause of the injuries LaToya Fossett suffered. As a result of Dr. Taylor's failure to meet the applicable standard of care LaToya Fossett required: **\*573** 1) At least one surgical wound exploration that might not have been necessary; 2) A hospital stay that was longer than should have been necessary had she been admitted 48 hours sooner; 3) A longer recovery than should have been necessary had she been admitted 48 hours sooner; 4) a larger scar; and 5) continued abdominal pain and discomfort.

Dr. Taylor challenged the legal sufficiency of Dr. Levine's report as failing to comply with the statutory requirements of section 74.351 and moved to dismiss Fossett's health care liability claims with prejudice pursuant to section 74.351(b). *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(b) (Vernon Supp. 2009) (if health care liability claimant does not serve expert report as required, the trial court must, upon motion by affected health care provider or physician, dismiss claim with prejudice). He argued the report was legally insufficient to satisfy the statutory requirements because Dr. Levine's opinions regarding the alleged violations of the standard of care and the alleged causal connection between such violations and injuries and damages claimed by Fossett were conclusory. After a hearing, the trial court concluded Dr. Levine's report was insufficient under section 74.351. The trial court, however, granted Fossett a thirty-day extension under section 74.351(c) "to cure a causation deficiency" in her expert's report:

> namely, whether in Dr. Levine's opinion, Dr. Taylor's failure to meet the appropriate standard of care in post-surgical wound care more likely than not or within reasonable medical probability caused LaToya Fossett to have one or more exploratory surgeries. The current language in the report is insufficient regarding the exploratory surgeries.

*See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(c) (trial court may grant extension to party that failed to serve expert report because timely served report found to be deficient). The trial court overruled any other objections to the report.

Within the thirty-day extension period, Fossett served a supplemental report prepared by Dr. Levine. Dr. Levine's supplemental report stated:

My original opinions regarding the medical care Dr. Taylor provided LaToya Fossett remain unchanged. Dr. Taylor failed to meet an appropriate standard of care for a post-surgical wound. Specifically, Dr. Taylor failed to timely examine, culture, investigate or treat what was an obvious post-surgical wound complication. Dr. Taylor's failure to examine, culture, investigate or treat LaToya Fossett's surgical wound more likely than not and within a reasonable degree of medical probability caused LaToya Fossett to have one or more exploratory surgeries and debridements. Dr. Taylor should have appropriately examined LaToya Fossett.

Further, Dr. Taylor should have recognized the possibility of MRSA infection because MRSA infections are common iatrogenic infections in hospitals. Had Dr. Taylor examined or cultured LaToya Fossett's surgical wound, Dr. Taylor might have properly diagnosed MRSA and begun treatment with appropriate antibiotic therapy it (sic) is more likely than not that LaToya Fossett would not have required subsequent surgeries which resulted in significant pain and permanent scarring.

Finally, it is my opinion, based on a reasonable degree of medical probability, that Dr. Taylor deviated from the accepted standard of care in this case and that his deviations from the standard of care caused LaToya Fossett's injuries.

**\*574** Dr. Levine's supplemental report added one opinion on causation that was not contained in his original report: "Had Dr. Taylor examined or cultured LaToya Fossett's surgical wound, Dr. Taylor might have properly diagnosed MRSA and begun treatment with appropriate antibiotic therapy it (sic) is more likely than not that LaToya Fossett would not have required subsequent surgeries which resulted in significant pain and permanent scarring."

Dr. Taylor again objected to the report and moved to dismiss Fossett's claims for failure to serve a sufficient expert report under section 74.351. He contended that Dr. Levine's opinions set forth in his original and supplemental reports, whether the reports are considered separately or collectively[1], were conclusory and lack sufficient factual specificity with regard to the violations of the standard of care alleged against Dr. Taylor and the alleged causal connection between any such violations and the injuries and damages claimed by Fossett. He further contended that the supplemental report, like the original report, merely concluded that Dr. Taylor caused Fossett's injuries by breaching the standard of care. After a hearing, the trial court found that the expert report of

Dr. Levine was sufficient and satisfied the requirements of section 74.351. *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 74.351(*l* ), 74.351(r)(6).

The trial court denied Dr. Taylor's motion to dismiss. Pursuant to section 51.014(a)(9) of the civil practice and remedies code, Dr. Taylor brought this interlocutory appeal challenging the trial court's denial of his motion to dismiss. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(9) (Vernon 2008).

## Standard of Review and Applicable Law

[1] [2] Dr. Taylor asserts the trial court abused its discretion when it denied his motion to dismiss because Dr. Levine's original and supplemental expert reports, whether considered separately or collectively, are legally and factually insufficient and conclusory. We review a trial court's order on a motion to dismiss a health care liability claim for an abuse of discretion. *See Am. Transitional Care Ctrs. of Texas v. Palacios,* 46 S.W.3d 873, 875 (Tex.2001); *Nexion Health at Terrell Manor v. Taylor,* 294 S.W.3d 787, 791 (Tex.App.-Dallas 2009, no pet.). A trial court has no discretion in determining what the law is or in applying the law to the facts. *See Walker v. Packer,* 827 S.W.2d 833, 840 (Tex.1992) (orig. **\*575** proceeding). An abuse of discretion occurs if the trial court clearly fails to analyze or apply the law correctly. *Id.*

[3] Under section 74.351 of the civil practice and remedies code, any person who brings suit asserting a health care liability claim must, within 120 days of filing the original petition, provide an expert report for each physician or health care provider against whom a claim is asserted. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(a). "Expert report" means a written report that provides a fair summary of the expert's opinions as to the applicable standards of care, the manner in which the care rendered failed to meet those standards, and the causal relationship between that failure and the injury, harm, or damages claimed. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(6); *see also, Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002). An expert report must provide enough information to fulfill two purposes if it is to constitute an objective, good faith effort to comply with the definition of an expert report under section 74.351(r)(6). The report must inform the defendant of the specific conduct the plaintiff has called into question and must provide a basis for the trial judge to conclude the claims have merit. *Leland v. Brandal,* 257 S.W.3d 204, 206–07 (Tex.2008); *Palacios,* 46 S.W.3d at 879.

**[4] [5] [6]** An expert report need not marshal all the plaintiff's proof. *Wright,* 79 S.W.3d at 52. However, it must do more than merely state the expert's conclusions about the standard of care, breach, and causation; it must explain the basis of the expert's statements and link his conclusions to the facts. *Id.* The report must contain sufficiently specific information to demonstrate causation beyond conjecture. *See, Farishta v. Tenet Healthsystem Hosps. Dallas, Inc.,* 224 S.W.3d 448, 453 (Tex.App.-Fort Worth 2007, no pet.). The report must not be conclusory in its explanation of causation; it must explain the basis of its statements sufficiently to link its conclusions to the facts. *Wright,* 79 S.W.3d at 52; *Quinones v. Pin,* 298 S.W.3d 806, 810 (Tex.App.-Dallas 2009, no pet.); *see also, Arkoma Basin Exploration Co. v. FMF Assocs. 1990–A, Ltd.,* 249 S.W.3d 380, 389 n. 32 (Tex.2008) (quoting BLACK'S LAW DICTIONARY 308 (8th ed. 2004)) (defining conclusory as "[e]xpressing a factual inference without stating the underlying facts on which the inference is based"). Thus, courts have reasoned that an expert report that describes causation in terms of mere possibilities does not accomplish the purpose of providing "a basis for the trial court to conclude that the claims have merit." *Wright,* 79 S.W.3d at 52; *see also Quinones,* 298 S.W.3d at 815–16.

**[7]** In determining whether a report complies with the requirements of section 74.351(r)(6), the court may not look beyond the report itself, because all information relevant to the inquiry should be contained within the document's four corners. *Wright,* 79 S.W.3d at 52; *Nexion Health at Terrell Manor,* 294 S.W.3d at 791. A trial court must grant a motion to dismiss a plaintiff's claims for failure to file an adequate expert report only if it appears to the court, after hearing, that the report does not represent an objective good-faith effort to comply with the statutory definition of an expert report. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(*l* ); *see also, Palacios,* 46 S.W.3d at 878.

### Analysis

**[8]** Dr. Levine opined in his original report[2] that Dr. Taylor breached the applicable **\*576** standard of care by failing to order re-examination of Fossett within 24 to 48 hours of her post-operative office visit, causing Fossett to suffer (1) at least one surgical wound exploration that might not have been necessary, along with resulting scarring and continued pain and discomfort and (2) hospitalization and recovery that was more lengthy "than should have been necessary had she been admitted [to the hospital] 48 hours sooner." Dr. Levine's supplemental report added the

opinion that had Dr. Taylor examined or cultured Fossett's surgical wound, he might have properly diagnosed MRSA and begun treatment with appropriate antibiotic therapy, thereby avoiding subsequent surgeries, pain, and permanent scarring.

Dr. Levine's supplemental report incorporated his original report. Therefore, in this analysis we collectively refer to the original and supplemental reports as Dr. Levine's "report." Dr. Levine's report emphasized the significance of the 24 to 48 hour period following Fossett's office evaluation by Dr. Taylor:

> Because of the possibility of worsening infection resulting in significant morbidity and mortality, [women with post-operative surgical incision] require both careful and frequent assessment of their surgical wounds every 24 to 48 hours by qualified personnel such as their physician, by wound management personnel, or by home health nursing.
>
> Antibiotics for minor infections may be given by mouth; provided the patient is seen within 24 to 48 hours to assess that the infection is not getting worse.
>
> Dr. Taylor failed to either admit LaToya Fossett to the hospital or to re-evaluate her within 24 to 48 hours [of Fossett's office evaluation by Dr. Taylor].
>
> The standard of care for evaluation and treatment of a post-operative surgical wound infection require[s] ... either admitting the patient to a hospital or arranging for close outpatient follow-up and re-evaluation within 24 to 48 hours....

According to Dr. Levine's report, Fossett was hospitalized "within 48 hours" of her post-operative visit in Dr. Taylor's office. Fossett's arrival at Baylor Hospital occurred within the time frame Dr. Levine determined a re-evaluation to be appropriate and consistent with the applicable standard of care. Had Dr. Taylor scheduled Fossett for re-evaluation 48 hours after her post-operative office visit, consistent with the standard of care articulated by Dr. Levine, the progression of Fossett's infection and wound dehiscence presumably would have been no more advanced or severe than the condition actually treated at Baylor Hospital following Fossett's arrival at the hospital within that same 48–hour period.

Dr. Levine did not assert in his report that had Fossett been re-evaluated by Dr. Taylor within 48 hours of her post-operative office visit, she would have avoided hospitalization and surgical treatment. Rather, Dr. Levine opined that the duration of Fossett's hospitalization and recovery would not have been longer than it "should have been." Dr. Levine provided no facts in his report

concerning the expected duration of Fossett's hospitalization and recovery in the absence of the alleged negligence of Dr. Taylor. Accordingly, Dr. Levine's report presented no factual basis for a conclusion that Dr. Taylor's alleged negligence resulted in a period of hospitalization and recovery that was longer than it would have been in the absence of such alleged negligence.

**\*577** [9] Dr. Levine's report claimed that as a result of Dr. Taylor's failure to meet the applicable standard of care, Fossett required at least one surgical wound exploration that might not have been necessary, sustained a larger scar from additional surgery and suffered continued pain and discomfort. He asserted that if Dr. Taylor had "appropriately evaluated and treated Fossett in a timely fashion according to the standard of care, she *might* have been admitted to the hospital earlier and required only one, if any, surgical wound explorations (sic). She would most likely not have required two surgeries." (Emphasis added.) Again, Dr. Levine's standard of care did not call for wound re-evaluation until up to 48 hours from the time of Fossett's post-operative office visit with Dr. Taylor. Within 48 hours of Fossett's office visit with Dr. Taylor, she was being treated at Baylor Hospital. Accordingly, Dr. Levine's report presented no factual basis for a conclusion that Dr. Taylor's alleged negligence resulted in surgical procedures, scarring, and pain that would not have occurred in the absence of such alleged negligence. Moreover, Dr. Levine's report suggested only that in the absence of the alleged negligence, Fossett *might* have been admitted to the hospital earlier and required only one, if any, surgical wound exploration. A description of only a possibility of causation is not sufficient to satisfy requirements concerning the necessary content of an expert report. *See Wright,* 79 S.W.3d at 53.

Dr. Levine's report claimed that had Dr. Taylor examined or cultured Fossett's surgical wound, he *might* have properly diagnosed MRSA and begun treatment with appropriate antibiotic therapy, thereby avoiding subsequent surgeries, pain, and permanent scarring. This attempt to establish causation also suffers from the infirmity that it presents only a possibility of causation. *See id.* Dr. Levine's report presented no factual basis for a conclusion that had Dr. Taylor examined or cultured Fossett's surgical wound, properly diagnosed MRSA, and begun treatment with appropriate antibiotic therapy, the subsequent surgical procedures, pain, and permanent scarring would have been avoided.

Dr. Levine's report omitted any factual explanation of how any act or omission by Dr. Taylor in delaying diagnosis and treatment of Fossett's condition for no more than 48 hours proximately caused additional complications or surgical interventions. Dr. Levine explained neither the impact of the alleged 48–hour delay in re-evaluation of Fossett on the nature and severity of the underlying infection nor in what manner the infection developed or changed in that period of time necessitating surgery that otherwise would not have been required. Dr. Levine's report left the trial court to infer that the alleged delay in diagnosis and treatment proximately caused the additional surgery, pain and scarring without actually providing a factual basis for the trial court to so infer. *Cf. Mosely v. Mundine,* 249 S.W.3d 775, 780 (Tex.App.-Dallas 2008, no pet.) (comparative description of nodule and growth of mass after two-year delay in diagnosis provided factual basis for conclusion that failure to identify nodule led to invasive and aggressive treatment claimant underwent).

Dr. Levine's report failed to articulate a causal connection between Dr. Taylor's care of Fossett and the injuries that allegedly resulted. Dr. Levine's statements concerning causation are conclusory, suggest only the possibility of causation, and are unsupported by a factual basis within the four corners of the report. Considering the report and applicable law, we conclude the report constitutes a factually and legally insufficient basis for the trial court to determine whether Fossett's claims have merit. *See* **\*578** *Leland,* 257 S.W.3d at 206–07. We conclude the trial court abused its discretion in denying Dr. Taylor's motion to dismiss based on an inadequate expert report.

[10] Dr. Taylor asserts the trial court abused its discretion in failing to award him attorney's fees and costs. Section 74.351(b) requires that if an expert report has not been served within the statutorily required period of time, upon the motion of the affected physician or health care provider, the trial court shall enter an order awarding reasonable attorney's fees and costs and dismiss the claim with prejudice. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(b); *see also, Hernandez v. Ebrom,* 289 S.W.3d 316, 318 (Tex.2009) ( "If a timely and sufficient report is not served, the trial court must award the provider its attorney's fees and costs and dismiss the case with prejudice."). Having concluded that the trial court should have granted Dr. Taylor's motion to dismiss as to Fossett's claims, under section 74.351(b) of the civil practice and remedies code, the trial court erred in denying Dr. Taylor's request for reasonable attorney's fees and costs of court. Accordingly, we sustain Dr. Taylor's assertion of entitlement to his reasonable attorney's fees and costs under section 74.351(b).

**Conclusion**

We reverse the trial court's order denying Dr. Taylor's motion to dismiss. We remand this case to the trial court for the limited purposes of determining and awarding Dr. Taylor reasonable attorney's fees and costs and for entry of a final order dismissing Fossett's claims against Dr. Taylor with prejudice.

Footnotes

1    Dr. Levine expressly incorporated the opinions he expressed in his original expert report in his supplemental expert report. On appeal, Fossett contends that "taken together," Dr. Levine's original and supplemental reports comply with the statutory requirements of section 74.351. Reports may be considered together in determining whether a claimant provided a report meeting the statutory requirements. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(i); *see also, Packard v. Guerra,* 252 S.W.3d 511, 527 (Tex.App.-Houston [14th Dist.] 2008, pet. denied) ("If a plaintiff can rely on more than one report to satisfy the standard of care, breach, and causation, we see no violation of section 74.351(i) just because a plaintiff attempted to cure an insufficient report with supplemental reports and refiled expert reports some of which initially were found to be insufficient.").
     We disagree with Fossett's argument on appeal that Dr. Taylor is precluded from raising objections to Dr. Levine's initial report because Dr. Taylor did not seek relief from this Court at the time of the trial court's order regarding that report. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(9) (Vernon 2008) (no appeal may be taken from trial court's order granting extension under section 74.351(c)); *see also, Ogletree v. Matthews,* 262 S.W.3d 316, 321 (Tex.2007) (in cases where report that implicated health care provider's conduct was served and trial court granted extension under section 74.351(c), appellate courts are without jurisdiction to reach merits of motion to dismiss).

2    Dr. Levine's original report contains numerous purported breaches of the standard of care by Dr. Taylor. Here, the analysis is dedicated to Dr. Levine's opinions concerning alleged breaches of the standard of care that he asserts caused injury or damage.

**End of Document**                                                   © 2015 Thomson Reuters. No claim to original U.S. Government Works.

351 S.W.3d 398
Court of Appeals of Texas,
El Paso.

TENET HOSPITALS LIMITED, A Texas Limited
Partnership, d/b/a Sierra Medical Center, Jaclyn
Brown, R.N., Tammy Prophet, R.N., Kayla Chavez,
R.N., Gloria Tomasino, R.N.C. and Dee Dee Shaw,
R.N., Appellants,
v.
Dalia DE LA RIVA, Individually and as Parent and
Next Friend of Daniella De La Riva, A Minor,
Appellee.

No. 08–10–00271–CV. | June 29, 2011.

**Synopsis**
**Background:** Patient, individually and as daughter's
mother, filed health care liability action against hospital,
obstetrician, nurses, and others alleging that daughter
suffered hypoxic ischemic brain injury as result of
inadequate care during birth. The 34th District Court, El
Paso County, William E. Moody, J., denied defendants'
motion to dismiss, and they appealed.

**Holdings:** The Court of Appeals, Guadalupe Rivera, J.,
held that:

[1] pediatric neurologist's expert report was insufficient to
establish causation, and

[2] board certified obstetrician and gynecologist was not
qualified to provide expert opinion regarding standard of
care and causation.

Reversed and remanded.

**Attorneys and Law Firms**

**\*400** Yvonne K. Puig, Fulbright & Jaworski L.L.P.,
Austin, TX, for Appellants.

T.O. Gilstrap, Jr., El Paso, TX, for Appellee.

Before CHEW, C.J., McCLURE, and RIVERA, JJ.

*OPINION*

GUADALUPE RIVERA, Justice.

Tenet Hospitals Limited, d/b/a/ Sierra Medical Center,
Jaclyn Brown, R.N., Tammy Prophet, R.N., Kayla
Chavez, R.N., Gloria Tomasino, R.N.C., and Dee Dee
Shaw, R.N., Appellants, appeal the trial court's denial of
its motion to dismiss Dalia De La Riva's health care
liability case. In two issues on appeal, Appellants contend
that the expert reports submitted by De La Riva were
inadequate and fatally deficient to maintain their case.[1]
For the following reasons, we reverse.

**BACKGROUND**

On January 21, 2007, Dalia De La Riva went to Sierra
Medical Center, exhibiting signs of labor. However, when
her obstetrician, Dr. Julio Novoa, determined that she was
not in labor, De La Riva was discharged. Three days later,
on January 24, 2007, at 1:19 a.m., De La Riva returned to
Sierra Medical Center, having contractions two to three
minutes apart. She was admitted, and soon, it was
discovered that the fetal heart rate was non-reassuring,
which was indicative of lack of oxygen. **\*401** That non-
reassuring heart rate lasted approximately two minutes.
Consequently, at 1:25 a.m., Nurse Jaclyn Brown, the
labor and deliver nurse assigned to De La Riva, called Dr.
Novoa. In response, Dr. Novoa ordered that De La Riva
take Pitocin, a labor induction agent.

At 2:27 a.m., another non-reassuring deceleration in the
heart rate occurred, and five minutes later, it occurred
again. Thus, at 2:35 a.m., Nurse Brown called Dr. Novoa
again. However, Dr. Novoa did not go to the hospital at
that time.

At 3:35 a.m., the fetal monitor showed another non-
reassuring fetal heart rate, and at 4:25 a.m., Nurse Brown
noted minimal variability and a drop in the fetal heart
rate. At 4:31 a.m., the fetal heart rate had an abnormal
baseline with a significant deceleration. By this time, both
Nurse Brown and Nurse Tammy Prophet were involved in
interpreting the fetal heart rate. At 4:34 a.m., Nurse
Brown documented moderate variability with
accelerations. However, at 4:51 a.m., there was a pattern
of marked variability. As such, Nurse Brown contacted
Dr. Novoa again at 5:03 a.m. Dr. Novoa ordered an
epideral but did not go to the hospital. De La Riva,

however, refused the epideral, despite having signed vaginal and c-section consent forms two hours earlier.

When other decelerations occurred at 5:18 a.m., 5:22 a.m., and 5:26 a.m., Nurse Brown, at 5:52 a.m., again called Dr. Novoa. At this point, Dr. Novoa decided to go to the hospital and arrived at Sierra Medical at 6:30 a.m. Approximately fifteen minutes later, Dr. Novoa ruptured the fetal membrane to induce labor, even though the fetus was in a floating position and such procedure could cause umbilical cord complications and oxygen deprivation. Despite noting the meconium stained amniotic fluid, Dr. Novoa agreed to allow De La Riva to continue to labor naturally. However, at 7:02 a.m., Dr. Novoa noted that the fetal heart rate was bradycardic, that is, it was slowing down, and when resuscitative measures were unsuccessful, he ordered an emergency c-section. Nurse Brown, Nurse Kayla Chavez, and Nurse Gloria Tomasino accompanied Dr. Novoa and De La Riva to the operating room.

The surgical scrub technicians, however, did not arrive in the operating room until three minutes after De La Riva's arrival. The operating room did not appear to be prepared as the nurses struggled to locate, open, and prepare surgical trays and disposable blades. Thus, the c-section was delayed approximately seven minutes. But at 7:15 a.m., the c-section was performed, and Daniella was born. Unfortunately, Daniella had no heart rate; thus, Nurse Shaw began resuscitation as a certified registered nurse anesthetist attempted intubation to establish an airway. Soon, Neonatal Nurse Jose Balderrama arrived, and by 7:24 a.m., Daniella's heart was beating less than 100 beats per minute. Believed to have suffered from hypoxic ischemic brain injury, Daniella now lives with neurological disabilities.[2]

De La Riva later filed a health care liability suit against Appellants and Tenet Healthcare Corporation, Dr. Novoa, First Choice OB/GYN Associates, Jose Balderrama, Timothy Aquilina, and Jasper Neuse, asserting various allegations based on the care and treatment rendered to her *402 daughter.[3] As to Nurses Brown and Prophet, De La Riva claimed that they failed to appropriately monitor the fetus, recognize and document signs of distress, communicate with Dr. Novoa, and implement the chain of command. Concerning Nurses Chavez and Tomasino, De La Riva alleged that they failed to properly prepare, equip, and staff the operating room. And as to Nurse Shaw, De La Riva asserted that she failed to follow neonatal resuscitation guidelines upon receiving the infant at delivery. The allegations against Sierra Medical were based on vicarious liability for the conduct of its nursing staff.

After timely serving experts report from Kathryn Snider, a labor and delivery nurse, Dr. Michael Kreitzer, a board certified obstetrician and gynecologist, Brigitte Grissom, a neonatal nurse, and Dr. Daniel Adler, a board certified pediatric neurologist, Appellants objected to the reports and moved to dismiss the case. Specifically, they argued that Dr. Adler was not qualified to opine on the standard of care or breach as to Appellants, nor was Dr. Kreitzer qualified to opine on the standard of care, breach, or causation as to Appellants. In addition, Appellants asserted that neither nurse was qualified to opine on causation, and that even if all the experts were qualified, their reports were inadequate as none addressed causation as to Appellants.

In response, De La Riva claimed that Dr. Adler and Nurse Snider were "highly qualified" and that their reports adequately met the statutory expert report requirements. De La Riva also attached a seven-page summary of the opinions of Nurse Snider and Dr. Adler, arguing that the combination of those two reports were adequate. At that time, De La Riva did not respond to Appellants' arguments regarding the lack of qualifications of Dr. Kreitzer, Nurse Grissom, or Nurse Snider. Subsequently, the trial court held a hearing on the motion to dismiss on May 19, 2010, and after further briefing on the matter, the trial court denied the motion.

## DISCUSSION

Appellants raise two issues on appeal. The first contends that the expert reports submitted were deficient, alleging that Dr. Adler wholly failed to address causation as to Daniella's injuries and that neither Dr. Kreitzer, Nurse Grissom, nor Nurse Snider had the knowledge or experience to offer causation opinions on Daniella's injuries. And Appellants' second issue asserts that even if we were to find that the expert reports sufficiently addressed causation, they were nonetheless conclusory and speculative. De La Riva responds that the reports constituted a good faith effort and that a fair reading of all the reports more than meets the statutory requirements. Finding merit in Issue One, we do not address the second.

### *Standard of Review*

A trial court's decision to deny a motion to dismiss under Section 74.351 is reviewed for an abuse of discretion. *See American Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 875 (Tex.2001); *Tenet*

*Hospitals, Ltd. v. Boada,* 304 S.W.3d 528, 533 (Tex.App.-El Paso 2009, pet. denied). An abuse of discretion only occurs when the trial court acted in an unreasonable or arbitrary manner, without reference to any guiding rules or principles. *Walker v. Gutierrez,* 111 S.W.3d 56, 62 (Tex.2003); *Boada,* 304 S.W.3d at 533. A trial court acts arbitrarily and unreasonably **\*403** if it could have reached only one decision, but instead reached a different one. *See Teixeira v. Hall,* 107 S.W.3d 805, 807 (Tex.App.-Texarkana 2003, no pet.); *Boada,* 304 S.W.3d at 533. To that end, a trial court abuses its discretion when it fails to analyze or apply the law correctly. *In re Sw. Bell Tel. Co.,* 226 S.W.3d 400, 403 (Tex.2007), *citing In re Kuntz,* 124 S.W.3d 179, 181 (Tex.2003); *Boada,* 304 S.W.3d at 533.

### Applicable Law

[1] If a plaintiff timely files an expert report and the defendant moves to dismiss because of the report's inadequacy, a trial court must grant the motion "only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report in Subsection (r)(6)." TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(*l* ) (West 2011). The definition of an expert report requires that the report contain a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(6) (West 2011). As the statute focuses on what the report discusses, the only information relevant to the inquiry is within the four corners of the document. *Palacios,* 46 S.W.3d at 878.

[2] In setting out the expert's opinions on each of the required elements, the report must provide enough information to fulfill two purposes if it is to constitute a good faith effort. *Id.* at 879. First, the report must inform the defendant of the specific conduct the plaintiff has called into question. *Id.* And second, the report must provide a basis for the trial court to conclude that the claims have merit. *Id.* Thus, if a report does not meet these purposes and omits any of the statutory requirements, it does not constitute a good faith effort. *Id.* Nor does a report that merely states the expert's conclusions about the standard of care, breach, and causation fulfill these purposes. *Id.* Rather, the expert must explain the basis of his statements to link his

conclusions to the facts. *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002).

However, a plaintiff need not present evidence in the report as if it were actually litigating the merits. *Palacios,* 46 S.W.3d at 879. The report can be informal, that is, the information contained in the report does not have to meet the same requirements as the evidence offered in a summary judgment proceeding or at trial. *Id.*

### Dr. Adler

[3] [4] Appellants first argue that Dr. Adler's report was insufficient to establish causation as the report did not address how each named defendant's conduct caused the injury. "An expert report must provide a fair summary of the causal relationship between the failure of a health care provider to meet the standards of care and the injury, harm, or damages claimed." *Estorque v. Schafer,* 302 S.W.3d 19, 27 (Tex.App.-Fort Worth 2009, no pet.); *see also Wright,* 79 S.W.3d at 53. It cannot be conclusory. *Wright,* 79 S.W.3d at 53; *Estorque,* 302 S.W.3d at 27. Rather, it must explain the basis of the expert's statements regarding causation and link his conclusions to the facts. *Wright,* 79 S.W.3d at 53; *Estorque,* 302 S.W.3d at 27–28. A causal relationship is established by proof that the negligent act or omission was a substantial factor in bringing about the harm and that absent said act or omission, the harm would not have occurred. **\*404** *Costello v. Christus Santa Rosa Health Care Corp.,* 141 S.W.3d 245, 249 (Tex.App.-San Antonio 2004, no pet.). Thus, merely providing some insight into the plaintiff's claims does not adequately address causation. *Wright,* 79 S.W.3d at 53; *Estorque,* 302 S.W.3d at 28. Accordingly, causation cannot be inferred; it must be clearly stated. *Castillo v. August,* 248 S.W.3d 874, 883 (Tex.App.-El Paso 2008, no pet.). Indeed, we may not fill in gaps in a report by drawing inferences or guessing what the expert meant or intended. *Austin Heart, P.A. v. Webb,* 228 S.W.3d 276, 279 (Tex.App.-Austin 2007, no pet.).

[5] Moreover, when a plaintiff sues more than one defendant, the expert report must set forth the standard of care applicable to each defendant and explain the causal relationship between each defendant's individual acts and the injury. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(a), (r)(6) (a claimant must provide each defendant with an expert report that sets forth the manner in which the care rendered failed to meet the standards of care and the causal relationship between that failure and the injuries claimed); *Doades v. Syed,* 94 S.W.3d 664, 671–72 (Tex.App.-San Antonio 2002, no pet.); *Rittmer v.*

*Garza,* 65 S.W.3d 718, 722–23 (Tex.App.-Houston [14th Dist.] 2001, no pet.). An expert report may not assert that multiple defendants are all negligent for failing to meet the standard of care without providing an explanation of how each defendant breached the standard of care and how that breach caused or contributed to the cause of injury. *Taylor v. Christus Spohn Health Sys. Corp.,* 169 S.W.3d 241, 244 (Tex.App.-Corpus Christi 2004, no pet.).

Here, Dr. Adler's report notes that he reviewed the medical records, and then the report sets out the factual recitations of what occurred on the day of Daniella's birth. In this recitation, Dr. Adler makes no mention of any of the nurses named as defendants, or what they were doing, what they did, how they participated in monitoring De La Riva, or how they aided in Daniella's delivery. The report does, however, mention Dr. Novoa, noting that "Dr. Novoa arrived at the hospital at 6:30 a.m.," and that "[h]e ruptured the membranes." The report next lists the "clinical impression" as hypoxic ischemic encephalopathy, motor and language delay, and mixed low tone-spastic quadriparesis. The report then concludes with his "formulation," which states as follows:

> Daniella De La Riva is a girl with significant and substantial neurological disabilities. She was delivered catastrophically ill at birth with a cardiac arrest. These neurological disabilities are the result of a hypoxic ischemic brain injury that occurred in the aftermath of a cardiac arrest, which was present immediately after birth. No other cause is possible.
>
> ...
>
> A delivery prior to the onset of the bradycardia noted on fetal heart monitoring would have prevented all of Daniella's neurologically problems. An earlier delivery and prompt resuscitation would have significantly mitigated if not wholly prevented Daniella's neurologically problems.

[6] This is deficient for causation. Looking to the four corners of the report, we note that it does not explain, identify, or describe what conduct, act or omissions are attributable to any of the Appellants, that is, the report does not explain the causal relationship between each defendant's individual acts and the injury caused to Daniella. Rather, the report would have us infer which party was responsible for each cause. But as set out in the other expert reports, each of the ten named defendants **\*405** had numerous and varying responsibilities as to the two patients involved. Based on the way Dr. Adler's report is written, there is no way to discern whether he believed that Daniella's injuries were caused by the acts or omissions of the pre-delivery nurses, those nurses in

the operating room, Dr. Novoa, Nurse Shaw or Balderrama, or someone else entirely. As the report fails to state who caused the injuries, we find it deficient.[4] *See Austin Heart,* 228 S.W.3d at 282–83 (finding expert report deficient that was "silent as to whether a single physician, multiple physicians, or all physicians mentioned in the report failed to meet the standard of care and caused injury to [the patient]"); *Taylor,* 169 S.W.3d at 245–46 (finding expert report deficient that failed "to state what each defendant should have done in order to meet the standard of care, what each defendant failed to do, and how such failure led to [the patient's] death").

Nevertheless, De La Riva asserts that when Dr. Alder's report is read in conjunction with the reports provided by the two nurses, causation is found. It is true that the expert report requirement may be satisfied by utilizing more than one expert report, and thus, we may read those reports together to supply missing elements. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(i) (West 2011). However, only a physician may render opinions regarding causation. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(5)(C); *see also Davis v. Webb,* 246 S.W.3d 768, 771 (Tex.App.-Houston [14th Dist.] 2008, no pet.). Nurses cannot.[5] *See HealthSouth Corp. v. Searcy,* 228 S.W.3d 907, 909 (Tex.App.-Dallas 2007, no pet.) (stating "it is clear [nurse] could not testify regarding causation").

Noting that law, De La Riva maintains that when the factual recitations supplied by the reports submitted by Nurses Grissom and Snider are read in conjunction with Dr. Adler's report, we can infer who caused Daniella's injuries by failing to provide an "earlier delivery" or "prompt resuscitation." However, Dr. Adler did not reference those reports in arriving at his conclusion. Moreover, as to the "earlier delivery" allegation, Dr. Adler provided no time reference as to how much earlier the delivery should have occurred and thus, whose conduct was implicated for not securing that earlier delivery. Should it have occurred seconds, minutes, or hours before? Should it have occurred when Nurse Brown first noted the non-reassuring heart rate, when Nurse Prophet started monitoring the fetal heart rate, or when De La Riva refused Dr. Novoa's recommendation for the earlier c-section and **\*406** wanted to continue to deliver Daniella naturally? And for those same reasons, whose conduct was implicated by failing to provide an earlier delivery? Was it Nurse Brown for not securing a delivery upon first noticing the non-reassuring heart rate, was it Nurse Prophet, once she started to interpret the fetal heart beats, or was it Dr. Novoa for acquiescing to De La Riva's request to continue to labor naturally?

Furthermore, the record reflects that at least two nurses engaged in resuscitation, Nurses Shaw and Balderrama.

As such, we cannot determine to whom Dr. Adler was referring with his "prompt resuscitation" allegation. Was it Nurse Shaw, Nurse Balderrama, or both? We, of course, are prohibited from supplying this missing information by inference. *See Wright,* 79 S.W.3d at 52; *Austin Heart,* 228 S.W.3d at 279; *Gray v. CHCA Bayshore L.P.,* 189 S.W.3d 855, 859 (Tex.App.-Houston [1st Dist.] 2006, no pet.). Consequently, because we cannot determine whose conduct was implicated by Dr. Adler's causation opinion, we must conclude that the report is insufficient to establish the same.

### Dr. Kreitzer and the Nurses

Appellants also assert that none of the remaining reports filed by De La Riva supply the missing causation. As to Dr. Kreitzer, Appellants assert that he is unqualified to opine on the neurological injuries at issue, and as to the nurses, Appellants note that by statute, they are prohibited from rendering any opinion on causation. We have already held above that nurses, by statute, cannot render opinions on causation; thus, we will not discuss that point of error further. Accordingly, we will move on to the complaint uttered against Dr. Kreitzer.

[7] To qualify as an expert on causation, the medical expert need not practice in the same specialty as the defendant. *Roberts v. Williamson,* 111 S.W.3d 113, 122 (Tex.2003). Rather, the expert simply must be a physician "who is otherwise qualified to render opinions on such causal relationship under the Texas Rules of Evidence." *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(5)(C). Rule 702 of the Texas Rules of Evidence states that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." TEX.R. EVID. 702.

[8] [9] [10] Nevertheless, not every licensed doctor is automatically qualified to testify on every medical question. *Broders v. Heise,* 924 S.W.2d 148, 152 (Tex.1996). Thus, the trial court's inquiry should not focus on the specialty of the medical expert. *Roberts,* 111 S.W.3d at 122. Instead, the trial court should determine whether the proffered expert has "knowledge, skill, experience, training, or education" regarding the specific issue before the court which would qualify the expert to give an opinion on that particular subject. *Broders,* 924 S.W.2d at 153–54 (applying Texas Rule of Evidence 702); *Blan v. Ali,* 7 S.W.3d 741, 746 (Tex.App.-Houston

[14th Dist.] 1999, no pet.). Therefore, a medical expert from one specialty may be qualified to testify if he has practical knowledge of what is customarily done by practitioners of a different specialty under circumstances similar to those at issue in the case. *Keo v. Vu,* 76 S.W.3d 725, 732 (Tex.App.-Houston [1st Dist.] 2002, pet. denied). Indeed, if the subject matter is common to and equally recognized and developed in all fields of practice, any physician familiar **\*407** with the subject may testify as to the standard of care. *Id.; Blan,* 7 S.W.3d at 745. However, the proffered medical expert's expertise must be evident from the four corners of his report and curriculum vitae. *See generally Palacios,* 46 S.W.3d at 878; *Christus Health Southeast Texas v. Broussard,* 267 S.W.3d 531, 536 (Tex.App.-Beaumont 2008, no pet.).

[11] Here, nothing in the four corners of Dr. Kreitzer's report indicates that he is qualified to opine on causation as to Daniella's injuries. Although Dr. Kreitzer, being board certified as an obstetrician and gynecologist, is qualified to render an opinion as to Dr. Novoa, he is not qualified to opine on the standard of care and causation as to infant hypoxia, neonatal resuscitation, and ischemic insult. Those matters appear to be within the realm of pediatric neurology. Certainly, if Dr. Kreitzer had some experience in practicing pediatric neurology, he would qualify as an expert in this regard, but neither his report nor curriculum vitae demonstrate any recent experience in perinatology. Indeed, his last experience in perinatology was more than twenty years ago, and he last wrote in that area over twenty-five years ago. Nor do the four corners of the report or curriculum vitae demonstrate that Dr. Kreitzer consulted any pediatric neurologists or recently read any medical articles or textbooks on pediatric neurology in arriving at his opinion. To qualify as an expert, the statute requires that he be "actively practicing medicine in rendering medical care services relevant to the claim." TEX. CIV. PRAC. & REM.CODE ANN. § 74.401(c)(2). Thus, experts that last practiced in the relevant field over eleven years ago have been held to be unqualified. *See Larson v. Downing,* 197 S.W.3d 303, 305 (Tex.2006). At most, Dr. Kreitzer, referring almost exclusively to Dr. Novoa's conduct, was hired to opine on his conduct, not that of Appellants. His report states, "I have been hired by you to offer my expert opinions in this case regarding the care given by Dr. Julio Novoa, obstetrician/gynecologist." Thus, we cannot conclude that Dr. Kreitzer was qualified to render a causation opinion as to Appellants' conduct. *Cf. Roberts,* 111 S.W.3d at 122 (pediatrician expert qualified when report demonstrated that he "studied the effects of pediatric neurological injuries," had "extensive experience advising parents about the effects of those injuries" and relied on the interpretation of MRIs and CT scans by a pediatric neurologist); *Livingston v. Montgomery,* 279 S.W.3d 868,

877 (Tex.App.-Dallas 2009, no pet.) (noting that obstetrician expert's report reflected that he had "knowledge and expertise to recognize the perinatal progression of hypoxia due to inadequate oxygenation through a compromised uteroplacental unit").

### *Summary*

Accordingly, having found that neither Dr. Kreitzer, nor the nurses, were qualified to render expert opinions on causation as to Daniella, and that Dr. Alder's report was insufficient to establish the same, we hold that the trial court abused its discretion by overruling Appellants' motion to dismiss. Issue One is sustained.

We must now determine what relief is appropriate. The Supreme Court recently stated that when an appellate court reverses a trial court's denial of a motion to dismiss a health care liability claim due to omission of any of the statutory expert report requirements, the appellate court may remand the case to the trial court to consider granting a thirty-day extension to cure the deficiencies in the report. *Leland v. Brandal,* 257 S.W.3d 204, 207–08

(Tex.2008); *see also Lewis v. Funderburk,* 253 S.W.3d 204, 208 (Tex.2008) (stating that a **\*408** deficient report may be cured by amending the report or by serving a new report from a separate expert that cures the deficiencies in the previously filed report). Moreover, the Supreme Court has noted that the trial court is in the best position to decide whether a cure is feasible. *See Samlowski v. Wooten,* 332 S.W.3d 404, 411–12 (Tex.2011). Thus, based on these decisions, we think it appropriate to remand the case to the trial court for consideration of whether the deficiencies can be cured, and therefore, whether to grant an extension of time.[6] *See Regent Health Care Center of El Paso, L.P. v. Wallace,* 271 S.W.3d 434, 441 (Tex.App.-El Paso 2008).

### CONCLUSION

Having sustained Appellants' first issue, we reverse the trial court's judgment and remand for proceedings consistent with this opinion.

Footnotes

[1]  Section 74.351 provides that if a health care liability claimant does not serve an expert report within 120 days after his original petition is filed, the trial court must dismiss the claim with prejudice. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(a)-(b) (West 2011).

[2]  "Hypoxia" is the "presence of less than the normal amount of oxygen, as in the air, in the blood, in a tissue, in the lungs, etc.," and "ischemia" is a "condition in which a part of the body suffers from a lack of blood, usually because of a contraction of the blood vessels." *See* Schmidt, J.E., M.D., Attorneys' Dictionary of Medicine Illustrated, Vol. 3, H–285, I–208–208.1 (Matthew Bender 2010).

[3]  The case against Timothy Aquilina and Jasper Neuse, both certified registered nurse anesthetists, was later nonsuited.

[4]  This case is certainly unlike *IHS Acquisition No. 131, Inc. v. Crowson,* 351 S.W.3d 368, 369–70, 373–74 (Tex.App.-El Paso 2010, no pet.) (not yet reported), which involved one nurse wasting approximately ten minutes trying to determine whether the victim, who was gasping for breath, was a "DNR" patient before the staff began CPR. There, it was clear that the expert was calling into question that one nurse's actions before the staff began resuscitative efforts. *Id.* at 373–74.

[5]  De La Riva points to several cases in her briefs to support her argument that causation may be supplied from other expert reports, but all of those cases concerned reports submitted by more than one physician. *See Packard v. Guerra,* 252 S.W.3d 511, 514 (Tex.App.-Houston [14th Dist.] 2008, pet. denied); *Perez v. Salinas,* No. 13–08–00192–CV, 2008 WL 4981565, at \*1 (Tex.App.-Corpus Christi Nov. 25, 2008, pet. denied) (mem. op., not designated for publication); *Comstock v. Clark,* No. 09–07–300–CV, 2007 WL 3101992, at \*1 (Tex.App.-Beaumont Oct. 25, 2007, pet. denied) (mem. op., not designated for publication); *Hiner v. Gaspard,* No. 09–07–240–CV, 2007 WL 2493471, at \*1–2 (Tex.App.-Beaumont Sept. 6, 2007, pet. denied) (mem. op., not designated for publication). None of those cases involved whether a non-physician could supply the missing causation from a physician's report. *See id.*

[6]  Appellants do not seem to assert on appeal that the reports served constituted no reports at all but merely assert that the reports are inadequate and insufficient. Thus, we do not address the "deficient versus no report at all" debate in our opinion here. *See, e.g., Simmons v. Texoma Med. Ctr.,* 329 S.W.3d 163, 181 (Tex.App.-El Paso 2010, no pet.) (discussing the deficient versus no report debate and holding that expert report by a person unrelated to the health care field constituted no report under the health

care liability statute).

---

**End of Document**                                     © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 1691362

SEE TX R RAP RULE 47.2 FOR DESIGNATION AND SIGNING OF OPINIONS.
**MEMORANDUM OPINION**
Court of Appeals of Texas,
Amarillo.

**W.B.M. MANAGEMENT COMPANY** d/b/a Vivians Nursing Home, Appellant
v.
Mary FLORES, Appellee.

No. 07–14–00008–CV. | April 25, 2014.

On Appeal from the 108th District Court, Potter County, Texas, Trial Court No. 101179–E, Honorable Douglas Woodburn, Presiding.

**Attorneys and Law Firms**

Arlene C. Matthews, W.C. Bratcher, for W.B.M. Management Company.

Lorren L. Lucero, for Mary Flores.

Before QUINN, C.J., and CAMPBELL and PIRTLE, JJ.

**MEMORANDUM OPINION**

JAMES T. CAMPBELL, Justice.

**\*1** This is an interlocutory appeal in a health care liability suit.[1] Appellant W.B.M. Management Company D/B/A Vivians Nursing Home ("the Home") appeals the trial court's order overruling its objections to an expert's report and denying its motion to dismiss the suit. We will reverse the trial court's order and remand the cause to the trial court for dismissal.

**Background**

Appellee Mary Flores filed suit against the Home after the death of her mother Dionisia Dominguez Gomez, alleging the Home was negligent in its care and treatment of her mother. Flores' amended pleadings alleged in particular the Home's employees negligently failed to diagnose

timely and treat her mother's urinary tract infection, leading eventually to her mother's death.

In May 2013, Flores served the Home with the report and curriculum vitae of James E. Moulsdale, M.D., F.A.C.S.[2] The Home timely objected to the report. After Flores responded, the trial court heard the Home's objections in September 2013. The trial court found the report deficient, and granted a 30–day extension to address the identified deficiencies.

The amended report was filed in late October 2013. The Home again filed objections and moved to dismiss Flores' claims pursuant to section 74.351(b) of the Civil Practice & Remedies Code. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(b) (West 2013). The trial court heard argument at a hearing in December 2013, overruled the objections to the amended report and denied the Home's motion to dismiss. The Home has brought this interlocutory appeal.

**Analysis**

Through one issue, the Home challenges the sufficiency of Moulsdale's amended expert report, contending the report was "impermissibly speculative and conclusory" in its attempt to describe the "causal relationship between the alleged breach of the standard of care by [the Home] and the death of Dionisia Dominguez Gomez." The Home's issue also contends the amended report inadequately described the applicable standard of care and its alleged breach.

We review a trial court's decision on a motion to dismiss a health care liability claim for abuse of discretion. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 875 (Tex.2001); *Gray v. CHCA Bayshore L.P.,* 189 S.W.3d 855, 858 (Tex.App.-Houston [1st Dist.] 2006, no pet.). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to guiding rules or principles. *Jelinek v. Casas,* 328 S.W.3d 526, 539 (Tex.2010). When reviewing matters committed to the trial court's discretion, we may not substitute our own judgment for that of the trial court. *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002). A trial court does not abuse its discretion merely because it decides a discretionary matter differently than an appellate court would in a similar circumstance. *Harris Cnty. Hosp. Dist. v. Garrett,* 232 S.W.3d 170, 176 (Tex.App.-Houston [1st Dist.] 2007, no pet.). However, an incorrect construction of the law or a

misapplication of the law to undisputed facts is an abuse of discretion. *Walker v. Packer,* 827 S.W.2d 833, 840 (Tex.1992) (orig.proceeding) ("A trial court has no 'discretion' in determining what the law is or applying the law to the facts"); *see Perry Homes v. Cull,* 258 S.W.3d 580, 598 n. 102 (Tex.2008) (quoting *Walker* ).

**\*2** A health care liability claimant must timely provide each defendant health care provider with an expert report. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 74.351; *Gray,* 189 S.W.3d at 858. The expert report must provide a fair summary of the expert's opinions as of the date of the report regarding the applicable standards of care, the manner in which the care rendered by the health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(r)(6).

If a defendant files a motion challenging the adequacy of the claimant's expert report, the trial court shall grant the motion to dismiss only if it appears to the court, after a hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(l). Making that inquiry, the court considers only the information contained within the four corners of the report. *Palacios,* 46 S.W.3d at 878. Although the claimant need not marshal all her proof in the report, the report must include the expert's opinion on each of the elements identified in the statute. *Palacios,* 46 S.W.3d at 878–79; *Gray,* 189 S.W.3d at 859.

To constitute a good faith effort, in setting out the expert's opinions on the standard of care, the breach of the standard and the causative relationship between the breach and the injury, harm or damages claimed, the report must provide enough information to fulfill two purposes. *Palacios,* 46 S.W.3d at 879. First, the report must inform the defendant of the specific conduct the claimant has called into question. *Id.* Second, the report must provide a basis for the trial court to conclude that the claim has merit. *Id.* A report that merely states the expert's conclusions does not fulfill these two purposes. *Id.* "Rather, the expert must explain the basis of his statements to link his conclusions to the facts." *Bowie,* 79 S.W.3d at 52 (*quoting Earle v. Ratliff,* 998 S.W.2d 882, 890 (Tex.1999)). But a claimant need not present evidence in the report as if she were actually litigating the merits. *Palacios,* 46 S.W.3d at 879. Furthermore, the report may be informal in that the information in the report need not meet the same requirements as the evidence offered in a summary-judgment proceeding or trial. *Id.*

In Moulsdale's October 2013 report, he stated:

I have been asked to review the care rendered to the above-captioned individual in January, 2011. She was, at that time, a resident of Vivians Nursing Home. Historically, the patient had had a CVA in the remote past, leaving her extremely debilitated and unable to care for herself, necessitating nursing home placement. I reviewed the records from Vivian's Nursing Home for the period of August, 2010 through January, 2011. On January 10, 2011, the patient was found to have increasing mental confusion and a probable urinary tract infection. She was subsequently taken by ambulance to Baptist St. Anthony Hospital in Amarillo, Texas, where she was found to have a severe urinary tract infection and probable urosepsis. She was treated aggressively and appeared to recover but was later sent to hospice care and expired there.

**\*3** The standard of care applicable to this type of patient is careful monitoring, especially since she was unable to communicate any problems she might be experiencing. Careful monitoring would include taking her vital signs (i.e. blood pressure, pulse rate, body temperature, and respiratory rate) at a minimum of once per day in order to detect any changes in her condition. Especially in a debilitated patient, it is essential to monitor vital signs in order to detect changes in the patient's condition, such as urinary tract infection, since the patient is not able to alert the staff on his/her own.

In reviewing the nursing home records, I found notes stating that Ms. Gomez's vital signs should be taken only once per week. The nursing home records further indicate that Ms. Gomez's vital signs were, in fact, only taken once per week. Had her vital signs been taken more frequently, at a minimum of once per day, it is much more likely that this condition would have been found earlier and might have been treated in the nursing home without the necessity of hospitalization. More likely than not, the vital signs would have shown an increase in body temperature, an increased heart rate, an increased respiratory rate, a decrease in blood pressure, or any combination of the above, indicating a change in the patient's medical condition which required further investigation. Because of the fact that her urinary infection was not discovered in a timely fashion, she required hospitalization and treatment in an intensive care unit. Because this is a life threatening illness, delay in diagnosis is a serious breach of the standard of care.

I believe that this claim does have merit because of the delay in the diagnosis of the urinary tract infection. In my training and experience as a urologist, it is more

likely than not that an undiagnosed urinary tract infection might develop into urosepsis, especially in a debilitated patient who is unable to communicate any symptoms or changes in their medical condition. I believe that this was the case in the care rendered to Ms. Gomez. Furthermore, it is documented in the death certificate that the cause of death was sepsis secondary to urinary tract infection.[3]

The Home's objections asserted that the amended report failed to adequately address the standard of care applicable to the Home and how the standard of care was allegedly breached by the Home or its employees. The Home also asserted the amended report failed to address the causal relationship between the alleged breach and the injury, harm or damages claimed by Flores, and asserted the amended report contained only global and conclusory statements concerning the causal connection.

Standard of care is defined by what an ordinarily prudent health care provider or physician would have done under the same or similar circumstances. *Palacios,* 46 S.W.3d at 880; *Strom v. Mem'l Hermann Hosp. Sys.,* 110 S.W.3d 216, 222 (Tex.App.-Houston [1st Dist.] 2003, pet. denied). Whether a defendant breached a duty to a patient cannot be determined absent specific information about what the defendant should have done differently. *Palacios,* 46 S.W.3d at 880.

**\*4** According to Moulsdale's report, the applicable standard of care for treatment of a debilitated patient like Ms. Gomez required that the Home monitor her carefully, taking her vital signs, defined as blood pressure, pulse rate, body temperature and respiratory rate, at least once per day to detect changes in her condition. Addressing the Home's breach of the standard of care, Moulsdale's report states that his review of the nursing home records reveals notes that Ms. Gomez's vital signs were to be taken only once per week and records further indicating that her vital signs were indeed taken once per week.

Moulsdale further explains that because the vital signs were not taken daily, Ms. Gomez's urinary tract infection went undetected long enough to develop into sepsis, a life-threatening condition requiring hospitalization. He states "[m]ore likely than not, the vital signs would have shown an increase in body temperature, an increased heart rate, an increased respiratory rate, a decrease in blood pressure, or any combination of the above, indicating a change in the patient's medical condition which required further investigation."

Our discussion will focus on causation because we readily conclude that in its discussion of that element, Moulsdale's amended report does not constitute a good

faith effort toward compliance with the statutory requirements.

Reiterated, an expert report that merely states the expert's conclusions does not provide enough information to fulfill the purposes of the report. *Bowie,* 79 S.W.3d at 52 (*citing Palacios,* 46 S.W.3d at 879). The report must explain the basis of the expert's statements to link his conclusions to the facts. *Bowie,* 79 S.W.3d at 52. Otherwise, the report neither informs the defendant of the specific conduct the claimant calls into question nor provides a basis for the trial court to conclude the claim has merit. *Id.*

A case Flores cites is helpful to demonstrate the inadequacies of Moulsdale's report. *Mosely v. Mundine,* 249 S.W.3d 775 (Tex.App.-Dallas 2008, no pet.), dealt with a claim a physician failed to detect an early stage of cancer. The physician moved to dismiss the claim, asserting the expert report expressed only conclusory statements as to the causative relationship between the failure to detect and the harm to the patient. *Id.* at 780–81. The expert report there, as relevant to causation, stated:

> In the case of Mrs. Mundine, Dr. Mosley [sic] failed to identify a 1cm nodule on the chest x-ray during the ER visit in 5/2004. Approximately 21 months later this nodule had developed into a 6cm mass extending into the lung tissue with undetermined metastasis. Mrs. Mundine has a poor prognosis given the extent of the tumor growth and required lung resection, chemotherapy [,] and radiation. Had this cancer been detected in 2004[,] the likelihood of survival for Mrs. Mundine would have been significantly greater with a much less invasive treatment protocol. Dr. Mosley [sic] breached the standard of care by failing to detect the early stage of the cancer in May 2004.

> **\*5** \* \* \*

> .... Dr. Mosely failed to identify the early cancer nodule in Mrs. Mundine in 2004. This failure resulted in delayed diagnosis of lung cancer, required invasive and aggressive treatment and in all medically probability significant reduction in the life expectancy of Mrs. Mundine.

249 S.W.3d at 780.

The appeals court affirmed the trial court's denial of the physician's motion. It held the trial court could have concluded the report "established a causal relationship" between the physician's departure from the standard of care and the patient's injury. In so concluding, the court found the expert's report linked the physician's failure to identify the one-centimeter nodule in 2004 to the patient's

injury from the developed six-centimeter mass some 21 months later. *Id.* at 781.

The report in *Mosely* gave the trial court a factual basis to understand the change in the patient's condition between the breach of the standard, occurring on a known occasion on which the patient had a one-centimeter nodule, and the later condition when the nodule had become a six-centimeter mass. 249 S.W.3d at 780. By contrast with that report found adequate as to causation, Moulsdale's report contains the facts that on January 10, 2011, Ms. Gomez, a debilitated patient, "was found to have increasing mental confusion and a probable urinary tract infection," and was subsequently taken by ambulance to the hospital, where she was diagnosed with a severe urinary tract infection and probable urosepsis. The report speaks in conclusory fashion of a "delay in diagnosis," but contains no facts on which one may base a conclusion that there occurred a delay in diagnosing her infection or that any such delay was attributable to a failure of the Home to check her vital signs daily. The report's statement that "more likely than not, the vital signs would have shown an increase in body temperature, an increased heart rate, an increased respiratory rate, a decrease in blood pressure, or any combination of the above, indicating a change in the patient's medical condition which required further investigation"[4] is not factual, but merely a more detailed statement of Moulsdale's opinion. The report contains no factual statement describing when, relative to January 10, the Home's employees last checked Ms. Gomez's vital signs. Nor does it contain statements of what any of Ms. Gomez's vital signs were at any point in time, before, during or after her diagnosis, or how any of her vital signs had changed from any point in time to another.

With regard to her hospital care, Moulsdale's report adds only the facts that Ms. Gomez was treated aggressively and appeared to recover but later died under hospice care. The report concludes with the statement that, according to her death certificate, the cause of Ms. Gomez's death was "sepsis secondary to urinary tract infection." But the report contains nothing to link that fact with his conclusion the Home's failure to check her vital signs daily in the days before her hospitalization led to her septic condition or her death some two weeks later. And we cannot engage in inferences to supply information not present within the four corners of the report. *See Bowie,* 79 S.W.3d at 53.

**\*6** Moulsdale's report may also be compared with the expert report considered in *Craig v. Dearbonne,* 259 S.W.3d 308 (Tex.App.-Beaumont 2008, no pet.). Mrs. Dearbonne was admitted to a hospital on January 25 with admitting diagnoses that included "respiratory distress/shortness of breath" and pneumonia. Over the

next four days, her condition deteriorated and she was transferred to another facility where she died a few days later. The expert report addressed what it described as breaches of the standard of care by a physician during her four-day hospital stay. Reversing the trial court's denial of challenges to the expert report, the appellate court held the report was conclusory as to causation. The court summarized the expert report's discussion of causation as follows:

> [Expert's] report explains that the standard of care required [the physician] to examine and assess [the patient] on a daily basis, and that daily chest x-rays should have been performed. In addition, the report states that if [the physician] had examined [the patient's] lungs, then "more likely than not" she would have found that [the patient's] pneumonia and congestive heart failure had worsened, and those conditions "could have been effectively treated more likely than not." The report also concludes that if [the physician] had performed "proper assessment and treatment" on January 26, 27, or 28, "then more likely than not, [the patient] could have been successfully treated and would not have died when she did." [Expert] further concludes in the report that [physician's] negligence proximately caused [patient's] death, and if [physician] had not been negligent, [patient] "would not have died when she did."

259 S.W.3d at 312. The court found the expert's statements conclusory because they were not linked to the facts and did not explain how the physician's alleged negligence caused the patient's death. *Id.* at 313 (citing, *inter alia, Gonzales v. Graves,* No. 07–03–00268–CV, 2004 Tex.App. LEXIS 2403, 2004 WL 510898 (Tex.App.-Amarillo Mar. 16, 2004, no pet.) (mem.op.)).

Moulsdale's report contains even fewer facts than the report in *Craig.* 259 S.W.3d at 312. That report at least described Mrs. Dearbonne's condition on her admission to the hospital, giving the trial court some means to understand the factual consequences of a failure to order daily x-rays. *See Craig,* 259 S.W.3d at 313–14 (Gaultney, J., dissenting). As noted, Moulsdale's report gives no facts regarding Ms. Gomez's vital signs on any day, providing no basis for evaluation of the effects of a failure to check her vital signs daily. *See also Foster v. Richardson,* 303 S.W.3d 833, 842 (Tex.App.-Fort Worth 2009, no pet.) (holding expert report "does not explain beyond mere conjecture" how condition of patient's ankle worsened from June to July so that physician's failure to give correct diagnosis in June caused the requirement of further treatment in July).

Moulsdale's report expresses his opinion that the Home's failure to take Ms. Gomez's vital signs at least daily caused a failure to find and timely treat her urinary tract infection. It further expresses his opinion that because the infection was left untreated, it developed into sepsis, a life-threatening condition, ultimately leading to her death. But the report does not explain the basis of Moulsdale's statements to link his conclusions to the facts, *Bowie,* 79 S.W.3d at 52, with the result that it also does not provide a basis for the trial court to conclude the claim has merit. *Id.* Ultimately, it states only Moulsdale's opinions on causation. Accordingly, the report does not set forth a "good faith effort" to provide a fair summary of the causation element as described in the statute. When it overruled the Home's objections to the report's causation element discussion and denied its motion to dismiss, the trial court misapplied the "good faith effort" standard. Our conclusion the report is inadequate in its discussion of causation makes it unnecessary for us to consider the adequacy of its discussion of the standard of care and breach.

### Conclusion

**\*7** We sustain the Home's sole issue. We reverse the trial court's order and remand the cause to the trial court for the limited purposes of determining the Home's reasonably incurred attorney's fees and costs and entry of an order dismissing with prejudice Flores' claims against the Home. TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(b).

PIRTLE, J., dissenting.

### DISSENTING OPINION

PATRICK A. PIRTLE, Justice.

**\*7** Respectfully disagreeing with my colleagues concerning the application of the law to the undisputed facts of this case, I dissent. By its opinion, the majority finds the trial court misapplied the law concerning the application of the "objective good faith" standard to the evaluation of an expert report under section 74.351(l) of the Texas Civil Practices and Remedies Code, resulting in a finding of abuse of discretion and the concomitant judgment to reverse and remand. Because I find the trial court did not act in an arbitrary or unreasonable manner

without reference to guiding rules or principles and did not, therefore, misapply the law to the undisputed facts of this case, or otherwise abuse its discretion, I respectfully dissent.

As the majority opinion correctly sets out, this is an interlocutory appeal in a health care liability suit, wherein Appellant, W.B.M. Management Company, d/b/a Vivians Nursing Home, seeks to overturn the decision of the trial court to deny Appellant's motion to dismiss the claims of Appellee, Mary Flores, pursuant to section 74.351(l). TEX. CIV. PRAC. & REM.CODE ANN. § 74.351(l) (West 2012). The majority concludes the trial court erred because the report of Dr. James E. Moulsdale does not constitute an objective good faith effort to describe a causal relationship between Appellant's failure to follow an appropriate standard of medical care and Appellee's claimed damages. Because the majority accurately sets forth the law applicable to a case such as this, I will not restate the principles of law governing an appellate court's analysis of the sufficiency of an expert report as statutorily defined. *Id.* at § 74.351(r)(6).

Reduced to its essence, Appellee claims Appellant's employees failed to provide medical care within an applicable standard of care, and their failure to do so resulted in the death of her mother, Dionisia Dominguez Gomez. In support of her claim, Appellee provided the expert report of Dr. James E. Moulsdale,[1] which opines, in part, as follows:

> In reviewing the nursing home records, I found notes stating that Ms. Gomez's vital signs should be taken only once per week. The nursing home records further indicate that Ms. Gomez's vital signs were, in fact, only taken once per week. Had her vital signs been taken more frequently, at a minimum of once per day, it is much more likely that this condition would have been found earlier and might have been treated in the nursing home without the necessity of hospitalization. More likely than not, the vital signs would have shown an increase in body temperature, an increased heart rate, an increased respiratory rate, a decrease in blood pressure, or any combination of the above, indicating a change in the patient's medical condition which required further investigation. Because of the fact that her urinary infection was not discovered in a timely fashion, she required hospitalization and treatment in an intensive care unit. Because this is a life threatening illness, delay in diagnosis is a serious breach of the standard of care.
>
> **\*8** I believe that this claim does have merit because of the delay in the diagnosis of the urinary tract

infection. In my training and experience as a urologist, it is more likely than not that an undiagnosed urinary tract infection might develop into urosepsis, especially in a debilitated patient who is unable to communicate any symptoms or changes in their medical condition. I believe that this was the case in the care rendered to Ms. Gomez. Furthermore, it is documented in the death certificate that the cause of death was sepsis secondary to urinary tract infection.

In the context of a claim based on a failure to timely diagnose Ms. Gomez's medical condition, the report (1) provides a summary of the expert's opinions regarding applicable standards of care, (2) relates the manner in which the care rendered failed to meet those standards, and (3) opines as to the causal connection between that failure and the injury, harm, or damages claimed. As such, the report meets the statutory purpose of an expert report because it (1) informs Appellant of the specific conduct Appellee has called into question and (2) provides a basis for the trial court to conclude the claim has merit. *See Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios,* 46 S.W.3d 873, 879 (Tex.2001).

Appellant contends, and the majority agrees, the expert report was "impermissibly speculative and conclusory" in its attempt to describe, within the four corners of the report, the "causal relationship between the alleged breach ... and the death of [Ms. Gomez]." The majority then analyzes relevant case law to reach the conclusion that this particular report does not "link" Dr. Moulsdale's conclusions to the facts of this case.

So, just what are the "facts" of this case? From the four corners of the report, we know that Ms. Gomez was "extremely debilitated," that she was "unable to care for herself," that Appellant was aware of the fact that she had a "probable urinary tract infection," and that in light of that knowledge, Appellant chose to take her vital signs only once per week. We also know the standard of care applicable to this type of patient called for "careful monitoring," which would specifically include taking her vital signs "a minimum of once per day," and that the purpose of that frequency of monitoring was "to detect *any* changes in her condition." We also know this monitoring was "especially" called for in a debilitated patient, like Ms. Gomez, because the patient was not otherwise able to alert the staff on her own. Finally, we know that within reasonable medical probability, "had her vital signs been taken more frequently ... it was much more likely that [her] condition would have been found earlier" and she might not have required hospitalization. The fact that more careful monitoring would have alerted the medical care providers to provide earlier, more aggressive treatment, establishes a causal relationship between the failure to closely monitor any change in her condition and harm suffered as a result of her declining medical health.

**\*9** Drawing insight from *Mosely v. Mundine,* 249 S.W.3d 775 (Tex.App.-Dallas 2008, no pet.), the majority opines that the expert report in that case was found to be sufficient because it gave the trial court a "factual basis to understand the change in the patient's condition"—in that case a change from a 1 cm nodule to a 6 cm mass over a 21 month period. Here, Dr. Moulsdale's report is really no different in that it places the emphasis on the differential diagnosis of Ms. Gomez's condition *from day to day* (as opposed to from week to week). The majority criticizes Dr. Moulsdale's report for failing to contain a statement concerning Ms. Gomez's vital signs at any specific point in time. In reaching this conclusion the majority completely overlooks the fact that it doesn't matter what her vital signs were at any particular moment because the medical significance is the *change,* not the difference. Dr. Moulsdale's report indicates that it was the daily *change* that would have, in all probability, alerted the Appellants to the imminent need for more aggressive treatment of her failing condition.

In another misinterpretation of Appellee's cause of action and the purpose of an expert report, the majority opines that the "report contains nothing to link [Dr. Moulsdale's opinion that Ms. Gomez's death was 'sepsis secondary to urinary tract infection'] with his conclusion the [Appellant's] failure to check her vital signs daily in the days before her hospitalization *led* to her septic condition or her death some two weeks later." (Emphasis in the original.) Appellee does not contend that the failure to timely diagnose *led* to Ms. Gomez's septic condition. Rather, Appellee contends her worsening septic condition (which would have been reflected in her daily vital signs and could have been treated earlier but for the delay in diagnosing Ms. Gomez's infection) led to injury, harm, or other damages because it was not timely diagnosed and treated. Simply put, Dr. Moulsdale's report establishes that Ms. Gomez was harmed by Appellant's breach of the appropriate standard of care.

Contrary to the conclusion reached by the majority, I find the facts of this case clearly provide a basis upon which the trial judge could reasonably have concluded that there was merit to the Appellee's claim. Accordingly, I would affirm the decision of the trial court.

**Parallel Citations**

Med & Med GD (CCH) P 304,923

Footnotes

| | |
|---|---|
| 1 | *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(9) (West 2012). |
| 2 | Dr. Moulsdale is a board-certified urologist who has practiced in the field for over 34 years. He holds accreditation in a number of urological fields, and has published several articles. The Home does not challenge Moulsdale's qualifications on appeal. |
| 3 | The date of Ms. Gomez's death is not stated in Moulsdale's report, but Flores' brief states she died on January 24, 2011. |
| 4 | The statement is one of those added by the amended report. |
| 1 | Dr. Moulsdale is a board-certified urologist who has practiced in the field of urology for over 34 years. Dr. Moulsdale's qualifications as an expert in this field are not challenged. |

---

**End of Document**                                          © 2015 Thomson Reuters. No claim to original U.S. Government Works.

---

827 S.W.2d 833
Supreme Court of Texas.

Charles F. WALKER and Mary Jeanette Walker et
al., Relators,
v.
The Honorable Anne PACKER, Judge,
Respondent.

No. C–9403. | Feb. 19, 1992. | Rehearing Overruled
May 6, 1992. | Dissenting Opinion by Justice
Gammage May 7, 1992.

Parents of child born with brain damage, who had brought action against obstetrician, hospital where child was born, and nurse attending at delivery, brought petition for writ of mandamus arguing that the trial court abused its discretion by refusing to order hospital to produce documents from its insurer's files and by ordering that portions of other responsive documents be stricken. The Supreme Court, Phillips, C.J., held that: (1) plaintiffs had not presented sufficient record to demonstrate that trial court clearly abused its discretion in failing to grant plaintiffs requested discovery from one of defendants, and (2) plaintiffs had adequate remedy by way of appeal as to documents they sought from nonparty for impeachment purposes.

Petition denied.

Gonzalez, J., concurred with opinion.

Doggett, J., dissented with opinion in which Mauzy, J., joined.

Gammage, J., dissented with opinion.

**Attorneys and Law Firms**

**\*835** Les Weisbrod and Michael S. Box, Dallas, for relators.

Philipa Remington, Stephen W. Johnson, James A. Williams, Kevin J. Keith, Martha L. Strother, Gary W. Sibley, Dallas and Delmar L. Cain, Austin, for respondent.

**OPINION**

PHILLIPS, Chief Justice.

This original mandamus action involves two pre-trial discovery requests sought by **\*836** relators, plaintiffs in a medical malpractice lawsuit. The first discovery dispute involves documents which the plaintiffs seek from one of the defendants, while the second involves documents which they seek from a nonparty for impeachment purposes. As to the first matter, we hold that relators have not presented a sufficient record to demonstrate that the trial court clearly abused its discretion in failing to grant them all requested relief. As to the second, we hold that relators have an adequate remedy by appeal. Thus, mandamus is inappropriate, and we deny the writ.

*The St. Paul and Aetna Records*

Catherine Johanna Walker sustained brain damage at birth in January 1983. In January 1985, her parents, Charles F. and Mary Jeanette Walker, sued Dr. Paul Crider, the obstetrician, St. Paul Hospital, where Catherine was born, and Iris Jean White, a nurse attending at the delivery.

In August 1987, the Walkers served on St. Paul their third request for production of documents pursuant to Tex.R.Civ.P. 167. One request asked for:

> Any and all writings, notes, documents, letters, etc., concerning, mentioning, alluding to, or making reference to (either directly or indirectly), the tape recorded statement given by Nurse White to an Aetna adjuster, including but not limited to any notes or entries in any Aetna adjuster's file, any attorney's file, or any file or writing in possession of any employee, representative or agent of St. Paul Hospital. This request is in reference to the tape recorded statement which you have been unable to locate, but which was previously requested....

St. Paul responded as follows:

> In an effort to respond to this request, this Defendant again checked with all appropriate personnel and files at St. Paul

Hospital and the law firm of Bailey and Williams. No such statement or taped recording was found. For the third time the Aetna Casualty and Surety Company was asked to check its records and files and a partially transcribed statement was located, a copy of which is attached. No taped recording was located.

Nearly two years later, the Walkers filed a motion to compel under Tex.R.Civ.P. 215, asserting that St. Paul failed to respond completely to the request.[1] The Walkers complained that "St. Paul Hospital did not even respond to what was requested in the request for production—that is, writings, notes, and notations in the adjuster's file or attorney's file mentioning, alluding to, or making reference to the tape recorded statement of Nurse White." At about the same time, the Walkers also served on Aetna Casualty and Surety Company, St. Paul's insurer, an "Amended Notice of Intention to Take Deposition Upon Written Questions—Duces Tecum," seeking, among other things, the same documents. Aetna moved to quash the notice.

The trial judge appointed a special master to review the Walkers' motion to compel and Aetna's motion to quash. After an evidentiary hearing on September 5, 1989, the master prepared findings, which formed the basis for two extensive orders signed by the trial court on September 20, 1989. In the first order, the court found that the Walkers were "entitled to all documentation sought in [the request] from the files of Defendant St. Paul or its attorney of record, but not from the files of Aetna Insurance Company, except as they may appear in the files of St. Paul or the attorneys of record of St. Paul." The court also stated that it "has been advised that St. Paul has supplied all documentation that is responsive to [the request], but that additional documentation will be made available **\*837** to the Court for in camera review." The court therefore *sustained* the Walkers' motion to compel "to the extent that on Friday, September 8, 1989 the Special Master will review in the Chambers of the 134th District Court the relevant portions of the St. Paul files and their attorney [sic] files, which may be in response to Plaintiff's request...." The court, however, did not order St. Paul to produce documents from Aetna's files for *in camera* inspection.[2]

After the master's September 8 *in camera* inspection, the court ordered discovery of three additional documents from the files of St. Paul and its attorneys, which it found "relate to the matters sought in discovery and should be supplied after irrelevant portions of such documents are stricken."

After unsuccessfully seeking relief in the court of appeals, the Walkers moved for leave to file a petition for writ of mandamus with this court, arguing that the trial court clearly abused its discretion by refusing to order St. Paul to produce the documents from Aetna's files and by ordering that portions of the other responsive documents be stricken. The Walkers contend that the order was a clear abuse of discretion because St. Paul 1) never objected to the Walkers' request for production, 2) had a superior right to the Walkers to compel production of the documents in Aetna's possession, and 3) never asked that any parts of the documents be excised.

The record before us does not include the statement of facts from the evidentiary hearing on the Walkers' motion to compel production. Without it, we cannot determine on what basis the trial judge and the special master reached their conclusions. Since we cannot assess whether or not the trial court's order was correct, we obviously cannot take the additional step of determining that the court's order, if incorrect, constituted a clear abuse of discretion.

[1] [2] [3] As the parties seeking relief, the Walkers had the burden of providing this Court with a sufficient record to establish their right to mandamus relief. Since an evidentiary hearing was held, the Walkers had the burden of providing us not only a petition and affidavit, *see* Tex.R.App.P. 121(a)(2)(C) and (F), but also a statement of facts from the hearing. *See, e.g., Cameron County v. Hinojosa,* 760 S.W.2d 742, 744 (Tex.App.—Corpus Christi 1988, orig. proceeding); *Greenstein, Logan & Co. v. Burgess Mktg. Inc.,* 744 S.W.2d 170, 177 (Tex.App.—Waco 1987, writ denied); *see also Western Casualty & Surety Co. v. Spears,* 730 S.W.2d 821, 822 (Tex.App.—San Antonio 1987, orig. proceeding).[3] Having failed to meet this burden, the Walkers have not provided us with a record upon which they can establish their right to mandamus relief against St. Paul.

### *The Obstetrics Faculty Records*

[4] The second discovery dispute arises out of the Walkers' attempt to secure documentary evidence to impeach one of the defendants' expert witnesses, Dr. Larry Gilstrap, a faculty member in obstetrics at the University of Texas Health Science Center at Dallas ("the Center"). Gilstrap testified at his deposition that expert witness fees earned by obstetrics faculty members are deposited into a "fund" in the obstetrics "billing department"; that obstetrics

faculty members get paid "indirectly" from this fund; that the fund is handled by Judy Wagers, a Center employee; and that he was unaware of any obstetrics department policy restricting faculty members from testifying for plaintiffs in medical malpractice cases.

**\*838** Thereafter, the Walkers noticed Wagers' deposition, requesting that she provide all documents regarding (1) the operation of the above-mentioned "fund" from 1985 to 1988; and (2) limitations placed upon obstetrics faculty members relating to their testimony in medical malpractice cases. The Center, on behalf of Wagers, moved to quash the notice, arguing that the request for documents was "vague and overly broad" and that production would be "costly and burdensome."

Two months later, in an unrelated lawsuit, the Walkers' counsel deposed Dr. Alvin L. Brekken, another obstetrics faculty member at the Center. Dr. Brekken testified that the obstetrics department's official policy, distributed in writing to all faculty members, requires a doctor to obtain authorization from other faculty members before testifying for any plaintiff in a medical malpractice case. Based on this testimony, the Walkers sought a court order to depose Wagers and obtain the requested documents.

After reviewing the Gilstrap and Brekken depositions and pleadings of counsel, the trial court ordered the Center to produce the documents for *in camera* review by the special master. Subsequently, in her September 20, 1989 order, the trial judge denied the discovery, stating in part:

> [S]uch requested discovery is improper pursuant to the Rulings of the Supreme Court of Texas in *Russell v. Young* [452 S.W.2d 434 (Tex.1970) ], as the potential witness is not a party to the suit and the records do not relate to the subject matter of the suit, but are sought solely for the purpose of impeachment, according to the Plaintiffs' pleadings.

Although noting that some of the documents "would be relevant to this cause of action," the court nevertheless denied discovery because "all such documents are controlled by the *Russell* decision."

In *Russell,* a party sought wholesale discovery of financial records of a potential medical expert witness who was not a party to the lawsuit.[4] The documents requested did not relate directly to the subject matter of the suit, but were sought solely in an attempt to impeach the potential witness by showing bias or prejudice. The credibility of

the witness, however, had not yet been put in doubt. Under these circumstances, we held that the documents were not discoverable, and we directed the trial court to vacate its order allowing the requested discovery. 452 S.W.2d at 435. We reasoned that "[t]here is ... a limit beyond which pre-trial discovery should not be allowed." *Id.* at 437.

The present case is distinguishable. Here, the Walkers presented to the trial court evidence of a specific circumstance—the Center's policy restricting the faculty's freedom to testify for plaintiffs—raising the possibility that Dr. Gilstrap is biased. Thus, the Walkers are not engaged in global discovery of the type disapproved in *Russell;* rather, they narrowly seek information regarding the potential bias suggested by the witness' own deposition testimony and that of his professional colleague.

Our rules of civil procedure, and the federal rules upon which they are based, mandate a flexible approach to discovery. A party may seek any information which "appears reasonably calculated to lead to the **\*839** discovery of admissible evidence." Tex.R.Civ.P. 166b(2)(a). Evidence of bias of a witness is relevant and admissible. *See* Tex.R.Civ.Evid. 613(b).[5]

The trial court erred in failing to apply the foregoing rules to determine whether the documents were discoverable. Instead, the trial court simply read *Russell* as an absolute bar to discovery, even though the circumstances here are quite distinguishable. In so doing, the trial court misapplied the *Russell* holding. We expressly disapprove such a mechanical approach to discovery rulings.[6]

Having concluded that the trial court erred in denying the discovery based solely on *Russell,* we now must determine whether the appropriate remedy lies by writ of mandamus. "Mandamus issues only to correct a clear abuse of discretion or the violation of a duty imposed by law when there is no other adequate remedy by law." *Johnson v. Fourth Court of Appeals,* 700 S.W.2d 916, 917 (Tex.1985).[7] We therefore examine whether the trial court's error in the present case constituted a clear abuse of discretion and, if so, whether there is an adequate remedy by appeal.

**1.** *Clear Abuse of Discretion*
Traditionally, the writ of mandamus issued only to compel the performance of a ministerial act or duty. *See Wortham v. Walker,* 133 Tex. 255, 277, 128 S.W.2d 1138, 1150 (1939); *Arberry v. Beavers,* 6 Tex. 457 (1851); Helen A. Cassidy, *The Instant Freeze–Dried Guide to*

*Mandamus Procedure in Texas Courts,* 31 S.Tex.L.Rev. 509, 510 (1990); Comment, *The Expanding Use of Mandamus to Review Texas District Court Discovery Orders: An Immediate Appeal Is Available,* 32 Sw.L.J. 1283, 1288 (1979).

Since the 1950's, however, this Court has used the writ to correct a "clear abuse of discretion" committed by the trial court. *See, e.g., Joachim v. Chambers,* 815 S.W.2d 234, 237 (Tex.1991); *Jampole v. Touchy,* 673 S.W.2d 569, 574 (Tex.1984); *West v. Solito,* 563 S.W.2d 240, 244 (Tex.1978); *Womack v. Berry,* 156 Tex. 44, 50, 291 S.W.2d 677, 682 (1956). *See generally,* David W. Holman & Byron C. Keeling, *Entering the Thicket? Mandamus Review of Texas District Court Witness Disclosure Orders,* 23 St. Mary's L.J. 365, 390 (1991); Cassidy, 31 S.Tex.L.Rev. at 510; Note, *The Use of Mandamus to Review Discovery Orders in Texas: An Extraordinary Remedy,* 1 Rev.Litig. 325, 326–27 (1981); Comment, 32 Sw.L.J. at 1290.

A trial court clearly abuses its discretion if "it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law." *Johnson v. Fourth Court of Appeals,* 700 S.W.2d at 917. This standard, however, has different applications in different circumstances.

[5] With respect to resolution of factual issues or matters committed to the trial court's discretion, for example, the reviewing court may not substitute its judgment for that of the trial court. *See Flores v. Fourth Court of Appeals,* 777 S.W.2d 38, 41–42 (Tex.1989) (holding that determination **\*840** of discoverability under Tex.R.Civ.P. 166b(3)(d) was within discretion of trial court); *Johnson,* 700 S.W.2d at 918 (holding that trial court was within discretion in granting a new trial "in the interest of justice and fairness"). The relator must establish that the trial court could reasonably have reached only one decision. *Id.* at 917. Even if the reviewing court would have decided the issue differently, it cannot disturb the trial court's decision unless it is shown to be arbitrary and unreasonable. *Johnson,* 700 S.W.2d at 918.

[6] On the other hand, review of a trial court's determination of the legal principles controlling its ruling is much less deferential. A trial court has no "discretion" in determining what the law is or applying the law to the facts. Thus, a clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion, and may result in appellate reversal by extraordinary writ. *See Joachim v. Chambers,* 815 S.W.2d 234, 240 (Tex.1991) (trial court abused discretion by misinterpreting Code of Judicial Conduct); *NCNB Texas National Bank v. Coker,* 765 S.W.2d 398, 400 (Tex.1989)

(trial court abused discretion by failing to apply proper legal standard to motion to disqualify counsel); *Eanes ISD v. Logue,* 712 S.W.2d 741, 742 (Tex.1986) (trial court abused discretion by erroneously finding constitutional violation).

[7] [8] In determining whether the trial court abused its discretion in the present case, we treat the trial court's erroneous denial of the requested discovery on the sole basis of *Russell* as a legal conclusion to be reviewed with limited deference to the trial court. This is consistent with our approach in previous mandamus proceedings arising out of the trial court's interpretation of legal rules. *Cf. Axelson, Inc. v. McIlhany,* 798 S.W.2d 550, 555 (Tex.1990); *Barnes v. Whittington,* 751 S.W.2d 493, 495–96 (Tex.1988); *Terry v. Lawrence,* 700 S.W.2d 912, 913–14 (Tex.1985). Under this analysis, the trial court's erroneous interpretation of the law constitutes a clear abuse of discretion.

## 2. Adequate Remedy by Appeal

In order to determine whether the writ should issue, however, we must further decide whether the Walkers have an adequate remedy by appeal.

[9] Mandamus will not issue where there is "a clear and adequate remedy at law, such as a normal appeal." *State v. Walker,* 679 S.W.2d 484, 485 (Tex.1984). Mandamus is intended to be an extraordinary remedy, available only in limited circumstances. The writ will issue "only in situations involving manifest and urgent necessity and not for grievances that may be addressed by other remedies." *Holloway v. Fifth Court of Appeals,* 767 S.W.2d 680, 684 (Tex.1989) (quoting James Sales, *Original Jurisdiction of the Supreme Court and the Courts of Civil Appeals of Texas* in *Appellate Procedure in Texas,* § 1.4[1] [b] at 47 (2d ed. 1979)). The requirement that persons seeking mandamus relief establish the lack of an adequate appellate remedy is a "fundamental tenet" of mandamus practice. *Holloway,* 767 S.W.2d at 684.

[10] Our requirement that mandamus will not issue where there is an adequate remedy by appeal is well-settled.[8] On a few occasions, however, we have not focused **\*841** on this requirement when applying mandamus review of discovery orders. For example, in *Barker v. Dunham,* 551 S.W.2d 41 (Tex.1977), the trial court refused to compel defendant's representative to answer certain deposition questions, and the plaintiff applied to this Court for a writ of mandamus. We concluded that the trial court had abused its discretion, and ordered that the writ conditionally issue. We never discussed the well-settled requirement of inadequate remedy by appeal.

A few months later, in *Allen v. Humphreys,* 559 S.W.2d 798 (Tex.1977), the Court again conditionally issued a writ of mandamus to correct a discovery abuse without considering whether the relator had an adequate remedy by appeal. The real party in interest in *Allen* raised this argument, but the Court avoided the issue by citing *Barker. Id.* at 801.

Commentators quickly criticized the *Barker* and *Allen* opinions. *See* James Sales, *Pre–Trial Discovery in Texas,* 31 Sw.L.J. 1017, 1033 (1977); Comment, *The Expanding Use of Mandamus to Review Texas District Court Discovery Orders: An Immediate Appeal Is Available,* 32 Sw.L.J. 1283, 1300 (1979) (In most cases "forcing a party to await the completion of the trial in order to seek appellate review will not endanger his substantial rights...."); Note, *Mandamus May Issue To Compel A District Judge to Order Discovery,* 9 Tex.Tech L.Rev. 782 (1978) (mandamus should not be a substitute for appeal).

In *Jampole v. Touchy,* 673 S.W.2d 569 (Tex.1984), the Court again used the extraordinary writ of mandamus to compel discovery which had been denied by the trial court. Unlike in *Barker* and *Allen,* however, the Court in *Jampole* addressed whether relator had an adequate appellate remedy. The underlying suit in *Jampole* was a products liability action, and the disputed discovery materials included alternate design and assembly documents. The Court held that relator did not have an adequate remedy by appeal because denial of this discovery effectively prevented relator from proving the material allegations of his lawsuit. 673 S.W.2d at 576. Remedy by appeal in a discovery mandamus is not adequate where a party is required "to try his lawsuit, debilitated by the denial of proper discovery, only to have that lawsuit rendered a certain nullity on appeal...." *Id.*

Although the Court in *Jampole* recognized the need to address whether relator had an adequate remedy by appeal, it expressly refused to overrule *Barker* and *Allen. Id.* Perhaps because of this, we have on several occasions since *Jampole* used mandamus to correct discovery errors without considering whether the relator had an adequate appellate remedy. *See Loftin v. Martin,* 776 S.W.2d 145 (Tex.1989); *Barnes v. Whittington,* 751 S.W.2d 493 (Tex.1988); *Lunsford v. Morris,* 746 S.W.2d 471 (Tex.1988); *Turbodyne Corp. v. Heard,* 720 S.W.2d 802 (Tex.1986); *Terry v. Lawrence,* 700 S.W.2d 912 (Tex.1985); *Lindsay v. O'Neill,* 689 S.W.2d 400 (Tex.1985).

On many other occasions, however, we have still required a showing of inadequate **\*842** remedy by appeal in

mandamus proceedings involving other types of pre-trial orders, even those involving discovery. *See, e.g., TransAmerican Natural Gas Corp. v. Powell,* 811 S.W.2d 913, 919 (Tex.1991); *Hooks v. Fourth Court of Appeals,* 808 S.W.2d 56, 59–60 (Tex.1991); *Bell Helicopter Textron, Inc., v. Walker,* 787 S.W.2d 954, 955 (Tex.1990); *Stringer v. Eleventh Court of Appeals,* 720 S.W.2d 801, 801–02 (Tex.1986). In *Hooks,* for example, we reaffirmed that the "cost or delay of having to go through trial and the appellate process does *not* make the remedy at law inadequate." 808 S.W.2d at 60.

[11] The requirement that mandamus issue only where there is no adequate remedy by appeal is sound, and we reaffirm it today. No mandamus case has ever expressly rejected this requirement, or offered any explanation as to why mandamus review of discovery orders should be exempt from this "fundamental tenet" of mandamus practice. Without this limitation, appellate courts would "embroil themselves unnecessarily in incidental pre-trial rulings of the trial courts" and mandamus "would soon cease to be an extraordinary writ." *Braden v. Downey,* 811 S.W.2d 922, 928 (Tex.1991). We thus hold that a party seeking review of a discovery order by mandamus must demonstrate that the remedy offered by an ordinary appeal is inadequate. We disapprove of *Barker, Allen,* and any other authorities to the extent they might be read as abolishing or relaxing this rule.

[12] We further hold that an appellate remedy is not inadequate merely because it may involve more expense or delay than obtaining an extraordinary writ. As we observed in *Iley v. Hughes,* the "delay in getting questions decided through the appellate process ... will not justify intervention by appellate courts through the extraordinary writ of mandamus. Interference is justified only when parties stand to lose their substantial rights." 158 Tex. at 368, 311 S.W.2d at 652.

On some occasions, this Court has used, or at least mentioned, the more lenient standard first articulated in *Cleveland v. Ward,* 116 Tex. 1, 14, 285 S.W. 1063, 1068 (Tex.1926), that the remedy by appeal must be "equally convenient, beneficial, and effective as mandamus." *See, e.g., Jampole v. Touchy,* 673 S.W.2d 569, 576 (Tex.1984); *Crane v. Tunks,* 160 Tex. 182, 190, 328 S.W.2d 434, 439 (Tex.1959). This standard, literally applied, would justify mandamus review whenever an appeal would arguably involve more cost or delay than mandamus. This is unworkable, both for individual cases and for the system as a whole. Mandamus disrupts the trial proceedings, forcing the parties to address in an appellate court issues that otherwise might have been resolved as discovery progressed and the evidence was developed at trial. Moreover, the delays and expense of

mandamus proceedings may be substantial. This proceeding, for example, involving rulings on collateral discovery matters, has delayed the trial on the merits for over two years. The impact on the appellate courts must also be considered. We stated in *Braden* that "[t]he judicial system cannot afford immediate review of every discovery sanction." 811 S.W.2d 922, 928. It follows that the system cannot afford immediate review of every discovery order in general.[9] We therefore disapprove of *Cleveland, Crane, Jampole* and any other authorities to the extent that they imply that a remedy by appeal is inadequate merely because it might involve more delay or cost than mandamus.

Justice Doggett's dissent argues that because discovery errors often constitute harmless errors under Tex.R.App.P. 81(b)(1), parties denied mandamus relief will be deprived of any remedy since the **\*843** error will not provide a basis for appellate reversal. This is nothing more than a thinly disguised attack on the harmless error rule. Avoiding interlocutory appellate review of errors that, in the final analysis, will prove to be harmless, is one of the principal reasons that mandamus should be restricted.

Justice Doggett's dissent also suggests that we will be unable to develop a coherent body of discovery law without unrestricted mandamus review. We do not think, however, that losing parties will be reluctant to raise perceived discovery errors on appeal, nor will an appellate court be foreclosed from writing on discovery issues, even when the error may be harmless. *See, e.g., Lovelace v. Sabine Consolidated, Inc.,* 733 S.W.2d 648, 652–53 (Tex.App.—Houston [14th Dist.] 1987, writ denied).

Nor are we impressed with the dissenters' claim that strict adherence to traditional mandamus standards will signal an end to effective interlocutory review for some parties or classes of litigants. There are many situations where a party will not have an adequate appellate remedy from a clearly erroneous ruling, and appellate courts will continue to issue the extraordinary writ. In the discovery context alone, at least three come to mind.

[13] First, a party will not have an adequate remedy by appeal when the appellate court would not be able to cure the trial court's discovery error. This occurs when the trial court erroneously orders the disclosure of privileged information which will materially affect the rights of the aggrieved party, such as documents covered by the attorney-client privilege, *West v. Solito,* 563 S.W.2d 240 (Tex.1978), or trade secrets without adequate protections to maintain the confidentiality of the information. *Automatic Drilling Machines v. Miller,* 515 S.W.2d 256

(Tex.1974). As we noted in *Crane:* "After the [privileged documents] had been inspected, examined and reproduced ... a holding that the court had erroneously issued the order would be of small comfort to relators in protecting their papers." 160 Tex. at 190, 328 S.W.2d at 439. It may also occur where a discovery order compels the production of patently irrelevant or duplicative documents, such that it clearly constitutes harassment or imposes a burden on the producing party far out of proportion to any benefit that may obtain to the requesting party. *See, e.g., Sears, Roebuck & Co. v. Ramirez,* 824 S.W.2d 558, 35 Tex.Sup.Ct.J. 454 (1992) (demand for tax returns); *General Motors Corp. v. Lawrence,* 651 S.W.2d 732 (Tex.1983) (demand for information about all vehicles for all years).

[14] [15] Second, an appeal will not be an adequate remedy where the party's ability to present a viable claim or defense at trial is vitiated or severely compromised by the trial court's discovery error. It is not enough to show merely the delay, inconvenience or expense of an appeal. Rather, the relator must establish the effective denial of a reasonable opportunity to develop the merits of his or her case, so that the trial would be a waste of judicial resources. We recently held that when a trial court imposes discovery sanctions which have the effect of *precluding a decision on the merits of a party's claims*— such as by striking pleadings, dismissing an action, or rendering default judgment—a party's remedy by eventual appeal is inadequate, unless the sanctions are imposed simultaneously with the rendition of a final, appealable judgment. *TransAmerican Natural Gas Corp. v. Powell,* 811 S.W.2d 913, 919 (Tex.1991). Similarly, a denial of discovery going to the heart of a party's case may render the appellate remedy inadequate.

[16] [17] Finally, the remedy by appeal may be inadequate where the trial court disallows discovery and the missing discovery cannot be made part of the appellate record, or the trial court after proper request refuses to make it part of the record, and the reviewing court is unable to evaluate the effect of the trial court's error **\*844** on the record before it. *See Tom L. Scott, Inc. v. McIlhany,* 798 S.W.2d 556, 558 (Tex.1990) ("[M]andamus is the only remedy because the protective order shields the witnesses from deposition and thereby prevents the evidence from being part of the record."); *see generally Jampole,* 673 S.W.2d at 576 ("Because the evidence exempted from discovery would not appear in the record, the appellate courts would find it impossible to determine whether denying the discovery was harmful."). If the procedures of Tex.R.Civ.P. 166b(4) are followed, this situation should only rarely arise. If and when it does, however, the court must carefully consider all relevant circumstances, such as the claims and defenses asserted, the type of

discovery sought, what it is intended to prove, and the presence or lack of other discovery, to determine whether mandamus is appropriate.[10]

**[18]** In the present case, the Walkers seek documents from the Center to impeach one defendant's expert witness. This information is not privileged, burdensome or harassing, nor does it vitiate or severely compromise the Walkers' ability to present a viable claim. In fact, as we have already noted, the trial court may ultimately conclude that it is not admissible or even discoverable. Finally, although the materials are not before us, they were considered below, and we know of no reason why they would not be available on appeal. Therefore, under our traditional standards of mandamus review, as measured by the factors we mention above, the Walkers have an adequate remedy by appeal and mandamus is inappropriate.

For the above reasons, we conclude that the Walkers have not established their right to relief by mandamus on either discovery matter. Therefore, we deny the Walkers' petition for writ of mandamus.

GONZALEZ, J., concurs and files an opinion.

DOGGETT, J., dissents and files an opinion, joined by MAUZY, J.

GAMMAGE, J., dissents and files an opinion.

GONZALEZ, Justice, concurring.

I agree with the court's disposition of this cause but disagree with the court's opinion regarding the "Obstetrics Faculty Records." Specifically, I disagree with the court's attempt to distinguish *Russell v. Young,* 452 S.W.2d 434 (Tex.1970). Nevertheless, I concur in the result.

*Russell* holds that wholesale discovery of the private records of a *non-party witness* is not permitted if the sole purpose for discovery is to impeach the credibility of the non-party.[1] 452 S.W.2d at 435. The policy considerations of *Russell* still apply today. By disapproving of *Russell* as "a mechanical approach to discovery rulings," at 839, the court forces trial courts to get further involved in discovery matters. This increases the backlog, delay, and cost of litigation by creating the need for more hearings.

In the instant case, the plaintiffs sought to discover documents from the University of Texas Health Science Center to confirm the existence of a written policy

restricting faculty members from testifying for plaintiffs in medical malpractice cases. This policy was sought for use in impeaching defendant's expert witness, Dr. Gilstrap. In refusing discovery, the trial court concluded **\*845** that the relevance of this material was limited to impeachment. As such, the requested documents fell squarely within the prohibition of *Russell.*

Despite the court's mischaracterization of *Russell,* the issues and type of evidence sought here and in *Russell* are identical. Just as in *Russell,* the records sought in the instant case did not relate directly to the subject matter of the suit. The only difference between the present case and *Russell* is the identity of the party seeking the information. In *Russell,* a defendant sought evidence to impeach the plaintiffs' expert; here, the plaintiff sought evidence to impeach a defendant's expert. Surely, we cannot have a rule that changes in application depending on whether the relator is a plaintiff or a defendant in the trial court.

In my opinion, the court strains to distinguish *Russell.* The court suggests that the trial judge made a mistake in her ruling by failing to read *Russell* in conjunction with the rules of civil procedure and evidence. However, when we adopted the new Texas Rules of Civil Evidence, there was no discussion whatsoever that, by their adoption, we intended to reject the settled rule that information sought solely for impeachment of a non-party is not discoverable. *Russell,* 452 S.W.2d at 435; *see also W.W. Rodgers & Sons Produce Co. v. Johnson,* 673 S.W.2d 291, 294–95 (Tex.App.—Dallas 1984, orig. proceeding). Furthermore, the scope of discovery has not changed in the twenty years since *Russell* has been on the books. When *Russell* was decided, the scope of discovery was codified in Texas Rule of Civil Procedure 186a. It provided in pertinent part that:

> [p]arties may obtain discovery regarding any matter which is relevant to the subject matter in the pending action whether it relates to the claim or defense of the party seeking discovery or the claim or defense of any other party.

This same text is now codified in Rule 166b(2)(a). Clearly, impeachment evidence regarding *collateral matters* would not relate to the subject matter of the pending action.

Implicitly, the court concludes that the credibility of a non-party witness alone is a relevant avenue of inquiry and, thus, is a matter properly open to discovery under some new, broader definition of relevancy.

While I agree that the definition of relevance in Rule 401 of the Texas Rules of Civil Evidence includes matters bearing on credibility, this alone does not explain or distinguish *Russell.* A witness' credibility has always been a relevant matter. As the United States Supreme Court has said: "[p]roof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony." *United States v. Abel,* 469 U.S. 45, 52, 105 S.Ct. 465, 469, 83 L.Ed.2d 450 (1984). Yet in *Russell,* we said that a trial court lacked "authority" to order discovery from a *non-party* solely for purposes of impeachment. 452 S.W.2d at 435. We chose to withdraw all discretion in this particular area of discovery. *Russell* concedes that impeachment evidence may be relevant and admissible at trial, but holds that it cannot be discovered from a non-party for its own sake prior to trial. 452 S.W.2d at 436.

The fact that a matter may have some relevance yet not be subject to discovery is hardly a novel concept. The basic premise of the rules of discovery is to weigh the legitimate needs of litigation against the other rights and values that would be irreparably harmed by unfettered discovery. *Russell* strikes the proper balance by protecting non-party witnesses from indiscriminate invasions into their private lives where the information sought would not appreciably shed light on the issues of the case.

Furthermore, the decision in *Russell was not* grounded on whether the credibility of the witness had been placed in doubt. Instead, the court highlighted the fact that **\*846** the witness had not offered testimony at trial nor was his deposition introduced into evidence at trial. The court said:

> Relator has not yet taken the witness stand nor has his deposition been introduced into evidence because there has not yet been a trial; relator's records cannot possibly have impeachment value because there is nothing yet to impeach and there may never be anything to impeach, depending upon the contents of the testimony, if any, which is introduced during the trial of the lawsuit.

*Russell,* 452 S.W.2d at 437. Thus, it is evident that the court has today reinterpreted *Russell* with little or nothing to gain in a way that further obscures the proper scope of discovery.

I am concerned that as a result of today's ruling, some *non-parties* will be subjected to harassment and intrusion into their private lives, and that trial courts will be inundated with hearings on collateral issues far afield from the merits of the cause of action or defense. The court has attempted to fix something that was not broken. This reinterpretation of *Russell* will further tax our overburdened judicial system without appreciably benefiting the litigants or the system.

Finally, for the reasons expressed in *Joachim v. Chambers,* 815 S.W.2d 234, 241 (Tex.1991) (Gonzalez, J., dissenting), I agree with the clarification of the standards for the issuance of mandamus.

DOGGETT, Justice, dissenting.

> *Them that's got shall get*
>
> *Them that's not shall lose*
> —*God Bless The Child*[1]

With a double standard, the majority strikes a devastating blow at the most direct method of curbing abuses of judicial power. Many judicial excesses far beyond the scope of anything alleged in this particular case will henceforth receive only an official nod and wink from the Texas Supreme Court.

Mandamus is the legal tool by which appellate courts can promptly correct arbitrary and capricious rulings by trial judges. Today's opinion announces that this remedy will be available to support concealment of the truth but not its disclosure. Mandamus is officially declared a one-way street in the Texas courts—our judiciary can help to hide but not to detect.

Despite a determination that a "clear abuse of discretion" has occurred in this particular case, at 840, all relief is denied. Finding a wrong and denying a remedy echoes the logic of the majority's recent conclusion that a tax is unconstitutional but must be paid anyway. *See Carrollton–Farmers Branch Indep. Sch. Dist. v. Edgewood Indep. Sch. Dist.,* 826 S.W.2d 489, 524 (1992) (*Edgewood III* ) (Doggett, J., dissenting). Rather than correcting the abuse, the court simply gives the Walkers the same message it gave Texas taxpayers—wait. Only after a full jury trial based upon incomplete discovery will the judiciary even consider any possibility of relief.

For those who have previously sought more specific guidelines for the use of mandamus concerning discovery orders, the majority responds with not one but two standards for reviewing trial court action: orders compelling discovery may be immediately corrected; review of denied discovery is postponed indefinitely in a manner to ensure that no meaningful relief will ever be forthcoming.

## I.

What a different path this court now pursues than that so recently proclaimed in its unanimous decision that

> Discovery is ... the linchpin of the search for truth, as it makes "a trial less **\*847** a game of blind man's bluff and more a fair contest with the issues and facts disclosed to the fullest practicable extent."

*State v. Lowry,* 802 S.W.2d 669, 671 (Tex.1991) (quoting *United States v. Proctor & Gamble Co.,* 356 U.S. 677, 682, 78 S.Ct. 983, 986, 2 L.Ed.2d 1077 (1958)). Similarly ignored are our recent, unanimous writings in *Axelson, Inc. v. McIlhany,* 798 S.W.2d 550, 553, 555 (Tex.1990, orig. proceeding) ("[Discovery should provide] the fullest knowledge of the facts and issues prior to trial.... [T]he ultimate purpose of discovery ... is to seek the truth...."); and *Tom L. Scott, Inc. v. McIlhany,* 798 S.W.2d 556, 559 (Tex.1990, orig. proceeding) ("The primary policy behind discovery is to seek truth so that disputes may be decided by facts that are revealed rather than concealed."). Without mandamus review to add meaning to these laudatory expressions, they are just hollow words. The new signal is clear—circumvent discovery and conceal information.

Today's opinion reflects the radical change in philosophy which has taken firm hold in this court—discovery is no longer a search for truth, it is merely a game of hide and seek. No longer may appellate courts intercede through mandamus even for the trial court's complete abuse of discretion in denying access to vital data; under the newly-announced double standard, intervention can, however, be accorded for those who persevere in evasion.

When a local business is defrauded, when a community is exposed to dangerous toxic wastes, when a manufacturer ignores reports that a safety design change would reduce user injuries, when a monopoly extorts unfair gain from the public, when discrimination results in job loss, and in numerous other circumstances, the burden of proving wrongdoing is exceedingly difficult to satisfy without obtaining evidence of that wrong from the files of the perpetrator. In such situations denial of discovery effectively means denial of all relief. That reality does not go unrecognized by today's majority.

Entities that begin litigation in control of most of the relevant evidence can often defeat their adversaries simply by denying them the power of information:

> [T]hose with established positions of power are more likely to ... win by preventing their adversaries from producing evidence; they are less likely to be in the position of having to extract evidence from their opponents to make out their case.

23 Charles A. Wright & Kenneth W. Graham, Jr., *Federal Practice & Procedure* § 5422, at 674 (1980). With its separate and unequal treatment of litigants, the majority gives yet another edge to the already advantaged. Providing immediate review for orders that start the flow of information but refusing to consider those that stop it, the majority once again expresses its preference for helping the powerful over the seemingly powerless. Those opposing meaningful discovery

> tend to be institutions rather than individuals, and tend to be among the more wealthy and powerful segments of society. A review system that gives priority (that is, immediate review) to the complaints of privilege holders, but which consigns the complaints of parties seeking discovery until after final judgment, gives an advantage to those wealthy institutional litigants. They have the power to achieve more favorable results during the pretrial process; their opponents must wait.

Elizabeth G. Thornburg, *Interlocutory Review of Discovery Orders: An Idea Whose Time Has Come,* 44 Sw.L.J. 1045, 1082 (1990) (hereinafter *Review of Discovery Orders* ) (footnote omitted).[2] In this way the **\*848** majority ensures that the scales of justice—which at the onset of litigation are often in reality uneven—never achieve balance.

Until this court included discovery orders within the scope of mandamus review, very few reported opinions addressed this important subject. Trial judges were effectively accorded unlimited discretion with a "resulting

atmosphere [that] was very hostile to discovery." *Id.* at 1071. As a practical matter, discovery battles, often both complex and time-consuming, were shunned. When the party controlling vital data exercises the power of withholding it, fighting every important request, the judicial command "go work it out" often amounts to a denial of meaningful discovery. The mud-wrestling that frequently ensues in such contests may discourage a trial judge from determining who is acting fairly and who started the fight. If mandamus is not available to correct ill-considered or hasty denials, the hope for ultimate justice in complex litigation is prematurely crushed. The majority's decision today marks a return to those dark ages when discovery was regularly denied as the path of least resistance and greatest convenience for the judiciary.

## II.

By its very nature, discovery involves a search for what is largely unknown from someone who may have an incentive to make that search as long and tortuous as possible. Efforts to prevent discovery have been limited only by the boundless imagination of the top legal talent in America. Requests are either too broad or too narrow; records produced are either minimal or in such voluminous, disorganized form as to make locating relevant information most difficult; vital documents vanish in "routine document destruction" programs or are misplaced. Accordingly, our discovery rules have required continual revision to cope with the newest ways invented by those intent on subverting the process. Each revision of the Texas Rules of Civil Procedure during the last decade has included attempted clarification and improvement of discovery procedures. This has produced a body of law that is "complex and rapidly evolving." David W. Holman & Byron C. Keeling, *Entering the Thicket? Mandamus Review of Texas District Court Witness Disclosure Orders,* 23 St. Mary's L.J. 365, 375 (1991) (hereinafter *Mandamus of Disclosure Orders* ).

Given the creativity of those who would thwart discovery, rules of procedure cannot be drawn to provide clear guidance in every situation; judicial interpretation is essential. The more complicated the rule, the more necessary the construction and the greater the likelihood for misinterpretation. *See id.* at 386 ("Erroneous interpretations of these changes ... are likely with the absence of prior significant precedent.... [and] could have a substantial effect on the subsequent course of a lawsuit."). This court's responsibility does not and cannot end when the text of promulgated amendments appears in the *Texas Bar Journal.* Rather, the court has a duty *both* to make the rules *and* to interpret them.

Our American system of jurisprudence is founded on the precept that it is of great benefit to have a written body of case law construing controlling legal principles and applying them to particular facts. This approach is undeniably desirable in the discovery context:

> In a system where trial court decisions are unreported and have no precedential value, the creation of a body of reported appellate case law regarding discovery has substantial value. Case law on discovery promotes uniform interpretation of the discovery rules and, in time, decreases the opportunity for individual **\*849** judge's biases to shape discovery outcomes. Reported decisions develop clear rules, where rules are possible, and narrow the range of judicial discretion in other areas simply by providing numerous cases finding that the trial court did or did not abuse its discretion. Such case law can be particularly helpful in a jurisdiction that has recently amended its discovery rules. Over time, the existence of discovery case law may even clarify the rules sufficiently so as to decrease the number of disputes in the trial court.

*Review of Discovery Orders* at 1080 (footnotes omitted). Appellate opinions properly applying mandamus produce, then, both more consistency and more accuracy in trial court decisions. *See id.* at 1077.[3]

The role of this court is particularly important in answering novel or significant questions of discovery law. *See Mandamus of Disclosure Orders* at 376 ("[P]re-trial appellate review of [important discovery] questions could lend critical guidance to the development of Texas discovery practice."). Rather than avoiding its responsibility, this court should utilize mandamus review to reduce the abuse of judicial power when "a unique question of discovery" law is presented. David West, Note, *The Use of Mandamus to Review Discovery Orders in Texas: An Extraordinary Remedy,* 1 Rev.Litigation 325, 327 (1981) (hereinafter *The Use of Mandamus* ).

Most trial court mistakes denying discovery result from the need to make repeated, quick decisions based upon limited information. Recognizing this circumstance, trial judges sometimes actually encourage litigants to raise disputed rulings affecting truly vital matters for appellate examination through mandamus by automatically staying their orders. Refusal of prompt appellate review not only denies a party its rights but may also deprive a trial court of desired guidance.

Today's opinion appropriately recognizes that "this Court will not grant mandamus relief unless we determine that the error is of such importance to the jurisprudence of the state as to require correction." At 839 n. 7. But under the standard announced, questions of importance concerning judicially-approved concealment of facts will never be considered. The significance to the state's jurisprudence of a ruling should certainly not be controlled by whether the order granted or denied discovery.

### III.

With mandamus now severely limited, many important issues will not be reviewed. *See generally Review of Discovery Orders* at 1056; *The Use of Mandamus* at 337 & n. 94. Abuses of judicial power will go forever uncorrected when the party disallowed discovery, realizing the difficulty of proving a case with less than full information and the uphill task of maintaining a successful appeal, is either forced to settle or forgoes a costly and extended appeal following defeat on the entire case. Nor will improper rulings ever be reviewed where one denied discovery, although severely handicapped, nonetheless prevails at trial.

Where appeals do occur, remedies will be rare even for egregious pretrial rulings. To succeed in this endeavor, one must show that

> the error complained of amounted to such a denial of the rights of appellant as **\*850** was reasonably calculated to cause and probably did cause rendition of an improper judgment in the case, or was such as probably prevented the appellant from making a proper presentation of the case to the appellate court.

Tex.R.App.P. 81(b). This standard is universally regarded as a "more difficult hurdle" than abuse of discretion. Helen A. Cassidy, *The Instant Freeze–Dried Guide to*

*Mandamus Procedure in Texas Courts,* 31 S.Tex.L.Rev. 509, 512 (1990). As another commentator has aptly concluded,

> only an unusual discovery order would be dispositive enough to show the harmful error that most jurisdictions require for appellate reversal. Many appellants, therefore, would not even raise the discovery points on appeal.

*Review of Discovery Orders* at 1056; *see also Mandamus of Disclosure Orders* at 376 n. 40 (observing that, because of the harmless error rule, many discovery rulings are not pursued on appeal). In denying mandamus today, the majority closes and locks the appellate courthouse door to any meaningful consideration of numerous significant matters.

### IV.

Only with the tragic recent change in course by this court's majority has such denial of access become acceptable. Previously both this court and the courts of appeals had employed their writ power as necessary to correct the abusive refusal of discovery. Among those cases providing the foundation for appropriate mandamus review is *Barker v. Dunham,* 551 S.W.2d 41 (Tex.1977, orig. proceeding), in which the trial court had overruled a motion to complete an expert witness's deposition and to compel production of his work papers. We interceded, stating that: "It is settled that the writ of mandamus may issue in a discovery proceeding to correct a clear abuse of discretion by a trial judge." *Id.* at 42. Similarly, in *Allen v. Humphreys,* 559 S.W.2d 798 (Tex.1977, orig. proceeding), the trial court refused to order discovery of tests, surveys and complaints by similarly affected persons. This court found an abuse of discretion and granted the writ, despite the argument that the plaintiff had "an adequate remedy via the normal appellate process." *Id.* at 801. It is difficult to perceive, in light of this argument and the court's subsequent grant of mandamus relief, how the majority can now claim that "we [had] not focused" on the requirement of an inadequate remedy by appeal in *Allen* and on, admittedly, a "few [other] occasions." At 840–841.

Following these two opinions, this court has not hesitated to consider and correct the wrongful denial of discovery. By issuing mandamus to rectify an erroneous trial court ruling refusing discovery in *Jampole v. Touchy,* 673

S.W.2d 569 (Tex.1984, orig. proceeding), this court recognized that appeal is not an adequate remedy:

> [R]equiring a party to try his lawsuit, debilitated by the denial of proper discovery, only to have that lawsuit rendered a certain nullity on appeal, falls well short of a remedy by appeal that is "equally convenient, beneficial, and effective as mandamus."

*Id.* at 576 (quoting *Crane v. Tunks,* 160 Tex. 182, 190, 328 S.W.2d 434, 439 (1959) (citation omitted)); *see also Cleveland v. Ward,* 116 Tex. 1, 14, 285 S.W. 1063, 1068 (Tex.1926).

A trial court's unwillingness to order the production of accident scene photographs was overturned by mandamus in *Terry v. Lawrence,* 700 S.W.2d 912 (Tex.1985, orig. proceeding). In *Lindsey v. O'Neill,* 689 S.W.2d 400, 402 (Tex.1985, orig. proceeding) (per curiam), the court overturned by mandamus an order limiting the scope of a deposition and quashing the accompanying document request. A blanket order protecting hospital records was similarly vacated by mandamus in *Barnes v. Whittington,* 751 S.W.2d 493 (Tex.1988, orig. proceeding). In *Lunsford v. Morris,* 746 S.W.2d 471 (Tex.1988, orig. proceeding), this court again granted mandamus to remedy a trial court's erroneous disallowance **\*851** of relevant discovery. *See also Loftin v. Martin,* 776 S.W.2d 145 (Tex.1989, orig. proceeding) (correcting by mandamus wrongful denial of discovery); *Turbodyne Corp. v. Heard,* 720 S.W.2d 802 (Tex.1986, orig. proceeding) (per curiam) (mandamus directing trial court to rescind order denying discovery of documents from insurer in subrogation action); *Ginsberg v. Fifth Court of Appeals,* 686 S.W.2d 105 (Tex.1985, orig. proceeding) (erroneous bar of deposition by court of appeals cured by mandamus).[4]

It is only after fifteen years of repeated judicial reliance upon *Barker* and *Allen* in the issuance of numerous opinions that we learn these precedents of our court are not good law. This is all the more strange in that we had explicitly refused to overrule them. When that very request was urged in *Jampole,* 673 S.W.2d at 576, our answer was unmistakable: "We decline to do so." But the majority's new answer is simple: "Line them up against the wall." What does it matter that a dozen or more Texas Supreme Court cases and countless decisions of the courts of appeals are to the contrary? They can be disposed of in a mass execution of precedent.[5] Today's firing squad announces that it is only answering the command of Jim Sales and two law students who separately criticized the court during the period 1977–79. At 840–841. It thereby rationalizes constructing so distorted a standard on the corpses of so many prior authorities.

One of the most significant casualties is *Jampole v. Touchy,* which has formed the centerpiece for discovery in litigation over defective products and toxic substances for almost a decade. The majority, in a massive understatement, "disapproves" *Jampole* "to the extent [it implies] that a remedy by appeal is inadequate merely because it might involve more delay or cost than mandamus." At 842. Although leaving untouched for now this court's prior writing on the proper scope of discovery, the majority has in fact overruled that landmark precedent in its entirety. Despite a gross abuse of discretion in denying critical discovery in *Jampole,* the majority's only correction by mandamus would be to require inclusion of the disputed materials in **\*852** the record, to await a deferred and meaningless appellate review.

### V.

Instead of affording the relief that prior rulings demand, the majority announces, after considerable mental gymnastics, that "at least three [discovery situations] come to mind" where mandamus is justified, at 843; then it strangely proceeds to describe six. The first three instances where remedy by appeal is inadequate stem from a trial court's wrongful allowance of discovery. First, mandamus will issue if "disclosure of privileged information ... will materially affect the rights of the aggrieved party." At 843. This requisite is easily fulfilled with discovery objections that include an assertion of privilege, the violation of which necessarily impinges on the objecting party's rights.

Second, mandamus will issue when a trial court orders the disclosure of "trade secrets without adequate protections to maintain the confidentiality of the information." At 843 (citing, without discussion, *Automatic Drilling Machs., Inc. v. Miller,* 515 S.W.2d 256 (Tex.1974, orig. proceeding)). Posing numerous problems, this hastily-drawn exception has no relevance to the instant case and was concocted by the majority without any briefing or argument by counsel. One privilege is thereby unjustifiably elevated above all others. Moreover, the writing implies an absolute protection of trade secrets from discovery when in fact this privilege is most definitely qualified, as recognized by *Automatic Drilling,* 515 S.W.2d at 259,[6] the rule itself, Tex.R.Civ.Evid. 507 (trade secrets not protected when nondisclosure conceals fraud or works injustice), and even Mr. Sales, whose writing purportedly warranted today's brash action.[7] Nor does this exception consider the availability in some cases of the interlocutory appeal mechanism provided in

Tex.R.Civ.P. 76a(8) to address the adequacy of a protective order. *See Eli Lilly & Co. v. Marshall,* Order Granting Leave to File Petition for Writ of Mandamus (Doggett, J., dissenting), 829 S.W.2d 156 (Tex.1991).

The third situation requiring mandamus is an "order [that] compels the production of patently irrelevant or duplicative documents, such that it clearly constitutes harassment or imposes a burden on the producing party far out of proportion to any benefit that may obtain to the requesting party." At 843. This "catch-all" exception indeed makes the extraordinary writ of mandamus an ordinary one. In almost any complex litigation, the claim of burden is essentially a form objection to discovery. It is difficult to perceive a dispute in which the party seeking to obstruct the process could not and, after today's decision, will not claim harassment or imposition of an undue burden. *See, e.g., Sears, Roebuck & Co. v. Ramirez,* 824 S.W.2d 558 (Tex.1992) (per curiam) (granting mandamus to preclude disclosure of corporate tax returns on the basis of undue burden and unnecessary expense, not privilege).[8]

A fourth exception, based on **\*853** *Transamerican Natural Gas Corp. v. Powell,* 811 S.W.2d 913 (Tex.1991, orig. proceeding), is described when the trial court imposes "discovery sanctions ... precluding a decision on the merits of a party's claims ... unless the sanctions are imposed simultaneously with the rendition of a final, appealable judgment." At 843 (emphasis deleted). The majority falsely suggests that today's standard creates a symmetry with *Transamerican.* Unlike *Transamerican,* which treated the striking of a petition in the same manner as the entry of a default judgment, this ruling creates a double standard. Unlike *Transamerican,* which involved a readily-perceptible wrong such as an order of dismissal, a determination of whether hidden documents "go to the heart of a party's case," at 843, involves significant uncertainties.

More importantly, *Transamerican* was issued at a time when the announced policy of this court was to deter abuses of discretion without regard to whether discovery was granted or denied. A wide spectrum of sanction orders arising from discovery rulings are immediately appealable. *See Braden v. Downey,* 811 S.W.2d 922 (Tex.1991, orig. proceeding). Superimposing *Transamerican* and *Braden* on today's double standard sends a clear message to the rare trial court that would impose significant penalties on those who obstruct discovery with deceit and delay—be careful. There is no real danger of immediate and genuine appellate examination of an order denying discovery, but there is a constant threat of appellate review of an order granting discovery or imposing meaningful sanctions on

obstructionists. Once again the majority provides an incentive for concealment.

The remaining two situations address the wrongful denial of discovery, and constitute a narrow path in the woods compared to the expressway for resisting discovery constructed in the previous four exceptions. Mandamus is possible when

> the missing discovery cannot be made part of the appellate record, or the trial court after proper request refuses to make it part of the record, and the reviewing court is unable to evaluate the effect of the trial court's error on the record before it.

At 843–844. The quick fix of including materials in the appellate record is both ingenious and ingenuous. It has the immediate "benefit" of excluding a great number of errors in the discovery area from mandamus review. As the majority in fact recognizes, "this situation should only rarely arise." At 844.[9] And if it ever does, the majority guarantees that no relief will be forthcoming, by directing that the reviewing court

> carefully consider all relevant circumstances, such as the claims and defenses asserted, the type of discovery sought, what it is intended to prove, and the presence or lack of other discovery, to determine whether mandamus is appropriate.
> At 844. Within these constraints, there will always be a readily available excuse to deny both discovery and mandamus.

In most cases the materials can be boxed up, file-stamped, and sent to the appellate court. How this will accomplish anything more than cluttering the judicial chambers is quite another matter. No clue is given as to how to resolve the obvious difficulties inherent in appellate determination, without any effective argument and analysis by counsel, of whether each item would have affected the result. Moreover, this approach improperly requires courts of appeals to act as juries while denying to the true fact-finder evidence that may be highly **\*854** relevant to the proceeding. This distrust of juries—of ordinary people resolving factual disputes—is increasingly reflected in the majority's decisions.[10]

The only hope for review of a trial court's order denying discovery is upon proof that a claim has been "vitiated or severely compromised by the trial court's discovery error." At 843. It must be shown "that the trial would be a waste of judicial resources," at 843, and that "a denial of

discovery [goes] to the heart of a party's case." At 843. It is far from clear whether these encompass one or three different standards. What is clear is that few cases, if any, will satisfy whatever standard is applied.

The majority offers no example of a case in which a party has ever met such a heavy burden. Apparently an applicant for mandamus in this court must confess that, without the discovery sought, the trial court should and must direct a contrary verdict. Any semblance of a chance at prevailing prevents a determination that the trial would be a "waste of judicial resources" or that the discovery denied goes "to the heart of a party's case." While this situation may theoretically arise in the future, it will be most unlikely. Nor is there any explanation of how a party can be expected to show such a probability without having any of the materials in question. We have previously recognized the hardship inherent in showing need for documents when their contents are unknown. *State v. Lowry,* 802 S.W.2d 669, 673 (Tex.1991) ("It is difficult for the [relators] to make a more particularized showing of need for these documents, the contents of which are unknown to them.").

Application of today's font of mandamus law to the Walkers' situation is most revealing. The majority summarily concludes that the trial court's misapplication of the law to deprive them of relevant evidence "does [not] vitiate or severely compromise the Walkers' ability to present a viable claim." At 844. Most ironically, today's announcement imposes one type of double standard on top of another alleged double standard. The Walkers claim they have uncovered a double standard at a taxpayer-financed institution that encourages faculty to defend those accused of medical malpractice while discouraging professional advice on behalf of the alleged victim. It is the merits of this revelation that the majority so eagerly seals away from both the Walkers and the public.

Fully aware of the impact of expert credibility on the outcome of much medical malpractice litigation, the majority denies the Walkers the very information that could perhaps demonstrate the bias of a key witness. An official blessing is thus provided for trial court action that may have a material, adverse effect on their ability to present a viable case. Having now learned that the denial of impeachment evidence is never susceptible to mandamus, it remains to be seen what other critical information will next be similarly viewed as unimportant to this majority.

While the nature of the double standard approved by today's writing requires that this dissent focus on wrongful denials, I recognize that the wrong can be every bit as real from improper grants of discovery. As a practical matter there is probably less danger that a trial judge will capriciously ignore properly established objections and privileges to accord too much information instead of too little. Nevertheless, I favor the use of mandamus to control abuse without regard to how it occurs or whom is helped. What I deplore is the discrimination which the majority officially substitutes for even-handedness. Scholars viewing **\*855** the so-called "*Walker* mandamus standard" should recognize that it is not a standard but an excuse for ignoring wrongdoing.

After today's decision, discovery disputes will no longer be resolved on a level playing field. I believe that mandamus should be available to correct any trial court abuse concerning a subject that is important to the jurisprudence of the state and which substantially affects rights of an aggrieved party. If this requisite is satisfied, relief should be accorded without regard to whether the trial court has granted or denied discovery.

## VI.

In supporting today's opinion, Justice Gonzalez insists that we must stem what he claims is an alarming increase in the number of mandamus filings. At 844–846 (Gonzalez, J., concurring). The view that "the sky is falling" is best reflected in the gruesome statistics and conclusions of his dissenting opinion in *Joachim v. Chambers,* 815 S.W.2d 234, 241 (Tex.1991). *See also Jampole,* 673 S.W.2d at 578 (Barrow, J., dissenting); *cf.* C.L. Ray & M.R. Yogi McKelvey, *The Mandamus Explosion,* 28 S.Tex.L.Rev. 413, 413–14 (1987).

Blaming an ever-increasing caseload for the Texas courts on the advent of the discovery mandamus is wholly insupportable. These petitions most often present emergency situations requiring expedited review and, consequently, are frequently viewed as a thorn in the side of appellate courts. *See Review of Discovery Orders* at 1059 n. 99. But I cannot agree that justice should be denied or delayed solely to accommodate appellate judges.

Recent studies have debunked the myth of the mandamus explosion. The *Joachim* dissent, to which Justice Gonzalez once again points with pride today, is based upon an analysis that fails to segregate filings arising from discovery disputes. A more detailed study of Supreme Court experience during a period of more than ten years correctly concluded that:

[I]nterlocutory review of discovery orders ... has [had] a positive effect.... The increase [in appellate caseloads] has been an extremely small and manageable one....

. . . . .

The numbers, then, suggest that while the availability of interlocutory review of discovery orders added cases to the appellate docket, interlocutory review has not added a large or burdensome number of cases.

*Review of Discovery Orders* at 1047, 1059.

The fact is that most petitions are denied, with fewer than 3% granted by us during fiscal year 1991. Most of these were handled expeditiously, with over half resolved within one month of filing. Moreover, Justice Gonzalez completely ignored the fact that mandamus requests in this court actually decreased over the last three years. There were 202 of these in fiscal 1991, down from 257 and 258, respectively, in fiscal 1989 and 1990. Although the court's overall workload is expanding, the contribution of mandamus filings is certainly not uncontrollable.[11] "In deciding whether courts should permit interlocutory **\*856** review in specific cases, judges and commentators tend to emphasize the needs of court administration over the needs of the litigants." *Id.* at 1049. While cutting off the right to mandamus review when discovery is denied may reduce the appellate workload, the result will be a significant decline in the quality of justice. The inconvenience caused by the unexpected arrival of a petition that often demands immediate action is the price paid "to assure that ... trial proceedings are fair and equitable to *all* concerned parties.... '*[W]e must not sacrifice justice upon the altar of expediency.*' " *Mandamus Review of Disclosure Orders* at 422 (quoting David W. Holman & Byron C. Keeling, *Disclosure of Witnesses in Texas: The Evolution and Application of Rules 166b(6) and 215(5) of the Texas Rules of Civil Procedure,* 42 Baylor L.Rev. 405, 458 (1990)) (emphasis added).

## VII.

The majority announces here not a standard, but a pseudo-standard. In reality, the rule is little more than "how can we help those whom we want to help?" The only true precedent for this is *Terrazas v. Ramirez,* 829 S.W.2d 712 (Tex.1991), where *R*epublican *r*elators in *r*edistricting were accorded relief in the Supreme Court never sought in any other forum. This "triple R exception to mandamus," *id.* at 760–61 (Mauzy, J., dissenting), only presages the continued pursuit of this goal.

If doubts remain as to the one-sidedness of the standard announced today, its application to currently pending cases should resolve them. *See, e.g., Remington Arms Co. v. Canales,* No. D–1867, 35 Tex.S.Ct.J. 245 (Dec. 13, 1991) (trial court order which found documents relating to firearm safety relevant and required their production stayed despite no timely response or objection being made); *Eli Lilly & Co. v. Marshall,* No. D–1827, 35 Tex.S.Ct.J. 168, 354 (Dec. 3, 1991 and Jan. 23, 1992) (stays of trial court order directing production of information relating to the drug Prozac); *see id.* at 189 (Order Granting Leave to File Petition for Writ of Mandamus) (Doggett, J., dissenting); *Valley Baptist Medical Center v. Bennett,* No. D–1193, 34 Tex.S.Ct.J. 668 (June 18, 1991) (stay issued to protect hospital from disclosure of materials relating to policy of informing patients of risk of treatment), and 35 Tex.S.Ct.J. 452 (Feb. 12, 1992) (motion for leave to file granted). One interested in verifying the true meaning of the majority's carefully chosen words will do well to observe how the court actually disposes of each of these matters.

## VIII. CONCLUSION

In an apparent attempt to cope with a false "mandamus explosion," today's opinion has offered us an explosion of another type—a reverberating detonation of this court's prior rulings. True the majority has considerable experience in disregarding precedent as merely a lifeless thing of the past. *See Edgewood III,* 826 S.W.2d at 516, 517 (Doggett, J., dissenting); *Terrazas,* 829 S.W.2d at 739 (Mauzy, J., dissenting); *Stewart Title Guaranty Co. v. Sterling,* 822 S.W.2d 1, 12 (Tex.1991) (Doggett, J., dissenting). But a dozen or more Texas Supreme Court authorities and even more rulings from the courts of appeals cut down at one time is not a modest accomplishment. Precedent, no matter how voluminous or how well-established, will clearly not restrain this majority from accomplishing its preconceived social policy objectives.

Through both deed and now word, the majority invites a true explosion in mandamus filings. What does an attorney whose client faces the possibility of a judgment for significant damages have to lose from accepting the beneficence of a majority of this court ever willing to serve as protector of the privileged? Will a deposition site other than that ordered by the trial court **\*857** be more costly and inconvenient to the claimant? Get a stay from the Texas Supreme Court, even if your petition is still pending in the court of appeals. *See Continental Can Co.*

*v. Wittig,* No. D–2015, 35 Tex.S.Ct.J. 355, 1992 WL 17415 (Jan. 29, 1992) (stay of trial court order directing engineering employee of products liability defendant to be deposed in Houston rather than Chicago even though mandamus petition was pending in court of appeals). Did the trial court resolve a conflict in deposition schedules in a manner unacceptable to an insurance company? Don't worry, the Texas Supreme Court will stay proceedings even without bothering to get a response from the affected judge. *See Cigna Corp. v. Spears,* No. D–2069, 35 Tex.S.Ct.J. 463 (Feb. 19, 1992). Any attorney whose client desires to make more difficult access to information that will jeopardize its credibility, suggest its liability or defeat its defenses would be foolish to accept a trial court discovery order. A majority of the Texas Supreme Court is ready and willing to interfere for the asking.

The ripple effect created by today's refusal to accord mandamus review to pretrial discovery orders will swell to tidal-wave proportion, and sweep before it any hope of fair and consistent application of our Texas discovery rules. In many cases it will leave buried in the sand any possibility of trials directed by the full and truthful revelation of the underlying facts. Juries will be forced to resolve critical disputes based not on truths but rather upon whatever half-truths can be discovered. Left in the wreckage on the beach will be the tattered remains of the many prior decisions of this court and others that viewed litigation as a search for truth in which fair and prompt appellate review of an order denying discovery was vital.

MAUZY, J., joins in this dissenting opinion.

GAMMAGE, Justice, dissenting.

I dissent. Today's decision departs from previous instances where this court has provided mandamus relief to correct a wrongful denial of discovery, and labors too hard to conclude that appeal is an adequate remedy for a party who is denied adequate discovery.

I would hold that mandamus is available to correct a trial court error which negatively and materially affects the right of aggrieved parties to adequately present their cases, whether the particular party is seeking discovery or resisting it. *See Iley v. Hughes,* 158 Tex. 362, 368, 311 S.W.2d 648, 652 (1958); *see also* Elizabeth G. Thornburg, *Interlocutory Review of Discovery Orders: An Idea Whose Time Has Come,* 44 SW.L.J. 1045 (1990). In the case before us, the trial court's denial of discovery has a material and adverse effect on the Walkers' ability to present their case. The information they seek could impugn the credibility of key expert witnesses at trial. Because their medical malpractice claim, like all such claims, will likely stand or fall on the credibility of the expert witnesses, I would hold that the Walkers are entitled to the information they seek, and that relief by appeal is inadequate.

Discovery is the "linchpin of the search for truth," and "[a]ffording parties full discovery promotes the fair resolution of disputes by the judiciary." *State v. Lowry,* 802 S.W.2d 669, 671 (Tex.1991). Today the court removes and disposes of that "linchpin" and abandons enforcement of fair and adequate discovery. Because I believe that mandamus relief should be readily available when a court allows *either* too much *or* too little discovery, I dissent.

Footnotes

1    St. Paul contends that the Walkers' request for mandamus relief is barred by laches since the Walkers delayed almost two years before seeking to compel production. Because we find that the Walkers have failed to establish the requirements for mandamus relief, we do not reach this issue.

2    The court also sustained Aetna's motion to quash, holding that the discovery requested was improper under the investigation exemption, the attorney-client privilege, and the work-product privilege. The Walkers do not complain to us about this ruling.

3    Even if no evidence had been presented, the Walkers would have had the burden of filing an affidavit so stating. *See Barnes v. Whittington,* 751 S.W.2d 493, 495 (Tex.1988) ("The undisputed fact that no testimony was adduced at any of the hearings, as set forth in the affidavit of relator's counsel, satisfies the relator's burden under Rule 121.").

4    The records sought in *Russell* included, among others:
        (2) All appointment books maintained by [the expert physician] during 1969;
        (3) All statements, listings, ledgers, or other books showing the accounts receivable of [the expert physician] during 1969;
        (4) All deposit slips or tickets showing deposits into bank accounts of [the expert physician] during 1969;
        (5) All statements, listings, ledgers, journals, or other books showing receipt of payments, either in cash, by check or by

any other means [by the expert physician] during 1969;
(6) All statements of account or bills for services rendered [by the expert physician] during 1969;
(7) All accounting ledgers, journals or other books of account of [the expert physician] maintained during 1969; and
(8) All financial statements showing income and expenses of [the expert physician] during 1969.
452 S.W.2d at 435.

5    Evidence of bias is not admissible if the witness "unequivocally admits such bias or interest" at trial. Tex.R.Civ.Evid. 613(b). To date, however, Dr. Gilstrap has not admitted any bias, but rather has flatly denied it. In this situation, such evidence should be discoverable.

6    We do not decide whether the documents were properly discoverable, only that the trial court erred in denying discovery based solely on *Russell.* If the Walkers sought the documents solely to attack the credibility of Dr. Gilstrap by showing that his deposition testimony was untrue, for instance, the information would probably not be reasonably calculated to lead to the discovery of admissible evidence. *See* Tex.R.Civ.Evid. 608(b). ("Specific instances of the conduct of a witness [other than criminal convictions], for the purpose of attacking ... his credibility, may not be ... proved by extrinsic evidence.").

7    Additionally, this Court will not grant mandamus relief unless we determine that the error is of such importance to the jurisprudence of the state as to require correction. *Cf.* Tex.Gov't Code § 22.001(a)(6); Tex.R.App.P. 140(b). This issue, however, is properly resolved in deciding whether to grant leave to file the petition, not in its disposition.

8    *See, e.g., TransAmerican Natural Gas Corp. v. Powell,* 811 S.W.2d 913, 919 (Tex.1991) (imposition of discovery sanctions); *Schultz v. Fifth Judicial District Court of Appeals,* 810 S.W.2d 738, 739 n. 4 (Tex.1991) (refusal to enforce turnover order by contempt); *Joachim v. Chambers,* 815 S.W.2d 234, 240 (Tex.1991) (refusal to bar judicial officer from testifying as expert witness); *Hooks v. Fourth Court of Appeals,* 808 S.W.2d 56, 59–60 (Tex.1991) (refusal to grant nonsuit); *Bell Helicopter Textron, Inc., v. Walker,* 787 S.W.2d 954, 955 (Tex.1990) (refusal to dismiss for lack of subject-matter jurisdiction); *Champion Int'l Corp. v. Twelfth Court of Appeals,* 762 S.W.2d 898, 899 (Tex.1988) (grant of new trial); *Stringer v. Eleventh Court of Appeals,* 720 S.W.2d 801, 801–02 (Tex.1986) (imposition of discovery sanction); *Johnson v. Fourth Court of Appeals,* 700 S.W.2d 916, 917 (Tex.1985) (grant of new trial); *Abor v. Black,* 695 S.W.2d 564, 566 (Tex.1985) (denial of plea in abatement); *State v. Walker,* 679 S.W.2d 484, 485 (Tex.1984) (refusal to reinstate temporary injunction); *Pat Walker & Co. v. Johnson,* 623 S.W.2d 306, 309 (Tex.1981) (refusal to extend time for filing statement of facts); *State Bar of Texas v. Heard,* 603 S.W.2d 829, 833 (Tex.1980) (refusal to suspend attorney); *Pope v. Ferguson,* 445 S.W.2d 950, 953 (Tex.1969) (refusal to dismiss criminal case pending against relator), *cert. denied,* 397 U.S. 997, 90 S.Ct. 1138, 25 L.Ed.2d 405 (1970); *Crane v. Tunks,* 160 Tex. 182, 190, 328 S.W.2d 434, 439 (1959) (discovery order); *Iley v. Hughes,* 158 Tex. 362, 367–68, 311 S.W.2d 648, 652 (1958) (bifurcation of trial); *Harrell v. Thompson,* 140 Tex. 1, 1, 165 S.W.2d 81, 81 (1942) (restriction of oil and gas production by Railroad Commission); *Ben C. Jones & Co. v. Wheeler,* 121 Tex. 128, 130, 45 S.W.2d 957, 958 (1932) (refusal to enter judgment nunc pro tunc); *Cleveland v. Ward,* 116 Tex. 1, 14, 285 S.W. 1063, 1068 (1926) (refusal to enter judgment); *Aycock v. Clark,* 94 Tex. 375, 376–77, 60 S.W. 665, 666 (1901) (refusal to enter injunction); *Screwmen's Benevolent Ass'n v. Benson,* 76 Tex. 552, 555, 13 S.W. 379, 380 (1890) (expulsion of member from charitable corporation).

9    We recently held that a mandamus action was never required to preserve error on appeal. *Pope v. Stephenson,* 787 S.W.2d 953 (Tex.1990). We explained: "The decision not to pursue the extraordinary remedy of mandamus does not prejudice or waive a party's right to complain on appeal." *Id.* at 954.

10   Courts use a similar approach in determining whether a witness has properly invoked the Fifth Amendment privilege against self-incrimination. It is often impossible for a witness to prove that an answer might incriminate him without actually answering and thereby forfeiting the privilege. Therefore, rather than requiring actual proof of the privilege, courts sustain the privilege if it is "evident from the implications of the question, in the setting in which it is asked, that a responsive answer [might be incriminating]." *Hoffman v. United States,* 341 U.S. 479, 487, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951).

1    If the records have relevance apart from their potential for impeachment, however, *Russell* does not bar discovery. *See Ex Parte Shepperd,* 513 S.W.2d 813, 816 (Tex.1974).

1    Billie Holiday, *God Bless the Child* (Okeh Records 1941) (words and music by Arthur Herzog, Jr. & Billie Holiday).

2    These entities rarely need information to prevail:
     Even when an institutional litigant appears as a plaintiff suing an individual defendant as, for example, when a corporation sues an individual on a debt, the institutional litigant tends to already have the information needed to prove its case.
     *Review of Discovery Orders* at 1070 n. 162. They are also less likely to require information from an opponent to establish affirmative defenses. *Id.* at 1070.

3    With no appellate opinions setting forth appropriate limitations upon trial court discretion, "litigants may receive widely divergent rulings from different judges, even in the same geographical location." *Id.* at 1077. Proper use of mandamus discourages forum shopping to obtain a trial judge more likely to provide a more favorable ruling and allows for greater consistency and accountability:

> [Such] review ... even[s] out inconsistencies in trial court rulings, and ... allows trial judges to operate with a more accurate understanding of the meaning of the discovery rules.... If the appellate court is consistent, it can fix disparities and inequities produced by the trial courts and promote consistency among the trial level decisionmakers.

> *Id.* at 1047, 1077 (footnotes omitted).

4    Intermediate appellate courts have also recognized the importance of mandamus to avoid trial court abuse in improperly limiting or denying discovery. *See, e.g., Kentucky Fried Chicken Nat'l Mgmt. Co. v. Tennant,* 782 S.W.2d 318 (Tex.App.—Houston [1st Dist.] 1989, orig. proceeding) (writ granted when discovery of plaintiff's psychiatric records denied); *Foster v. Heard,* 757 S.W.2d 464 (Tex.App.—Houston [1st Dist.] 1988, orig. proceeding) (mandamus issued against trial court's denial of discovery of post-accident investigation report); *Super Syndicate, Ltd. v. Salazar,* 762 S.W.2d 749 (Tex.App.—Houston [14th Dist.] 1988, orig. proceeding) (granting mandamus against trial court's denial of discovery of claims investigator's files); *Goodspeed v. Street,* 747 S.W.2d 526 (Tex.App.—Fort Worth 1988, orig. proceeding) (trial court's denial of discovery of hospital records based on privilege without presentation of evidence overturned); *Estate of Gilbert v. Black,* 722 S.W.2d 548, 551 (Tex.App.—Austin 1987, orig. proceeding) (denial of discovery of insurer's internal communications overturned on mandamus, despite argument that "mandamus is proper only [for] improperly ordered discovery of privileged material, not when the trial court has denied discovery."); *Essex Crane Rental Corp. v. Kitzman,* 723 S.W.2d 241 (Tex.App.—Houston [1st Dist.] 1986, orig. proceeding) (writ granted to correct trial court's order quashing deposition); *Velasco v. Haberman,* 700 S.W.2d 729, 730 (Tex.App.—San Antonio 1985, orig. proceeding) (mandamus appropriate "not only where the trial court order improperly grants discovery, but the writ may also issue where the trial court improperly limits or denies discovery."); *Aztec Life lns. Co. v. Dellana,* 667 S.W.2d 911 (Tex.App.—Austin 1984, orig. proceeding) (mandamus issued against trial court for denying discovery of claims files).

5    The majority identifies by name five cases in conflict with today's writing, declaring that: "We disapprove of *Barker* and *Allen,* and any other authorities," at 842, and "[we] disapprove of *Cleveland, Crane, Jampole,* and any other authorities," at 842, to the extent they conflict with the new *Walker* standard. Subsumed within the "other" designation are a great number of additional cases from this court and the courts of appeals that would grant to the Walkers relief when the trial court has clearly abused its discretion in denying discovery. The court's willingness to sweepingly erase whole unidentified categories of recent precedent is exemplified by their signing of a blank check: "any other authorities," meaning all other authorities, are now endangered.

6    The few cases citing *Automatic Drilling* do not expand its holding to that suggested by the court today. *See Jampole,* 673 S.W.2d at 574–75 ("We hold that discovery cannot be denied because of an asserted proprietary interest in the requested documents when a protective order would sufficiently preserve that interest."); *Firestone Photographs, Inc. v. Lamaster,* 567 S.W.2d 273, 278 (Tex.Civ.App.—Texarkana 1978, no writ) ("[T]he claim of trade secrets ... does not necessarily defeat the right of discovery.").

7    James B. Sales, *Pretrial Discovery in Texas Under the Amended Rules: Analysis and Commentary,* 27 S.Tex.L.Rev. 305, 345–46 (1986), stating that:

> Trade secrets ... are not, per se, exempt from discovery. The trial court is obligated to weigh the need for discovery against the interests on secrecy.... The need to protect the confidentiality of documents does not constitute an absolute bar to discovery....

8    Although also citing *General Motors Corp. v. Lawrence,* 651 S.W.2d 732 (Tex.1983, orig. proceeding), as allowing mandamus relief from an allegedly burdensome trial court discovery order, the majority fails to note the very expansive discovery permitted in that case. The efforts of General Motors to limit discovery to results from tests performed on the particular type of truck and the particular type of impact involved in the subject incident were rejected, and it was directed to supply all impact test results for all types of trucks manufactured over a 23–year period.

9    If the trial court "refuses to make [the discovery] part of the record," At 843, presumably the only relief accorded under today's standard would be issuance of a writ directing inclusion of these materials.

10   *See Caller Times Publishing Co. v. Triad Communications,* 826 S.W.2d 576, 597–608 (Tex.1992) (Doggett, J., dissenting) (addressing court's refusal to allow evidence of predatory intent); *see also Greater Houston Transp. Co. v. Phillips,* 801 S.W.2d 523, 527 (Tex.1990) (Doggett, J., dissenting); *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Co.,* 823 S.W.2d 591, 596 & n. 1 (Tex.1992) (Mauzy, J., dissenting); *Reagan v. Vaughn,* 804 S.W.2d 463, 488 (Tex.1990) (Doggett, J., concurring and dissenting).

11

<u>Supreme Court Filings</u>

| Year | Mandamus Discovery Orders | All Mandamus Filings | Total Mandamus and Applications for Writ | Discovery as Percentage of Total |
|------|------|------|------|------|
| 1979 | 24 | 129 | 933 | 2.6% |
| 1981 | 17 | 98 | 943 | 1.8% |
| 1989 | 51 | 257 | 1078 | 4.7% |
| 1991 | 64 | 202 | 1257 | 5.1% |

*Interlocutory Review of Discovery Orders* at 1058–59; the 1989 and 1991 figures are derived from my review of court filings.

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

988 S.W.2d 829
Court of Appeals of Texas,
San Antonio.

Neale WOOD, Appellant,
v.
Diane TICE, D.D.S.; Barry Solomon, D.D.S.; and
Dental Centers of America, L.L.C., also doing
business as Windsor Dental Center, Appellees.

No. 04–98–00392–CV. | Feb. 17, 1999.

Patient sued dentists and dental clinic for malpractice. The 57th Judicial District Court, Bexar County, Peter Michael Curry, J., dismissed action, and patient appealed. The Court of Appeals, Green, J., held that: (1) patient's failure to timely provide dental clinic with copy of deposition warranted dismissal of clinic; (2) deposition testimony of one of dentists being sued failed to satisfy the Medical Liability Act's requirement of an expert report; (3) finding that patient was not entitled to 30–day grace period in which to file expert report was supported by evidence; and (4) patient was not entitled to new trial in order to file expert report.

Affirmed.

**\*829** From the 57th Judicial District Court, Bexar County, Texas Trial **\*830** Court No. 98–CI–03977 Honorable Peter Michael Curry, Judge Presiding.[1]

**Attorneys and Law Firms**

Randy Gathany, David W. Rogers, Law Offices of Dave Rogers, Inc., San Antonio, for Appellant.

Todd A. Prins, Stanley E. Faye, Edward C. Mainz, Jr., Robert B. Biechlin, Jr., Thornton, Summers, Biechlin, Dunham & Brown, L.C., San Antonio, for Appellee.

Before CATHERINE STONE, Justice, PAUL W. GREEN, Justice, KAREN ANGELINI, Justice.

## OPINION

PAUL W. GREEN, Justice.

Neale Wood appeals an order dismissing his suit for failing to file an expert report under the Medical Liability and Insurance Improvement Act. Wood contends he satisfied the statute with an expert's deposition transcript. Alternatively, Wood maintains the trial court abused its discretion by denying him an extension of time to file an expert report. Finding no error, we affirm.

## Background

On November 1, 1996, Wood sued Diane Tice, Andre Smith, Barry Solomon, and Dental Centers of America, L.L.C. for negligent treatment of a chipped tooth. In March 1997, Wood took Dr. Smith's deposition, which was transcribed and distributed to Drs. Tice, Smith, and Solomon on April 17, 1997. Dental Centers did not receive a copy of the deposition.

In January 1998, the defendants moved to dismiss the case based on Wood's failure to provide an expert's report. See TEX.REV.CIV. STAT. ANN. art. 4590i, § 13.01(d–e) (Vernon Supp.1998) ("Medical Liability Act"). In response, Wood filed a motion for extension of time to file an expert report, which included an affidavit indicating his belief that Dr. Smith's deposition satisfied the statute. On January 16, the trial court orally granted a dismissal with prejudice. Its order, however, was not signed until March 10.

On April 23, Wood moved for a new trial, arguing he did not learn about the signed order until April 15. See TEX.R.APP. P. 304a(4–5). He also urged the court to grant him an extension of time to file an expert report. The trial court denied the motion for new trial, finding it had no jurisdiction. The court also denied Wood's motion to reconsider.[2] Despite Wood's lack of notice, he timely perfected this appeal.

## Compliance with the Medical Liability Act

Wood claims he satisfied the Medical Liability Act with a copy of Dr. Smith's deposition. In contrast, the defendants contend the deposition is too "generalized and speculative" to satisfy the statute's requirement of an expert report. We agree with the defendants.

We review the trial court's dismissal order with the abuse of discretion standard. See Pony Express Courier Corp. v. Morris, 921 S.W.2d 817, 820 (Tex.App.—San Antonio 1996, no writ). In applying this standard, we defer to the trial court's factual determinations but review questions of law de novo. Id.; see also Johnson v. City of Fort

*Worth,* 774 S.W.2d 653, 656 (Tex.1989) (describing statutory construction as question of law).

[1] The legislature enacted the Medical Liability Act to curtail frivolous claims against physicians and other health care providers. *Horsley–Layman v. Angeles,* 968 S.W.2d 533, 537 (Tex.App.—Texarkana 1998, no pet.). To that end, section 13.01 requires a plaintiff to provide each defendant with one or more expert reports relating to liability and causation. *See* TEX.REV.CIV. STAT. ANN. art. 4590i, § 13.01(i–j) (Vernon Supp.1998); HOUSE COMM. ON CIVIL PRACTICES, BILL ANALYSIS, Tex. H.B. 971, 74th Leg., R.S. (1995). The expert report must be "furnish[ed]," together with a curriculum vitae, no later than 180 days after suit is filed. TEX.REV.CIV. STAT. ANN. art. 4590i, § 13.01(d) (Vernon Supp.1998). If the plaintiff fails to timely provide the report, the trial court "shall, on **\*831** the motion of the affected physician or health care provider, enter an order" dismissing the suit with prejudice. *Id.* § 13.01(e).[3]

[2] The statute defines "expert report" as a "written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." *Id.* § 13.01(r)(6). The report must specifically refer to the defendant and discuss how that defendant breached the applicable standard of care. *See Horsley–Layman,* 968 S.W.2d at 535; *cf.* TEX.REV.CIV. STAT. ANN. art. 4590i, § 13.01(*l* ) (Vernon Supp.1998) (requiring good faith effort to comply with the definition of expert report).

[3] Wood filed suit on November 1, 1996. His expert's report was due April 30, 1997. On April 17, the individual defendants received copies of Dr. Smith's deposition, but Wood neither provided Dental Centers with a copy nor did he indicate he would rely on the deposition as an expert report. Because Dental Centers is a health care provider entitled to receive a report, the trial court did not abuse its discretion in dismissing Wood's claim against that defendant. *See* TEX.REV.CIV. STAT. ANN. art. 4590i, § 1.03(a)(3) (Vernon Supp.1998) (defining health care provider as a professional association providing dental services); *see also id.* § 13.01(d–e).

[4] To determine whether the trial court properly dismissed the remaining defendants, we must evaluate whether Dr. Smith's deposition satisfies the definition of an "expert report." At the dismissal hearing, Wood argued the following excerpt satisfied the definition by establishing the liability of Dr. Tice:

> Q. So when a patient comes in with any type of a complaint, you should take an x-ray, no matter what?
>
> A. Yes.
>
> Q. Okay. And would it be below the minimum accepted standard of care to fail to take that x-ray?
>
> A. Yes.
>
> ...
>
> Q. If it turns out that there was an x-ray that was taken, and for some reason was not shown in here, and that this x-ray appeared somewhere in the future and it showed that there had been an infection in it, would it have been—infection in Tooth No. 12, would it have been below the minimum standard of care to put this miracle mix on there anyway? ...
>
> A. Yes, sir.

The deposition also includes the following information about Dr. Tice's potential liability:

> Q. Would you, going back to the reference to the reasonably prudent dentist, would you consider that it would be below a minimum standard of care for a dentist to start a root canal that soon after the procedures that are described for November 5th of 1994?
>
> ...
>
> A. I don't think any reasonable and prudent dentist would.

At the dismissal hearing, Wood claimed the following excerpt discussed Dr. Solomon's liability:

> Q. When you—so what type of guidelines were established with them for the means whereby you did various procedures?
>
> A. There were really no guidelines except for self-imposed guidelines.
>
> Q. So if a dentist chose to on an individual basis, was there anybody overseeing that dentist [sic]—the quality of that dentist's work?
>
> A. No, sir.

The deposition testimony fails to mention the defendants by name, fails to specify how **\*832** the defendants breached the standard of care, and fails to demonstrate causation and damages. Furthermore, there is no

indication the deposition included a copy of Dr. Smith's curriculum vitae. Therefore, as a matter of law, Dr. Smith's deposition does not satisfy the Medical Liability Act's requirement of an expert report. Accordingly, the trial court did not abuse its discretion in dismissing Wood's claims against the remaining defendants.

### Grace Period

[5] Wood argues the trial court erred by denying him a thirty-day grace period under section 13.01(g) of the Medical Liability Act. We disagree.[4]

We review the trial court's decision with the abuse of discretion standard. *Estrello,* 965 S.W.2d at 758. We further note the trial court does not abuse its discretion when it bases its decision on conflicting evidence. *Id.*

[6] Section 13.01(g) provides:

> Notwithstanding any other provision of this section, if a claimant has failed to comply with a deadline established by Subsection (d) of this section and after hearing the court finds that *the failure of the claimant or the claimant's attorney was not intentional or the result of conscious indifference but was the result of an accident or mistake,* the court shall grant a grace period of 30 days to permit the claimant to comply with that subsection. A motion by a claimant for relief under this subsection shall be considered timely if it is filed before any hearing on a motion by a defendant under Subsection (e) of this section.

TEX.REV.CIV. STAT. ANN. art. 4590i, § 13.01(g) (Vernon Supp.1998) (emphasis added). Proof of accident or mistake must establish "some" excuse, not necessarily a "good" excuse. *McClure v. Landis,* 959 S.W.2d 679, 681 (Tex.App.—Austin 1997, pet. denied) (applying

*Craddock v. Sunshine Bus Lines,* 134 Tex. 388, 133 S.W.2d 124, 126 (1939)).

Wood filed his motion for extension of time on the day the trial court heard the defendants' motion to dismiss. In his motion, Wood alleged "he had a good faith belief that the deposition constituted an expert report." Responding to this assertion during the hearing, counsel David Coates said he discussed the absence of an expert report with plaintiff's counsel, Randy Gathany, in December 1997. According to Coates, Gathany never indicated reliance on Dr. Smith's deposition until the day of the hearing. In contrast, Gathany said he "believe[d]" he "mentioned the deposition."[5] Because the evidence of Wood's reliance was conflicting, we cannot say the trial court abused its discretion in denying Wood an extension of time. *See Estrello,* 965 S.W.2d at 758 (finding no abuse of discretion when evidence conflicted). *Contra Horsley–Layman,* 968 S.W.2d at 536–37 (finding that statement of belief was not controverted).

[7] In his motion for new trial, Wood also requested an extension of time to file an expert report. He contends the trial court erred in finding it had no jurisdiction over the motion. The trial court's ruling, however, is irrelevant because the motion for new trial was unnecessary in light of Wood's previous request for an extension of time. *Cf.* TEX.REV.CIV. STAT. ANN. art. 4590i, § 13.01(g) (Vernon Supp.1998) (noting section 13.01(g) may be invoked before dismissal under section 13.01(e)); *McClure,* 959 S.W.2d at 682 (demonstrating section 13.01(g) may be invoked after dismissal under section 13.01(e)). Additionally, Wood's motion for new trial offered no new evidence regarding his lack of intentional or conscious indifference. Instead, it was limited to new allegations that **\*833** he did not timely receive notice of the dismissal order.[6] Despite this lack of notice, Wood timely perfected his appeal. Thus, Wood's complaint is without merit.

### Conclusion

We affirm the trial court's dismissal order.

Footnotes

1    The Honorable Peter Michael Curry signed the appealable order, but the Honorable Martha Tanner presided at the hearing.

2    Technically, the motions should have been dismissed for lack of jurisdiction.

3 The Medical Liability Act also permits dismissal if the plaintiff fails to "file" either a cash deposit, cost bond, or expert report 90 days after suit is filed. TEX.REV.CIV. STAT. ANN. art. 4590i, § 13.01(a–b) (Vernon Supp.1998). This provision was not raised by the defendants in the trial court.

4 This case does not involve any other extensions of time permitted by the Medical Liability Act. *See, e.g.,* TEX.REV.CIV. STAT. ANN. art. 4590i, § 13.01(h) (Vernon Supp.1998) (extending 180–day period by agreement); *id.* § 13.01(f) (extending 180–day period by court order); *cf. Estrello v. Elboar,* 965 S.W.2d 754, 758 (Tex.App.—Fort Worth 1998, no pet.) (suggesting a § 13.01(f) extension must be requested by the plaintiff and granted by the court within 30 days of the date the 180–day period ends).

5 Neither attorney objected to the unsworn testimony. *See Banda v. Garcia,* 955 S.W.2d 270, 272 (Tex.1997) (finding unsworn attorney testimony to be evidence in the absence of an objection).

6 In contrast, the defendants offered additional evidence that Gathany told Coates in their December conversation that "the courts never dismiss a case for failing to file an expert's report."

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.